UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | )  Case No. 23-60507 (PGR) |
| The Roman Catholic Diocese of | ) |
| Ogdensburg, New York, | )  Chapter 11 |
| | ) |
| Debtor. | ) |

### DECLARATION OF MARK MASHAW REGARDING THE DIOCESE'S ASSETS AND OPERATIONS AND IN SUPPORT OF THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, Mark Mashaw hereby declares and states as follows:

1.    I am a certified public accountant and the Diocesan Fiscal Officer ("DFO") for The Roman Catholic Diocese of Ogdensburg, New York (the "Diocese").  I was appointed to serve as DFO in December 2022.  Prior to accepting my appointment as DFO, I was in private practice with Pinto, Mucenski, Hooper, VanHouse, & Co., where, for approximately fifteen years, I was on the audit team for the Diocese's annual independent financial audit.  Based on that experience, and in my capacity as DFO, I am familiar with the assets, liabilities and sources of income for the Diocese.

2.    I make this Declaration based upon: (a) my personal knowledge of certain facts stated herein, (b) information supplied to me by others associated with the Diocese, (c) my review of relevant documents, and (d) upon my experience and knowledge of Diocesan operations.  If I were called to testify, I would testify to the facts as set forth herein.  I am authorized by the Diocese to submit this Declaration.

3.      On July 17, 2023 (the "Petition Date"), the Diocese will file a voluntary petition under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, the "Bankruptcy Code") commencing its chapter 11 reorganization case (the "Chapter 11 Case").

4.      Contemporaneously with the petition, the Diocese will also be filing several motions and applications seeking various types of relief on an expedited basis (collectively the "First Day Motions").  The First Day Motions seek relief aimed at facilitating a smooth transition into this Chapter 11 Case, permitting the Diocese to continue its mission by maintaining employee compensation, maintaining the goodwill and morale of the employees, parishioners, clerics and others who rely on the programs and services provided by the Diocese and preserving and maintaining the property available to satisfy the Diocese's creditors.  I have reviewed each of the First Day Motions and am familiar with their contents.  I respectfully submit that the First Day Motions are vital to the Diocese's reorganization efforts and expedited approval of the First Day Motions is important to the Diocese's successful reorganization.

## OPERATIONS

5.      The Diocese, through its administrative offices (a) provides operational support to the Catholic parishes, schools and certain other Catholic entities that operate within the territory of the Diocese (each, a "Related Party" and collectively the "Related Parties")) in support of their shared charitable, humanitarian and religious missions; (b) provides Catholic schools operated by parishes with financial, operational and educational support; and (c) provides comprehensive risk management services to the Related Parties through the Diocese's insurance program.

(i) ***Operational Support***.  The Diocese provides operational and functional support to the Related Parties in the areas of finance, building & properties, legal, human resources,

stewardship and communications, canonical tribunal, schools, evangelization and catechesis, pastoral services and clergy services.

(ii) **School Operations**.  The Diocesan Catholic School Office serves as an administrative and educational resource for 7 Catholic schools operated by parishes within the Diocese by developing system-wide policies and regulations that govern the entire school system in conjunction with authority of each school's lay boards, as well as providing a superintendent to oversee the implementation of such policies and regulations.

(iii) **Risk Management**.  The Diocese maintains and manages a risk management program which provides a broad array of insurance coverage for the Diocese and Related Parties.  The risk management program is more fully described in the discussion below with respect to the Diocese's Insurance Motion (defined below).

## <u>THE DIOCESE'S FINANCES</u>

6.      The Diocese is a not-for-profit Religious Corporation formed by special act of the New York State legislature.

7.      The Diocese operates on a fiscal year ending June 30.  As of June 30, 2022, the date of the Diocese's most recent audited financials, the Diocese reported net assets of approximately $26.3 million, approximately $16.9 million of which was subject to donor restrictions and $9.4 million was unrestricted.  As of the Petition Date the Diocese has been named as a defendant in approximately 124 lawsuits asserting contingent and unliquidated personal injury claims arising from or related to sexual abuse allegedly perpetrated by persons associated with the Diocese, many of which also name Related Parties as codefendants.  While the Diocese believes that factual and

legal defenses may be available to some of these actions, they represent a large source of potential liability for the Diocese and its Related Parties.

8.    The Diocese derives revenue from several sources including (i) parish assessments, (ii) contributions, (iii) bequests, (iv) investment income, (v) grants, (vi) management fees, and (vii) fees and premiums charged for auxiliary services provided by the Diocese, the most significant of which being the Diocese's joint insurance program.

9.    The Diocese has made efforts to reach out to survivors of abuse to assist them both spiritually and financially through monetary settlements.  In 2018, the Diocese established its Independent Reconciliation and Compensation Program ("IRCP") to address the claims of victims of clergy sexual abuse of minors.  The Diocese engaged Kenneth Feinberg and Camille Biros (the "Administrators") to design, implement and administer a program for the submission, evaluation and settlement of individual claims which had been previously brought to the attention of the Diocese.  The IRCP was modeled after similar programs established by the Archdiocese of New York and the Dioceses of Brooklyn, Rockville Centre, and Syracuse, all of which were also administered by Mr. Feinberg and Ms. Biros.  Participation by claimants in the IRCP was purely voluntary and all eligibility decisions and settlement amounts under the IRCP were left to the discretion of the Administrators.  No aggregate cap was imposed upon the settlements proposed under the IRCP, and the Diocese agreed to pay the amount deemed appropriate by the Administrators in each case.

10.    Thirty-eight survivors successfully resolved their claims by settlement through the IRCP, receiving approximately $5.5 million in aggregate compensation.  The Diocese has also settled approximately fourteen additional survivor claims outside of the IRCP.

12044334.4

11.     On January 28, 2019, the New York State Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA").  New York's Governor signed the legislation on February 14, 2019. This legislation modified the statute of limitations and created a limited "window" during which victims of child sex abuse whose claims were previously time barred could commence a timely civil action.  In addition, the CVA extends the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age.  On May 24, 2022, New York State's Governor signed into law the Adult Survivors Act (S66/A648) (the "ASA") which created a similar window for previously time-barred claims of survivors of sexual offenses committed against them who were eighteen (18) years of age or older at the time they were abused.

12.     The Diocese is a defendant in approximately 124 lawsuits filed by plaintiffs who are seeking damages as a result of alleged abuse.  While the CVA window has now closed, there is a possibility that the Diocese may be named in additional actions brought under the ASA by plaintiffs who allege that they were abused as adults.  The Diocese believes that some of the claims against it are covered by insurance, however the Diocese anticipates that some insurance carriers will attempt to deny or raise defenses to coverage.

13.     The Diocese is a not-for-profit religious corporation with limited resources, including limited insurance coverage which may be applicable to claims of abuse survivors.  In light of the mounting costs of litigation and potential exposure to abuse-related claims, the Diocese has determined that the prudent course of action at this time is to pursue a financial restructuring through this Chapter 11 Case.

12044334.4

## PURPOSE AND GOALS OF THE CHAPTER 11 FILING

14.    The Diocese does not seek to avoid responsibility for any past misconduct by clergy or for any acts or omissions of the Diocese relating to such misconduct.  The Diocese does not seek bankruptcy relief to hide the truth or deny any person a day in court.  In fact, the Diocese is committed to pursuing the truth and has never prohibited any person from telling his/her story or speaking his/her truth in public.  The Diocese has publicly disclosed known perpetrators.  The Diocese has made and requires criminal referrals to be made for all credible allegations of sexual abuse.  Bishop LaValley has acknowledged past shortcomings by the Diocese and has attempted to offer aid and comfort to abuse victims.  The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

15.    The Diocese has commenced this Chapter 11 Case (a) to maximize its assets (including available insurance assets) in order to provide the greatest recovery for the greatest number of abuse victims; (b) to provide an orderly claims administration process that will ensure fairness in distribution and avoid the inherent inequities in the proverbial "race to the courthouse" that would otherwise result in the most aggressive litigants depleting the Diocese's assets at the expense of other claimants; and (c) to achieve certainty with respect to the Diocese's unliquidated and contingent liabilities in a manner that will allow the Diocese to reorganize and continue to fulfil its charitable, humanitarian and religious mission in service of the Catholic faith.

16.    A swift exit from bankruptcy is of the utmost importance given the Diocese's limited resources and because it is a not-for-profit religious corporation.  The Diocese is dependent upon the charity of its faithful to sustain its very existence.  The pendency of this Chapter 11 Case

may impact the Diocese's ability to effectively raise funds if donors become concerned about the ability of the Diocese to successfully reorganize. I respectfully submit that the best way to alleviate these concerns is to emerge from chapter 11 as soon as possible.

## FIRST DAY MOTIONS

17.    To further the Diocesan mission and continue operations while this Chapter 11 Case is pending, the Diocese respectfully requests that the following First Day Motions be granted:[1]

I.    **Motion for Entry of an Order Authorizing the Diocese to File Portions of Schedule F, the Statement of Financial Affairs, the Master Creditor Mailing Matrix, Certain Certificates of Service and Other Pleadings and Documents Under Seal (the "Motion to File Under Seal")**

18.    Many of the unsecured creditors in this Chapter 11 Case are individuals whose claims against the Diocese are premised on allegations of sexual abuse ("Abuse Claimants"). Some Abuse Claimants have filed tort claims against the Diocese following the passage of New York's Child Victims Act and have elected to file their litigation claims against the Diocese pseudonymously, with their real identity to be revealed only to the defendants in the course of litigation and with the understanding that their identities would not be publicly disclosed. The Diocese has also previously entered into out-of-court settlements with some Abuse Claimants where the Diocese agreed to keep the Abuse Claimant's name confidential but did not require the Abuse Claimant to keep the settlement confidential.

19.    In light of the sensitive nature of the claims of Abuse Claimants, to avoid causing unnecessary additional anguish or embarrassment, and to encourage such individuals to feel safe

---

[1] Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the respective First Day Motions. The relief requested in the First Day Motions and the factual bases for such relief are summarized in this Declaration for the convenience of the Court. To the extent of any inconsistency between this Declaration and the First Day Motions, the First Day Motions should control.

12044334.4

and secure in advancing their claims without fear of retribution or reprisal, the Diocese submits that it would be inappropriate and potentially harmful to require the public disclosure of identifying information relating to Abuse Claimants (the "Confidential Information").

20.    The Diocese has been operating under confidentiality restrictions for some time, and believes that it is imperative that the decision to come forward and identify oneself as an Abuse Claimant be left to the individuals in question, and that such accommodations can be made without adversely affecting the rights of any other parties in interest.

21.    By this Motion, the Diocese respectfully requests permission to protect the identities of Abuse Claimants while providing them notice of this Chapter 11 Case and notice of such events and motions as is required by the Bankruptcy Code and applicable Bankruptcy Rules. The Diocese further seeks to share names and contact information for Abuse Claimants with the Court and Bankruptcy Clerk under seal. The Diocese also seeks to file under seal a portion of the Statement of Financial Affairs, as well as certain certificates of service, that contain Confidential Information.

22.    It is proposed that Abuse Claimants represented by counsel be given notices in the Diocese's Chapter 11 Case only through their respective counsel, and that service on their respective counsel be considered adequate service.

23.    Item seven of Official Form 207 (Statement of Financial Affairs) requires the Diocese to disclose all pending legal actions in which the Diocese is a party, including the case title and case number. The Diocese is seeking authority to redact its responses to item seven on the publicly filed Statement of Financial Affairs and to file under seal such portion of its responses

to item seven which contain the name, case number and any other identifying information relating to Abuse Claimants who have filed lawsuits against the Diocese in their own name.

24.     Similarly, the Diocese will be required from time to time to serve notice of certain pleadings, orders and other events with respect this Chapter 11 Case upon various parties in interest, including, on occasion, Abuse Claimants and individuals who may have been accused of perpetrating acts of abuse or of engaging in other improper and/or illegal conduct.  The Diocese is seeking authority to redact from such certificates of service the names and addresses of all Abuse Claimants to protect their privacy.  Additionally, while the Diocese has no intention of concealing the identity of confirmed perpetrators (in fact, the Diocese publishes on its website a list of those individuals against whom substantiated allegations of abuse of a minor have been made), for public safety reasons the Diocese should be allowed to redact the address of any confirmed perpetrators, and the name and address of any alleged perpetrators, from any publicly filed certificates of service to reduce the risk of vigilantism or other breaches of the peace.  The Diocese seeks authority to file unredacted copies of all such certificates of service under seal.

25.     The Diocese requests in this Motion that the Court enter an order:

i.       Authorizing the Diocese to file under seal portions of Schedule F, the Statement of Financial Affairs, the Master Creditor Mailing Matrix and certain certificates of service and to seek approval on an expedited basis to file under seal any other pleadings, reports or other documents that might be filed from time to time in this Chapter 11 Case, that, if made publicly available, would disclose any of the Confidential Information;

ii.      Authorizing the Diocese to publicly file redacted copies of the Master Creditor Mailing Matrix, Schedule F, the Statement of Financial Affairs and certain certificates of service so as to eliminate Confidential Information from those documents;

iii.      Authorizing the Diocese to identify, schedule and notify Abuse Claimants who are represented by counsel by and through their counsel on Schedule F and the Master Creditor Mailing Matrix;

iv.      Authorizing the Diocese to provide copies of the sealed portions of any such pleadings, reports or documents to the Office of the United States Trustee, as necessary, and authorizing the United States Trustee to use such documents in the discharge of its duties and obligations, including but not limited to solicitation and appointment of any committee under 11 U.S.C. § 1102 but as protected by 11 U.S.C. § 107(c)(3);

v.      Authorizing the Diocese to provide sealed reports, documents and pleadings to counsel for any committee appointed under 11 U.S.C. § 1102 who has been retained pursuant to Court approval, but only after confidentiality procedures are agreed upon between the Diocese and counsel for any such committee;

vi.      Authorizing the Diocese to file a full and complete unredacted copy of the mailing matrix above (the "Confidential Mailing List") with the Court to be held under seal pending further order of the Court;

vii.      Providing that notwithstanding any applicable rule to the contrary, the relief granted under the order shall be immediately effective and enforceable upon entry; and

viii.      Providing that any order granting the relief requested in this Motion is without prejudice to any future determined confidentiality protocol regarding filing proofs of claim and objections to proofs of claim.

26.      Because the Diocese has already been ordered by state courts to maintain the confidentiality of Abuse Claimant identifying information in several cases, it has a legal duty to protect the identities of these Abuse Claimants. Moreover, the Diocese strongly believes that it has a moral and ethical duty to protect the identities of all Abuse Claimants unless they choose to identify themselves. Subject to the limitations imposed by sections 107(b) and (c) of the Bankruptcy Code, the Diocese has no intention to oppose any steps by individual Abuse Claimants who wish to make their identities public or to disclose Confidential Information regarding their

claims; however, the Diocese believes that such a decision should be of the Abuse Claimants' own accord.

27.    In addition to the filing of the Master Creditor Mailing Matrix under seal, the Diocese will file a redacted version of the Master Creditor Mailing Matrix on the docket for use by other parties seeking to provide notice in this Chapter 11 Case.  The Diocese also intends to seek approval of the retention of a claims noticing agent to help fulfill these confidential noticing procedures, to keep claimants informed of developments in the Chapter 11 Case, and to assist in the claims and solicitation processes with respect to all Abuse Claimants and other creditors in this Chapter 11 Case.

28.    Although some Abuse Claimants may have filed suit against the Diocese in their own name, it is possible they did so without being aware that it was possible to seek authority to sue using a pseudonym.  Additionally, even if an Abuse Claimant knowingly assented to having his or her name included as part of the public record in a private lawsuit, they likely did not contemplate at the time that their lawsuit would be included among the disclosures required of the Diocese in connection with this Chapter 11 Case.  The Diocese further submits that the media scrutiny and exposure afforded to this Chapter 11 Case is likely to be well beyond the scope of what any individual Abuse Claimant could have reasonably expected.  Therefore, to afford the greatest degree of privacy possible to Abuse Claimants, their names should be shielded from public disclosure unless an Abuse Claimant elects to make their identity public.

29.    Regrettably, many claims asserted against the Diocese relate to alleged instances of abuse of minors.  The Diocese has been able to substantiate some, but by no means all, such allegations.  However, even in the case of allegations that have been substantiated by the Diocese

following an independent investigation, the alleged abuse perpetrators may not have been criminally charged, tried, or convicted, found liable in a civil capacity, or otherwise accorded due process of law and the opportunity to defend themselves before any court of competent jurisdiction. Moreover, even where those individuals are responsible for the acts of abuse they are alleged to have committed, the Diocese respectfully submits that identifying such individuals as alleged abusers, and publishing their names and addresses in certificates of service required to be filed in this Chapter 11 Case, will create an undue risk to the physical well-being of such individuals, as well as the general public safety. Persons understandably enraged over the accusations asserted by the Abuse Claimants may seek to obtain "justice" through acts of vigilantism or harassment, and may otherwise pursue retaliation by causing disturbances and breaches of the peace where such alleged perpetrators reside. Accordingly, prudence dictates that the addresses of such alleged perpetrators and, in the case of individuals against whom allegations have not yet been substantiated, their names, be redacted and withheld from the public record with respect to any certificates of service that may otherwise be required to be filed in this Chapter 11 Case.

II.   **Motion for Entry of an Order Pursuant to Bankruptcy Rules 1007(c) and 9006(b)(1) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Motion to Extend Time to File Schedules")**

30.   By this Motion, the Diocese respectfully requests that the Court enter an order extending the time to file the Schedules and Statements through and including August 31, 2023 (an extension of 31 days, for a total of 45 days from the Petition Date), without prejudice to the Diocese's ability to request additional time should it become necessary.

31.     The Diocese anticipates that there will be more than 300 creditors and interested

parties involved in this Chapter 11 Case, including approximately 124 individuals whose claims

relate to alleged instances of abuse and whose names and other identifying information will be

sought to be filed under seal to protect their privacy in accordance with the Motion to File Under

Seal discussed above.  Given the need for confidentiality, preparing the Schedules and Statements

accurately and with sufficient detail and adherence to confidentiality requires significant attention

from the Diocese's personnel and advisors.  Further, the Diocese's personnel will be heavily

involved with public relations outreach in the days following the Petition Date, to facilitate the

stabilization of the Diocese's operations and in support of its mission.

32.     In addition to the reasons set forth above, the complexity of the Diocese's

operations, the limited staff available to perform the required internal review of financial records

and affairs, the numerous critical operational and mission stabilization matters that the Diocese's

personnel must address in the early days of this Chapter 11 Case, the pressure incident to the

commencement of this Chapter 11 Case, and the fact that certain prepetition invoices may not be

received or entered into the Diocese's accounting system prior to the Petition Date provide ample

cause justifying the requested extension of the deadline to file the Schedules and Statements.

33.     Focusing the attention of key personnel on critical operational and chapter 11

compliance issues during the early days of this Chapter 11 Case will help the Diocese make a

smoother transition into chapter 11 and, therefore, will ultimately maximize the value of the

Diocese's estate for the benefit of creditors and all parties in interest.  Consequently, it is in the

best interests of the Diocese and its creditors to obtain an extension of the filing deadline set forth

under Bankruptcy Rule 1007(c), which would provide the Diocese with a total of 45 days from the

Petition Date to file the Schedules and Statements.

### III.    Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, and (B) Granting Adequate Protection (the "Cash Collateral Motion")

34.    As of the Petition Date, the Diocese is indebted to NBT Bank, National Association

("NBT") pursuant to the following transactions and documents:

(i)    Letter of Credit Application and Agreement, together dated as of November 9, 2020 (the "NBT LOC Agreement"), pursuant to which NBT made available to the Diocese a $1,950,707 Letter of Credit (the "NBT Letter of Credit") issued by NBT to the New York State Worker's Compensation Board (the "WCB") to secure the Diocese's obligations under its self-insured worker's compensation program;[2] and

(ii)    Specific Security Agreement (Pledged Account) dated as of November 9, 2020 (the "NBT Pledge Agreement"), pursuant to which the Diocese pledged all of its property in the possession of, or subject to the control of NBT including, without limitation, its interest in approximately $2.3 million of securities held in a blocked investment account at NBT (the "Blocked NBT Account"), to secure its obligations to repay NBT for any amounts drawn on the NBT Letter of Credit.

35.    The NBT LOC Agreement, NBT Letter of Credit, and NBT Pledge Agreement are

collectively referred to herein as the "Prepetition Debt Documents" and the securities held in the

Blocked NBT Account, as well as any cash or other collateral subject to NBT's lien under the

Prepetition Debt Documents, are collectively referred to in this Motion as the "Prepetition

Collateral."

36.    The Diocese seeks to use cash and securities (other than cash or securities held in

the Blocked NBT Account) existing on or after the Petition Date that may be part of the Prepetition

---

[2]  As of the date of this Declaration, the WCB has made no attempt to draw upon the NBT Letter of Credit and, upon information and belief, there exists no cause for the WCB to do so.

Collateral (the "Cash Collateral"). Additionally, the Diocese seeks the ability to continue to manage its investments in the Blocked NBT Account in accordance with its prepetition practices and the Prepetition Debt Documents, and to provide NBT with adequate protection of its respective interests in the Prepetition Collateral by providing rollover liens.

37. The Diocese has an urgent need to use Cash Collateral. Many of the Diocese's bank accounts are held with NBT, including its general operating account (the "Operating Account"). Accordingly, in addition to the liens granted to NBT pursuant to the Prepetition Debt Documents, NBT also has a possessory lien on all funds held in NBT bank accounts.

38. As described more fully in the Diocese's Cash Management Motion (defined below), the Diocese relies upon its Operating Account to collect accounts receivable and to fund the majority of its disbursements, including for payroll, vendor and utility payments, and other expenses. Because the majority of the Diocese's unrestricted funds are held at NBT, absent the ability to use Cash Collateral, the Diocese would not be able to pay wages, utility charges, and other business and operating expenses critical to carrying out the Diocese's mission.

39. In order to adequately protect any interest NBT may have in the Cash Collateral, the Diocese proposes to grant NBT, to the extent of any diminution in the value of its interest in the Prepetition Collateral, and effective as of the Petition Date, perfected replacement security interests in, and valid, binding, enforceable and perfected liens (the "NBT Rollover Liens"), on all of the Diocese's cash, deposit accounts, and investment property in the possession of, or subject to the control of, NBT, and all proceeds of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising (collectively, the "Postpetition Collateral") *provided*, *however*, that the Postpetition Collateral shall not include, and the NBT Rollover Liens shall not

- 15 -

attach to, any funds or property held by the Diocese (i) for the purpose of administering its insurance programs, (ii) in trust for the benefit of parishes or other Catholic entities within the Diocese, (iii) which represent trust fund taxes or employee payroll deductions, or (iv) which are endowed funds or subject to donor restrictions on use.

40.    Because the value of the Blocked NBT Account is already in excess of NBT's potential exposure under the NBT Letter of Credit, and because the WCB has not drawn on the NBT Letter of Credit, nor is there any reason for the WCB to do so, the Diocese submits that the proposed NBT Rollover Liens more than adequately protect NBT's interest in the Cash Collateral.

41.    The Diocese seeks interim approval of the use of Cash Collateral through August 15, 2023 to pay only (i) reasonable and necessary expenses to be incurred in the ordinary course in connection with the operation of its business and fulfilment of its religious mission, (ii) administrative expenses incurred in connection with this Chapter 11 Case, and (iii) employee wages and such other payments as may be authorized by separate order of the Court.

42.    The Diocese respectfully requests that the Court conduct a preliminary hearing on this Motion and authorize the Diocese to use Cash Collateral on an interim basis pending a hearing to consider authorizing such use on a final basis.  Interim access to the Cash Collateral will ensure that the Diocese is able to avoid immediate and irreparable harm at the outset of this Chapter 11 Case.

43.    Following a final hearing, the Diocese requests that the Court schedule a hearing to consider entry of an order granting the Cash Collateral Motion authorizing the use of Cash Collateral on a final basis (the "Final Order"), and that the Final Order authorize the Diocese to use Cash Collateral in accordance with its business judgment, subject only to the Bankruptcy

- 16 -

Code's limitations on paying prepetition claims as the same may be modified by any order of the Court authorizing such payments.

> **IV.**   **Motion for Entry of Interim and Final Orders Authorizing the Diocese to (A) Pay Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Medical and Other Benefits and (C) Continue Employee Benefit Programs (the "<u>Wages Motion</u>")**

44.    By this Motion, the Diocese seeks interim and final orders authorizing, but not directing, the Diocese, in its discretion to (a) pay prepetition compensation, reimbursable business expenses, benefit plans, deductions and payroll taxes, all as described herein, (b) pay and honor medical and other benefit plans on a post-petition basis, and (c) continue its employee benefit programs.

45.    The Diocese's employees are essential to the administration of the Diocese's Chapter 11 Case, the preservation of its assets and the continuation of the Diocese's mission.  In addition to providing religious guidance and facilitating religious services and activities in the Diocese, the Diocese's employees also provide other critical functions including, without limitation, finance, human resources, risk management, office of safe environment, information technology, legal, catholic education, evangelization and catechesis, stewardship and communications, pastoral and clergy services, canonical tribunal, archives, building and grounds maintenance, development, family and child services, and administration.  Without its employees, the Diocese would be unable to provide these services to individuals of the Roman Catholic faith and the parishes and schools within the Diocese and would also be unable to provide necessary support for the formulation of a plan of reorganization to benefit all creditors.

46.    The Diocese currently employs 66 non-clergy employees, (the "<u>Non-Clergy Employees</u>"), including 38 full time employees, 6 part time employees, and 22 temporary/seasonal

employees, on a bi-weekly payroll schedule.  The Diocese currently employs 6 clergy employees (the "Clergy Employees" and together with the Non-Clergy Employees, the "Employees") consisting of 1 full time clergy and 5 part time clergy.  Twenty-seven (27) of the Employees are salaried and the remainder are paid on an hourly or daily basis.  All of the Employees are non-union employees, and none are entitled to commissions.

47.     The vast majority of the Employees rely exclusively on the compensation and benefits they receive from the Diocese to provide for their daily living expenses. If the Diocese were not permitted to continue paying such compensation and benefits in the ordinary course of its business, the Employees would likely be exposed to significant financial difficulties.

48.     To minimize the personal hardship that the Employees would suffer if prepetition obligations are not paid when due or as expected, and to maintain morale and stability in the Diocese during this critical time, the Diocese seeks authorization to (a) pay and honor certain prepetition claims for compensation, reimbursable business expenses, and benefit plans, and continue to provide all other benefits that the Diocese has historically provided to its Employees in the ordinary course of business, each as described below (collectively, the "Employee Wages and Benefits"), (b) pay all administrative costs associated with Employee Wages and Benefits, (c) continue to pay and provide the Employee Wages and Benefits in the ordinary course of business on and following the Petition Date, and (d) withhold (as applicable) and remit deductions and payroll taxes as described below.

49.     ***Compensation***.   The Non-Clergy Employees are paid bi-weekly in arrears. Payment is made on the Thursday following the end of each pay period.  Based upon historical data, the average bi-weekly aggregate payroll for the Diocese's Non-Clergy Employees is

approximately $88,700, including applicable taxes and deductions.  The Clergy Employees are paid on a monthly basis, on the 15th of every month.  Based upon historical data, the average monthly aggregate payroll for the Diocese's Clergy Employees is $8,740 including applicable taxes and deductions.

50.     As of the Petition Date, there are approximately ten (10) days of prepetition wages earned by the Non-Clergy Employees which are due to be paid on July 20, 2023, and one (1) day of prepetition wages earned by the Non-Clergy Employees due to be paid on August 3, 2023. Because Clergy Employees are paid in advance and not in arrears, as of the Petition Date, there are 11 days of postpetition wages earned by Clergy Employees that were paid on July 14, 2023.

51.     The Diocese estimates that total unpaid compensation for all Employees as of the Petition Date is approximately $104,000 (the "Unpaid Compensation").  The Diocese believes that it does not owe any single Employee a prepetition amount in excess of the $15,150 cap on priority claim amounts imposed by section 507(a)(4) of the Bankruptcy Code.  Accordingly, the Diocese is not seeking authority to pay any amount over the $15,150 cap to any Employee.

52.     Items of Unpaid Compensation are due and owing on the Petition Date because, among other things:

   (i)     the Chapter 11 Case was filed during the Diocese's regular payroll periods;

   (ii)    some checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and

   (iii)   Employees have not yet been paid all of their salaries and wages for services performed prior to the Petition Date because the Diocese pays payroll in arrears.

12044334.4

53. ***Reimbursable Business Expenses***.  Prior to the Petition Date and in the ordinary course of business, the Diocese has reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Diocese ("Business Expenses").  As of the Petition Date, the Diocese is aware of approximately $500 in accrued and unpaid Business Expenses for Employees. It is also possible that certain Employees may have incurred prepetition Business Expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Diocese after the Petition Date.

54. The Business Expenses are incurred by Employees on the Diocese's behalf and with the understanding that they will be reimbursed.  Accordingly, to avoid harming Employees who may have incurred Business Expenses, the Diocese requests the authority, to be exercised in its sole discretion, to: (a) continue paying Business Expenses in accordance with prepetition practices; (b) modify its prepetition policies relating thereto as the Diocese deems appropriate; and (c) pay all Business Expenses that relate to the prepetition period.

55. ***Benefit Plans***.  The Diocese provides eligible Employees and their eligible dependents with various employee benefits as follows (collectively, the "Benefit Plans"):

    (i)    *Health Plan.* The Diocese provides its eligible Non-Clergy Employees with an option to obtain medical coverage through Excellus Blue Cross Blue Shield ("Excellus"), and the Diocese pays a portion of the cost of such coverage for participating Non-Clergy Employees, with the remaining portion paid by the Non-Clergy Employees through payroll deductions. Approximately 10 Non-Clergy Employees receive health benefits through the Diocese.  On average, the Diocese pays approximately $13,343 per month to Excellus for health insurance, of which approximately $3,558 represents withheld Non-Clergy Employee contributions.  Four (4) Clergy Employees receive health benefits through Excellus.  The Diocese pays 100% of the Clergy Employee premiums which are approximately $4,448 per month.  There are 175 employees of other diocesan institutions covered under the Excellus Plan.  The cost for these employees is incurred by and paid from the applicable diocesan institution.  The Diocese pays Excellus

directly and is then reimbursed 100% by each diocesan institution as such cost relates to the employees of that entity. The Diocese also provides health benefits under a United Healthcare Group Medicare Advantage Plan. The Diocese contributes 100% of the cost for this benefit to 38 retired priests and one (1) disabled priest. The Diocese currently pays approximately $15,110 per month to United Healthcare for these 39 priests. The United Healthcare Medicare Advantage Plan also covers six (6) religious and four (4) lay retirees. The cost for the coverage for these retirees is passed on to other entities or the individuals receiving such coverage. The Diocese does not provide a dental or vision plan to Employees.

(ii)     *Paid Time Off ("PTO")*. The Diocese provides PTO for its Employees, the amount of which is based generally on an Employee's length of service with the Diocese. When an Employee elects to take PTO, that Employee is paid his or her regular hourly or salaried rate. Employees' full annual allotment of PTO vests at the beginning of each calendar year and Employees are generally expected to use all available time by the end of the calendar year. When an Employee ceases employment with the Diocese, they are paid their regular hourly or salaried rate for PTO that was earned, but not taken. The Diocese estimates that, as of the Petition Date its Employees have approximately $60,000 of vested, unused PTO. This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused PTO when employment is terminated. Any such payout of PTO to a terminated Employee would be subject to the cap imposed by section 507(a)(4) of the Bankruptcy Code for any pre-petition portion of this payment. Moreover, the Diocese anticipates that its Employees will utilize any accrued PTO in the ordinary course of business, which will not create any cash flow requirements beyond the Diocese's normal payroll obligations.

(iii)    *Paid Family Leave and Short-Term Disability*. The Diocese provides paid family leave and short-term disability benefits pursuant to New York State law. The Diocese is authorized by the New York State Workers' Compensation Board to self-insure for the cost of providing paid family leave and short-term disability benefits. Historically, the cost to the Diocese of providing paid family leave and short-term disability benefits has been less than $45,000 annually. The Diocese believes that it is generally current with respect to all payment obligations associated with these benefit programs as of the Petition Date.

(iv)    *Long-Term Disability Insurance*. The Diocese sponsors long-term disability benefits covering eligible Employees. The Diocese pays approximately $735 per month to Guardian Life Insurance for this benefit.

As of the Petition Date, the Diocese is generally current with respect to its long-term disability insurance premium payments to Guardian Life Insurance. Employees may also obtain supplemental disability and cancer insurance through AFLAC. The cost of such supplemental coverage is funded entirely from Employees' voluntary payroll deductions. As of the Petition Date, the Diocese does not owe any payroll deduction amounts to AFLAC for premiums under these policies.

(v)     *Life Insurance*.  The Diocese sponsors group term basic life insurance for its eligible Employees through Guardian Life Insurance. The premiums for basic life insurance coverage are fully paid by the Diocese, and enrollment in this benefit is required for all full-time Employees. The Diocese pays Guardian Life Insurance approximately $750 per month for this benefit. Employees also have the option of purchasing additional voluntary life insurance from Guardian through payroll deductions. As of the Petition Date, the Diocese is generally current with respect to its payment obligations to Guardian Life Insurance.

(vi)    *Flexible Spending Plans*.  The Diocese sponsors flexible spending plans for its Employees for medical and dependent care expenses. Participating Employees' flex accounts are funded through voluntary payroll deductions. Benefit Resources manages the flexible spending plans and the Diocese pays administrative fees of $150 on a monthly basis in exchange for such services. As of the Petition Date, the Diocese is generally current with respect to its payment obligations for withholdings and administrative fees under the flexible spending plans.

(vii)   *403(b) Plan*.  The Diocese also offers eligible Non-Clergy Employees the opportunity to participate in a defined contribution qualified retirement plan under section 403(b) of the Internal Revenue Code. Participating Non-Clergy Employees may elect to contribute to the plan through payroll deduction. Christian Brothers Retirement Services administers the 403(b) plan at no direct administrative expense to the Diocese. As of the Petition Date, the Diocese is generally current with respect to its payment obligations for withholdings under the 403(b) Plan.

(viii)  *Retirement Trusts*.  The Diocese also contributes to a defined benefit pension trust for eligible Non-Clergy Employees, (the "<u>Lay Plan</u>"). The Lay Plan provides retirement income to eligible Employees of the Diocese, as well as employees of parishes, cemeteries and schools affiliated with the Diocese. The Lay Plan is noncontributory and covers Employees who meet certain minimum service requirements**.** The Diocese makes contributions to the Lay Plan annually of approximately $1,500,000. The Diocese also maintains a non-qualified retirement plan which covers all eligible

- 22 -

Diocesan priests (the "Priest Plan"). The Priest Plan is funded through assessments from the parishes to fund retirement benefits for priests. The Diocese does not make contributions to the Priest Plan. There is no underfunded liability owed by the Diocese to the Priest Plan as of the Petition Date.

(ix)     *Additional Benefits*.  In addition to those benefits offered to the Diocese's Non-Clergy Employees, the Diocese offers its Clergy Employees a special medical reimbursement benefit, matching independent retirement account contributions, an education allowance and a retreat allowance. Medical expenses for Clergy Employees not covered by health insurance are reimbursed up to $3,200 per year upon presentation of receipts for such expenses.  IRA contributions by Clergy Employees are matched up to $1,200 per year.  The Diocese contribution to the Clergy Employee's IRA, upon presentation of documentation that the Clergy Employee's contribution has been made, is deposited directly into the IRA or retirement account.  Continuing education costs up to $550 per year are reimbursed upon presentation of receipts for such expenses.  Additionally, Clergy Employees are also expected to attend an annual retreat and the cost of the retreat is reimbursable up to $700 upon submission of the receipt for the cost of the retreat. If the Clergy Employee is a part-time diocesan employee the Diocese pays a percentage of the expenses (for example, a half-time employee would get up to $350 of the expense incurred from the retreat reimbursed from the Diocese).  The cost to the Diocese of providing these additional benefits to Clergy Employees is approximately $4,000 annually and, as of the Petition Date, the Diocese is generally current in its obligations to provide these additional benefits to Clergy Employees.

(x)      *Religious Sisters.*  For Religious Sisters providing services to the Diocese, reimbursement is made by the Diocese for retirement, health insurance, Medicare Part B premiums, and housing allowances. The Diocese pays these reimbursements to the Religious Sisters' Order or employer in the amount of approximately $31,000 annually.  As of the Petition Date, the Diocese is generally current with respect to providing these reimbursements.

(xi)     *Workers' Compensation*.  The Diocese provides workers' compensation benefits (the "Workers' Compensation Benefits") for its Employees.  The Diocese is self-insured for the first $200,000 in benefits payable for any workers' compensation claim.  Thereafter, the Diocese maintains an excess insurance policy through BPIC and Safety National Casualty Corporation which provides additional coverage for benefits up to the statutory

- 23 -

maximum.[3]  The Diocese utilizes Gallagher-Bassett Services as its third party administrator for workers' compensation claims and pays approximately $15,000 annually for claims administration services.  The Diocese maintains the NBT Letter of Credit with the New York State Workers' Compensation Board to secure the Diocese's obligation to pay claims under its self-insured program.  The Diocese pledged all of its property in the possession of, or subject to the control of NBT including, without limitation, its interest in approximately $2.3 million of securities held in a blocked investment account at NBT to secure its obligations to repay NBT for any amounts drawn on the NBT Letter of Credit.  As of the Petition Date the Diocese is generally current with respect to its payment obligations for Workers' Compensation Benefits.

Failure to provide continued Workers' Compensation Benefits could result in the institution of administrative or legal proceedings against the Diocese and its officers.  By this Motion, the Diocese seeks authority to continue paying and/or contesting in good faith, as appropriate in the Diocese's business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date including, without limitation, any payments to insurers required as a result of such claims and wage loss makeup obligations, as they become due in the ordinary course of the Diocese's business.

56.     *Deductions*.  During each applicable pay period, the Diocese routinely withholds certain amounts from Employees' pay that the Diocese is required to transmit to third parties. Examples of such withholding include 403(b) contributions, charitable donations, child support payments, wage garnishments and other pre-tax and after-tax deductions payable pursuant to certain of the benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, legally-ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

---

[3] The Diocese's excess workers' compensation insurance policy is addressed in further detail in the Diocese's *Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Maintenance of the Diocese's Insurance Program and (II) Authorizing the Payment of Prepetition Obligations In Respect Thereof* filed contemporaneously herewith.

57.     The Diocese forwards the Deductions to the appropriate third-party recipients.  On average, the Diocese deducts approximately $5,820 in non-tax items from its Non-Clergy Employees' paychecks each bi-weekly pay period.[4]  Due to the commencement of the Chapter 11 Case, however, certain Deductions that were deducted from Employees' pay may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.

58.     ***Payroll Taxes***.  Further, the Diocese is required by law to withhold from its Employees' wages amounts related to federal and state income taxes and Social Security and Medicare taxes for remittance to the appropriate federal or state taxing authority (collectively the "Withheld Amounts").  The Diocese must match from its own funds Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes").  On average, the Diocese pays Payroll Taxes in the amount of approximately $25,600 for each bi-weekly pay period for Non-Clergy Employees, and approximately $2,214 for each monthly pay period for Clergy Employees.  The Diocese believes that accrued but unpaid Payroll Taxes as of the Petition Date total approximately $28,200.

59.     The Diocese believes that the Deductions and Payroll Taxes, to the extent that they remain in the Diocese's possession, constitute monies held in trust and therefore are not property of the Diocese's bankruptcy estate.  Accordingly, by this Motion the Diocese seeks authorization, but not direction, to forward any unpaid Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities and to continue to forward the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

---

[4] At present, the Diocese does not make non-tax Deductions from its Clergy Employees' paychecks.

60.     To facilitate the other relief requested herein, the Diocese requests that the Court authorize and direct all banks and other financial institutions at which the Diocese maintains an account, to receive, process, honor and pay (provided that sufficient funds are on deposit in the applicable accounts to cover such payments) any and all prepetition and post-petition checks issued or to be issued, and fund transfers requested or to be requested, by the Diocese on account of Employee Wages and Benefits that were not honored or paid as of the Petition Date, whether presented or requested prior to or after the Petition Date.  The Diocese also seeks the authority to issue new prepetition checks, or effect new fund transfers, to satisfy the Employee Wages and Benefits to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

61.     In order to retain Employees, the Diocese must have authority to pay or otherwise satisfy the Employee Wages and Benefits as summarized above.  The amounts requested to be paid pursuant to this Motion are reasonable compared with the importance and necessity of the Diocese's payments to Employees and the harm that these individuals and the Diocese would likely suffer if these amounts are not paid.

62.     Additionally, the relief requested will significantly reduce the administrative burden which might otherwise be imposed in the Chapter 11 Case.  For the Diocese to identify the extent to which individual Employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose additional burdens of administration and expenses which are unwarranted under the circumstances.

63.     The Diocese's books and records indicate that in no instance should the amount owing to any Employee on account of the Employee Wages and Benefits as of the Petition Date

exceed the sum of $15,150, which amount is allowable as a priority claim under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. Moreover, the Diocese only seeks authority to make payments to Employees up to the combined statutory maximum of $15,150 on account of wages and compensation earned within 180 days before the date of the filing of a petition, allowed as a priority claim under section 507(a)(4) and contributions to employee benefit plans allowed as a priority claim under section 507(a)(5).

64.     As such, payment of the Employee Wages and Benefits in the ordinary course of business should neither prejudice general unsecured creditors nor materially affect the Diocese's estate, because section 507(a)(4) and section 507(a)(5) priority claims are already entitled to payment in full under a reorganization plan.

65.     Based upon the foregoing, the Diocese respectfully requests that the Court enter an Order granting the Wages Motion and authorizing the Diocese to pay or otherwise satisfy, in the ordinary course of business, the Employee Wages and Benefits. Such relief is justified because the failure to pay any such amounts will likely disrupt the services that the Employees provide to the Diocese and ultimately, the Diocese's ability to successfully administer its Chapter 11 Case.

**V.      Motion for Entry of Interim and Final Orders Authorizing Payment of Prepetition Taxes and Regulatory Fees (the "Taxes Motion")**

66.      By this Motion, the Diocese hereby seeks authority to pay, in its sole discretion, in the ordinary course of its business and on its normal due dates, all undisputed prepetition prepetition sales, gross receipts, utility-users, federal excise and use, and certain other governmental taxes, including any amounts subsequently determined to be owing upon audit (collectively, the "Taxes"), regulatory fees, including, but not limited to, federal, state and local regulatory fees (the "Regulatory Fees"), and permit or other licensing fees (the "Licensing Fees"

and together with the Taxes and Regulatory Fees, the "Taxes and Fees") owed to the Taxing Authorities, including all Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

67.     In the ordinary course of its business, the Diocese is required to pay Taxes and Fees. The Diocese must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Diocese conducts business.  The process by which the Diocese remits the Taxes and Fees varies, depending on the nature of liability at issue and the Taxing Authority to which the relevant payment is made.

68.     As of the Petition Date, the Diocese believes that it is current with respect to the payment of Taxes and Fees with the exception of minimal sales tax obligations in connection with the operations of Camp Guggenheim, a residential summer camp for teens, and certain minimal tax obligations in connection with the North County Catholic Newspaper.  Additionally, certain Taxes may have accrued prepetition but have not yet come due for payment.

69.     The Diocese pays the Taxes and Fees to the Taxing Authorities on a periodic basis with funds drawn by checks or by means of electronic fund transfers whether sent directly to the Taxing Authorities or sent to a third-party administrator who pays the appropriate Taxing Authorities.  Prior to the Petition Date, certain Taxing Authorities may have been sent checks or electronic transfers in respect of such obligations that may not have cleared the Diocese's banks or other financial institutions as of the Petition Date.

70.     The Diocese further requests that all applicable banks and financial institutions be authorized and directed, when requested by the Diocese in its sole discretion, to receive, process, honor and pay any and all checks or electronic transfers drawn on the Diocese's accounts, to pay

all prepetition Taxes and Fees owed to the Taxing Authorities, whether those checks were presented prior to or after the Petition Date, and to make other transfers, provided that sufficient funds are available in the applicable accounts to make such payments.  To the extent the Taxing Authorities have not otherwise received payment for all prepetition Taxes and Fees owed, the Diocese seeks authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary, to pay all outstanding Taxes and Fees owing for periods prior to the Petition Date.

71.    Furthermore, even if certain Taxes and Fees would not ordinarily be considered "trust fund" taxes in a particular jurisdiction, payment of such Taxes and Fees should nevertheless be authorized because failure to pay the Taxes and Fees may adversely affect the Diocese's good standing in a jurisdiction, potentially impairing its ability to engage in certain transactions and continue to conduct its business.  In addition, some Taxing Authorities may audit the Diocese, if such Taxes and Fees are not timely paid, which would needlessly divert the Diocese's attention from its reorganization efforts.  Timely payment of the Taxes and Fees is necessary to avoid such distractions and is thus in the best interests of the Diocese and its estate.

72.    To the extent that any Taxes and Fees remain unpaid by the Diocese, the Diocese's directors and officers may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases.  Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Diocese and its officers, certain employees and directors from effectuating the Diocese's reorganization, to the detriment of all parties in interest to these Chapter 11 Cases.

73.    Any delay in paying the obligations relating to the Taxes and Fees would be detrimental to the Diocese, its creditors and its estate.  Indeed, the Diocese's ability to manage and run its business operations with as little disruption as possible requires, in part, that it remain in good standing with the relevant Taxing Authorities.  For the foregoing reasons, the relief requested through the Taxes Motion herein is necessary and appropriate and is in the best interests of the Diocese's estate, its creditors and other parties in interest.

**VI.    Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service on Account of Prepetition Amounts Due, (B) Determining Adequate Assurance of Payment For Post-Petition Utility Services Under 11 U.S.C. § 366, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

74.    By this Motion, the Diocese respectfully requests that the Court enter interim and final orders, (a) prohibiting those utility companies that provide service to the Diocese (each a "Utility Company" and, collectively, the "Utility Companies") from altering, refusing or discontinuing service on account of prepetition amounts due, (b) determining that the Diocese's furnishing of deposits to Utility Companies, upon their timely request for adequate assurance, in an amount equal to one month of the Diocese's estimated average monthly usage, constitutes adequate assurance of payment, and (c) establishing a procedure to address assertions by Utility Companies that they are entitled to additional adequate assurance.

75.    The Diocese's ongoing operations require the Diocese to maintain uninterrupted utility services, including electricity, natural gas, telephone, water, waste removal, internet and other services.  Termination of a utility service would cause immediate and irreparable harm to the Diocese's operations and critical reorganization efforts.

- 30 -

76.    The Diocese receives utility services from several different providers for multiple properties.  These properties include: 604 Washington Street, Ogdensburg, New York; 622 Washington Street, Ogdensburg, New York; 624 Washington Street, Ogdensburg, New York; 100 Elizabeth Street, Ogdensburg, New York; 4917 S. Catherine St., Plattsburgh, NY; and the properties of the Guggenheim Center for Religious Programs at 1468 County Route 18, Forest Home Road, Saranac Lake, New York 12983.  A list of the Utility Companies and the service addresses is attached as Schedule 1 to the Utilities Motion.[5]  The Diocese is generally current with respect to the payment of its prepetition obligations for all utility services and none of the Utility Companies hold prepetition deposits.  Pursuant to section 366(c) of the Bankruptcy Code, the Diocese proposes to provide the Utility Companies adequate assurance of payment as follows:

(i)    Upon request, the Diocese will provide each Utility Company a cash deposit (each, a "Deposit") in an amount approximately equal to the average monthly cost of its utility consumption from each Utility Company, as calculated over the past year.  If a Utility Company provides the Diocese with services under multiple accounts, then the Diocese may provide that Utility Company with separate Deposits or with one Deposit that equals one month of the aggregate estimated usage under all of the Diocese's accounts with that Utility Company.  A Deposit shall be provided within 10 business days of the receipt, by the Diocese or its bankruptcy counsel, of a written request from a Utility Company for adequate assurance under the Bankruptcy Code.

(ii)   In the event that a Utility Company believes that the proposed Deposit does not constitute adequate assurance of payment that is satisfactory to that

---

[5] The Diocese reserves the right to amend or supplement the list of Utility Companies included on Schedule 1.  It is possible that, despite the Diocese's best efforts, certain Utility Companies have not yet been identified by the Diocese or included on Schedule 1.  To the extent the Diocese identifies additional Utility Companies, the Diocese will file amendments to Schedule 1, and will serve copies of the interim order in respect to this Motion (when and if entered) on such newly-identified Utility Companies.  The Diocese requests that any order entered with respect to this Motion be binding on all Utility Companies regardless of when any given Utility Company was added to Schedule 1 and that all Utility Companies, including subsequently added Utility Companies, be prohibited from altering, refusing, or discontinuing utility services to the Diocese absent further order of the Court.  Designation of a service provider as a Utility Company on Schedule 1 is not intended, nor shall it be construed, as an admission or concession by the Diocese that such provider is a "utility" within the meaning of Bankruptcy Code section 366, and the Diocese reserves all rights and defenses with respect thereto.

12044334.4

Utility Company within the meaning of section 366 of the Bankruptcy Code, the Utility Company, no later than 20 days following the entry of the interim order with respect to this Motion, must serve upon the Diocese and Diocese's counsel, and file with the Court, a specific request for adequate assurance (each, an "<u>Assurance Request</u>").  An Assurance Request must include: (i) the location and account number(s) for which utility services are provided; (ii) the outstanding balance (if any) on the account and a summary of the Diocese's payment history; (iii) the reasons why a Deposit does not constitute satisfactory adequate assurance of payment; and (iv) a proposal of what would constitute satisfactory adequate assurance of payment. Without further order of the Court, the Diocese may, in its discretion, enter into agreements to provide additional adequate assurance to any Utility Company.  Failure by a Utility Company to timely file and serve an Assurance Request will result in the Utility Company waiving any right to request additional adequate assurance of payment beyond a Deposit and each such Utility Company will be deemed to have received adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code.

(iii)    In the event that a Utility Company timely submits an Assurance Request and the parties cannot promptly resolve such Assurance Request on a consensual basis, the Court shall determine the appropriate amount of adequate assurance and the Diocese will schedule a hearing on shortened notice and serve notice of such hearing on the Utility Company by overnight mail or hand delivery.  Each Utility Company submitting an Assurance Request shall be prohibited from altering, refusing or discontinuing service to the Diocese until, after a hearing on adequate assurance, the Court issues an order authorizing such action.

77.    Here, the Diocese proposes to provide each Utility Company, upon request, a cash Deposit equal to one month average usage over the past year, and adequate funds have been budgeted for payment of all post-petition utility services.  Based upon the foregoing, the Diocese believes that most, if not all, of the Utility Companies have adequate assurance of payment even *without* the Diocese's proposed Deposit.  When the offered Deposit is complemented by the Diocese's ability to pay postpetition invoices through access to cash from continued operations, such assurance of payment significantly alleviates—if not eliminates—any honest concern of nonpayment on the part of the Utility Companies, and is therefore adequate.

78.     Moreover, under the procedure proposed by the Diocese, if a Utility Company disagrees with the Diocese's adequate assurance analysis, the Utility Company may file an Assurance Request and negotiate a resolution thereof with the Diocese or, if necessary, seek Court intervention without jeopardizing the Diocese's continuing operations.  If a Utility Company fails to file an Assurance Request prior to any deadline established by this Court, such Utility Company should be deemed to consent to receipt of a Deposit as adequate assurance of payment.

79.     The Diocese has proposed reasonable procedures that will allow for a Utility Company to submit an Assurance Request and for the scheduling of a hearing thereon.  The Diocese anticipates that in conjunction with the Diocese's proposed Deposits, the Diocese will maintain post-petition liquidity, and therefore, the Utility Companies will not suffer any prejudice. Thus the Utility Motion should be granted.

**VII.    Motion for Interim and Final Orders (A) Authorizing, But Not Directing, the Diocese to (I) Continue Using Existing Bank Accounts, Banking Practices and Business Forms, (II) Maintain Investment Accounts and Practices, and (III) Continue Using Credit Cards, and (B) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) (the "<u>Cash Management Motion</u>")**

80.     By this Motion, the Diocese respectfully requests that the Court enter interim and final orders authorizing the Diocese to continue to use its Cash Management System in the ordinary course of its operations.  Specifically, the Diocese seeks authority to (i) continue to use, in the same manner and with the same account numbers, the Bank Accounts and Investment Accounts (each as defined below), (ii) treat the Bank Accounts as debtor-in-possession accounts; (iii) maintain its prepetition banking and investment practices, including the ability to deposit funds in, and withdraw funds from, the Bank Accounts and Investment Accounts by usual means, including check, wire transfer, automated clearinghouse transfer, draft, electronic fund transfer,

centralized lockbox, or other items presented, issued, or drawn on the Bank Accounts; (iv) continue

to use, in their present form, all correspondence and business forms (including, without limitation,

letterhead, purchase orders and invoices) and other documents relating to its Bank Accounts and

Investment Accounts existing immediately before the Petition Date, without reference to its status

as a debtor-in-possession; and (v) continue use of credit cards.

81.    To maintain the efficient operation of the Cash Management System during this

Chapter 11 Case, the Diocese further requests that the Court authorize all banks and institutions at

which any of the Bank Accounts are maintained (collectively, the "Banks") to continue to

maintain, service and administer the Bank Accounts, including charging any undisputed,

outstanding service charges owed to the Banks on the Petition Date, and that each of the Banks be

authorized and directed to receive, process, honor, and pay (i) all post-petition checks, drafts, wire

transfers and other electronic payment requests (to the extent of funds on deposit) together with

(ii) any prepetition checks or payment requests, but solely to the extent they relate to payments or

obligations approved by separate order of this Court.

**Bank Accounts**

82.    The Diocese's primary banking relationship is with NBT Bank, N.A. ("NBT

Bank").  In addition to NBT Bank, the Diocese also utilizes the services of certain other banks, set

forth herein.  Specifically, the Diocese utilizes the following accounts to receive, hold and

distribute funds (collectively, the "Bank Accounts"), each of which are described in more detail

below:

| Account Name | Depositary Institution | Last four digits of account number |
|---|---|---|
| Operating Account | NBT Bank | 3544 |
| Trust Sweep Repurchase Account | NBT Bank | 2669 |
| PSIP Checking Account | Citibank | 9828 |

| Disability Checking Account | NBT Bank | 3714 |
| Bishop's Individual Assistance Account | Community Bank | 1739 |
| Worker's Compensation Account | Citibank | 2209 |
| Deposit and Loan Fund Checking Account | NBT Bank | 8036 |
| Diocesan Trust Fund Checking Account | NBT Bank | 8044 |
| Restructuring Expense Account | NBT Bank | 1587 |

83.    *Operating Account (xx3544)*.  The Operating Account is the Diocese's primary bank account and is used to collect the Diocese's general revenues and donations, to pay operating expenses, to transfer funds to the Diocese's other specialized accounts, and to fund payments to a third-party payroll service to cover payroll and related costs.  The Operating Account is the only Bank Account (other than the newly-established Restructuring Expense Account discussed below) where the Diocese regularly maintains a significant balance.  As of the Petition Date, the Diocese estimates that it has approximately $749,000 in its Operating Account.

84.    *Trust Sweep Repurchase Account (xx2669)*.  The Trust Sweep Repurchase Account is used in conjunction with the Operating Account.  In the evening, on a daily basis, the closing balance from the Operating Account is automatically transferred to the Trust Sweep Repurchase Account so that interest can be earned, overnight, on those funds.  The next morning, those funds are transferred back to the Operating Account to be utilized in the ordinary course of operations.  The Diocese does not make any deposits directly into, or withdraw any amounts directly from, the Trust Sweep Repurchase Account.

85.    *PSIP Checking Account (xx9828)*.  The PSIP Checking Account is the primary account used to pay loss claims related to the Diocese's Insurance Program, excluding workers' compensation and disability claims.  When notified by the Diocese's third-party insurance administrators that a claim is payable, the Diocese transfers funds into the PSIP Checking Account from the Operating Account to cover the payment of such claims.

- 35 -

86.     *Disability Checking Account (xx3714).*  The Disability Checking Account is used to pay self-insured employee disability claims.  Funds are transferred into the Disability Checking Account from the Operating Account on an as-needed basis to cover payment of such claims.

87.     *Bishop's Individual Assistance Account (xx1739).*   The Bishop's Individual Assistance Account is funded by donors.  It is used by Bishop LaValley, in his discretion, to provide assistance to individuals in need.

88.     *Workers' Compensation Account (xx2209).*  The Workers' Compensation Account is used to pay self-insured workers' compensation claims.  Funds are transferred into the Workers' Compensation Account from the Operating Account to cover payment of such claims.

89.     *Deposit and Loan Fund Checking Account (xx8036).*  The Deposit and Loan Fund Checking Account is used to collect funds from parishes, schools, and other Catholic entities who are eligible to participate in the Deposit and Loan Fund for deposit into their respective accounts in the Deposit and Loan Fund.  This account is also used to collect individual donations for the annual Bishop's Fund Appeal.

90.     *Diocesan Trust Fund Checking Account (xx8044).*  The Diocesan Trust Fund Checking Account is used to collect funds from parishes, schools, and other Catholic entities who are eligible to participate in the Diocesan Trust Fund to be invested in their respective accounts in the Diocesan Trust Fund.

91.     *Restructuring Expense Account (TBD).*  The Restructuring Expense Account was recently established by the Diocese to provide a segregated fund to cover costs of administration of this Chapter 11 Case.  As of the Petition Date, there is $3,000,000.00 on deposit in the Restructuring Expense Account.

**Investment Accounts**

92.     In addition to its Bank Accounts, the Diocese maintains the following investment

accounts in the ordinary course of its business (collectively, the "Investment Accounts" and

together with the Bank Accounts, the "Accounts"), each of which is described in more detail

below:

| Account name | Depositary Institution | Last four digits of account number |
|---|---|---|
| Diocesan Trust Fund | NBT Bank | xx60 |
| Diocesan Trust Fund | CBIS | 3777 |
| Diocesan Trust Fund | Dimensional Fund Advisors | N/A |
| Diocesan Trust Fund | TIFF Realty Opportunity Fund, LLC | N/A |
| Retirement Plan for Priests | NBT Bank | xx73 |
| Retirement Plan for Priests | CBIS | 4609 |
| Retirement Plan for Priests | Dimensional Fund Advisors | N/A |
| Retirement Plan for Priests | TIFF Realty Opportunity Fund, LLC | N/A |
| Charitable Gift Annuity | NBT Bank | xx63 |
| Collateral Account | NBT Bank | xx50 |
| Deposit and Loan Fund | NBT Bank | xx61 |
| Deposit and Loan Fund - MY | NBT Bank | xx82 |
| Endowment Fund | NBT Bank | xx51 |
| Chancery Certificate of Deposit | NBT Bank | 3991 |

93.     *Diocesan Trust Fund.*  The Diocesan Trust Fund is an investment vehicle, similar

in many ways to a mutual fund, operated by the Diocese in order to maintain endowment funds

and other long-term investments of parishes and related Catholic entities.  Although the Diocesan

Trust Fund accounts are held in the Diocese's name, all investments in the Diocesan Trust Fund

are held in trust for the benefit of parishes and other entities.  The Diocesan Trust Fund is designed

to pay quarterly dividends and to provide long term capital appreciation.  As of the Petition Date,

the Diocese estimates that the Diocesan Trust Fund has approximately $25 million in total assets

under management.  The majority of Diocesan Trust Fund investments are held in a custodial

account at NBT Bank and professionally managed by Manning and Napier Advisors.  Additional

investments are held and managed by Christian Brothers Investment Services, Dimensional Fund

Advisors and TIFF Realty Opportunity Fund.  The Diocesan Fiscal Office calculates dividends,

monitors investment performance, and provides bookkeeping and accounting services for the

Diocesan Trust Fund.

94.     *Retirement Plan for Priests.*  The Diocese maintains a non-qualified retirement plan

which covers all eligible Diocesan priests.  Plan payments include retirement benefits and health

insurance premiums.  Like the Diocesan Trust Fund, investments in the Diocese's Retirement Plan

for Priests are held and managed by a variety of professional investment managers, including

Manning and Napier advisors, Christian Brothers Investment Services, Dimensional Fund

Advisors and TIFF.  As of the Petition Date the Diocese estimates that the plan's assets have a

market value of approximately $8.7 million.

95.     *Charitable Gift Annuity.*   The Diocese maintains a charitable gift annuity program

pursuant to N.Y. Insurance Law § 1110, which allows the Diocese to enter into agreements with

donors under which the Diocese receives gifts for the benefit of itself and other Catholic entities

in exchange for its agreement to make annuity payments calculated based upon the actuarial

projected lifespan of the annuitant.  Gifts received through this program are invested in an account

maintained by the Diocese at NBT Bank and are used to fund payments to the annuitants during

their lifetimes.  Upon the death of an annuitant, the remaining corpus of the gift becomes the

property of the beneficiary named in the annuity agreement, which can be the Diocese or a parish,

school, religious order, or other Catholic entity separate from the Diocese.   The Diocese holds a

permit, issued by the New York State Department of Financial Services ("<u>DFS</u>"), to run its charitable gift annuity program, and it submits annual reports and undergoes periodic audits by DFS with respect to the program. Investments in this account are made in accordance with the statutory requirements set forth in the N.Y. Insurance Law. As of the Petition Date, the Diocese estimates that the Charitable Gift Annuity program has approximately $1.6 million in assets.

96.    *Collateral Investment Account.*    This account is required by NBT Bank for the purpose of providing collateral for a letter of credit issued by NBT Bank to the New York State Workers' Compensation Board with respect to the Diocese's self-insured workers' compensation obligations. As of the Petition Date, the Diocese estimates that this account holds securities with a market value of approximately $2.3 million.

97.    *Deposit and Loan Fund.*    The Diocese operates a Deposit and Loan Fund through which the Diocese, parishes, and other related Catholic entities pool their resources for purposes of investment and to make loans to organizations within the diocesan family to assist with liquidity for repairs, capital projects, working capital, and other needs. Depositors enter into an agreement with the Diocese which provides that deposits remain the property of the depositor and are guaranteed as to principal and interest by the Diocese. The Diocese maintains separate sub-fund accounts of the balances for each participant in the Deposit and Loan Fund. As of the Petition Date, the Diocese estimates that the Deposit and Loan Fund holds approximately $11.2 million in liquid assets. The liquid assets of the Deposit and Loan Fund are derived, in part, from $10.2 million tendered by parishes and other Catholic entities. Loans from the Deposit and Loan Fund are memorialized in an agreement detailing, among other things, the principal amount loaned, the interest rate, the date of the loan, and the name of the borrower, and typically have a repayment

term of ten years (five years for automotive purchases) and accrue interest at 4%. Deposits in excess of outstanding loans are invested through a custodial account at NBT Bank. Income from investment activity and loan payments is used to pay interest on monies deposited in the program.

98.    *Endowment Fund.*    The Endowment Fund holds various donor–restricted endowments of the Diocese. These endowments are permanently restricted in nature and earnings from investments are distributed based upon donor instructions. Investments in the Endowment Fund are held in a custodial account at NBT Bank and managed by Manning and Napier Advisors. As of the Petition Date, the Diocese estimates that the market value of the Endowment Fund is approximately $4.3 million.

99.    *Certificate of Deposit (3991).*    The Diocese owns one certificate of deposit purchased from NBT Bank in 2015, at a purchase price $13,900, which renews every three (3) years. The balance at the time of the latest renewal was $14,978.34.

**Credit Cards**

100.    The Diocese utilizes 25 credit cards (the "Credit Cards") issued by NBT Bank to manage business expenses for the Diocese and its employees. The aggregate credit limit for the Diocese's Credit Card program is $100,000, however each card issued to Diocesan personnel has a lower individual limit, with most cards limited to $5,000 or less. On average, the Diocese incurs approximately $12,000 per month in charges on the Credit Cards, and the balances on the Credit Cards have traditionally been paid in full at the end of each billing cycle in the ordinary course of business. As of the Petition Date the Diocese anticipates that the balance on the Credit Cards will be approximately $33,000.

12044334.4

101.     The Diocese is seeking NBT Bank's consent to maintain the Credit Card program in place.  To the extent NBT Bank agrees to maintain the Credit Card program, the Diocese seeks authority to continue to use and pay the Credit Cards in the ordinary course of business, including any prepetition amounts that may be owed with respect to such Credit Cards.

**Business Forms**

102.     In the ordinary course of business, the Diocese uses checks associated with the Bank Accounts as a method of paying many of its accounts payable.  Additionally, the Diocese uses a variety of correspondence and business forms including, but not limited to, letterhead, purchase orders and invoices.

103.     To minimize the expense and disruption to the Diocese's estate associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion of employees, vendors and suppliers, the Diocese seeks authority to continue to use all correspondence and business forms as they existed immediately prior to the Petition Date, without reference to the Diocese's status as debtor-in-possession.  The Diocese will use reasonable efforts to mark "debtor-in-possession" on newly issued payment checks as soon as practicable following the Petition Date.

### *The Diocese's Banking Practices and Accounts are Essential to the Diocese's Ongoing Operations and Restructuring Efforts.*

104.     The Diocese has a long-standing relationship with each of the financial institutions where it maintains Bank Accounts and a long-established practice with respect to its use of its Bank Accounts.  The Diocese respectfully requests that the Court authorize it to continue using its prepetition Bank Accounts rather than closing them and opening new post-petition accounts.

105.    Closing the Bank Accounts would cause substantial disruption to the Diocese's operations and fulfillment of its mission.  If the Diocese were required to open new accounts as of the Petition Date, it would unnecessarily distract the Diocese's key business office personnel in an office that is already operating at maximum capacity.  In addition, changing accounts would also cause disruptions in essential deposit and automated debit activity, potentially leading to loss of revenue, missed payments or overdraws and therefore causing harm to the Diocese's operations.  Specifically, key operating expenses such as payroll and associated payroll taxes, and workers compensation payments are all automatically withdrawn from the Diocese's Bank Accounts.  As a result, the Diocese respectfully submits it is appropriate to maintain its prepetition Bank Accounts and practices.

106.    The continued use of the existing Bank Accounts will facilitate the Diocese's transition into this Chapter 11 Case by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of post-petition debts.  The Diocese respectfully submits that parties in interest will not be harmed by the continued maintenance of its Bank Accounts because, with the assistance of professionals, the Diocese has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

**Strict Adherence to the U.S. Trustee's Guidelines Would Cause Substantial Disruption to Diocese's Operations.**

107.    The U.S. Trustee has promulgated Operating Guidelines and Financial Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines")[6] which

---

[6]  *See* https://www.justice.gov/ust-regions-r02/file/region_2_operating_guidelines.pdf/download.

12044334.4

purport to require debtors in bankruptcy to: (a) close all existing bank accounts and open new debtor-in-possession accounts; (b) maintain a separate debtor-in-possession account for cash collateral; and (c) obtain checks that bear the designation "debtor in possession," unless the bankruptcy court orders otherwise.

108.    One of the purposes of the U.S. Trustee Guidelines is to provide a clear line of demarcation between prepetition and post-petition claims and payments to help prevent inadvertent payment of prepetition claims, by voiding checks drawn before the Petition Date.  As discussed below, the Diocese will ensure a separation between pre-petition and post-petition financial activity through clear record keeping.

109.    Maintaining the existing Bank Accounts will facilitate the Diocese's ability to collect, deposit and account for receipts and pay post-petition bills.  Closing the Bank Accounts would require the Diocese to open new accounts and arrange alternative procedures for electronic and manual transfers to and from the Bank Accounts.  The result would be a disruption of processing payments, and similarly would disrupt wire transfers, payroll obligations, and post-petition obligations to vendors and other creditors.

110.    The Diocese also seeks authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts.  The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts.  In accordance with existing practices, the Diocese will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of this case and will ensure that its records properly distinguish between pre-petition and post-petition transactions and report accordingly to the U.S. Trustee.

- 43 -

111.    Maintenance of the Bank Accounts will avoid delays in payments to administrative creditors, ensure a smooth transition into chapter 11, and facilitate the Diocese's efforts to complete this Chapter 11 Case expeditiously and successfully.  Thus, the Diocese respectfully requests that its existing Bank Accounts be deemed debtor-in-possession accounts and that the maintenance and continued use of those accounts (in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period) be authorized, subject only to a prohibition against honoring prepetition checks without specific authorization from this Court.

112.    Strict adherence to the U.S. Trustee Guidelines in this Chapter 11 Case would significantly disrupt the ordinary financial operations of the Diocese, reducing efficiencies and causing unnecessary expense, while providing little benefit to creditors.  The Diocese respectfully requests that the Court waive the requirements of the U.S. Trustee Guidelines in this Chapter 11 Case as requested herein.

### The Diocese Should be Granted Authority to Use Existing Business Forms and Checks.

113.    To minimize expenses and disruption to the Diocese's chapter 11 estate, the Diocese respectfully requests authority to continue to use all correspondence and business forms (including letterhead, purchase orders, envelopes, charitable solicitation material, invoices and the like) as such forms were in existence immediately before the Petition Date, without reference to the Diocese's status as debtor-in-possession.  The Diocese also requests authorization to use the existing check stock without the "debtor-in-possession" label for checks that it manually writes.  As soon as practicable after the Petition Date, the Diocese will include "debtor-in-possession" or "DIP" on checks it prints electronically.

114.    By virtue of the nature and scope of the Diocese's operations and the number of suppliers of goods and services with whom the Diocese transacts on a regular basis, it is important that the Diocese be permitted to continue to use its existing checks and other business forms without alteration or change, except as requested herein.  Indeed, changing business forms is unnecessary and unduly burdensome, as it would appear that the parties doing business with the Diocese will be aware of the Diocese's status as debtor-in-possession as a result of the anticipated media coverage of this Chapter 11 Case and because the Diocese intends to distribute communications and notices of commencement of this Chapter 11 Case to such parties.  Moreover, if the Diocese is required to change its current business forms, the new forms may cause confusion to Diocesan employees, vendors and donors.  It would be costly and disruptive to cease using all existing forms and to purchase new stationery and business forms.  Accordingly, the Diocese seeks a waiver of the U.S. Trustee Guidelines with respect to the continued use of its business forms and checks.

### *The Diocese Should Be Authorized to Continue Using Debit, Wire and ACH Payments.*

115.    The Diocese requests further relief from adherence to the U.S. Trustee Guidelines to the extent doing so would require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement.  Considering the nature of the Diocese's operations, in certain instances, it may be necessary for the Diocese to conduct transactions by debit, wire or ACH Payments and other similar methods, as discussed above.  The Diocese maintains accurate records and will be able to properly account for any such transactions. The Diocese, therefore, requests that its banks and other financial institutions be authorized to

continue to pay, honor and execute any and all debit instructions, wires and ACH Payments issued and drawn on the Bank Accounts after the Petition Date.

### The Diocese Should Be Authorized to Honor Certain Prepetition Obligations Related to its Accounts.

116.    In accordance with its contractual arrangements with the various financial institutions where it maintains its Accounts, the Diocese incurs periodic service charges, management or administrative charges, and other fees, costs, charges and expenses in connection with the maintenance of the Accounts (collectively, the "Service Charges").  Payment of the prepetition Service Charges is in the best interests of the Diocese and all parties in interest in this Chapter 11 Case, as it will prevent any disruption to the Accounts.  Further, in many instances, the financial institutions have setoff rights for the Service Charges and therefore payment of prepetition Service Charges should not alter the rights of unsecured creditors in this Chapter 11 Case.  Accordingly, by this Motion, the Diocese also seeks authority to pay, at the Diocese's sole discretion, prepetition Service Charges, if any.

### The Court Should Authorize the Diocese to Continue to Maintain and Utilize the Investment Accounts, and Cause Exists for Waiving the Investment and Deposit Guidelines of Section 345 of the Bankruptcy Code with Respect to the Investment Accounts.

117.    The Diocese respectfully requests authority to continue its prepetition investment practices and to maintain each of the Investment Accounts in the ordinary course of business.

118.    By retaining its prepetition investment practices and Investment Accounts, the Diocese will be able to earn reasonable returns on its investments, as contemplated by section 345(a) of the Bankruptcy Code, without incurring the administrative costs and compliance risk associated with converting its holdings to cash or U.S. Government Securities.

12044334.4

119.    The Diocese's investment practices are overseen by independent professional outside financial advisors who ensure that a diversified mix of investments is maintained to achieve moderate targeted growth with minimal exposure to down-side risk in any particular investment.  Moreover, the Diocese is itself a large, financially sophisticated organization that employs a professional accounting staff devoted to proper oversight and management of the Diocese's finances.  Accordingly, the Diocese is not seeking to make unnecessarily risky or speculative investments, but merely to deploy its resources consistent with the recommendations of its professional advisors in an organized and diversified manner as most institutions of similar size do in the ordinary course.

120.    As of the Petition Date, the Investment Accounts have an aggregate value of nearly $53 million, approximately $16.1 million of which are Diocesan assets, with the balance being funds that parishes and other Catholic entities have entrusted to the Diocese to manage. Accordingly, the Diocese is not the unsophisticated debtor with minimal assets Congress sought to protect when it enacted the requirements of section 345(b) of the Bankruptcy Code.  Rather, the Diocese is precisely the type of debtor that the 1994 amendment allowing a waiver of those requirements "for cause" was meant to address.  The Diocese has a long track record of responsibly investing these funds (both restricted and unrestricted) to achieve reasonable growth with limited risk.  If the Diocese were forced to liquidate the current holdings of the Investment Accounts and instead invest in treasury securities or to maintain a collateralized deposit account in strict compliance with section 345(b) of the Bankruptcy Code, it would not be able to obtain a comparable rate of interest or growth, and the reduced income available could force the Diocese to curtail portions of its mission.

121.    In addition, the Diocese respectfully submits that the sheer size of the investments will make it difficult and unnecessarily expensive, if not outright impossible, to obtain a bond or collateral securities to cover the full amount invested in the Investment Accounts and/or to find an authorized depository willing to take on such a deposit.

### *The Court Should Approve the Diocese's Continued Use of the Credit Cards in the Ordinary Course of Business*

122.    Use of credit cards and similar payment methods is a widespread means of facilitating day-to-day business transactions.  As a result, the Diocese believes that it does not require the Court's approval to continue using the Credit Cards on a postpetition basis.  Further, although the Diocese owes approximately $33,000 with respect to prepetition amounts charged on its Credit Cards, pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code, the Diocese requests authority to pay any such prepetition obligations related to the Credit Cards.

123.    Absent an order clearly authorizing the Diocese to continue to use and pay the Credit Cards, NBT Bank, may cancel or restrict the use of the Credit Cards or the extension of further trade credit.  Moreover, NBT Bank may seek to set-off any amounts owing against cash in the Diocese's Bank Accounts held at NBT Bank.  If that were to occur, it would be costly, disruptive to the Diocese's operations, burdensome to it's the Diocese's estate, and time-consuming for the Diocese to establish new payment card and/or trade credit programs with alternate providers.  To avoid any disruption in its operations, the Diocese could be forced to ask employees to front the cost of purchases and expenses on their own (and seek reimbursement later), which could be a personal hardship and would more than likely damage the Diocese's relationships with such employees.  Furthermore, it would be burdensome for the Diocese to seek to establish new credit programs.  Accordingly, the Diocese seeks authorization for the continued use of its

12044334.4

Credit Cards and authorization to pay any outstanding amounts owing with respect to such Credit Cards.

**VIII.    Motion for Interim and Final Orders Authorizing, but not Directing, the Diocese to Continue to Administer the Deposit and Loan Fund and Diocesan Trust Fund in the Ordinary Course of Business and Consistent with Past Practices (the "Related Party Liquidity Motion")**

124.    By this Motion, the Diocese respectfully requests that the Court enter interim and final orders authorizing, but not directing, the Diocese to continue to (a) accept deposits, honor withdrawals, originate loans, and otherwise administer the Deposit and Loan Fund (the "Fund"), and (b) administer the Diocesan Trust Fund (the "DTF"), in each case in the ordinary course of business and consistent with prepetition procedures and practices, and subject to the Budget as set forth herein.  Specifically, the Diocese seeks authority to accept deposits into the Fund and permit withdrawals by the Depositors (as defined herein) to continue to make and service loans from the Fund, and to continue to make disbursements from endowed funds in the DTF in accordance with all applicable endowment restrictions.

**The Fund**

125.    The depositors in the Fund are the Diocese and non-debtor entities consisting of parishes and other Catholic institutions and entities that operate within the territory of the Diocese (collectively, the "Depositors", and each a "Depositor") that are qualified as federally tax-exempt entities pursuant to section 501(c)(3) of the Internal Revenue Code of 1986 (the "Tax Code"), who have invested significant funds into the Fund in an effort to maximize their return on such investments through the cumulative financial strength and investment strategy of the Fund.  Any inability for the Depositors to access their funds maintained in the Fund may cause significant financial hardship to those Depositors because they would lose the ability to access their

investments, which are primarily utilized by any such Depositor in the operation of its business.
Moreover, because of the hierarchical structure of the Catholic Church, the Diocese relies upon
the continued operation of the Depositors for its own revenue and to carry out its mission,
accordingly, any restriction on the availability of monies held in the Fund will also have negative
repercussions for the Diocese.

126.    Accordingly, the Diocese believes that continuing to operate the Fund in the
ordinary course of business and consistent with its prepetition practices is in the best interest of
the estate and will avoid the unnecessary and complex burden that would be imposed on the
Diocese if it were forced to cease to operate the Fund and, thus, have to transfer the Depositors'
assets maintained in the Fund to other investment vehicles.

127.    The Fund was created to operate exclusively for the benefit of the Depositors.  The
Fund is overseen by an advisory committee consisting of the Moderator of the Curia (Father Kevin
O'Brien), the Chancellor (Deacon James Crowley), and the Diocesan Fiscal Officer (Mark
Mashaw) (the "Fund Committee").  The Fund Committee is responsible for the general oversight
of the Fund, including: (a) review of quarterly financial statements; (b) review of loan applications
and recommendation to the Diocese for approval/denial of loan requests; (c) recommendation to
the Diocese for changes in the interest rate paid to Depositors and the interest rate charged to
borrowers; (d) recommendations for amendments to the Deposit & Loan Fund Agreement; and
(e) other duties as assigned by the Diocesan Bishop.

128.    Investments in the Fund are managed by Manning & Napier Advisors, Inc.  There
are two portfolios, one used to attain a target asset allocation of 30% equities, 70% fixed income,
with authority to invest 20% equities and 80% fixed income, and one to invest 100% in equities.

The investments are managed within the guidelines established in the Diocese's investment policy. By investing in the Fund, Depositors have agreed that monies in the Fund will only be used in accordance with the specific purposes set forth in the Fund, which includes cash flow needs for operations, site/building repair or renovation, capital purchases and capital improvements. No part of the net earnings of the Fund are payable to or for the benefit of any private individual. The Fund does not conduct activities not permitted to be conducted by any organization which is tax exempt or by an organization to which donations are deductible from taxable income to the extent allowed by the Tax Code.

**The Fund's Assets**

129.     Deposits into the Fund are the assets of the respective Depositors, and only entities listed in the Official Catholic Directory (the "Kenedy Directory") for the Diocese may invest in the Fund. Current practice directs parishes and schools associated with the Diocese to invest their surplus monies in excess of what is needed for operating purposes, into the Fund. Depositors in the Fund earn an interest rate of .5% on deposits. All interest payments are issued quarterly and are either paid or reinvested on or before the 20th day of the month subsequent to the end of the quarter.

130.     The Fund may receive and accept funds from any corporations, associations or entities affiliated with the Diocese, approved by the Bishop and associated with the Diocese in the Kenedy Directory in accordance with and pursuant to provisions of the Fund. Monies received and accepted by the Fund are held by the Diocese for investment for the benefit of the Depositors. Deposits to the Fund are guaranteed as to both principal and interest by the Diocese. At the time a new account in the Fund is established, a Deposit Account Agreement is executed by the Diocese

and the Depositor.  Subsequent deposits or requests for withdrawals from an account are made by the Depositor, in writing, using a form approved by the Diocese.  The Diocese is the residual beneficiary of the Fund, meaning that any net assets of the Fund in excess of accounts held by other Depositors, are the property of the Diocese.

**Use of the Fund's Assets**

131.    Monies received from the Depositors are held and invested by the Diocese for the benefit of the Depositors.  Monies are invested under the guidelines of the Diocese's investment policy.  The Diocese's investment advisory committee oversees all investment portfolios on behalf of the Diocese, including the Fund, to ensure compliance with established Diocesan policy.

132.    At the discretion of the Diocese, monies held in the Fund may be loaned to Depositors (a "Fund Borrower").  All such loans to Fund Borrowers are memorialized in an agreement detailing, among other things, the principal amount loaned, the interest rate, the date of the loan, and the name of the borrower (the "Lending Agreement").

133.    A Depositor in the Fund may request a loan to assist it in meeting cash flow needs for operations, site/building repair or renovation, capital purchases or capital improvements.  A loan request must be made in writing using the loan application authorized by the Diocese.  Upon approval of the loan by the Diocese, monies are made available to the Fund Borrower upon execution of a Lending Agreement.

134.    Unless otherwise provided in a Lending Agreement, the Fund Borrower makes quarterly principal and interest payments to the Fund no later than January 31, April 30, July 31 and October 31 of the calendar year (the "Quarterly Payments").  Loans are typically repayable over 10 years (5 years for motor vehicle loans) and bear interest at 4%, although the terms of each

loan are subject to change at the discretion of the Diocese.  Advance repayment of loan principal

may be made at the option of the Fund Borrower or at the direction of the Diocese pursuant to the

terms of the applicable Lending Agreement.  Should a Fund Borrower default on a loan, the Diocese

is obligated to restore all principal and accrued interest to the Fund.  To protect its interests, the Diocese

may use some or all of the Fund's net assets to establish a reserve for defaulted loans.

135.    Monies may be transferred into or out of the Fund by check or electronically, at the

direction of the Depositor.

**The DTF**

136.    Beginning in or around December 1976, the Diocese established the DTF for

religious and charitable purposes, pursuant to which the Diocese, as Trustee, received, and

thereafter has continued to receive, funds (the "Trust Funds") that are restricted in use and

perpetual or permanent in nature from the settlors of the DTF (each a "Beneficiary," and

collectively the "Beneficiaries"), all of which are parishes and other Catholic institutions within

the Diocese, pursuant to custody agreements.  In accordance with the terms of the trust agreement

for the DTF (the "Trust Agreement"), the Diocese holds, manages, invests, and disposes of the

Trust Funds for the benefit of the Beneficiaries.

137.    The benefits of the DTF include the pooling of funds for investment purposes,

making a greater diversification of investments available than would be available in smaller

accounts, achieving economies of scale by spreading management fees and other costs that might

be burdensome to the investment of smaller amounts, the reduction of bookkeeping and

administrative burdens for the Beneficiaries, and the establishment of consistency in investment

oversight and management over time and throughout changes within the Beneficiaries.

12044334.4

138.    The DTF is an investment vehicle, similar in many ways to a mutual fund, operated by the Diocese to maintain endowment funds and other long-term investments of the Beneficiaries. Although the DTF accounts are held in the Diocese's name, all investments are held in trust for the benefit of the Beneficiaries. The DTF is designed to pay quarterly dividends and to provide long term capital appreciation. As of the Petition Date, the DTF has approximately $25 million in total assets under management.

139.    The majority of DTF investments are held in a custodial account at NBT Bank and professionally managed by Manning and Napier Advisors. Additional investments are held and managed by Christian Brothers Investment Services, Dimensional Fund Advisors and TIFF Realty Opportunity Fund. The Diocesan Fiscal Office calculates dividends, monitors investment performance, and provides bookkeeping and accounting services for the DTF.

140.    The funds held in the DTF are restricted for endowment and perpetual use and, in the event that a Beneficiary desires a distribution from the DTF, it must submit to the Diocese a request in writing and in a form acceptable to the Diocese (a "Distribution Request"). A Distribution Request must demonstrate that the funds to be distributed will be used in a manner consistent with applicable restrictions.

141.    The Depositors' monies in the Fund are not the Diocese's property. Depositors have a clear equitable interest in their respective balances in the Fund and preventing the non-debtor Depositors from obtaining access to their investments in the Fund, either through withdrawal and/or loan requests, to be utilized by such Depositor for an authorized purpose under the Fund, may cause substantial financial hardship to the Depositors and operational difficulties for the Diocese.

- 54 -

12044334.4

142.     Similarly, although the DTF accounts are held in the Diocese's name, all investments in the DTF are restricted and held in trust for the benefit of the Beneficiaries and are not property of the Diocese.  The Diocese merely performs investment and bookkeeping services in connection with its administration of the DTF.

143.     The Diocese is not seeking unfettered authority to withdraw and loan all or substantially all of the monies held in the Fund, or to distribute all or substantially all of the monies held in the DTF.  The Diocese does, however, seek authorization to operate the Fund and administer the DTF in accordance with its prepetition business practices.

144.     Accordingly, based on projected budget needs, it is anticipated that between the Petition Date and the end of the current fiscal year on June 30, 2024, Depositors will seek to withdraw no more than $1,500,000 from the Fund, and Fund Borrowers will seek no more than $750,000 in new loans (the "Fund Budget").  Moreover, based on projected budget needs and scheduled disbursements in accordance with endowment restrictions, it is anticipated that, between the Petition Date and June 30, 2024, principal distributions from the DTF will not exceed $400,000 and the DTF will return approximately $875,000 in investment gains to Beneficiaries in the form of dividends, consistent with prior custom and practice (the "DTF Budget", and together with the Fund Budget, the "Budgets").

145.     The Diocese seeks authority at this time to honor withdrawals and make loans from the Fund, and to make disbursements from the DTF, only to the extent set forth in the Budgets.  The Diocese will not exceed the amounts set forth in the Budgets without first obtaining either (i) consent of any official committee (once appointed in this Chapter 11 Case) representing the interests of abuse claimants or (ii) further order of this Court.  Furthermore, the Diocese does not

anticipate any need to make loans from the Fund or distributions from the DTF prior to the entry

of a final order on this Motion, and, subject to the entry of a subsequent interim or final order, is

only seeking interim authority to honor a maximum of $150,000 in withdrawals from the Fund

between the Petition Date and August 15, 2023.

146.    Therefore, in light of the foregoing, the Diocese should be authorized to continue

to operate the Fund and administer the DTF consistent with its prepetition and ordinary course of

business practices.

147.    To the extent administration of the Fund and the DTF, including, without limitation,

implementing investment decisions for the Fund and the DTF and approving new loans to Fund

Borrowers, is inconsistent with the requirements of section 345 of the Bankruptcy Code, the

Diocese respectfully submits that cause exists to waive such requirements.

148.    By retaining its prepetition investment practices with respect to the Fund and the

DTF, the Diocese will be able to ensure reasonable returns on the investments held in the Fund

and DTF, as contemplated by section 345(a) of the Bankruptcy Code, without incurring the

administrative costs and compliance risk associated with converting its holdings to cash or U.S.

Government Securities.  Moreover, continuing ordinary course prepetition practices with respect

to the Fund and the DTF is critical to supporting the ongoing operations of parishes and other

related Catholic entities upon whom the Diocese relies for its own revenue and for support in

carrying out the mission of the Catholic Church.  Accordingly, there is ample cause to waive the

section 345(b) investment requirements to the extent they may apply to the operation and

administration of the Fund and DTF.

**IX.    Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Maintenance of the Diocese's Insurance Program; and (II) Authorizing Payment of Obligations in Respect Thereof (the "<u>Insurance Motion</u>")**

149.    By this Motion, the Diocese requests that the Court enter interim and final orders allowing the Diocese to continue to maintain and operate the Insurance Program in the ordinary course of business, consistent with its past practices.  The Diocese also seeks entry of an order authorizing, but not directing, the Diocese in its discretion, to pay any prepetition or postpetition claims, premiums, defense costs, obligations and administrative costs related to the Insurance Program, and authorizing banks to honor checks and other withdrawals, whether for pre- or post-petition periods, for amounts representing payments or reimbursement of claims payable under the Insurance Program.

150.    To the extent coverage may be available under the Diocese's insurance policies for lawsuits or other claims asserting liability against Insurance Program Participants arising from or related to alleged sexual abuse, whether such claims are made pursuant to the New York Child Victims Act, New York Adult Survivors Act, or otherwise, the Diocese is not seeking authority to make indemnity payments at this time. The Diocese proposes to address all abuse-related claims, as well as any indemnity coverage which may be available to satisfy them, in connection with its plan of reorganization.  The Diocese does intend, however, to continue to pay any necessary costs of defense, up to the amount of any applicable deductible or self-insured retention ("<u>SIR</u>"), consistent with its past practices under the Insurance Program.

151.    An order granting the relief requested herein is necessary to minimize unnecessary disruption to the Diocese and other Insurance Program Participants and to continue the insurance

- 57 -

coverage funded with their premium payments.  The Diocese is not requesting the assumption or rejection of any executory contracts in connection with this Motion.

### *The Insurance Program*

152.   The Diocese has historically ensured that the Diocese and other participating Catholic entities within the territory of the Diocese have adequate insurance protection at a reasonable price by spreading risk among a large number of participants and leveraging their collective buying power to secure coverage at favorable rates.[7]

153.   The Insurance Department of the Diocese coordinates and administers an insurance program providing coverage and risk management services for the Diocese and each of the Insurance Program Participants.  The Insurance Program currently provides coverage for property, equipment, boiler and machinery, general liability, auto liability, directors and officers, workers compensation, and sexual misconduct, among others.

154.   The Diocese's third-party insurance brokers Arthur J. Gallagher and Co., and Gallagher Basset Services, Inc., assist the Diocese in purchasing appropriate primary and excess coverage and to administer various risk management programs.   The Diocese also utilizes third party claims administrators to oversee the administration and payment of workers' compensation claims in compliance with New York law.

155.   The Diocese funds the Insurance Program primarily by billing each Insurance Program Participant a ratable portion of the projected overall cost of administering the program and paying claims, using allocation methodologies which consider numerous different ratable

---

[7] A list of the current Insurance Program Participants is attached to the Insurance Motion as ***Exhibit C***.

12044334.4

exposure bases.  The Diocese strives to achieve a consistent and fair allocation of premium costs among the Insurance Program Participants.  For fiscal year 2023-2024, the Diocese has budgeted approximately $2.45 million in premium revenue related to providing the Insurance Program.  This premium revenue is used to pay administrative costs of the program, to pay claims for losses (including any defense costs) that are within the applicable policies' deductible or SIR, and to pay premiums to carriers for commercial primary and excess coverage.

156.    Under the Insurance Program, the Diocese is responsible for paying all claims for losses by any Insurance Program Participant, including any SIR or deductible amount, up to the point coverage becomes available from a traditional commercial insurance carrier.

157.    The Diocese typically renews its insurance policies on an annual basis, effective July 1, in connection with the start of its fiscal year.  Aggregate premiums for the 2023/2024 renewal in the amount of approximately $1,520,000 were paid prior to the Petition Date.

158.    A summary of the coverages provided through the Insurance Program for the fiscal year beginning July 1, 2023, and any applicable limits or self-insured retention ("SIR"), is set forth in the below table:[8]

| Coverage 2023-2024 | Self-Insured Retention | Maximum Coverage |
|---|---|---|
| All Risk, Property, Equipment, and Auto Physical Damage | $250,000 | $100,000,000 |
| Boiler and Machinery | $2,500 | $50,000,000 |
| General Liability, Auto Liability, Directors and Officers Liability | $250,000 | $9,750,000 |
| Workers Compensation | $200,000 | Statutory |
| Sexual Misconduct | $250,000 | $2,750,000 |
| Cyber Liability | $5,000 | $1,000,000 |
| Crime | $75,000 | $1,000,000 |
| Fiduciary Liability | $25,000 | $1,000,000 |

---

[8] The coverages and limits set forth here are intended solely as a summary for the Court's convenience.  The Diocese reserves all of its rights with respect to the interpretation of insurance policy documentation in connection with asserting any rights to coverage thereunder.

| Student Accident | | $50,000 |
|---|---|---|
| Volunteer Accident | | $25,000 |
| Camper Accident | | $25,000 |

159.    While modern-day liability coverage under the Insurance Program is in many instances limited to claims made during the applicable policy period, there are also older liability policies dating back as far as 1959 which were written on an occurrence basis, and which may be available to provide coverage for historical liabilities of the Diocese, subject to the satisfaction of any applicable deductible or SIR under those policies.

160.    If there are surplus Insurance Program funds remaining at the end of a fiscal year after payment of all costs and expenses related to the program, such surplus funds are held by the Diocese and generally used to offset future obligations under the program.

161.    The Diocese Insurance Department employs two claims professionals who establish case-specific reserves for each claim.  As of the Petition Date, the Insurance Program had established case-specific reserves in the amount of approximately $80,000 for liability and property damage claims and $750,000 for workers' compensation claims.  The Diocese's obligations for workers' compensation claims are backed by a letter of credit issued by NBT Bank in favor of the Workers Compensation Board, which is collateralized by the Diocese's interest in an investment account held at NBT Bank.

162.    The Insurance Program provides a practical, cost-effective way to manage risk for the Insurance Program Participants under a single, comprehensive insurance program.  If the Insurance Program is not continued, the Diocese, together with each of the Insurance Program Participants, will be forced to purchase separate insurance policies covering each entity and their respective properties.  Upon information and belief, each of the Diocese and the other Insurance

- 60 -

Program Participants would incur substantially higher costs to obtain their own individualized insurance (with or without a retention or deductible) than what they are currently assessed under the Insurance Program.   Moreover, without the broad collective risk profile provided by the Insurance Program, certain types of coverage and available coverage limits may simply not be available on an individualized basis or on commercially reasonable terms.

163.    The Diocese seeks to continue to maintain the Insurance Program for itself and on the behalf of the Insurance Program Participants and to pay claims under the Insurance Program in accordance with past practice and in the ordinary course of business.  The Diocese believes that the maintenance of the Insurance Program is in the best interest of the estate and its creditors.

164.    The continuance of the Insurance Program is essential to the Diocese's ability to minimize disruption during this Chapter 11 Case and to maximize the value of its estate for the benefit of its creditors.  Thus, the Diocese respectfully requests authorization (but not direction) to fully retain in place the existing Insurance Program and to honor prepetition and  obligations related thereto.   The Diocese further respectfully requests authorization to renew or obtain replacement insurance coverage in its discretion with respect to the continued maintenance of the Insurance Program.

**X.      Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 362(a) Confirming the Applicability of the Automatic Stay (the "Stay Confirmation Motion")**

165.     By this Motion, the Diocese seeks the entry of an order confirming that section 362 of the Bankruptcy Code automatically stays all proceedings in any lawsuit or other action where the Diocese is named as a party defendant, in accordance with the Second Circuit's recent controlling decision in *In re Fogarty*, 39 F.4th 62.

166.    The Diocese is a named defendant in 124 pending Abuse Actions where plaintiffs

are seeking to establish liability against the Diocese arising from or relating to allegations of child

sexual abuse.  In most of those lawsuits, parishes, schools, and other non-debtor Catholic entities

(the "Related Entities") are also named as codefendants.  The Diocese respectfully submits that,

under the Second Circuit's explicit mandate as set forth in *Fogarty*, upon the commencement of

the Diocese's Chapter 11 Case, all 124 Abuse Actions where the Diocese is named as a defendant

were stayed by operation of section 362(a)(1).[9]  Accordingly, the Diocese seeks entry of an order

confirming the applicability of the automatic stay of section 362(a)(1) in any case or proceeding

in which the Diocese is a named defendant.  The Diocese intends to file a copy of such order in

each of the pending 124 Abuse Actions to provide plaintiffs and the state courts overseeing the

actions notice of, and guidance with respect to, the scope and impact of the automatic stay.

167.    The Diocese further submits that maintaining a stay of such actions is critical to

achieving the Diocese's goal of negotiating a global settlement to resolve not just its own liability

for alleged abuse, but also any liability that the Related Entities may have, and effectuating such

settlement through a Diocesan plan of reorganization in this Chapter 11 Case.  The Diocese

believes that such a global resolution is the only way to ensure a fair and equitable result for all

survivors.  Nevertheless, drawing from the experiences of other Catholic dioceses in New York

that have sought to reorganize in chapter 11, the Diocese anticipates that certain plaintiffs may

argue that they can obtain full relief against non-debtor Catholic codefendants, and may therefore

seek to sever their claims against the Diocese and to proceed with their lawsuits against the non-

---

[9] The Diocese further believes that many, if not all, such actions are also stayed pursuant to subsections (a)(3) and (a)(6) of section 362, and reserves all of its rights to argue the applicability of those sections.

debtor Related Entities, in order to prioritize their own individualized recovery over the greater

good of all creditors and parties in interest and/or to use litigation against Related Entities to exert

inappropriate settlement pressure on the Diocese.

168.    The Diocese respectfully submits that there are a multitude of reasons why

proceeding against codefendant Related Entities alone should not be allowed, including, without

limitation, to avoid: (i) diversion and dissipation of shared insurance resources, (ii) distraction

from the reorganization efforts of key personnel of the Diocese and the Related Entities, their

insurers, and plaintiffs and their counsel, who are essential to achieving a successful resolution of

this Chapter 11 Case and ensuring a fair and equitable result for survivors, (iii) prejudice to the

Diocese in the form of collateral estoppel, issue preclusion, record taint, and inconsistent

judgments, and (iv) unnecessary professional fees and expenses related to monitoring and

protecting the Diocese's interests (even as a non-party).

169.    The Diocese respectfully submits that its interests could be inequitably affected if

litigation proceeds solely against its codefendant Related Entities, thereby making the Diocese a

necessary party to such litigation.  Any attempt to sever the Diocese will thus require the Diocese

to oppose the motion to protect its rights, and adjudicating the contested motion will require the

state court to issue a decision or order that entails deliberation, discretion, and judicial

involvement.  As such, it would embody the quintessential "continuation" of a proceeding

prohibited by section 362(a)(1), and would be well outside the narrow court-created exception to

the automatic stay accorded to certain actions deemed to be solely ministerial in nature.

170.    Because (i) the 124 pending Abuse Actions are currently stayed in their entirety

pursuant to section 362(a)(1), (ii) many, if not all, are also stayed pursuant to sections 362(a)(3)

- 63 -

and/or (a)(6), and (iii) the Diocese and its estate stand to suffer real and permanent harm in the event litigation were to proceed against Related Entity codefendants while this Chapter 11 Case is pending, the Diocese respectfully requests that the Court include, in any order confirming the applicability of the automatic stay, a requirement that any person or entity seeking to move in state court to sever the Diocese and proceed solely against non-debtor codefendants must first obtain relief from the stay from this Court by showing cause, pursuant to section 362(d)(1), or otherwise showing that one or more provisions of sections 362(d)(2)-(4) apply, to justify modification of the automatic stay.

## XI.    Applications to Appoint Stretto as Claims and Noticing Agent and as Administrative Advisor (the "Stretto Applications")

171.    The Diocese is seeking to retain the services of Stretto, Inc. to serve as its Claims and Noticing Agent and as Administrative Advisor in this Chapter 11 Case.

172.    The Diocese anticipates that there will be more than 300 creditors or other interested entities to be noticed in these cases, including approximately 124 individuals whose claims relate to alleged instances of abuse and whose names and other identifying information the Diocese is seeking to maintain under seal out of respect for their privacy.  Utilization of a Claims and Noticing Agent will relieve the Court and the Diocese of a significant administrative burden and will also  provide a mechanism by which proofs of claim can be filed confidentially and by which any party in interest who wishes to effect notice on all creditors, including those whose names and addresses are filed under seal, may do so without the necessity to disclose any confidential identifying information.

173.    The Diocese intends to file confidential information related to claims made against the Diocese relating to alleged instances of abuse under seal.  The Diocese proposes that, rather

than making the entire creditor matrix publicly accessible, any party wishing to effect notice on

such claimants should do so by utilizing, at the sole expense of the party seeking to effect such

notice, the services of Stretto who will have access to the full creditor matrix and can thereby

provide notice to all creditors and parties in interest without disclosing alleged abuse claimant's

names or other identifying information in order to protect their privacy.  Without the ability to use

a Claims and Noticing Agent for such notice, the only way to protect abuse claimants' privacy

would be to place the burden of providing such notice on either the Clerk's Office or Diocese's

counsel, which would result in increased costs of administration and peak-workload issues.

Additionally, the Diocese will seek to establish a procedure pursuant to which proofs of claim

relating to abuse claims may be filed confidentially.  Utilizing a third-party Claims and Noticing

Agent such as Stretto will facilitate that effort as Stretto has systems in place to handle such

confidential procedures as opposed to the Clerk's Office whose electronic case management

system is designed to provide public access to the claims register.

174.    The Diocese also seeks to engage Stretto as Administrative Advisor to assist with

bankruptcy solicitation and administration services that may fall beyond the scope of its role as

Claims and Noticing agent pursuant to 28 U.S.C. § 156(c), including to:

a.    Assist with, among other things, legal noticing, claims management and reconciliation, plan solicitation, balloting, disbursements, and tabulation of votes, and prepare any related reports, as required in support of confirmation of a chapter 11 plan, and in connection with such services, process requests for documents from parties in interest, including, if applicable, brokerage firms, bank back-offices and institutional holders;

b.    Prepare an official ballot certification and, if necessary, testify in support of the ballot tabulation results;

- 65 -

c.  Assist with the preparation of any amendments to the Dioceses' schedules of assets and liabilities and statements of financial affairs and gather data in conjunction therewith;

d.  Provide a confidential data room, if requested;

e.  Manage and coordinate any distributions pursuant to a chapter 11 plan;

f.  Provide such other processing, solicitation, balloting and other administrative services described in the Engagement Agreement, but not included in the Section 156(c) Application, as may be requested from time to time by the Diocese, the Court or the Office of the Clerk of the United States Bankruptcy Court for the Western District of New York; and

g.  Perform any other duty or task that falls within the normal responsibilities of an Administrative Advisor at the direction of the Diocese.

175.    Based upon the declarations of Sheryl Betance submitted in connection with the Diocese's applications to employ Stretto, the Diocese believes that Stretto is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code and respectfully requests that the Court enter orders authorizing the Diocese to employ Stretto as both Claims and Noticing Agent and Administrative Advisor.

## ADDITIONAL FILINGS

176.    In addition to the First Day Motions, the Diocese intends to file on the Petition Date or shortly thereafter, a number of additional pleadings that it will seek to have heard on regular notice, including the following:

### I.    Adversary Complaint (the "Insurance Adversary Complaint")

177.    The Diocese and its parishes, schools and other Catholic entities (collectively, the "*Related Entities*") share insurance coverage for many of the Abuse Claims asserted against them pursuant to the terms of certain policies of insurance (the "Policies") issued by various insurance

carriers (the "Insurers").   Nevertheless, certain Insurers have disclaimed coverage or issued reservation of rights notifications with respect to their respective Policies.

178.    Contemporaneously with the filing of its petition for chapter 11 relief, the Diocese and numerous Related Entities commenced an adversary proceeding (the "Insurance Adversary") against the following Insurers:

- Markel Insurance Company as successor to Associated International Insurance Company

- Certain Underwriters at Lloyd's, London and Certain London Market Companies

- Employers Mutual Liability Insurance Company of Wisconsin, Wausau Underwriters Insurance Company, and Employers Insurance Company of Wausau

- Granite State Insurance Company

- Insurance Company of North America, International Insurance Company, and Illinois Union Insurance Company

- Interstate Fire & Casualty Company

- St. Paul Surplus Lines Insurance Company

179.    Through the Insurance Adversary, the Diocese and Related Parties assert claims against the Insurers for breach of contract and declaratory judgment, seeking a declaration of the rights, duties and liabilities of the Insurers on their respective Policies.

180.    The Policies represent a significant source of potential recovery.  Ascertaining the rights of the Diocese and Related Parties to coverage under those Policies will play a considerable role in determining the assets available to satisfy Abuse Claims, and the resolution of such issues will be critical to the Diocese reorganization efforts.

181.    The Insurance Adversary was commenced in order to preserve the rights of the

Diocese and Related Parties against the Insurers, and to secure jurisdiction for this Court to

adjudicate, if necessary, claims related to the Policies.    However, notwithstanding the

commencement of the Insurance Adversary, the Diocese is seeking, by separate motion, to address

disputed insurance coverage issues through mediation.

**II.      Motion for Entry of an Order Referring Certain Matters to Mediation (the "Mediation Motion")**

182.    By this Motion, the Diocese intends to seek entry of an order, pursuant to section

105(a) of the Bankruptcy Code, Rule 1001 of the Bankruptcy Rules, and Local Rule 9019-1,

directing the Diocese, the Related Entities, the Official Committee of Unsecured Creditors or any

other official committee appointed in this Chapter 11 Case to represent the interests of holders of

Abuse Claims (the "Committee"), and the Insurers (collectively, the "Mediation Parties"), to

mediate any and all issues relating to (i) the merits and valuation of Abuse Claims, including any

legal and factual defenses to liability the Diocese or the Related Parties may have, (ii) the

availability of insurance coverage for the Abuse Claims pursuant to the Policies, including any

legal or factual defenses to coverage asserted by Insurers, (iii) identifying assets of the Diocese

and the Related Parties available for contribution to a global settlement of Abuse Claims, and

identifying assets that are restricted for charitable use or necessary to be retained for continued

future operations in support of the Church's mission, and (iv) all other controversies relating to the

development, funding, and contents of a chapter 11 plan of reorganization addressing the Abuse

Claims (collectively, the "Mediation Issues").

183.    Mediation is warranted in both this Chapter 11 Case and in the Insurance Adversary

because the Mediation Issues to be addressed will involve the complex analysis and application of

disputed issues of both law and facts, all of which would be incredibly time consuming and expensive to resolve through traditional litigation.  Moreover, mediation affords an opportunity for all Mediation Parties to consider the strengths and weaknesses of their respective positions and to exchange proposals for compromise solutions in a confidential process, and with the assistance of a neutral mediator to guide discussions, which will facilitate the Diocese's ability to propose and confirm a consensual plan of reorganization and increase the prospects for a successful resolution of this Chapter 11 Case.

184.    A swift resolution of this Chapter 11 Case is in the best interests of all the Mediation Parties.  The Diocese and Related Parties have limited assets available to compensate survivors, and survivors are all advancing in age and would be ill served by a protracted litigation process where significant value would be subsumed by legal fees and other costs of administration.  Even the Insurers should be motivated to pursue an expeditious resolution, as doing so is consistent with their contractual obligations to their insureds and because it will provide their underwriters with greater certainty regarding their exposure and liabilities on the Policies.  The Diocese respectfully submits that mediation is the most efficient method for addressing certain threshold issues necessary to facilitate the Diocese's ability to propose and confirm a plan of reorganization in this Chapter 11 Case.  Permitting the Mediation Parties to concentrate resources on mediation will minimize the litigation expenses for all such parties.  Referring the Chapter 11 Case and the Adversary Proceeding to mediation will allow judicial resources to be used efficiently while furthering the needs of all the Mediation Parties.

185.    Accordingly, the Diocese respectfully requests that the Court enter an order directing the Mediation Parties to mediation to address each of the Mediation Issues identified

12044334.4

above, together with any and all other issues that the mediator and/or the Mediation Parties

determine will be helpful in achieving a settlement of the Abuse Claims and the Diocese's and

Related Parties' claims against the Insurers, or otherwise facilitating the formulation of a chapter

11 plan of reorganization for the Diocese.

III.    **Motion for Entry of an Order Establishing a Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Motion")**

186.    The Diocese intends to file shortly a motion seeking establishment of a deadline for

filing proofs of claim against the Diocese and approving a specialized supplemental form to gather

necessary information beyond that specified in Official Form 410 to enable the Diocese, Insurers,

and other parties in interest to appropriately evaluate the allegations and damages asserted by

persons filing Abuse Claims.  The Bar Date Motion will also seek to establish confidentiality

protocols to enable Abuse Claims to be filed confidentially and limiting access to such Abuse

Claims to those parties who have a need to access such information.  This motion will also seek

approval of the Diocese's proposed noticing procedures to ensure that all claimants and potential

claimants receive adequate notice of the applicable deadline to file proofs of claim.

IV.    **Applications to Retain Professionals**

187.    The Diocese will be filing shortly applications to retain several professionals in this

Chapter 11 Case, including:

> (i)  Bond, Schoeneck & King, PLLC, as general bankruptcy counsel;
>
> (ii) Blank Rome LLP, as special insurance counsel;
>
> (iii)Schwerzman & Wise, as special litigation counsel;
>
> (iv)Costello, Cooney & Fearon, as special litigation counsel; and

- 70 -

(v) Pinto, Mucenski, Hooper VanHouse, as accountants.

The Diocese reserves the right to seek appointment of additional professionals to assist it in this Chapter 11 Case as and when the services of such professionals are needed.

**V.      Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Members of Official Committees (the "Interim Compensation Motion")**

188.     The Diocese will be filing shortly a motion to establish interim compensation procedures for professionals and members of official committees which will both (i) facilitate an efficient review of professional fees by the Diocese, the U.S. Trustee, the Court, and other parties in interest, and (ii) enable professionals retained in this case to be compensated on a regular basis rather than waiting several months for payment until after an interim fee application is approved.

## CONCLUSION

189.     For the reasons set forth herein, and in the First Day Motions, the Diocese respectfully requests that the Court grant the relief requested in the First Day Motions and provide such other and further relief as the Court may deem just and proper.

190.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*[signature page follows]*

- 71 -

Dated:  July 17, 2023

/s/  Mark Mashaw

Mark Mashaw
Diocesan Fiscal Officer