UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) <br> ) <br> ) Case No. 23-60507 (PGR) <br> ) <br> ) Chapter 11 <br> ) <br> ) <br> ) |
| The Roman Catholic Diocese of Ogdensburg, New York, | |
| Debtor. | |

**RESPONSE TO THE UNITED STATES TRUSTEE'S OBJECTION
TO THE DIOCESE'S MOTION FOR INTERIM AND FINAL ORDERS (A)
AUTHORIZING, BUT NOT DIRECTING, THE DIOCESE TO (I) CONTINUE USING
EXISTING BANK ACCOUNTS, BANKING PRACTICES AND BUSINESS FORMS, (II)
MAINTAIN INVESTMENT ACCOUNTS AND PRACTICES, AND (III) CONTINUE
USING CREDIT CARDS, AND (B) GRANTING LIMITED RELIEF FROM
THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 345(b)**

The Roman Catholic Diocese of Ogdensburg, New York (the "Diocese"), by and through its undersigned counsel, hereby submits this response (this "Response") to the United States Trustee's objection [Docket No. 48] (the "Objection") to, and in further support of, the Diocese's *Motion for Interim and Final Orders (A) Authorizing, But Not Directing, the Diocese to (I) Continue Using Existing Bank Accounts, Banking Practices and Business Forms, (II) Maintain Investment Accounts and Practices, and (III) Continue Using Credit Cards, and (B) Granting Limited Relief From the Requirements of Bankruptcy Code Section 345(b)* [Docket No. 15] (the "Motion").[1]  As and for its response, the Diocese respectfully states as follows:

**BACKGROUND**

1.  On July 17, 2023 (the "Petition Date"), the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of New York (the "Court"), commencing the Diocese's chapter 11 case (this

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

16494581.5

"Chapter 11 Case"). The Diocese continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for a trustee or examiner has been made in this Chapter 11 Case, and as of the date of this filing, no official committees have been appointed or designated.

2. On August 11, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to Bankruptcy Code section 1102 [Docket No. 65]. As of the date of this filing, no other official committees have been appointed or designated.

3. The Committee has selected Pachulski Stang Ziehl & Jones LLP as its bankruptcy counsel [Docket Nos. 88, 115, 123].

4. Information regarding the Diocese's history, business operations and structure, and the events leading up to this Chapter 11 Case is set forth in the *Declaration of Rev. Kevin O'Brien Regarding Structure and Pre-Filing History of The Diocese and in Support of the Chapter 11 Petition and First Day Pleadings* [Docket No. 7], and the *Declaration of Mark Mashaw Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings* [Docket No. 6] (the "Mashaw Declaration"), and incorporated herein by reference.

5. As part of the relief requested in the Motion, the Diocese is seeking a waiver of the requirements of section 345(b) of the Bankruptcy Code that its investments be either federally guaranteed or backed by a bond or collateral securities, specifically with respect to the Diocese's various Investment Accounts.

6. On July 19, 2023, the Court entered an order granting the Motion on an interim basis [Docket No. 39] (the "First Interim Order"). The First Interim Order provided a limited waiver of the requirements of section 345(b). *See* First Interim Order at ¶ 12.

16494581.5

7. On August 8, 2023, the United States Trustee (the "U.S. Trustee") filed the Objection.

8. On August 29, 2023, the Court entered a second interim order with respect to the Motion [Docket No. 100] (the "Second Interim Order") further extending the waiver of section 345(b).

9. On August 31, 2023, the Diocese filed its Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 107 and 108].

10. On September 11, 2023, the U.S. Trustee held a section 341 meeting of creditors and asked the Diocese extensive questions regarding the Diocese's bank and investment accounts and financial affairs generally.

11. Contemporaneously herewith, the Diocese has also filed the *Supplemental Declaration of Mark Mashaw in Further Support of the Diocese's Request for a Limited Waiver of the Requirements of Section 345(b) of the Bankruptcy Code* (the "Supplemental Mashaw Declaration") which is incorporated herein by reference.

## RESPONSE

**A.    ADDITIONAL INFORMATION REGARDING THE INVESTMENT ACCOUNTS**

12. Since the U.S. Trustee filed its Objection, the Diocese has filed it Schedules and Statement of Financial Affairs, has submitted to examination in a section 341 meeting of creditors that lasted nearly three and a half hours, and has also provided a significant amount of information related to its various investments to the U.S. Trustee. The Diocese respectfully submits that it has addressed the concerns raised by the U.S. Trustee regarding the Investment Accounts' underlying investments and their allocation, and that as set forth further herein, the assets held within the Investment Accounts are subject to appropriate safeguards. *See* Objection ¶¶ 22-24.

13. As set forth in the Motion, the vast majority of assets in the Investment Accounts are held for the benefit of parishes and other catholic entities, and the Diocese respectfully submits, are therefore not property of the Diocese's estate.[2]

14. The Diocese's management of the Investment Accounts is overseen by a committee comprised primarily of individuals with a background in business, finance, or accounting (the "<u>Investment Advisory Committee</u>"). The roles and responsibilities of the Investment Advisory Committee are set forth in an Investment Policy Statement adopted by the Diocese that provides, among other things, the Diocese's investment philosophy, guidelines for asset allocations and investment objectives. A copy of the Investment Policy Statement is attached to the Supplemental Mashaw Declaration as ***Exhibit A***. The following individuals serve on the Investment Advisory Committee:

(i) Father Kevin O'Brien – Moderator of the Curia;

(ii) H. Bruce Russell – Licensed Financial Advisor;

(iii) John Pinkerton – Regional Development Director; past City Manager for the City of Ogdensburg; Finance Committee Member – Claxton-Hepburn Medical Center; Finance Committee Member – Ogdensburg Boys' and Girls' Club;

(iv) Joseph Cosmo – Licensed Financial Advisor;

(v) Mary Lou Peters – Treasurer, St. Peters Church; Community Bank NA (retired); and

(vi) Matthew Hurteau – Licensed Financial Advisor.

---

[2] Although the Diocese asserts that most of the monies in the Investment Accounts constitute property held for the benefit of others, the Diocese is not, through this Motion, seeking a determination by the Court as to whether the Investment Accounts are property of the Diocese's estate pursuant to section 541 of the Bankruptcy Code. Accordingly, the Court does not need to make such a determination in order to grant the relief sought in the Motion.

15. I also serve as an advisor to the Investment Advisory Committee in my capacity as Diocesan Fiscal Officer.

16. Additionally, the Investment Advisory Committee employs an investment consultant, DHK Financial Advisors to analyze the Diocese's investment practices and investment advisors and provide insight and information for the Investment Advisory Committee to consider in formulating investment decisions and fulfilling its fiduciary responsibility to manage the Investment Accounts. DHK Financial Advisors participates in Investment Advisory Committee meetings and provides quarterly reports to the Investment Advisory Committee concerning the performance of the Investment Accounts.

17. *Diocesan Trust Fund.* The terms pursuant to which the Diocese operates the Diocesan Trust Fund are presently set forth in an agreement dated September 30, 2020 (the "Trust Agreement"). The investments in the Diocesan Trust Fund are professionally managed and are primarily held in a custodial account at NBT Bank. Approximately 73.8% of the Diocesan Trust Fund investments are managed by Manning and Napier Advisors, approximately 23.8% of the Diocesan Trust Fund investments are managed by Christian Brothers Investment Services, approximately 2.10% of the Diocesan Trust Fund investments are managed by Dimensional Fund Advisors, and the remaining approximately 0.3% of the Diocesan Trust Fund investments are managed by TIFF Realty Opportunity Fund.

18. As a general matter, the Diocesan Trust Fund investments are made up entirely of long-term investments and are allocated across diverse asset classes such as (i) Bonds and Government and U.S. Agency Bond Fund, (ii) Equities and Equity Fund, (iii) Real Estate and Real Estate Trusts, and (iv) Money Markets. Copies of the most recent monthly statements for Diocesan

Trust Fund investments which provide, among other things, a summary of the respective investment holdings, are attached to the Supplemental Mashaw Declaration as *Exhibit B*.

19.    *Retirement Plan for Priests.*  The Diocese has a canonical obligation to provide care and sustenance for priests after retirement.[3]  Accordingly, the Diocese maintains a non-qualified retirement plan that covers all eligible Diocesan priests.  The primary source of funding for the Priest Retirement Plan comes from parish assessments, and a special collection solicited from parishioners at Christmas; therefore, the Diocese believes that funds in the Retirement Plan for Priests would be deemed restricted assets.  The funds held and invested within the Retirement Plan for Priests are managed by a variety of professional investment managers, including Manning and Napier advisors, Christian Brothers Investment Services, Dimensional Fund Advisors and TIFF. As of the Petition Date the Diocese estimates that the plan's assets have a market value of approximately $8.7 million.  Copies of the most recent monthly statements for Retirement Plan for Priests investments which provide, among other things, a summary of the respective investment holdings, are attached to the Supplemental Mashaw Declaration as *Exhibit C*.

20.    *Charitable Gift Annuity.*    The Diocese currently maintains approximately 37 contracts with annuitants within its charitable gift annuity program.  The Diocese runs the program in accordance with a permit issued by the New York State Department of Financial Services ("DFS").  The Diocese's gift annuity program was last examined by DFS in 2018,[4] and the Diocese is currently in compliance with the terms of its permit and the requirements of N.Y. Insurance Law § 1110(b), which requires that charitable gift annuity funds "be segregated as separate and distinct

---

[3] https://www.vatican.va/roman_curia/pontifical_councils/intrptxt/documents/rc_pc_intrptxt_doc_20000429_fondo-clero_en.html

[4] The New York State DFS audits the Diocese's charitable gift annuity program every five years.  This Diocese is due to have its charitable gift annuity program audited for the five years spanning from the 2018 through 2022 this coming year.

funds, independent of all other funds of [the sponsoring organization], and shall not be applied to pay its debts and obligations or for any purpose except the aforesaid annuity benefits." N.Y. Insurance Law § 1110(b).  As of the Petition Date, the Diocese estimates that the Charitable Gift Annuity Program has approximately $1.6 million in assets, approximately 80% of which are fixed income investments, approximately 18% of which are stocks and real assets, and approximately 2% of which are cash equivalents.  A copy of the most recent monthly statement of the Charitable Gift Annuity Program which provides, among other things, a summary of the investment holdings, is attached to the Supplemental Mashaw Declaration as *Exhibit D*.

21.    *Collateral Investment Account.*  As set forth in the Diocese's Schedule D, Diocese owned securities having an approximate value of $2,300,000 are held in a brokerage account bearing the last four digits xx50 with NBT Bank, as collateral for a $1,950,707.00 letter of credit. The beneficiary of the NBT Bank letter of credit is the New York State Workers' Compensation Board.  This letter of credit is held to secure the Diocese's obligations under its self-insured workers compensation program and is required by N.Y. State law.  A copy of the most recent monthly statement of the Collateral Investment Account which provides, among other things, a summary of the investment holdings, is attached to the Supplemental Mashaw Declaration as *Exhibit E*.

22.    *Deposit and Loan Fund.*  Investments in the Deposit and Loan Fund are managed by Manning & Napier Advisors, Inc.  Only the entities listed in the Official Catholic Directory for the Diocese may invest in the Deposit and Loan Fund, and currently the depositors are made up of the Diocese and non-debtor entities consisting of parishes and other Catholic institutions and entities that operate within the territory of the Diocese (collectively, the "Depositors", and each a "Depositor").  The funds invested in the Deposit and Loan Fund remain the assets of the respective

Depositors but the Diocese is the residual beneficiary of the Deposit and Loan Fund, meaning that any net assets of the Fund in excess of accounts held by other Depositors, are the property of the Diocese.  A copy of the most recent monthly statements of funds held in the Deposit and Loan Fund which provides, among other things, a summary of the investment holdings, is attached to the Supplemental Mashaw Declaration as ***Exhibit F***.

23.  *Endowment Fund.*  The Endowment Fund is comprised of funds that are permanently restricted by the donor for a specified purpose, and which are therefore not available to satisfy creditor claims.  Moreover, the beneficiaries of the endowed monies held in this fund are parishes and other non-debtor entities.  The earnings from investments, if any, are distributed based upon donor instructions.  Investments in the Endowment Fund are managed by Manning and Napier Advisors and are held in a custodial account at NBT Bank.  As of the Petition Date, the Diocese estimates that the market value of the Endowment Fund is approximately $4.3 million.  The investments held in the Endowment Fund are allocated approximately 51% in stocks and real assets, approximately 46% in fixed income assets, and approximately 3% in cash equivalents.  A copy of the most recent monthly statement of the Endowment Fund, which provides, among other things, a summary of the investment holdings, is attached to the Supplemental Mashaw Declaration as ***Exhibit G***.

24.  *Certificate of Deposit (3991).*  The Diocese respectfully submits that no section 345 waiver is required for the Certificate of Deposit account as such account is federally insured by the FDIC.[5]  Accordingly, the Certificate of Deposit account is in compliance with section 345(b).

---

[5] https://www.fdic.gov/resources/deposit-insurance/financial-products-insured/

16494581.5

## B. THE TOTALITY OF THE CIRCUMSTANCES SUPPORT A LIMITED WAIVER OF SECTION 345(b) OF THE BANKRUPTCY CODE

25. The Diocese respectfully submits that strict adherence to § 345(b) of the Bankruptcy Code is not necessary under the facts of this case and a waiver of these requirements is in the best interests of both the Diocese and its creditors. By maintaining its prepetition investment practices and the Investment Accounts, the Diocese will earn a reasonable rate of return on investments, without subjecting the funds held in the Investment Accounts to unnecessary risk. The totality of circumstances favors allowing the Diocese to maintain the Investment Accounts undisrupted.

26. Strict compliance with section 345(b) for large and sophisticated chapter 11 debtors is often inconsistent with the requirement under section 345(a) that deposits be maintained in a manner that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Larger debtors with sophisticated investment policies can often achieve a higher rate of return on their investments than would be available in a traditional FDIC insured bank account, while diversifying assets sufficiently to protect against loss in value of any single investment.

27. In response to the 3rd Circuit opinion in *Columbia Gas* which held that section 345(b) compliance was mandatory even where such compliance would cause a hardship or operational difficulty for the debtor, Congress amended section 345 in 1994 to allow for a court to waive the requirements of section 345(b) for cause. *See In re Columbia Gas Systems, Inc.*, 33 F. 3d 294 (3d Cir. 1994). According to the seminal case addressing this issue, cause is determined by taking into consideration a number of factors and making a "totality of the circumstances inquiry." *In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999). This approach has been adopted by courts within the Second Circuit. *In re Diocese of Buffalo, N.Y.*,

621 B.R. 91, 93 (Bankr. W.D.N.Y. 2020) (observing that cause under section 345(b) implicitly requires a totality of the circumstances inquiry); *In re Ditech Holding Corp.*, 605 B.R. 10, (Bankr. S.D.N.Y. 2019) ("In determining whether there is "cause" to waive the account collateralization requirements under section 345(b), the Court will apply a totality of the circumstances test set like the one used by the court in Service Merchandise, although it will not be bound by the factors considered by that court.").

28.   In the Motion, the Diocese analyzed each of the *Service Merchandise* factors and made a showing that the totality of the circumstances weighs in favor of granting a limited waiver of section 345(b) to allow the Investment Accounts to remain undisturbed. *See* Motion at ¶¶ 55 – 70.

29.   The U.S. Trustee argues, without support, that the Diocese has not provided sufficient evidence that the "totality of circumstances" favor granting the § 345(b) waiver. However, the U.S. Trustee does not challenge the factual basis of the Diocese's submissions, but merely claims that the Diocese has not sufficiently distinguished its own situation from the garden variety debtor in bankruptcy. Moreover, the U.S. Trustee's Objection fails to address the implications of strictly adhering to the section 345(b) requirements. Following the Objection of the U.S. Trustee to its logical conclusion, the Diocese would be required to liquidate all of its holdings in the Investment Accounts and park millions of dollars in bank accounts bearing modest interest rates which, when inflation is taken into account, may actually result in negative growth. Requiring the unwinding of the Investment Accounts will also place an administrative burden on the financial staff of the Diocese and utilize precious resources that could otherwise be focused solely on assembling a confirmable plan for the Diocese to exit chapter 11.

30. The U.S. Trustee has apparently adopted a policy position whereby it will oppose waivers of section 345(b)'s investment requirements, regardless of the underlying merits or cause shown. This generally-applicable, zero-discretion, zero-tolerance approach is clear from the U.S. Trustee's argument that, if evidence of size and sophistication such as that provided by the Diocese "were the benchmark for 'sophistication' to avoid the requirements of section 345(b), most debtors would be eligible for a waiver." *See* Objection, ¶ 20. This argument from the U.S. Trustee misses the mark and misstates the purpose of the test laid out by the court in the *Service Merchandise* case. The test is not whether, or how many, other debtors in similar positions would also qualify for a waiver of section 345(b) (although the teachings of *Columbia Gas* and Congress' swift move to amend section 345(b) suggest that such waivers may well be appropriate in many chapter 11 cases), but instead whether the totality of the circumstances present in *this case* suggests that *this debtor* should be relieved of the burdens of strictly complying with section 345(b)'s investment restrictions. Moreover, the U.S. Trustee's argument conveniently side-steps the fact that section 345(b) is a statute of general applicability and therefore governs not only large and complex chapter 11 cases like this one, but also the legion of chapter 7, 12 & 13 cases which make up the overwhelming majority of bankruptcy cases and which very rarely present facts which would justify a section 345(b) waiver. Accordingly, the Court can be assured that finding cause in this case will not lead to a slippery slope of 345(b) waiver requests in circumstances where such a waiver would be inappropriate. Indeed, Courts have found cause to waive the section 345(b) investment requirements in each of the five diocesan chapter 11 cases currently pending in New York. *See The Roman Catholic Diocese of Syracuse, New York*, Case No. 20-30663 (Bankr. N.D.N.Y., September 18, 2020) [Docket No. 116] (overruling U.S. Trustee objection to 345 waiver request); *see also The Roman Catholic Diocese of Albany, New York*, Case No. 23-10244 (Bankr.

11

N.D.N.Y., September 11, 2023) [Docket No. 463] (same); *The Diocese of Rochester*, Case No. 19-20905 (Bankr. W.D.N.Y. January 14, 2020) [Docket No. 368] (same), *The Diocese of Buffalo, N.Y.*, Case No. 20-10322 (Bankr. W.D.N.Y. October 20, 2020) [Docket No. 616] (same); and *The Roman Catholic Diocese of Rockville Centre, New York*, Case No. 20-12345 (Bankr. S.D.N.Y. December 10, 2020) [Docket No. 253].

31.     In *Service Merchandise*, the court pointed specifically to the size, sophistication, complexity of the debtor's investments, and the fact that the debtor used multiple accounts to manage large sums of money as evidence of cause supporting a waiver of section 345(b) of the Bankruptcy Code. *See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

32.     As of the Petition Date, the Diocese held approximately $53 million in various Investment Accounts, of which approximately $16.1 million is property of the Diocese. The U.S. Trustee asserts that $53 million is an insufficient dollar amount to be considered a factor in support of a section 345(b) waiver simply because a waiver was refused in a different case with a greater amount at issue. *See In re Ditech*, 605, B.R. 10 (Bankr. S.D.N.Y 2019). The U.S. Trustee's reliance on Ditech however, is misplaced. While the court in *Ditech* did decline to grant a section 345(b) waiver, the underlying analysis of that case shows a fact pattern completely different than what is presently before the Court. In *Ditech*, the accounts at issue were traditional bank accounts (as opposed to investment accounts holding securities), and the dispositive factor for the Court in analyzing whether a section 345(b) waiver was appropriate was that the financial institution at which the accounts were held had agreed to collateralize the accounts to bring them into compliance with section 345, so long as the debtor absorbed the cost to do so. *See Ditech*, 605 B.R. at 21. Because the court found that the cost to collateralize the accounts (and thereby comply with section 345(b)) was minor compared to the benefit the debtor received by retaining the

16494581.5

accounts, the Court refused to grant the section 345(b) waiver, and instead ordered the debtor to bring the accounts at issue into compliance with section 345(b) by paying to collateralize them. *Ditech*, 605 B.R. at 21-22.  In sum, the court in *Ditech* refused to waive the requirements of section 345(b) because it was apparent to the court that the debtor could easily comply with the default statutory requirements.  That is not the case for the Diocese.

33.     To the extent the underlying holdings in any of the Investment Accounts consist of treasury securities, or certificates of deposit, the Diocese submits that such investments are already in compliance with section 345(b)'s requirement.   However, because the Investment Accounts are also comprised of equity investments and bond-based debt instruments (primarily held through institutionally managed mutual funds), the option to collateralize the Investment Accounts is not available to the Diocese in the way it was for the debtor in *Ditech*.  Because many of the underlying assets held in the Investment Accounts are equity or debt holdings (primarily mutual funds), their value naturally fluctuates with market conditions. Accordingly, although the risk of such investments is mitigated by the diversification of the overall portfolio, no financial institution will guaranty these Investment Accounts against the chance of loss.  In the event that a section 345(b) waiver is not obtained, the Diocese will be forced to liquidate the holdings in the Investment Accounts. Respectfully, this would be financially irresponsible.  There is no way for the Diocese and the other participants in the Investment Accounts to obtain a comparable rate of return while complying with section 345(b).  The restrictions associated with doing so could result in the Diocese being forced to make cuts to its mission and will negatively impact assets that are potentially available to satisfy creditor claims.  Further, the size of the Investment Accounts will make timely compliance with section 345(b) an administrative drain upon the Diocese's limited

13

administrative resources. Given the important issues at the heart of the bankruptcy case, it is important that the Diocese's resources be focused on assembling a plan of reorganization.

34. The U.S. Trustee also suggests that a waiver of section 345(b) is not appropriate because this case does not meet the U.S. Trustee's definition of a "large" case. *See* Objection, ¶ 21. As an initial matter, section 345(b) of the Bankruptcy Code makes no distinction as to the size of the case. In fact, nothing in the Bankruptcy Code provides any basis for classifying cases as "large", or otherwise. Moreover, the standard set forth in the *Service Merchandise* case, as expounded upon by *Ditech*, is not whether the case is unofficially denominated as a "large" case. Instead, it is whether the size and complexity of the Diocese's business operations, together with consideration of the other *Service Merchandise* factors, show that forcing the Diocese to comply with section 345(b) would be adverse to the best interests of the Diocese and its creditors. The Congressional Record is useful in understanding how the factor of the debtor's size should be applied:

> [w]hile this requirement [section 345(b)] is wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger more sophisticated debtors.

*In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) quoting HR Rep 103-834 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994).

35. The Diocese manages tens of millions of dollars and operates in a territory that includes eight (8) counties, and serves over 71,000 Catholics residing in those counties. It is a stretch of imagination to consider the Diocese anything but a large sophisticated organization, and it is clear that a robotic application of section 345(b)'s requirements to all debtors is neither what Congress intended, nor what the statute requires.

16494581.5

36. While there is inherent risk in any investment, the Investment Accounts at issue here are professionally managed, and invested in balanced-risk portfolio of equities, bonds, and other diversifying securities. None of Investment Account holdings would be characterized as high-risk investments. The Diocese's investment approach is consistent with that adopted by most non-profit organizations with respect to endowment-type funds held to advance their charitable purposes, namely, to seek modest growth over an elongated investment horizon. This is also the approach mandated by the N.Y. Prudent Management of Institutional Funds Act, which is incorporated into the Diocese's Investment Policy Statement. *The Diocese of Buffalo, N.Y.*, Case No. 20-10322 (Bankr. W.D.N.Y. October 30, 2020) [Docket No. 629] (holding that "[t]he purposes of 11 U.S.C. § 345(b) are not necessarily antithetical to the goals of the Prudent Management of Institutional Funds Act", and that because the Diocese of Buffalo was in compliance with the Prudent Management of Institutional Funds Act, the Diocese "satisfied its burden to establish cause for a waiver of the requirements of 11 U.S.C. § 345(b).").

37. Additionally, the Diocese's use of use of multiple investment advisors, with similar goals, but different investment strategies, is an additional safeguard against market volatility in any specific sector. The Diocese believes that the low risk of the underlying investments in the Investment Accounts in combination with the safeguards in place to mitigate against loss balance appropriately with the historical and projected rate of return on the underlying investments in the Investment Accounts warrants a waiver of section 345(b) of the Bankruptcy Code for cause shown.

38. Finally, the Diocese respectfully submits that with the exception of the U.S. Trustee's Objection, no other objections to the Motion have been filed.

39. Through the Motion, the Mashaw Declaration, this Response, and the Supplemental Mashaw Declaration, the Diocese respectfully submits that it has provided ample information to

demonstrate that appropriate safeguards are in place to ensure that the funds in the Investment Accounts are not subject to undue risk of loss. The Diocese further respectfully submits that in applying the totality of circumstances test to the Investment Accounts, the high level of sophistication of the Diocese's business, the size of the Diocese's business, the amounts invested in the Investment Accounts, the safeguards put in place to ensure the safety of the assets invested in the Investment Accounts, and various other factors as set forth in the Motion and in this Response, a waiver of 345(b) for cause is appropriate.

## CONCLUSION

**WHEREFORE**, the Diocese respectfully requests that the Court enter an order, substantially in the form of the proposed order attached as ***Exhibit B*** to the Motion, granting the relief requested in the Motion on a final basis and providing such other and further relief as the Court deems just and proper.

Dated: September 26, 2023

BOND, SCHOENECK & KING, PLLC

By: /s/ Charles J. Sullivan
Stephen A. Donato (Bar Roll #101522)
Charles J. Sullivan (Bar Roll #507717)
Grayson T. Walter (Bar Roll #518237)
Andrew S. Rivera (Bar Roll #700712)
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Fax: (315) 218-8100
Email: sdonato@bsk.com
csullivan@bsk.com
gwalter@bsk.com
arivera@bsk.com

*Attorneys for The Roman Catholic Diocese of Ogdensburg, New York*