## Exhibit A

Investment Policy Statement



*Revised August 31, 2022*

# DIOCESE OF OGDENSBURG

# INVESTMENT POLICY STATEMENT

## INVESTMENT MISSION STATEMENT

The Diocese of Ogdensburg is called to exercise faithful, competent and socially responsible stewardship in how it manages its financial resources. As a Roman Catholic organization the Diocese draws its values, directions and criteria which guide its financial choices from the Gospel and universal Church teaching. In order to function effectively and carry out its mission, the Diocese depends on a fair and reasonable return on its investments and is required to operate in a fiscally sound, responsible and accountable manner. The combination of religious mandate and fiscal responsibilities suggests the need for a clear and comprehensive set of policies to guide the Diocese's investments and other activities related to corporate responsibility.

The New York Prudent Management of Institutional Funds Act ("NYPMIFA," or the "Act") took effect on September 17, 2010. The Act governs the management and investment of funds held by not-for-profit corporations and other institutions. The Act requires institutions to set forth guidelines on investments and delegation of management and investment functions in accord with its standards. The Diocese of Ogdensburg is subject to the Act.

The following investment policies shall guide the Diocese's Investment Advisory Committee, Diocesan Staff, Investment Managers, and Investment Consultants in fulfilling their fiduciary responsibility managing the Diocesan Investment Program.

## INTRODUCTION

In accordance with Canon 1284 the Bishop consents to the investment of the money which is left over after expenses and can be usefully set aside for the purposes of the Diocese of Ogdensburg. Investment of monies shall be governed by this Investment Policy Statement.

The purpose of this Investment Policy Statement is to establish a clear understanding and the management between the Investment Advisory Committee of the Diocese of Ogdensburg and the Investment Manager(s)/Investment Consultant(s) on issues regarding objectives and policies applicable to their investment portfolio. This Investment Policy Statement will:

- Comply with the provisions of NYPMIFA.
- Establish reasonable expectations, objectives and guidelines in the investment of the Diocese's assets from which Investment Manager(s)/Investment Consultant(s) may formulate and execute their investment decisions.

- Provide the investment of the Diocese will be made for the exclusive benefit of diocesan entities.
- Encourage effective communication between the Investment Manager(s)/Investment Consultant(s) and the Investment Advisory Committee.
- Create the framework for a well-diversified asset mix that can be expected to generate acceptable long-term returns at a level of risk suitable to the Diocese.

The Investment Policy Statement is intended to cover the management of various investment portfolios or funds, including the Lay Employees' Retirement Fund, the Priests' Pension Fund, the Deposit & Loan Fund, the Charitable Gift Annuity Reserve Fund, the Diocesan Trust Fund, the Endowed Care Cemeteries Fund and any others that may exist or may be created (collectively referred to after as "Investment Funds"). The Bishop, as Administrator of the Investment Funds, will appoint an Investment Advisory Committee (the "Committee") to oversee the administration of the Investment Funds in accordance with its roles and responsibilities assigned in this policy. The Committee will report on the status of the Investment Funds to the Bishop on a quarterly basis. The investments of the Investment Funds will be made for the exclusive benefit of Investment Fund participants and beneficiaries. This policy statement is issued for the guidance of fiduciaries, including investment managers, investment consultants, and members of the Investment Advisory Committee (the "Committee"), in the course of investing assets for the Investment Funds.

The Bishop approves the Investment Policy Statement ("Statement"). The Statement is issued for the guidance of the Committee, the Investment Funds' investment managers, investment consultants (if any are retained), and the custodian bank(s). This Statement is intended to set forth an appropriate set of goals and objectives for the Investment Funds' assets and to define guidelines within which the investment managers may formulate and execute their investment decisions. The Bishop may amend this Statement upon his own initiative and/or upon consideration of the advice and recommendations of the Committee, the investment managers and/or investment consultants (if any are retained). Changes to the Statement approved by the Bishop shall be communicated to the Diocesan Fiscal Officer, who will be responsible for informing the Committee, investment managers, investment consultants (if any are retained), and custodian bank(s) of such changes.

The judgment of the Bishop in decisions affecting the administration of the Investment Funds shall be binding and conclusive upon the Committee, investment managers, investment consultants (if any are retained), and the custodian bank(s).

## STATEMENT OF GOALS AND OBJECTIVES

The investment goals for the Investment Funds are outlined below. Specific benchmarks and guidelines for investment managers are included in Appendices I and III.

1. Total return, consistent with prudent investment management, is the primary goal of the Investment Funds. Total return, as used herein, includes income plus realized and unrealized gains and losses on Investment Funds' assets minus management fees.

2. Assets of the Diocese shall be invested to ensure that principal is preserved and enhanced over time.

3. The total return for each of the overall Investment Funds will be compared to their respective benchmarks as listed in Appendix I.

4. Total portfolio risk exposure and risk-adjusted returns will be regularly evaluated and compared with a universe of similar funds.

5. Investment objectives are intended to provide quantifiable benchmarks to measure and evaluate return and risk. The Committee is aware that there will be deviations from these performance targets. Results will be evaluated over three, five, and ten-year time periods. Shorter-term results will be regularly reviewed and earlier action taken if in the best interest of the Investment Funds.

## INVESTMENT PHILOSOPHY

In making investment decisions, the Investment Manager(s)/Investment Consultant(s) should be aware of the mission of the Catholic Church, which believes that it has the responsibility to influence corporate policy and public conscience to create a more just global society, foster the common good and respect the dignity of life.

The Diocese believes that the assets should be managed in a manner that is consistent with the philosophy of the Roman Catholic Church and that reflects the purposes for which the Diocese was established. The role of fixed income investments is to reduce the volatility of the overall portfolio which providing a predictable stream of income.

The purpose of diversification between and within asset classes is to provide reasonable assurance that no single security or asset class has a disproportionate impact on the total portfolio.

## INVESTMENT GUIDELINES

The Roman Catholic Diocese of Ogdensburg was incorporated in 1945 to oversee the theological and financial affairs of the parishes and missions within the northern counties of New York State. It is responsible for charitable funds and the income generated by funds of multiple donors. The Diocese is committed to promoting the well-being of all its affiliated and related parishes, corporations, departments, institutions, organizations, entities, and programs.

Each person responsible for managing and investing a fund must do so in good faith and with the care an ordinarily prudent person would exercise under similar circumstances.

As mandated by NYPMIFA, the Investment Advisory Committee shall consider the following prudent factors, if relevant, for investment of diocesan funds:

1. The purposes of the Diocese.
2. General economic conditions.

3.  The possible effect of inflation or deflation.
4.  The expected tax consequences of investment decisions or strategies.
5.  The role that each investment or course of action plays within the overall investment portfolio of the fund.
6.  The expected total return from income and appreciation of investments.
7.  Other resources of the Diocese.
8.  The needs of the Diocese and investment funds to make distributions and preserve capital.
9.  An asset's special relationship or special value, if any, to the purposes of the Diocese.

The overall capital structure targets and permissible ranges for eligible asset classes are detailed in Appendix I.

Full discretion, within the parameters of the guidelines described herein, is granted to the investment managers regarding the asset allocation, the selection of securities in accordance with Appendix IV and the timing of transactions. Securities of an individual issuer, excepting the government and U.S. government agencies, shall not constitute more than 5% of an investment manager's portfolio at any time. Specific guidelines for the investment managers are included as Appendix III.

## Diversification of Investments

In recognition of the prudence required of fiduciaries, reasonable diversification will be sought where possible. Experience has shown that financial markets and inflation rates are cyclical and, therefore, control of volatility will be achieved through diversification of asset classes and selection of managers of diverse styles.

## Benefit Payments

Investment managers should assume that withdrawals might be made from the Investment Funds from time to time to meet diocesan needs, as communicated by the Diocesan Fiscal Officer. Appropriate liquidity should be maintained to fund these withdrawals without impairing the investment process. The Diocesan Fiscal Officer will endeavor to provide ample notice of any material withdrawals.

## Ineligible Investments

Unless specifically approved by the Committee, certain securities, strategies, and investments are ineligible for inclusion within this Investment Funds' asset base. These are:

- Lettered, legend or other so-called restricted stock.
- Investments prohibited under Appendix IV, Guidelines for Responsible Investing.
- Unregistered or restricted stock.
- Conditional Sales Contracts.
- Uncovered Options.
- Transferable certificates of participation in business trusts.

-4-

- Securities of the investment managers or their respective parents, subsidiaries or affiliates unless authorized by the Committee.
- Securities lending, pledging and hypothecating securities.

## Communication of Changes in Strategy or Specific Holdings

From time to time it may be necessary to inform the investment managers of a change in investment strategy or the need to dispose of specific investments. Such communication by the Committee will be in writing, copied to the Diocesan Bishop and the Diocesan Finance Council.

## Proxy Voting

Responsibility for the exercise of ownership rights through proxy voting shall rest solely with the investment managers, who shall exercise this responsibility strictly for the long-term economic benefit of the Investment Funds, its participants and beneficiaries in accordance with Appendix IV, Guidelines for Responsible Investing. Investment managers shall annually report to the Committee on their standing policies with respect to proxy voting, including any changes that have occurred in those policies.

Additionally, investment managers shall provide a written annual report of the proxy votes for all shares of stock in companies held in the Investment Funds' investment program. These reports shall specifically note and explain any instances where proxies were not voted in accordance with standing policy.

## Directed Commissions

Investment managers shall use their best efforts to ensure that portfolio transactions are placed on a "best execution" basis. Additionally, arrangements to direct commissions should only be implemented by specific authorization of the Committee.

## Commingled Funds

Appendix IV, Guidelines for Responsible Investing, states that ownership of mutual funds is to be minimized. The Committee will work with Investment Consultants (if any are retained) to monitor the investment policies of any commingled fund in which Investment Funds are allocated to ascertain if they are appropriate for the Investment Funds.

## ROLES AND RESPONSIBILITIES

## Investment Advisory Committee

The Investment Advisory Committee shall consist of seven members, one of whom shall be the Moderator of the Curia. Other members of the Committee shall be appointed by the Bishop.

The Diocesan Fiscal Officer shall serve in an advisory role to the Committee, but shall not be a member of the Committee.

Investment Advisory Committee members shall elect a chairperson whose duties include working with the Diocesan Fiscal Officer to develop meeting agendas and to run the business of the meeting.

The Committee shall meet subsequent to the end of each calendar quarter to review the performance of Investment Funds. Other relevant business may be conducted at these meetings as deemed appropriate by the Committee. Minutes of each Committee meeting shall be taken to maintain a record of the business transacted.

The Committee shall review the total investment program in accordance with provisions of NYPMIFA. The Committee shall provide overall direction to the administrative staff in the execution of the investment policy. The Committee is responsible for evaluating, hiring, and terminating investment managers and custodian banks. The Committee may choose to retain an investment consultant to assist them with their responsibilities.

The Diocesan Fiscal Officer shall provide minutes of each committee meeting to the Diocesan Finance Council.

**Investment Managers**

The duties and responsibilities of each of the investment managers retained by the Committee include:

1. Managing the assets under its management in accordance with the policy guidelines and objectives expressed herein.
2. Meeting or exceeding the manager specific benchmarks expressed in Appendix I.
3. Exercising investment discretion within the guidelines and objectives stated herein. Such discretion includes decisions to buy, hold or sell securities in amounts and proportions reflective of the manager's current investment strategy and compatible with the investment objectives.
4. Initiating written communication with the Committee when the investment manager believes that this policy statement is inhibiting and/or should be altered. No deviation from the guidelines and objectives is permitted until after such communication has occurred and the Bishop has documented his approval.
5. Complying with all provisions pertaining to the investment manager's duties and responsibilities as a fiduciary, Investment Funds' assets should be invested with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent professional investment manager, acting in a like capacity and familiar with such matters, would use in the investment of Investment Funds' assets.
6. Using best efforts to ensure that portfolio transactions are placed on a "best execution" basis.
7. Exercising ownership rights, where available, through proxy voting, doing so strictly for the economic benefit of the Investment Funds.
8. Adhering to the Guidelines for Responsible Investing shown in Appendix IV.
9. Investment managers managing investments totaling $10 million or more shall meet with the Committee quarterly. Other investment managers will meet with the Committee at its request.

10. Acknowledging in writing to the Committee the investment manager's intention to comply with this Statement as it currently exists or as modified in the future.
11. Acknowledging in writing to the Committee any changes in investment personnel.

## Investment Consultant

Should the Committee elect to do so, investment consultants may be retained. Investment consultants are expected to provide a knowledgeable, unbiased and independent service to the Committee. Investment consultants shall not hesitate to advocate their views on investment matters discussed by the Committee. The duties and responsibilities of Investment consultants retained by the Committee include:

1. Monitor the performance of investment managers to provide the Committee with the ability to determine progress toward the investment objectives stated in this policy. Quarterly reports evaluating investment manager performance will be provided to the Committee.
2. Advise the Committee on asset allocation, manager or fund selection, establishment of benchmarks and other general investment matters.
3. Gather, analyze and summarize data for presentation to the Committee in an effort to educate the Committee regarding investment opportunities.
4. Assist in the annual review of this investment policy.
5. Conduct investment manager searches when requested by the Committee.
6. Attend all meetings of the Committee.

## Custodian Bank(s)

In order to maximize the Investment Funds' return, no money should be allowed to remain idle. Dividends, interest, proceeds from sales, new contributions, and all other monies are to be invested or reinvested promptly.

The custodian bank(s) will be responsible for performing the following functions:

1. Accept instructions from designated Fiscal Office staff.
2. Advise designated staff of changes in cash equivalent balances.
3. Immediately advise designated Fiscal Office staff of additions or withdrawals from account.
4. Notify investment managers of proxies, tenders, rights, fractional shares or other dispositions of holdings.
5. Resolve any problems that designated Fiscal Office staff may have relating to the custodial account.
6. Safekeeping of securities.
7. Collection of interest and dividends.
8. Daily cash sweep of idle principal and income cash balances.
9. Processing of all investment manager transactions.
10. Collection of proceeds from maturing securities.
11. Disbursement of all income or principal cash balances as directed.
12. Providing monthly statements by investment account and a consolidated statement of all assets.

13. Working with the investment consultant and the Investment Funds' accountant to ensure accuracy in reporting.
14. Provide written statements revealing monthly reconciliation of custody and investment managers' accounting statements.

## CONFLICT OF INTEREST

It is the policy of the Committee to avoid conflicts of interest in its operations and in the selection of investment managers or funds. Therefore, members of the Committee shall not have a pecuniary relationship in any manager or fund being considered. No independent investment consultants retained by the Committee, or any entity, in which such consultants may have an interest, shall be a party to any transaction with, or have a financial or other interest in, any investment manager providing services to the Committee.

## POLICY REVIEW

It is the intent of the Committee to propose to the Bishop revisions to the Statement of goals and objectives to reflect modifications and revisions to the Investment Funds that may develop from time to time. It is also the policy of the Committee to review these goals and objectives at least once per year. Proposed revisions to the Statement shall be recommended by the Committee to the Bishop for his consideration. Changes to the Statement approved by the Bishop shall be communicated to the Diocesan Fiscal Officer, who will be responsible for informing the Committee, investment managers, investment consultants (if any are retained), and custodian bank(s) of such changes.

The investment managers and investment consultants are expected to notify the Committee when, in their judgment, they believe it is appropriate to modify the Statement.

## IMPLEMENTATION

All monies invested for the Investment Funds by its investment managers after the adoption of this Investment Policy shall conform to this policy.

# APPENDIX  G-I

## The Diocese of Ogdensburg Investment Fund

## *SUB-ACCOUNT  ASSET  ALLOCATION  GUIDELINES*

In order to have a reasonable probability of consistently achieving the Investment Funds' return objectives the Committee has adopted the asset allocation policy outlined below.

The Committee will review asset allocation at the end of the calendar quarter.

Note 1:  The Overall Target allocation represents the  overall target among all investment managers in the portfolio. The Permissible Range represents the allowable allocation for each specific investment manager. The Target Benchmark represents the benchmark for the investment manager responsible for the Asset Class.

**Priests' Pension Plan**

| Asset Class | Overall Target | Target Ranges | Target Benchmark |
|---|---|---|---|
| US Equity | 40% | 36%-54% | 40% Wilshire 5000 Index |
| Non-US Equity | 15% | 12%-18% | 15% EAFE Index |
| Fixed | 35% | 20%-40% | 35% Barclays Aggregate Bond Index |
| Emerging Markets | 5% | 0-10% | 5% MSCI Emerging Markets Index |
| US Direct Real Estate | 5% | 0-10% | 5% NCREIF Index |

**Diocesan Trust Fund**

| Asset Class | Overall Target | Target Ranges | Target Benchmark |
|---|---|---|---|
| US Equity | 45% | 36%-54% | 50% Wilshire 5000 Index |
| Non-US Equity | 15% | 12%-18% | 10% EAFE Index |
| Fixed | 30% | 20%-40% | 30% Barclays Aggregate Bond Index |
| Emerging Markets | 5% | 0-10% | 5% MSCI Emerging Markets Index |
| US Direct Real Estate | 5% | 0-10% | 5% NCREIF Index |

**Endowed Care Cemeteries Fund**

| Asset Class | Overall Target | Target Ranges | Target Benchmark |
|---|---|---|---|
| US Equity | 45% | 36%-54% | 50% Wilshire 5000 Index |
| Non-US Equity | 15% | 12%-18% | 10% EAFE Index |
| Fixed | 30% | 20%-40% | 30% Barclays Aggregate Bond Index |
| Emerging Markets | 5% | 0-10% | 5% MSCI Emerging Markets Index |
| US Direct Real Estate | 5% | 0-10% | 5% NCREIF Index |

**Deposit & Loan Fund**

| Asset Class | Overall Target | Target Ranges | Target Benchmark |
|---|---|---|---|
| US Equity | 25% | 20%-30% | 30% Wilshire 5000 Index |
| Non-US Equity | 10% | 8%-12% | 5% EAFE Index |
| Fixed | 60% | 40%-80% | 60% Barclays Aggregate Bond Index |
| Cash | 5% | 0-10% | 90 Day T-Bill |

**Charitable Gift Annuity Reserves**

| Asset Class | Overall Target | Target Ranges | Target Benchmark |
|---|---|---|---|
| US Equity | 25% | 20%-30% | 20% Wilshire 5000 Index |
| Non-US Equity | 10% | 8%-12% | 5% EAFE Index |
| Fixed | 60% | 40%-80% | 70% Barclays Aggregate Bond Index |
| Cash | 5% | 0-10% | 90 Day T-Bill |

**Diocesan Endowment Fund**

| Asset Class | Overall Target | Target Ranges | Target Benchmark |
|---|---|---|---|
| US Equity | 45% | 36%-54% | 50% Wilshire 5000 Index |
| Non-US Equity | 15% | 12%-18% | 10% EAFE Index |
| Fixed | 30% | 20%-40% | 30% Barclays Aggregate Bond Index |
| Emerging Markets | 5% | 0-10% | 5% MSCI Emerging Markets Index |
| US Direct Real Estate | 5% | 0-10% | 5% NCREIF Index |

**Diocesan Collateral Account**

| Asset Class | Overall Target | Target Ranges | Target Benchmark |
|---|---|---|---|
| US Equity | 25% | 20%-30% | 20% Wilshire 5000 Index |
| Non-US Equity | 10% | 8%-12% | 5% EAFE Index |
| Fixed | 60% | 40%-80% | 70% Barclays Aggregate Bond Index |
| Cash | 5% | 0-10% | 90 Day T-Bill |

## EVALUATION BENCHMARK

The structure of the Investment Policy has been designed to maximize return with specified risk constraints. Furthermore, the structure allows the Investment Manager of those assets with longer time horizons to invest in securities with an increased potential for appreciation. The evaluation of each portfolio will be the following:

Priests' Pension Plan – 40% Wilshire 5000 Index, 15% EAFE Index, 35% Barclays Aggregate Bond Index, 5% Emerging Markets Index, 5% NCREIF Index.

Diocesan Trust Fund – 50% Wilshire 5000 Index, 10% EAFE Index, 30% Barclays Aggregate Bond Index, 5% Emerging Markets Index, 5% NCREIF Index.

Endowed Care Cemeteries Fund – 50% Wilshire 5000 Index, 10% EAFE Index, 30% Barclays Aggregate Bond Index, 5% Emerging Markets Index, 5% NCREIF Index.

Deposit & Loan Fund – 30% Wilshire 5000 Index, 5% EAFE Index, 60% Barclays Aggregate Bond Index, 5% 90-day T-bill.

Charitable Gift Annuity Reserves – 20% Wilshire 5000 Index, 5% EAFE Index, 70% Barclays Aggregate Bond Index, 5% 90-day T-bill.

Diocesan Endowment Fund – 50% Wilshire 5000 Index, 10% EAFE Index, 30% Barclays Aggregate Bond Index, 5% Emerging Markets Index, 5% NCREIF Index.

Diocesan Collateral Account – 20% Wilshire 5000 Index, 5% EAFE Index, 70% Barclays Aggregate Bond Index, 5% 90-day T-bill.

In addition to the blended benchmarks, comparative institutional benchmarks will be utilized to judge the relative performance of the Lay Employees' Retirement Plan, Priests' Pension Plan, Diocesan Trust Fund, and Catholic Cemeteries Fund.

These comparisons would include the Wilshire TUCS median, National Association of College and Business Officers' Study, and the Council on Foundations.

# APPENDIX  G-II

## The Diocese of Ogdensburg Investment Fund

### *INVESTMENT  MANAGER  REPORTING  REQUIREMENTS*

**As Necessary** (based on occurrence)

1. Review of Organizational Structure

    A. Organizational changes (i.e., ownership).
    B. Discussion of any material changes to the investment process.
    C. Departures/additions to investment staff.
    D. Material changes in assets under management for the product managed on behalf of the Investment Funds and for total firm.

**Quarterly**

1. Reports should be in writing and delivered by the fifteenth (15th) business day following the end of the quarter.

2. Summary of Investment Guidelines
    A. Discuss adherence to guidelines.
    B. Comments, concerns, or suggestions regarding policy constraints, guidelines, etc.

3. Performance Review
    A. Present total fund and asset class returns for last calendar quarter, year-to-date and fiscal year-to date, last year, last three years, last five years, last ten years and since inception versus designated benchmarks. Show both pre and post fee returns.
    B. Discuss performance relative to benchmarks; provide attribution analysis which identifies returns due to allocation and selection decisions, as appropriate.
    C. Provide portfolio characteristics relative to benchmark.

4. Provide Portfolio Holdings
    A. Present book value and current market value.
    B. List individual's securities by sector, asset class, or country, as appropriate.\

5. Other Comments or Information

**<u>Annually</u>**

1. Reports should be in writing and delivered by the fifteenth (15th) business day following the end of the year.

2. Review of Investment Process and Evaluation of Portfolio Management Process
   A. Brief review of investment process.
   B. Investment strategy used over the past year and underlying rationale.
   C. Evaluation (in hindsight) of strategy's appropriateness.
   D. Evaluation of strategy's success/disappointments.
   E. Current investment strategy and underlying rationale.

# APPENDIX  G-III

**SECTION 1**

## The Diocese of Ogdensburg Investment Funds

## INVESTMENT OBJECTIVES AND GUIDELINES FOR MANNING & NAPIER ADVISORS, INC.

**I.    Objectives**

A.  Total return, net of fees, is expected to exceed the targeted benchmark shown in Appendix I and CPI + 5% over a rolling three to five-year period. Total Return will be compared to:

1. The total return for the Morningstar U.S. Balanced Universe, similar sized pooled asset results for investment portfolios with an investment of long-term growth, as well as the aggregate client index provided by the manager.

2. The total return for the Morningstar short-term U.S. Fixed Income Universe for investment portfolios with an objective of defensive growth.

B.  Return objectives should be achieved without assuming undue risk. The risk - as measured by the standard deviation of returns - and the risk-adjusted return will be compared to:

1. The Morningstar U.S. Balanced Universe for investment portfolios with an objective of long-term growth.

2. The Morningstar short-term U.S. Fixed Income Universe for investment portfolios with an objective of defensive growth.

**II.    Guidelines**

A.  The manager is granted full discretion, within the guidelines described herein.

B.  Eligible securities are equity securities traded in domestic and international markets, American Depository Receipts and other dollar denominated, domestically traded securities, exceeding those prohibited under the guidelines in Appendix IV.

-14-

C. The manager is expected to be fully invested within the permissible range for each asset class stated in Appendix I; this notwithstanding, the Committee understands that some liquidity in the portfolio is necessary to facilitate trading, and does not place an explicit restriction on the holding of cash equivalents. The custodian bank Short Term Investment Fund ("STIF") is an allowed investment, as are other cash equivalents, provided they carry an S&P rating of at least Al or an equivalent rating.

D. The portfolio weight of the securities of an individual issuer, excepting the U.S. government and U.S. government agencies, shall not exceed 5%.

E. Responsibility for the exercise of ownership rights including proxy solicitations is delegated to the manager. The manager is expected to vote all proxies and to summarize votes to the Committee as requested, but not less than annually.

F. Setting stop loss orders for all equities upon acquisition of each equity and updated every three months thereafter. The stop orders price shall be set at 90% of the purchase price for newly acquired equities and 90% of the closing price on the day before the beginning of each quarter thereafter.

G. Exceptions may be made to the foregoing general investment objectives and guidelines in the event of a readily evident national or global catastrophe that could cause severe adverse effects on the Funds' assets. The agreement with the Financial Manager(s) should provide that the allocation of investments to protect the Funds' asset value may be made by the Bishop/Diocesan Administrator without the approval of the Trustees or any advisory committees of the Diocese in the event of such a catastrophe. In such circumstances, portfolio protection strategy may include reallocation of investment assets into a cash position or the use of inverse equity funds or exchange traded funds to neutralize erosion of principal in diocesan funds.

**APPENDIX  G-III**

**SECTION 2**

## The Diocese of Ogdensburg Investment Funds

### *INVESTMENT OBJECTIVES AND GUIDELINES FOR DIMENSIONAL FUND ADVISORS EMERGING MARKETS*

I.    **Objectives**

    A.  Total return, net of fees, is expected to exceed the target benchmark shown in Appendix I over a rolling three to five-year period.

    B.  Total return, net of fees, will be compared to the total return for the Morningstar Emerging Markets Universe.

    C.  Return objectives should be achieved without assuming undue risk.

II.   **Guidelines**

    A.  The manager is granted full discretion, within the guidelines described herein.

    B.  Other guidelines to be determined.

    C.  The portfolio weight of the securities of an individual issuer, excepting the U.S. government and U.S. government agencies, shall not exceed 5%.

    D.  Responsibility for the exercise of ownership rights including proxy solicitations is delegated to the manager. The manager is expected to vote all proxies and to summarize votes to the Committee as requested, but not less than annually.

    E.  Exceptions may be made to  the foregoing general investment objectives and guidelines in the event of a readily evident national or global catastrophe that could cause severe adverse effects on the Funds' assets.  The agreement with the Financial Manager(s) should provide that the allocation of investments to protect the Funds' asset value may be made by the Bishop/Diocesan Administrator of the Diocese without the approval of the Trustees or any advisory committees of the Diocese in the event of such a catastrophe.  In such circumstances, portfolio protection strategy may include reallocation of investment assets into a cash position or the use of inverse equity funds or exchange traded funds to neutralize erosion of principal in diocesan funds.

**APPENDIX  G-III**

**SECTION 3**

# The Diocese of Ogdensburg Investment Funds

## *INVESTMENT OBJECTIVES AND GUIDELINES FOR THE INVESTMENT FUND FOR FOUNDATIONS REALTY OPPORTUNITY FUND*

**I.      Objectives**

A.  Total return, net of fees, is expected to exceed the target benchmark shown in Appendix I over a rolling three to five-year period.

B.  Return objectives should be achieved without assuming undue risk.

**II.     Guidelines**

A.  The manager is granted full discretion, within the guidelines described herein.

B.  Other guidelines to be determined.

C.  The portfolio weight of the securities of an individual issuer, excepting the U.S. government and U.S. government agencies, shall not exceed 5%.

D.  Responsibility for the exercise of ownership rights including proxy solicitations is delegated to the manager. The manager is expected to vote all proxies and to summarize votes to the Committee as requested, but not less than annually.

E.  Exceptions may be made to the foregoing general investment objectives and guidelines in the event of a readily evident national or global catastrophe that could cause severe adverse effects on the Funds' assets. The agreement with the Financial Manager(s) should provide that the allocation of investments to protect the Funds' asset value may be made by the Bishop/Diocesan Administrator of the Diocese without the approval of the Trustees or any advisory committees of the Diocese in the event of such a catastrophe. In such circumstances, portfolio protection strategy may include reallocation of investment assets into a cash position or the use of inverse equity funds or exchange traded funds to neutralize erosion of principal in diocesan funds.

**APPENDIX  G-III**

**SECTION 4**

## The Diocese of Ogdensburg Investment Funds

### *INVESTMENT OBJECTIVES AND GUIDELINES FOR CHRISTIAN BROTHERS INVESTMENT SERVICES (CBIS)*

**I.    Objectives**

A.  Total return, net of fees, is expected to exceed the targeted benchmark shown in Appendix I and CPI + 5% over a rolling three to five-year period. Total Return will be compared to:

1. The total return for the Morningstar U.S. Balanced Universe, similar sized pooled asset results for investment portfolios with an investment of long-term growth, as well as the aggregate client index provided by the manager.

2. The total return for the Morningstar short-term U.S. Fixed Income Universe for investment portfolios with an objective of defensive growth.

B.  Return objectives should be achieved without assuming undue risk. The risk - as measured by the standard deviation of returns - and the risk-adjusted return will be compared to:

1. The Morningstar U.S. Balanced Universe for investment portfolios with an objective of long-term growth.

2. The Morningstar short-term U.S. Fixed Income Universe for investment portfolios with an objective of defensive growth.

**II.    Guidelines**

A.  The manager is granted full discretion, within the guidelines described herein.

B.  Eligible securities are equity securities traded in domestic and international markets, American Depository Receipts and other dollar denominated,

domestically traded securities, exceeding those prohibited under the guidelines in Appendix IV.

C. The manager is expected to be fully invested within the permissible range for each asset class stated in Appendix I; this notwithstanding, the Committee understands that some liquidity in the portfolio is necessary to facilitate trading, and does not place an explicit restriction on the holding of cash equivalents. The custodian bank Short Term Investment Fund ("STIF") is an allowed investment, as are other cash equivalents, provided they carry an S&P rating of at least Al or an equivalent rating.

D. The portfolio weight of the securities of an individual issuer, excepting the U.S. government and U.S. government agencies, shall not exceed 5%.

E. Responsibility for the exercise of ownership rights including proxy solicitations is delegated to the manager. The manager is expected to vote all proxies and to summarize votes to the Committee as requested, but not less than annually.

F. Setting stop loss orders for all equities upon acquisition of each equity and updated every three months thereafter. The stop orders price shall be set at 90% of the purchase price for newly acquired equities and 90% of the closing price on the day before the beginning of each quarter thereafter.

G. Exceptions may be made to the foregoing general investment objectives and guidelines in the event of a readily evident national or global catastrophe that could cause severe adverse effects on the Funds' assets. The agreement with the Financial Manager(s) should provide that the allocation of investments to protect the Funds' asset value may be made by the Bishop/Diocesan Administrator without the approval of the Trustees or any advisory committees of the Diocese in the event of such a catastrophe. In such circumstances, portfolio protection strategy may include reallocation of investment assets into a cash position or the use of inverse equity funds or exchange traded funds to neutralize erosion of principal in diocesan funds.

# APPENDIX G-IV

# GUIDELINES FOR RESPONSIBLE INVESTING

## Statement of Principles

All human activity is to be judged in the light of how well it protects and fulfills the dignity of persons. Any activity that attacks or subordinates human persons as means to ends must be repudiated. "Respect for the human person entails respect for the rights that flow from his dignity as a creature. These rights are prior to society and must be recognized by it" *The Catechism of the Catholic Church* (CCC), 1930.

Economic activity concerns the supplying of human material needs and wants. Economic choices and institutions are to be judged by whether they protect or threaten the goods of persons. "The fundamental moral criterion for all economic decisions, policies, and institutions is this: They must be at the service of **all people, especially the poor**" *Economic Justice for All* (EJ), 24.

With social teachings grounded in the dignity of the human person, the Church seeks to apply these teachings to every institution and aspect of social life. To that end the Church seeks: a) to strengthen the family as the central institution of society, b) to affirm the right to life and those things necessary for human decency, c) to put the needs of the poor and vulnerable first, d) to respect the rights of workers, e) to practice solidarity with the whole human family, and f) to be good stewards of creation [cf. "Sharing Catholic Social Teaching: Challenges and Directions," United States Catholic Conference, 1998, pp.4-5].

In its investments, the Roman Catholic Diocese of Ogdensburg will direct that its investments be managed in accord with principles of morality rooted in Catholic belief. Investing involves the application of the principles of cooperation. Catholic moral teaching distinguishes direct or formal cooperation in evil from indirect or material cooperation. Formal cooperation in evil is one with the intention of the evildoer and as such, is always wrong. In material cooperation, the cooperator intends a good act that indirectly gives material support to an evil agent. Such cooperation can be justified for a proportionate reason, that is, where the harmful consequences do not exceed the good consequences. The more proximate the material cooperation, the greater must be the good consequences to justify it.

The Diocese of Ogdensburg will seek to provide guidance and example in applying the Catholic Church's moral teaching to the production and practices of companies. Through its shareholding, the Diocese will also seek to influence corporate decisions that affect the common good. Through divestment, the Diocese will seek to separate itself from involvement with products and practices deemed significantly immoral.

**Policies**

In the light of the moral and social teaching of the Catholic Church, the Diocese of Ogdensburg directs that its investments are to be formulated and maintained in accord with the following policies. These applications are based in part on the 1991 "Socially Responsible Investment Guidelines" first revised in 2003, later revised in 2021, of the United States Conference of Catholic Bishops. In making application of the following policies, the Diocese will utilize material published by the Social Investment Research Service (SIRS), and other appropriate sources which make possible the application of principles of Catholic moral teaching.

Investment managers for the diocese are responsible for implementing the provisions of these policies. It is expected that they will utilize screening services available from third party sources, such as *SIRS,* applying them to the investments of the Diocese in keeping with these policies. Managers shall refer investments deserving further consideration to the Investment Advisory Committee. However, the Investment Advisory Committee retains the right to review all diocesan investments and make decisions regarding the appropriateness of each.

A.  PROTECTING HUMAN LIFE

1.  We will not invest in any company whose activities include direct participation in or support of abortion, euthanasia or assisted suicide. Direct participation involves the manufacture of materials that are produced and/or marketed for the specific purpose of abortion (including abortifacients), euthanasia, or assisted suicide as well as companies that perform abortions or facilities assisted suicide or euthanasia.

2.  For companies where it is discovered that there is some tangential connection to abortion, euthanasia, or assisted suicide related issues, we will engage companies through proxy voting and support of shareholder resolutions to eliminate this connection.

3.  We will not invest in companies that utilize *in vitro* fertilization for either assisting conception or for research.

4.  We will not invest in companies that engage in scientific research on human fetuses or embryos that results in the end of pre-natal human life or makes use of tissue derived from abortions or other life-ending activities and/or develops products and services from such research.

5.  We will not invest in companies that engage in scientific research whose purpose is the cloning of human beings and/or develops products and services from such research.

6.  We will encourage companies through proxy voting and support of shareholder resolutions to undertake or participate in programs designed to make life-sustaining drugs and vaccines available at affordable prices in both the United States and in low-income countries, consistent with our Catholic values.

7. We will actively engage companies through corporate dialogues, proxy voting, and support of shareholder resolutions to develop life-sustaining drugs and vaccines that do not rely on any cell lines procured from abortions.

## B. PROMOTING HUMAN DIGNITY

1. We will engage companies through proxy voting and support of shareholder resolutions to direct their efforts to protecting and promoting human rights – as understood by Church teaching[1] - and supply chain transparency. We will consider divesting from companies whose activities are known to persistently violate the human rights of their workers or contract with companies or governments who persistently violate human rights until sufficient action has been taken to correct these human rights violations. Some tools in evaluating and recommending changes are the United Nations' *Guiding Principles on Business and Human Rights*,[2] and the International Labor Organization's *Conventions*,[3] insofar as these resources do not contradict the teaching of the Catholic Church.

2. We will encourage companies through proxy voting and support of shareholder resolutions to provide sufficient wages, decent working conditions, and other social benefits that enable their employees and families to meet basic human needs while abiding by the rule of law and safeguarding against environmental degradation particularly among developing countries.

3. We will engage companies through poxy voting and support of shareholder resolutions toward implementing policies and practices to ensure they do not discriminate against people based on their sex, race, skin color, language, or religion.[4]

4. We will engage companies through proxy voting and support of shareholder resolutions to develop and maintain policies toward equal opportunities, pay, and leadership opportunities – including inclusion on corporate boards – for women, people of color, and people with disabilities. We will also encourage companies to develop specific goals to become more diverse, including within the membership of their corporate boards.

5. We will not invest in a company whose sole purpose is to appeal to an indecent interest in sex or to incite sexual excitement through the production of sexually explicit films, videos, or internet sites or services. We will also actively encourage companies through proxy voting and support of shareholder resolutions to disengage from receiving revenue from the distribution of these products or services.

---

[1] Pontifical Council for Justice and Peace, *Compendium of the Social Doctrine of the Church*, (2004), Part One, chapter 3, section IV.

[2] See https://www.ohchr.org/Documents/Publications/GuidingPrinciplesBusinessHR_EN.pdf

[3] See https://www.ilo.org/global/standards/introduction-to-international-labour-standards/conventions-and-recommendations/lang--end/index.htm

[4] See *Guadium et spes*, no. 29. To aid in defining discrimination, see also https://www.eeoc.gov/discrimination-type insofar as this resource does not contradict the teaching of the Catholic Church.

6. We will advocate through proxy voting and support of shareholder resolutions company initiatives to promote responsible, marriage affirming and family-oriented program content development by media, technology, and telecommunications companies.

7. We will engage companies through proxy voting and support of shareholder resolutions to effectively address human trafficking and forced labor by developing codes of ethics that follow the Palermo Protocol of 2000, insofar as this resource does not contradict the teaching of the Catholic Church,[5] and identify high risk areas for human trafficking and forced labor along their supply chains and partner companies and make necessary changes.

8. We will not invest in companies that directly participate in the performance of surgeries or in the administration of drugs or hormones for the purposes of delaying normal puberty or modifying the body's appearance and/or functions in order to express an identity incongruent with one's biological sex.[6]

9. We will encourage companies through proxy voting and support of shareholder resolutions to advocate for an understanding of marriage or sexuality that is consistent with Church teaching and natural law.

10. We will not invest in companies that manufacture contraceptives or derive more than 10% of their revenue from the sale of contraceptives, even if they do not manufacture them.

## C. ENHANCE THE COMMON GOOD

1. We will not invest in firms that derive any revenue from the production of weapons inconsistent with Catholic teaching on war (e.g. biological and chemical weapons, landmines, nuclear weapons, weapons of mass destruction, etc.).[7] We will not invest in companies that manufacture firearms with the exception of those companies that only manufacture firearms for hunting and/or legitimate military or law enforcement organizations.[8]

2. We will engage companies through proxy voting and support of shareholder resolutions efforts to limit weapons production, to limit foreign sales of weapons, and to convert corporate capacity to non-military uses. For companies that may cause, contribute to, or be linked to warfare, such as technology companies or financial institutions, we will actively encourage them through voter proxy to uphold and incorporate human rights standards as understood by the Church into their business decisions.

3. We will not invest in companies whose primary purpose is to derive revenue from gambling or the production of tobacco or the recreational use of cannabis.

---

[5] See https://www.ohchr.org/EN/ProfessionalInterest/Pages/ProtocolTraffickingInPersons.aspx
[6] Pope Francis, *Amoris Laetitia*, no. 56.
[7] Catechism of the Catholic Church, no. 2314.
[8] See https://www.usccb.org/issues-and-action/human-life-and-dignity/violence/upload/Remarks-Bishop-Dewane-Responses-to-the-Plague-of-Gun-Violence-11-11-2019.pdf

4. We will encourage companies through proxy voting and support of shareholder resolutions to move away from the production, marketing, or distribution of additive or other harmful materials.

5. We will actively encourage through proxy voting and support of shareholder resolutions media and telecommunication companies, including social media companies, to employ and enforce guidelines that promote the dignity of the human person, as understood by Church teaching. We should avoid investing in media corporations that have demonstrated resistance to adopting and implementing a human rights policy that is consistent to Church teaching.[9]

## D.  PURSUING ECONOMIC JUSTICE

1. We will strongly encourage companies through proxy voting and support of shareholder resolutions to report on social, environmental, as well as financial performance.

2. We will promote and engage companies through proxy voting and support of shareholder resolutions the adoption of corporate social and environmental responsibility guidelines within companies.

3. We will engage companies through proxy voting and support of shareholder resolutions to provide decent working conditions, just wages,[10] employee ownership/profit sharing, the right to organize, protecting children worker-led social responsibility models, and other initiatives aimed at the protection and promotion of human dignity and economic justice.

4. We will advocate and engage companies through proxy voting and support of shareholder resolutions to promote just wage and benefit policies, and worker safety. In addition, we will work toward the protection of migrant and seasonal workers.

5. We will encourage companies through proxy voting and support of shareholder resolutions to adopt practices for ethical and responsible banking, including as it relates to corporate lending activities, project finance, and consumer banking to ensure there are appropriate due diligence and risk management systems in place to identify and mitigate abuses such as those related to discriminatory practices and excessive rates and fees and to serve the underbanked or financially marginalized.[11]

6. We will communicate, where appropriate, to its financial institutions support for initiatives to reach out to the poor by providing access to fair credit[12] and other means to help improve livelihoods, the financing of low-income housing, and

---

[9] See Pope John XXIII, *Pacem in terries*, no. 9. See also *Economic Justice for All*, no. 80 and the United Nations' *Guiding Principles on Business and Human Rights*, insofar as this resource does not contradict the teaching of the Catholic Church.

[10] See Catechism of the Catholic Church, no. 2434, and Pontifical Council for Justice and Peace, Compendium of the Social Doctrine of the Church, no. 302.

[11] This includes companies whose revenues derive from 10% or more of revenue from predatory lending. See https://www.usccb.org/resources/backgrounder-predatory-banking-payday-lending

[12] See Compendium of the Social Doctrine of the Church, no. 341.

increased access to capital for communities of color. We will encourage companies through proxy voting and support of shareholder resolutions engaged in real estate activities to construct and preserve affordable housing that serves low-income individuals and families.

E.  SAVING OUR GLOBAL COMMON HOME

1.  We will actively invest in companies whose business models are consistent with the emission reduction goals of the Paris Agreement, insofar as this resource does not contradict the teaching of the Catholic Church.[13]

2.  We will encourage companies through proxy voting and support of shareholder resolutions to establish greenhouse gas emission reduction goals, provide disclosure around low-carbon planning, and mitigate climate change. We will consider divestment from those companies that consistently fail to initiate policies intended to achieve the Paris Agreement goals.[14]

3.  We will actively encourage companies through proxy voting and support of shareholder resolutions to demonstrate high standards of protection for living organisms and terrestrial, marine, and other ecosystems. One resource outlining definitions, principles, and best practices for biodiversity protection is the United Nations Convention on Biological Diversity[15] insofar as this resource does not contradict the teaching of the Catholic Church.

4.  We should avoid investing in companies that have caused specific instances of biodiversity loss, or whose practices have significantly contributed to biodiversity loss and have not worked toward correcting or remediating the damage their operations have caused.

5.  We should avoid investing in companies whose activities directly contribute to depletion and/or degradation of available water, without mitigating these impacts, and in companies engaged in extraction of natural resources that do not demonstrate formal and/or informal compliance with the principles of the Extractive Industries Transparency Initiative[16] insofar as this resource does not contradict the teaching of the Catholic Church.

6.  We will encourage companies through proxy voting and support of shareholder resolutions to employ water saving policies and technologies along with other means of saving water.

---

[13] See https://unfccc.int/files/essential_background/convention/application/pdf/english_paris_agreement.pdf. For the Church's support of these goals, see https://www.vatican.va/content/francesco/en/messages/pont-messages/2020/documents/papa-francesco_20200901_messaggio-giornata-cura-creato.html and https://www.usccb.org/issues-and-action/human-life-and-dignity/environment/upload/USCCB-CRS-Letter-to-Secretary-Tillerson-on-Care-for-Creation-02-17-2017.pdf

[14] "Promote responsible investments in social and environmental sectors, for example by evaluating progressive investment from the fossil-fuel sector" (Interdicasterial Working Group of the Holy See on Integral Ecology, *Journeying Towards Care for Our Common Home: Five Years After* Laudato Si', (Vatican City: *Iberia Editrice Vaticana*, 2020, p. 179.

[15] See https://www.cbd.int/convention/text/.

[16] See https://eiti.org/.

7. We will actively encourage technology companies through proxy voting and support of shareholder resolutions to employ and enforce guidelines that promote the dignity of the human person and protect the environment. Technology companies have a particular responsibility to ensure that they promote responsible consumption, employ efficient and renewable energy use, contribute to the common good, and conform to environmental standards.

8. We will encourage companies through proxy voting and support of shareholder resolutions to uphold the highest environmental standards and to change and remediate practices that negatively impact the environment either in their operations, or those of their contractors or supply chain, and in their products or services. This may include, for example, a company's emissions, spills, hazardous waste or other forms of pollution, non-compliance with environmental regulations, damage to ecosystems, concerns over the risks that a company's products/services may pose to the environment and public health, or concerns related to products at the end of their life cycle.

9. We should avoid investing in companies that are non-compliant with the three environmental principles (7, 8, and 9) of the UN Global Compact[17] insofar as this resource does not contradict the teaching of the Catholic Church.

\* \* \* \* \* \* \* \* \* \*

Exclusion on the basis of *SIRS* ratings or those of other similar services will not be applied to companies which are not graded by the agency.

As a diocese we are seeking to exercise leadership in applying Catholic moral principles to our investment portfolios. By doing so we hope to remove ourselves as much as possible from participating in products and practices that we understand to be wrong. We recognize, however, that an investor's moral accountability is complex.

On the matter of pooled investments or mutual funds, the principles of moral cooperation must be applied. There may never be direct or formal cooperation with evil actions, but where ownership is indirect and the cooperation material and remote, as is the case with many commingled investments, then investment may be acceptable for the economic opportunity it offers. Pooled investments in sectors that have a significant proportion of companies with morally unacceptable products or practices should be avoided. Investments in companies in developing countries and emerging markets may present more difficulties for our assessment because of a lack of screening mechanisms to apply to them, but the same principles of cooperation apply. Moreover, our investing in emerging markets can have the benefit of helping the generally poorer populations of the developing countries to take their rightful place in the world economy.

Some may be concerned that there is a lack of consistency in application of the moral principles of the Church when U.S. government bonds and notes are purchased for our portfolios even

---

[17] See https://www.unglobalcompact.org/what-is-gc/mission/principles

though our government is engaged in activities which are contrary to the teachings of the Church, such as the promotion of abortion or the production or potential use of particular weapons. Direct participation in a morally objectionable act is incurred when one is a willing owner of an entity responsible for such activity. The same criterion is not met in the case of lending money to the government through the purchase of bonds. Nevertheless, the values remain in conflict. In light of the fiduciary responsibility the Diocese has toward the People of God in the North Country and those who benefit from the use of its financial resources, and by virtue of the absence of direct participation in works of the government to which we object, the Diocese will continue to allow government bonds and notes to be purchased for its accounts.

**Addendum 1**

Some of the Church's specific moral teachings that bear upon a moral appraisal of the products and activities of companies are as follows (all quotations are from *The Catechism of the Catholic Church):*

God alone is the Lord of life from its beginning until its end; no one can under any circumstance claim for himself the right directly to destroy an innocent human being. (2258)

The legitimate defense of persons and societies is not an exception to the prohibition against the murder of the innocent that constitutes intentional killing. (2263)

Human life must be respected and protected absolutely from the moment of conception. From the first moment of his existence, a human being must be recognized as having the rights of a person--among which is the inviolable right of every innocent being to life. (2270)

Direct euthanasia consists in putting an end to the lives of handicapped, sick, or dying persons. It is morally unacceptable. (2277)

It [pornography] offends against chastity because it perverts the conjugal act, the intimate giving of spouses to each other. It does grave injury to the dignity of its participants (actors, vendors, the public, etc.), since each one becomes an object of base pleasure and illicit profit for others. (2354)

Every action which, whether in anticipation of the conjugal act, or in its accomplishment, or in the development of its natural consequences, proposes, whether as an end or as a means, to render procreation impossible is intrinsically evil. (2370)

In the beginning God entrusted the earth and its resources to the common stewardship of mankind to take care of them, master them by labor, and enjoy their fruits. The goods of creation are destined for the whole human race. (2402)

The **right to private property,** acquired by work or received from others by inheritance or gift, does not do away with the original gift of the earth to the whole of mankind. The

**universal destination of goods** remains primordial, even if the promotion of the common good requires respect for the right to private property and its exercise. (2403)

Any system in which social relationships are determined entirely by economic factors is contrary to the nature of the human person and his acts. (2423)

A system that "subordinates the basic rights of individuals and of groups to the collective organization of production" is contrary to human dignity. Every practice that reduces persons to nothing more than a means of profit enslaves man, leads to idolizing money, and contributes to the spread of atheism. (2424)

Those **responsible for business enterprises** are responsible to society for the economic and ecological effects of their operations. They have an obligation to consider the good of persons and not only the increase of **profits.** Profits are necessary, however. They make possible the investments that ensure the future of a business and they guarantee employment. (2432)

Charity and respect for the truth should dictate the response to every **request for information or communication.** (2489)

Christian purity requires a **purification of the social climate.** It requires of the communications media that their presentations show concern for respect and restraint. (2525)

The tenth commandment forbids **greed** and the desire to amass earthly goods without limit. It forbids **avarice** arising from a passion for riches and their attendant power. It also forbids the desire to commit injustice by harming our neighbor in his temporal goods.