**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
MICHAEL M. KLOTZ
1301 Avenue of Americas
Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
Email: tschiavoni@omm.com
mklotz@omm.com

**CLYDE & CO US LLP**
MARIANNE MAY
340 Mt. Kemble Ave., Suite 300
Morristown, NJ 07960
Telephone: (973) 210-6700
Email: Marianne.May@clydeco.us

*Attorneys for Century Indemnity Company,*
*as successor to CCI Insurance Company,*
*as successor to Insurance Company of North America*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-60507 (PGR) |
| The Roman Catholic Diocese of Ogdensburg, New York, | ) | Chapter 11 |
| | ) | |
| Debtor. | . | |

**CENTURY'S OBJECTION TO DEBTOR'S PROPOSED SOLICITATION PROCEDURES AND CASE MANAGEMENT ORDER**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 4

ARGUMENT .......... 7

I. The Proposed Procedures Make It Impossible To Determine Whether Any Claims Against Individual Additional Debtor Parishes Voted To Approve The Joint Plan .......... 7

A. The Code Requires At Least One Impaired Accepting Class *For Each* Debtor .......... 7

B. The Proposed Case Management Order Disenfranchises Parish Claimants From Voting And Violates *Purdue Pharma* .......... 9

II. Each Individual Claimant Must Receive a Solicitation Package and Class 4 Ballot Directly To Sign and Return Their Own Ballot .......... 11

A. Direct Solicitation and Balloting of Claimants Ensures Integrity of Solicitation by Balloting Agent .......... 11

B. The Proposed Self-Certification Procedure Is Unlawful and Will Enable Manipulation of Voting .......... 13

C. An Essential Purpose of Rule 2019 Is To Ensure Counsel Has Authority To Act On Behalf Of Claimants .......... 15

III. Claimants Without Legally Cognizable Claims Should Not Be Permitted To Vote .......... 20

CONCLUSION .......... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIO US, Inc.*,
No. 24-11836, 2025 WL 2426380 (Bankr. D. Del. Aug. 21, 20225) ........ 8

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
321 B.R. 147 (D.N.J. 2005) ........ 13, 15, 16

*Estate of R.S.G. v. Catholic Foreign Mission Socy. of Am., Inc.*,
195 N.Y.S.3d 374 (N.Y. Sup. Ct. 2023) ........ 21

*Harrington v. Purdue Pharma*,
603 U.S. 204 (2024) ........ 10

*In re Am. Cap. Equip., Inc.*,
405 B.R. 415 (Bankr. W.D. Pa. 2009) ........ 22

*In re CF Holding Corp.*,
145 B.R. 124 (Bankr. D. Conn. 1992) ........ 16

*In re Combustion Engineering, Inc.*,
391 F.3d 190 (3d Cir. 2004) ........ 12

*In re Cruisephone, Inc.*,
278 B.R. 325 (Bankr. E.D.N.Y. 2002) ........ 21

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005) ........ 17

*In re Indian Palms Assocs., Ltd.*,
61 F.3d 197 (3d Cir. 1995) ........ 14

*In re Ionosphere Clubs, Inc.*,
101 B.R. 844 (Bankr. S.D.N.Y. 1989) ........ 16

*In re N. Bay Gen. Hosp., Inc.*,
404 B.R. 443 (Bankr. D. Tex. 2009) ........ 17

*In re N. Bay Gen. Hosp., Inc.*,
404 B.R. 443 (Bankr. S.D. Tex. 2009) ........ 15

In re Okla. P.A.C. First Ltd. P'shipt,
122 B.R. 387 (Bankr. D. Ariz. 1990) ........ 16, 19

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005) ........ 10

*In re Red River Talc LLC*,
670 B.R. 251 (2024) ........ 12

*In re Stokes*,
320 B.R. 821 (Bankr. D. Md. 2004) ........ 21

*In re The Muralo Co.*,
295 B.R. 512 (Bankr. D. N.J. 2003) ........ 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) .......... 7, 11

*In re W.R. Grace & Co.*,
626 B.R. 217 (Bankr. Del. 2021) .......... 22

*In re Wash. Mut. Inc.*,
419 B.R. 271 (Bankr. D. Del. 2009) .......... 15

*Nortex Trading Corp. v. Newfield.*,
311 F.2d 163 (2d Cir. 1962) .......... 21

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship.*,
507 U.S. 380 (1993) .......... 22

*Reid v. White Motor Corp.*,
886 F.2d 1462 (6th Cir. 1989) .......... 19

**Statutes**

11 U.S.C. § 1126(a) .......... 11

11 U.S.C. § 1126(c) .......... 7, 11

11 U.S.C. § 1129(a)(10) .......... 7

11 U.S.C. § 1129(a)(3) .......... 24

11 U.S.C. § 502(b)(1) .......... 24

Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the Solicitation Procedures and Case Management Order proposed by the Diocese's *Motion For Entry of Orders (A)(I) Approving Disclosure Statement; (II) Approving Solicitation Packages And Distribution Procedures; (III) Approving The Forms of Ballots And Establishing Procedures For Voting On The Plan; (IV) Approving The Form, Manner, And Scope Of Confirmation Notices; (V) Establishing Certain Deadlines In Connection With Approval Of The Disclosure Statement And Confirmation Of The Joint Plan; (VI) Approving Procedures For Temporary Allowance And Estimation Of Claims For Voting Purposes; (B) Establishing Procedures For The Filing And Administration Of Rapid Prepackaged Chapter 11 Cases For Additional Debtors; And (C) Granting Related Relief* [Dkt. No. 1398] (the "Motion"). In support of this Objection, Century respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Court should reject the proposed Solicitation Procedures.

2. First, the proposed ballot only asks Claimants to certify they hold an "Abuse Claim ***against the Diocese***." However, the Diocese asks this Court to confirm a Joint Plan that applies not only to the Diocese, but also to an array of other entities that have not yet filed for Chapter 11 bankruptcy and have no proofs of claim filed against them. The Code requires a debtor's plan of reorganization to be approved by two-thirds of each class of creditors entitled to vote; that requirement cannot be satisfied for any Additional Debtor Parish under the proposed Solicitation Procedures when there is no way to determine that any Abuse Claims against any individual Parish voted to approve or reject the Joint Plan.

3. Where a joint plan covers debtors whose estates remain separate, Code section

1129(a)(10) requires at least one non-insider impaired accepting class for each debtor; acceptance of such class is measured by Code section 1126(c)'s two-thirds-in-amount and majority-in-number test. The Diocese and the Additional Debtors are not substantively consolidated, and they are not even being jointly administered yet—and still will not be while the proposed Joint Plan is being solicited. As a matter of convenience, the plans filed by each of the debtors in the case are contained in a single document that may be described colloquially as 'the plan.' As a statutory matter, however, they can only be understood as multiple, each of which must meet the requirements for confirmation.

4. Second, the proposed Case Management Order cannot just take the votes cast by the Diocese's claimants to the Additional Debtors after the Additional Debtors file for bankruptcy, the Additional Debtors' plans must be voted on `by their respective unique pools of claimants. Even if voting and solicitation occurs prior to the Additional Debtors' bankruptcy petitions being filed, the debtors must solicit the claim holders for each debtor and satisfy the Code's two-thirds approval requirements.

5. Forcing the votes cast for the Diocese's plan onto individuals holding claims against the Additional Debtors forces nonconsensual releases and injunctions onto those individuals, violating the Supreme Court's prohibition on such releases in *Purdue Pharma*. Those individuals never have the opportunity to vote on the plan but are forced to abide by the plan's releases and injunctions preventing them from pursuing claims against the Additional Debtor. Each of these individuals must be given a choice regarding the plan, otherwise the plan is unconfirmable, particularly where, as here, solicitation occurs before the universe of Additional Debtor claimants is unknown since proofs of claim aren't due until after the confirmation order has been entered.

6. Third, the Solicitation Procedures require the Solicaiton Packages and Ballots to be sent to the claimant's attorneys where there address is provided in the proofs of claim instead of the directly to the claimants, effectively putting the entire solicitation process in the hands of the plaintiff firms. Only one firm has filed a Rule 2019 disclosure statement and its retention agreement lacks a multi-party engagement waiver that complies with New York law, and none of the others have submitted any evidence of agency authority exacerbating concerns about their ability to facilitate a valid claims voting process since the firms all have an economic interest in the plan distributions different from their clients.

7. The balloting agent is charged with maintaining the integrity of the plan voting process. Its duties cannot be abdicated to interested parties, particularly when such interested parties have not made the disclosures required by Rule 2019 demonstrating their authority to act on behalf of the claimants. The Solicaiton Procedures should be amended to require counsel to provide the address lists for their clients to the balloting agent within seven (7) days such that Solicitation Packages and Ballots can be delivered directly to the individual claimants. And the Solicaiton Procedures should be further amended to require any plaintiff firms submitting a ballot to file make Rule 2019 disclosures, as expressly required by the Bankruptcy Rules.

8. The proposed Joint Plan and proposed Solicitation Procedures make the situation even worse by allowing invalid Abuse Claims to vote and receive distributions. A problem the self-interested plaintiff firms have no incentives to remedy. The Debtors have made no effort to weed out such invalid Abuse Claims despite Century's efforts to challenge several allegedly invalid claims, and, if approved, the Solicitation Procedures would inevitably lead to the solicitation of votes from holders of invalid claims, in direct contravention of the Bankruptcy Code. The court should not greenlight solicitation unless and until some effort is made to ensure

that the voting process will not be irrevocably tainted.

9. Finally, all of these issues directly and materially impact Century as a contractual counterparty of the Debtor impacted by the array of third-party non-consensual injunctions, releases, and exculpations contained in the Joint Plan. The proposed Joint Plan is designed to prejudice the defense of claims by the non-settling insurers. To facilitate this, the plan proponents are gerrymandering the voting pool.

## STATEMENT OF FACTS

### *The Solicitation Procedures Do Not Solicit Claimants Holding Abuse Claims Against The Additional Debtors*

10. The proposed ballot and solicitation procedures only provide for Claimants holding Abuse Claims against the Diocese to vote on the Joint Plan. *See* Proposed Solicitation Procedures Order, at 3, 21 [Dkt. No. 1398-1] (includes a finding that the form of Ballot attached as Exhibit 1 is appropriate for the holders of Claims in Class 4 (Abuse Claims) entitled to vote to accept or reject the Joint Plan, and the form of Ballot only asks Claimants to certify they hold an "Abuse Claim against the Diocese" without reference to any Additional Debtors). The Motion states that "[a]ll persons who filed a proof of claim asserting an Abuse Claim against the Diocese and/or an Additional Debtor shall receive a Solicitation Package containing a Class 4 Ballot for voting on the Joint Plan,"[1] but the deadline to file a proof of claim asserting an Abuse Claim against an Additional Debtor won't occur until "twenty-one (21) days after the entry of the Confirmation Order by the Bankruptcy Court,"[2] well after the deadline to return a Ballot voting on the Joint Plan. The Motion even includes an express clarification that those "who did not file a proof of claim . .

[1] Motion, at ¶ 25.

[2] Joint Plan [Dkt. No. 1396], at § 1.1.13; *see also* Proposed Case Management Order [Dkt. No. 1398-2], at § 7.

. with respect to Claims filed against the Additional Debtors . . . shall not receive a Solicitation Package or a Class 4 Ballot unless they submit a request for such materials in writing to the Diocese's counsel."[3]

11. The Disclosure Statement does not identify how many claims have been asserted against any individual Additional Debtor or what the Additional Debtors' assets are. Nor does the Disclosure Statement disclose the nature of the claims that have been asserted against the Additional Debtors.

***Balloting Agent Has No Way To Verify Which Debtor A Claim Is Against***

12. The proposed procedures for tabulating votes also do not require the balloting agent to tabulate votes on per debtor basis, but rather simply state "Stretto will tabulate only those Ballots received by the Voting Deadline." *See* Motion, at ¶ 47; Proposed Solicitation Procedures Order, at 10 [Dkt. No. 1398-1]. From a practical perspective, it would be impossible for the balloting agent to do otherwise since there is nothing in the proposed Solicitation Procedures that would differentiate between ballots submitted for claims against the Diocese versus claims against Additional Debtors.

13. The balloting agent won't have the Additional Debtor Proofs of Claim and nothing in the proposed Solicitation Procedures requires a claimant to identify which Debtor their claim is against.

***Defective Claims Are Permitted To Vote And Receive Distributions***

14. Century filed a number of motions seeking the disallowance of defective claims,[4]

---

[3] Motion, at ¶ 25.
[4] *See* Dkt. Nos. 1372, 1373, 1374, 1375, 1376, 1377, 1378, 1379.

the Court found these motions were denied without prejudice,[5] nevertheless Century continues to maintain the relevant claims are defective.

15. The proposed Solicitation Procedures do not contain any procedural safeguards to prevent invalid claims from voting on the proposed Joint Plan or receiving distributions under the proposed Joint Plan. The proposed Allocation Protocols include provisions that expressly permit late filed Abuse Claims that would otherwise be time barred. *See* Allocation Protocols [Dkt. No. 1431-1], at § 3.1 (allowing distributions to late filed claims with a potential reduction determined at the Abuse Claims Reviewer sole discretion).

***Ballots Are Sent To Claimants' Attorneys Instead of Directly to Claimants***

16. The Solicitation Packages will be "served via the noticing address included on their proof of claim and/or on the Confidential Sexual Abuse Claim Supplement Form approved by the Bar Date Order." Motion, at ¶ 27. Meaning most Solicitation Packages and Class 4 Ballots will go to a small number of plaintiff firms, not to claimants directly. *Id.* ("[f]or the avoidance of doubt, if such noticing address is the address of the Abuse Claimant's attorney, the Abuse Claimant will be served a Solicitation Package through such attorney unless such Abuse Claimant or their attorney has notified the Diocese or Stretto that the representation has terminated.").

17. To date, only one plaintiff firm has filed a Verified Rule 2019 Disclosure in this case.[6]

---

[5] *See* Dkt. No. 1384.
[6] *See* Dkt. No. 616.

## ARGUMENT

### I. The Proposed Procedures Make It Impossible To Determine Whether Any Claims Against Individual Additional Debtor Parishes Voted To Approve The Joint Plan

18. The proposed ballot asks Claimants to certify only they hold an "Abuse Claim ***against the Diocese***." Proposed Solicitation Procedures Order, at 21 [Dkt. No. 1398-1] (emphasis added). There is no requirement that the persons solicited to vote or who vote offer anything estalishing that they have or even that they contend that they a claim against a parish or which parish. Nor are there proofs proofs of claim on file for any of the parishes or other catholic entities to allow the balloting agent or anyone else to verify that they asserted a timely claim against a parish. However, the Diocese asks this Court to confirm a Plan that applies not only to the Diocese, but also to at least 79 Parishes and Catholic Ministry Entities[7] that have not filed for Chapter 11 bankruptcy, and have no proofs of claim filed against them. The Code requires a debtor's plan of reorganization to be approved by two-thirds of each class of creditors entitled to vote;[8] that requirement cannot be satisfied for any Additional Debtor Parish under the proposed Solicitation Procedures when there is no way to determine that any Abuse Claims agaisnt any individual Parish voted to approve or reject the Joint Plan.

#### A. The Code Requires At Least One Impaired Accepting Class *For Each* Debtor

19. Under *Tribune*, where a joint plan covers debtors whose estates remain separate, Code section 1129(a)(10) requires at least one non-insider impaired accepting class for ***each*** debtor; acceptance of such class is measured by Code section 1126(c)'s two-thirds-in-amount and majority-in-number test. *In re Tribune Co.*, 464 B.R. 126, 180-83 (Bankr. D. Del. 2011) . Just as in *Tribune*, the Diocese and the Additional Debtors are not substantively consolidated, and more

[7] *See Disclosure Statement*, Art. 1, 2.C [Dkt. No. 1395] (the Disclosure Statement variously describes the Additional Debtors as including 86 entities in Article 1 and as comprising 79 entities in Article 2.C).
[8] 11 U.S.C. §§ 1126(c), 1129(a)(10) .

importantly they are not being jointly administered yet—and still wo not be while the proposed Joint Plan is being solicited. *See*, *i.d.*, at 182-183 (finding the subject debtors were not substantively consolidated as liabilities and assets remain separate for each debtor even though the joint plan included a single distribution scheme "in which sources of plan funding and distribution are designed without regard to where assets are found or where liabilities lie"). The single distribution scheme in the Joint Plan is described as being used as a matter of convenience, but "convenience alone is not sufficient reason to disturb the rights of impaired classes of creditors of a debtor not meeting confirmation standards" and would undermine entity separateness. *Id.* at 183.

20. Even when a plan is drafted as a single document, in a case in which separate entities are not substantively consolidated as in this Case, the "plan" must be understood as separate plans for each of the debtors. Those plans must each independently satisfy the requirements of confirmation as to each debtor. *See id.* at 183; *AIO US, Inc.*, No. 24-11836, 2025 WL 2426380, at *30 (Bankr. D. Del. Aug. 21, 2025) ("As a matter of convenience, [the 20 plans filed by each of the 20 debtors in the case] are contained in a single document that may be described colloquially as 'the plan.' As a statutory matter, however, they can only be understood as 20 plans, each of which must meet the requirements for confirmation.").

21. The 81 parishes are separate legal entities "formed under New York's Religious Corporation Law, Pursuant to Article 5 of the Religious Corporations Law," and each "is governed by a Board of Trustees," "owns the real and personal property that is used in its ministry," "holds its own meetings, appoints its own councils and committees, and establishes its own annual budget." *Decl. of Rev. Kevin J. O'Brien*, ¶¶ 24-25 [Dkt. No. 7]. They are independent legal entities, operating separate and apart from the Diocese, which is why the Additional Debtors could not simply obtain releases through the Diocese's own plan. Nothing in the proposed Joint Plan

seeks to substantively consolidate any of the Additional Debtors with the Diocese. Therefore, for purposes of confirmation, the Joint Plan must be understood as separate plans for each of the debtors and each plan must satisfy the requirements for confirmation including the voting thresholds required by Code section 1129(a)(10).

### B. The Proposed Case Management Order Disenfranchises Parish Claimants From Voting And Violates *Purdue Pharma*

22. The proposed Case Management Order cannot just apply the Diocese solicitation and voting, along with the solicitation procedures certification and voting report, to the Additional Debtor Parishes after they file for bankruptcy. Proposed Case Management Order, § 6 [Dkt. No. 1398-2]. A pre-packaged plan of reorganization must still adhere to the Bankruptcy Code's solicitation and voting requirements for each debtor. That means, even if voting and solicitation occurs prior to the petition being filed, the debtors must solicit the claim holders for each debtor and satisfy the Code's two-thirds approval requirements.

23. Further, the proposed Case Management Order calls for the Court to set a bar date for the Additional Debtors pursuant to proposed procedures for the filling of proofs of claim against the Additional Debtors, but does not permit any claimants who submit a proof of claim to vote on the Joint Plan. Proposed Case Management Order, § 7 [Dkt. No. 1398-2]. This is confirmed in the Diocese's Motion, stating that those who have Claims filed against the Additional Debtors, but did not submit a proof of claim against the Diocese, "shall not receive a Solicitation Package or a Class 4 Ballot unless they submit a request for such materials in writing to the Diocese's counsel." Motion, at ¶ 25.

24. The stated purpose of the Case Management Order and the Rapid Prepackaged Cases is to efficiently file the parishes such "that holders of Abuse Claims agaisnt the Additional Debtors will, as part of the global settlement, provide releases of those Additional Debtors" which

ca not be done otherwise in light of *Harrington v. Purdue Pharma*, 603 U.S. 204 (2024) . Motion, at ¶¶ 72-73. But this structure still violates *Purdue Pharma*'s prohibition against non-consensual third-party releases.

25. While this Joint Plan contemplates joint administration, the Additional Debtor Parishes will not have filed for bankruptcy when the Joint Plan is solicited and no proofs of claim have been submitted for any Parishes.

26. It is legally impermissible to solicit votes of solely claims against the Diocese and apply those same votes to each of the 79 or more Additional Debtors who have not yet filed for bankruptcy protection and are subject to claims by a different set of claimants. *See In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) (the Third Circuit struck down a similar "deemed" consolidation structure that would have treated the debtor and nondebtor affiliates as consolidated for claim valuation, voting, and distributions while leaving their entities separate; using consolidation to obtain a tactical voting advantage prejudices creditors in the absence of grounds for consolidation). The Solicitation Procedures, by counting claimants as a single pool voting for a single plan, disenfranchises the votes holders of claims against a specific parish. There is no mechanism for claimants to opt out of the releases for their claims against a specific parish, and claimants who only have claims agaisnt a specific parish woulD not be provided a Solicitation Package or Class 4 Ballot to vote at all.

27. The Additional DebtorS have not filed for bankruptcy when the plan is solicited, yet seek full release for present and future Abuse Claims against them without identifying the claims, if any, against them or the consent of those with claims against each Additional Debtor. This is precisely the type of non-consensual third-party release the Supreme Court found was impermissible in *Purdue Pharma*. *See Purdue Pharma*, 603 U.S. at 215 ("The Sacklers have not

filed for bankruptcy and have not placed virtually all their assets on the table . . . [t]hey hope to win a judicial order releasing pending claims against them brought by [tort] victims. They seek an injunction "permanently and forever" foreclosing similar suits in the future . . . [a]nd they seek to do this without the consent of those affected.").

28. In order to satisfy the two-thirds in amount voting threshold for each debtor and to comply with *Purdue Pharma*, the Solicitation Procedures must include a procedure to determine the specific debtor(s) against whom each claimant holds a valid Abuse Claim such that their vote can be tabulated for the relevant debtor(s). 11 U.S.C. § 1126(a), (c) ; *see also In re Tribune Co.*, 464 B.R. 126, 180-83 (Bankr. D. Del. 2011) .

29. Soliciting classes of claimants with claims against different debtors requires a separate ballot for each debtor or use a ballot where each claimant can select which individual debtor(s) they have claims against and for whom they are voting to approve or reject the plan. The proposed Solicitation Procedures and form ballots takes neither approach.

## II. Each Individual Claimant Must Receive a Solicitation Package and Class 4 Ballot Directly To Sign and Return Their Own Ballot

30. Each claimant holding an Abuse Claim against the Diocese or any Additional Debtor Parish is entitled to vote on whether to approve or reject the proposed Joint Plan, which means each such claimant must receive a Solicitation Package and Class 4 Ballot and, if they decide to vote on the plan, individually sign and return a ballot to the balloting agent. Anything less impacts the integrity of the vote, particularly when, as in this case, none of the plaintiffs' firms have filed verified Rule 2019 disclosures.

### A. Direct Solicitation and Balloting of Claimants Ensures Integrity of Solicitation by Balloting Agent

31. The balloting agent is charged with overseeing the integrity of solicitation and voting which is in turn essential to the integrity of the plan formation process. Balloting agent's

function is central to the reliability of plan solicitation and vote tabulation, including validating ballot authority and eligibility and addressing inconsistent ballots under court-approved procedures. *See*, *e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004) (debtor's balloting agent helped verify which votes may be properly counted by contacting firms whose master ballots lacked evidence of authority and excluded ballots that lacked valid powers of attorney, as well as ballots invalid for other reasons); *In re Red River Talc LLC*, 670 B.R. 251 (Bankr. S.D. Tex. 2025) (the court examined conflicting master ballots and held that the approved tabulation procedures required the solicitation agent to make reasonable efforts to coordinate with the relevant firms to cure the discrepancy; the court found that had not happened). The balloting agent cannot do so without first confirming Solicitation Packages and Class 4 Ballots are going directly to individual claimants at their respective personal addresses.

32. The proposed solicitation procedures do not include any process for the balloting agent to assure that the claimants received the solicaiton package or confirm that the claimants the ballot or, if signed by someone else, that they were authorized to do. This is significant because many of the proofs of claims were filed with only the address of counsel while others were on behalf of persons who appear were dead. For example, Proof of Claim Nos. CC046, CC114, and CC105 (claimant deceased) filed in this Case do not include a claimant address.

33. Yet, all of the Solicitation Packages will be "served via the noticing address included on their proof of claim and/or on the Confidential Sexual Abuse Claim Supplement Form approved by the Bar Date Order." Motion, at ¶ 27. Meaning most Solicitation Packages and Class 4 Ballots will go to a small number of plaintiff firm with the largest individual stake in this case, not to claimants directly. *Id.* ("[f]or the avoidance of doubt, if such noticing address is the address of the Abuse Claimant's attorney, the Abuse Claimant will be served a Solicitation Package

through such attorney unless such Abuse Claimant or their attorney has notified the Diocese or Stretto that the representation has terminated."

34. Under the proposed Solicitation Procedures, proofs of claim will have been signed by counsel, submitted by counsel, then Solicitation Packages and Class 4 Ballots sent to that counsel and returned to the balloting agent by that same counsel. Meanwhile, no attorney filed a Rule 2019 disclosure as required to evidence their authority to act on behalf of such claimant(s).

35. To prevent such abdication of a critically neutral responsibility, there should be a requirement in the proposed Solicitation Procedures for a compliant verified Rule 2019 statement to be filed by each plaintiff's law firm and for current addresses to be provided to the balloting agent for each individual claimant within seven (7) days after this Court's entry of the solicitation procedures approval order. S*ee Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 168 (D.N.J. 2005)( law firms representing multiple tort creditors must disclose information required under Rule 2019).

**B. The Proposed Self-Certification Procedure Is Unlawful and Will Enable Manipulation of Voting**

36. Allowing self-certification of authority to vote on behalf of its clients only after submitting their votes—and without filing compliant 2019 statements—will further taint the solicitation and voting process.

37. Under the proposed solicitation procedures, the plaintiff firms that listed their firm address on the proofs of claim rather than their claimant are to be provided the Solicitation Package and Class 4 Ballot by the balloting agent such that the firm shall collect and submit the ballots rather than the balloting agent.[9] But requiring only a conclusory certification of each firm's

[9] *See* Motion, at ¶ 27.

customary practices or its authority to vote on behalf of its clients invites abuse and would vitiate Bankruptcy Rule 2019's requirement that persons acting on behalf of multiple claimants file with the Court the instrument granting them the claimed authority.

38. Bankruptcy Rule 2019(b) provides that a verified statement "*shall* be filed," thus imposing a mandatory requirement. *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 208 (3d Cir. 1995) (use of the term "shall" imposes a requirement of mandatory, as opposed to discretionary, compliance); *In re The Muralo Co.*, 295 B.R. 512, 524 & n.10 (Bankr. D. N.J. 2003) (holding that "Rule 2019(a) requires entities, including counsel, who would represent in a chapter 11 case more than one creditor, to file a verified statement listing those creditors" and "explaining the circumstances of their agency").

39. To comply with Bankruptcy Rule 2019, the Court should thus require that persons or law firms purporting to act on behalf of multiple claimants file *evidence* of their authority as a matter of course. Specifically, the Court should only permit representative voting if the lawyer claiming authority submits a power of attorney establishing that he or she has been specifically authorized to vote on the client's behalf on *this* particular proposed Joint Plan. *See*, *e.g.*, *Combustion Eng'g*, 391 F.3d at 245 n.66 (explaining that "[w]here the voting process is managed almost entirely by proxy, it is reasonable to require a valid power of attorney for each ballot to ensure claimants are properly informed about the plan and that their votes are valid."). As the court explained in *In re Congoleum Corp.*:

> I want to emphasize, the power of attorney must be bankruptcy specific. If it merely refers to the personal injury case, it is not enough. Authority to take action on a client's behalf in a personal injury case is not sufficient to give authority to vote on that client's behalf in the bankruptcy case.[10]

---

[10] July 26, 2004 Hr'g Tr. at 52-52, *In re Congoleum Corp.*, No. 03-51524 (Bankr. D. N.J. July 26, 2004) [Dkt. No. 1090]; *see also* Dec. 30, 2004 Hr'g Tr. at 57, *In re Congoleum Corp.*, No. 03-51524 (Bankr. D. N.J. Dec. 30, 2004) [Dkt. No. 1861] (holding that a "certification in the master ballots doesn't really solve the problem" and therefore "a bankruptcy specific power-of-attorney is something that must

40. The need for evidence—and not a mere certification—is particularly acute because this Court is the sole arbiter of the legal sufficiency of an attorney's authority to submit a ballot on behalf of a client, and a record must exist from which the Court can make such a determination. Indeed, once counsel have filed the requisite powers of attorney under Bankruptcy Rule 2019, the Court should allow parties in interest to object, if appropriate, to any authorization that may be insufficient. This process would ensure that claimants have specifically authorized their counsel to vote in a particular manner on the *specific* plan under consideration, and the Court can therefore be confident that the votes on the proposed Joint Plan reflect the interests and intentions of the actual claimants, rather than their counsel. *See*, *e.g.*, *Baron & Budd, P.C.*, 321 B.R. at 165 (D. N.J. 2005) ("Regulation of professional responsibility with respect to creditors' or debtors' counsel, moreover, is squarely within the purview of the bankruptcy court regardless of whether third party, non-debtors are involved.").[11]

**C. An Essential Purpose of Rule 2019 Is To Ensure Counsel Has Authority To Act On Behalf Of Claimants**

41. Compliance with Rule 2019 is mandatory for any firm representing multiple creditors in a single bankruptcy case, and its requirements are self-effectuating. This includes law firms that file proofs of claim on behalf of multiple claimants, they are subject to Rule 2019 and must file a verified statement complying with the rule.[12] Rule 2019 is meant "to further the

---

be strictly complied with here").

[11] Likewise, if a claimant is deceased, the person submitting the ballot for such a claim should provide evidence that they are the duly appointed agent for the estate of the deceased claimant.

[12] *See*, *e.g.*, *Baron & Budd, P.C.*, 321 B.R. at 168 (law firms representing multiple tort creditors must disclose information required under Rule 2019); *In re Wash. Mut., Inc.*, 419 B.R. 271, 275 (Bankr. D. Del. 2009) (members of an ad hoc committee must make Rule 2019 disclosures because they represent "multiple creditors holding similar claims," "filed pleadings and appeared in these chapter 11 cases collectively, not individually," and retained common counsel "that has never advised this Court that it is representing less than all the Group"); *In re N. Bay Gen. Hosp., Inc.*, 404 B.R. 443, 452 (Bankr. S.D. Tex. 2009) ("Any entity seeking to represent more than one creditor in a Chapter 11 case must file an application that conforms with" these requirements); *In re CF Holding Corp.*, 145 B.R. 124, 126 (Bankr.

Bankruptcy Code's goal of complete disclosure during the business reorganization process" and "was designed to cover entities which, during the bankruptcy case, act in a fiduciary capacity to those they represent, but are not otherwise subject to control of the court." *In re CF Holding Corp.*, 145 B.R. at 126, citing 8 COLLIER ON BANKRUPTCY ¶ 2019.03 at 2019-4 (15th ed. 1992) .

42. The requirements of the rule are defined broadly, consistent with its purpose. For example, the term "disposable economic interest" means "***any*** claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest." Rule 2019(a)(1) (emphasis added). As the advisory committee notes to the Rule indicate, the term "is intended to be sufficiently broad to cover any economic interest that could affect the legal and strategic positions a stakeholder takes in a chapter 9 or chapter 11 case." Rule 2019, Committee Notes on Rules—2011 Amendment. Similarly, questions of professional responsibility related to fee arrangements "qualify as pertinent facts and circumstances in connection with the employment of counsel, because they may have a direct bearing on both good faith and the fairness of the plan's classification system." *Baron & Budd*, 321 B.R. at 165 (cleaned up) ; *In re Okla. P.A.C. First Ltd. P'ship*, 122 B.R. 387, 393 (Bankr. D. Ariz. 1990) (Rule 2019 was designed for courts to "play a role in ensuring that lawyers adhere to certain ethical standards").

43. Finally, the Rule "requires that an entity must file an instrument which empowers the entity to act on behalf of the creditors. This includes an executed power of attorney authorizing counsel to file a proof of claim in this case." *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 852 (Bankr. S.D.N.Y. 1989) . The burden to establish an agency relationship for several claimants is

D. Conn. 1992) (an attorney representing multiple creditors must file a copy of the document empowering the attorney to act on the creditors' behalf).

on the party seeking such agency status, in this case the plaintiffs' attorney. *Id.*; *see also In re N. Bay Gen. Hosp., Inc.*, 404 B.R. 443, 453 (Bankr. S.D. Tex. 2009) ("Bankruptcy Rule 2019(a) also requires that the entity provide a copy of the instrument, if any, whereby the entity, committee, or indenture trustee is empowered to act on behalf of creditors") (internal citation and quotation marks omitted); *In re Enron Corp.*, 326 B.R. 497, 499 (S.D.N.Y. 2005) (noting that an entity's "failure to submit the required disclosures under Bankruptcy Rule 2019 raises the question of whether these unidentified [claimants] in fact have consented to this agency relationship in relation to the bankruptcy").

44. The Rules of Professional Conduct governing New York attorneys negotiating aggregate settlements on behalf of multiple clients underscore that the disclosures required by Rule 2019 are needed here. Rule 1.8 of the Rules of Professional Conduct provides that lawyers may not represent two or more clients "in making an aggregate settlement of the claims of or against the clients, absent court approval, unless each client gives informed consent in writing signed by the client."[13] The comments to the rules recognize that aggregate settlements

> inherently creat[e] conflicts for lawyers and prevent[] lawyers from obtaining settlements covering multiple clients without receiving the approval of each client. If a group settlement is to be achieved by compromising on client's claim for a lesser amount than would have been possible had that client's claim been settled separately, the lawyer has a conflict in deciding which client to favor and the client who may be making this sacrifice should know and consent.[14]

Formal Opinion 2020-3 of the New York Committee on Professional and Judicial Ethics is also crystal clear that the prohibition against aggregate settlements without consent applies to negotiations, not just settlements themselves.

---

[13] New York Rule of Prof'l Conduct 1.8(g). *See also* Model Rule of Prof'l Conduct 1.8(g).

[14] *Id.*, citing N.Y. Rule of Prof'l Conduct 1.8, cmt. [13].

45. A lawyer may not avoid the informed consent requirement through a claim of waiver: "a client may not waive her individual right to approve the terms of a proposed aggregate settleemtn that would, if accepted, bind her along with other parties jointly represented by the same counsel."[15] Each plaintiff's attorney in this Case must verify in a Rule 2019 disclsoure that they are authorized to act on behalf of their clients and that they have the informed consent for each claimant they represent with respect to the Joint Plan and its approval.

46. For the claimants' counsel that have not filed compliant Rule 2019 disclosure statements to comply with the unambiguous requirements of Rule 2019, the Court should order them to supply the following information within 5 days of entry of the disclosure statement approval order:

- Under subsection (c)(3)(A) ("name and address" of "each creditor or security holder represented by an entity, group, or committee"), counsel must provide a list of any entities that are members of its organization that have a financial interest in claims against the Debtor estate and the identity of each of the contingent creditors on whose behald Claimants' Attorneys are authorized to act.

- Under subsection (c)(3)(B) ("the nature and amount of each disclosable economic interest"), counsel must supply reasonably detailed information disclosing the financial interest that each of the entities that are members of its organization have in claims against the Debtor estate and any fee splitting or sharing arrangements between them.

- Under subsection (c)(1) ("a recital of the pertinent facts and circumstances concerning . . . the employment of the entity, including the name of each creditor or equity security holder at whose instance the employment was arranged"), counsel must provide information disclosing the entities or law firms with whom they are associated, including any evidence of informed consent by any affected claimant and any co-counsel, fee-sharing, or referral agreements, and the basis for counsel to have privity with the underlying claimants.

- Under subsection (c)(4) ("a copy of the instrument, if any, authorizing the entity, group, or committee to act on behalf of creditors or equity security holders"),

[15] New York Committee on Professional and Judicial Ethics, Formal Opinion 2009-6. *See also* ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 06-438 (2006) ("the informed consent required by the rule generally cannot be obtained in advance of the formulation of such an offer or demand").

> counsel must supply the retention agreements, fee-sharing agreements, arrangements and/or co-counsel agreements authorizing the Claimants' Attorneys to "act on behalf of those creditors . . . ."

The lack of transparency regarding the scope, facts, and circumstances of multiple representations and how they affect this bankruptcy's plan formulation, claim classification, allowance and distribution, and claimant voting require this Court's intervention to preserve the integrity of a public and open bankruptcy process.

47. Alternatively, the Court should bar non-complying claimants' counsel from participating in the bankruptcy. The Court has the authority to bar claimants' counsel from participating in this bankruptcy (on behalf of any clients) unless they comply with their Rule 2019 obligations. *See* Fed. R. Bankr. P. 2019(e)(2) (in response to a falure to comply with Rule 2019(b), Court may "refuse to permit the entity, group, or committee to be heard or to intervene in the case" and "grant other appropriate relief").

48. This relief is appropriate at this juncture, as courts regularly have held that the votes of any claimants affected by non-compliance with Rule 2019 will not be counted. *See In re Mid-Valley, Inc.*, Case No. 03-35592 (Bankr. W.D. Pa. Apr. 13, 2004), Hr'g Tr., Dkt. No. 1186 at 87-88 ("[I]f there isn't a 2019 statement of record, the votes will not be counted. . . . And by the time we get to the plan confirmation hearing, if they're not of record, their claims will not be counted."); *In re Congoleum Corp.*, No. 03-51524 (Bankr. D.N.J. Dec. 30, 2004), Hr'g Tr., Dkt. No. 1861 at 37. The "[f]ailure to comply [with Rule 2019] may result in inability to be heard in the case, and invalidity of reorganization plan ballots or other documents filed on behalf of the creditors by the attorney, or other appropriate relief." Fed. R. Bankr. P. 2019(e)(2); 9 Norton Bankr. L. & Prac. 3d § 172:22; *Oklahoma P.A.C.*, 122 B.R. 387; *Reid v. White Motor Corp.*, 886 F.2d 1462 (6th Cir. 1989) .

## III. Claimants Without Legally Cognizable Claims Should Not Be Permitted To Vote

49. Claims that are not legally cognizable should not be permitted to submit a vote on the Joint Plan because they should not be eligible for any distributions under the Joint Plan. There have been numerous proofs of claim filed in this Case on behalf of claimants for time-barred claims where the statute of limititations under the CVA has run, four of which were objected to by Century:

- Proof of Claim No. CC048 is a proof of claim that is time-barred because it did not involve a sexual act revived by the CVA, and time-barred in any case because the claimant filed never filed a CVA lawsuit but only a proof of claim [Dkt. No. 1372].
- Proofs of Claim Nos. CC064, CC065, and CC067 include three claims submitted by siblings alleging abuse outside of the state of New York at their family home which are time-barred because only conduct occurring within the state was revived [Dkt. Nos. 1375-77].

50. There are also numerous other proofs of claim filed in this Case alleging claims that are not legally cognizable for other reasons and also should not be allowed any distributions under the Joint Plan or permitted to vote, including, for example, the following two other claims Century objected to:

- Proof of Claim No. CC096 is for a claim involving a current high-ranking cleric in the Diocese of Ogdensburg that alleges abuse when he was living outside the United States [Dkt. No. 1374].
- Proof of Claim No. CC042 is for a claim involving a cleric employed by a different religious order not controlled by the Diocese of Ogdensburg [Dkt. No. 1373].

51. The Allocation Protocol [Dkt. No. 1431-1] includes provisions to allow time-barred claims to be paid, potentially in full at the sole discretion of the Abuse Claims Reviewer,[16] and to

[16] *See* Section 3.1 of Allocation Protocol [Dkt. No. 1431-1] (a claimant with a late-filed claim only needs to submit an additional written statement regarding the basis for filing their Claim after the Bar Date and it is in the Abuse Claims Reviewer's sole discretion based on the claimant's written statement whether to reduce the points awarded to such Claim or not).

pay claims filed on behalf of deceased persons.[17] The proposed solicitation procedures likewise do not contain any procedures for screening out votes cast for claims that were not revived by the CVA or any procedures for establishing that the person to actually votes a deceased claimant's claim is legally authorized to do so. Allowing facially deficient claims to vote or receive distributions would inflate the claims count, dilute the recovery of claimants with legally meritorious claims and distort the vote.[18]

52. ***Deceased-Claimant Claims***. Allowing deceased-claimant claims is contrary to New York law. A sexual abuse cause of action is time-barred as of the date of the decedent's death, meaning no action may be commenced under the CVA by a decedent's estate on behalf of a deceased claimant.[19] A proof of claim is the bankruptcy equivalent of "commencement of an action,"[20] and where claimants' counsel filed proofs of claim in the name of claimants who were already dead at the time of filing, New York's CVA bars those claims. The Joint Plan proposes to pay claims that cannot be brought under New York law, and thus the plan is patently defective. And since the solicitation procedures allow votes to be submitted for such claims, the solicitation

---

[17] See Section 3.5 of the Allocation Protocol [Dkt. No. 1431-1].

[18] *See* Mark D. Taylor and Scott L. Alberino, *Who Is Authorized to Vote on a Plan of Reorganization?: Issue Pending in the USG Bankruptcy Case Could Alter the Asbestos Bankruptcy Landscape*, Mealey's Asbestos Bankr. Rep. Vol. 2, #6 (Jan. 2003); William P. Shelley and Jacob C. Cohn, *Unraveling the Gordian Knot of Asymptomatic Claimants: Statutory, Precedential and Policy Reasons Why Unimpaired Asbestos Claimants Cannot Recover in Bankruptcy*, Mealey's Asbestos Bankr. Rep. Vol. 3, #10 (2004).

[19] *See Estate of R.S.G. v. Catholic Foreign Mission Socy. of Am., Inc.*, 195 N.Y.S.3d 374, 378-80 (N.Y. Sup. Ct. 2023) (holding that the New York CVA was drafted for the benefit of *victims* of childhood sexual abuse and "not a victim's distributes seeking to recover for their own purely pecuniary losses").

[20] *Nortex Trading Corp. v. Newfield*, 311 F.2d 163, 164 (2d Cir. 1962) ("The filing by Nortex of its proof of claim is analogous to the commencement of an action within the bankruptcy proceeding."); *In re Cruisephone, Inc.*, 278 B.R. 325, 330 (Bankr. E.D.N.Y. 2002) ("In the bankruptcy context, a proof of claim filed by a creditor is conceptually analogous to a civil complaint, an objection to the claim is akin to an answer or defense and an adversary proceeding initiated against the creditor that filed the proof of claim is like a counterclaim."); *In re Stokes*, 320 B.R. 821, 825 (Bankr. D. Md. 2004) ("The proof of claim filed by the IRS is analogous to a complaint filed in the District Court.").

procedures are equally defective.

53. ***Late-filed Claims.*** Code section 502(b)(9) also applies to disallowance of untimely claims, and the exception for § 726(a) distributions is a Chapter 7 mechanism that requires excusable neglect under the *Pioneer* standard.[21] But the Allocation Protocol does not require a judicial determination of excusable neglect; it simply allows the Abuse Claims Reviewer to consider in his sole discretion a claimants written statement on the basis for filing their claim after the deadline for distribution without any judicial determination. This removes the procedural protections under the Bankruptcy Code and dilutes the recovery of timely-filing survivors.

54. The inclusion of POC No. CC048 and other invalid claims among those permitted to draw from the estate's assets will make the Joint Plan unconfirmable. Under 11 U.S.C. § 502(b)(1) , a court cannot allow proofs of claim that are "unenforceable against the debtor" to remain within the estate. *See In re W.R. Grace & Co.*, 626 B.R. at 235 ("The expiration of the statute of limitations on a claim is a common rationale for disallowing a claim under 11 U.S.C. § 502(b)(1)."). And under 11 U.S.C. § 1129(a)(3) , a bankruptcy plan is only subject to approval if it "has been proposed in good faith and not by any means forbidden by law."

55. While some plaintiff counsel would undoubtedly be "eminently more than happy" to approve a bankruptcy plan that includes invalid claims which would otherwise be valueless, such a plan is clearly not in "good faith" and cannot be approved, particular if votes are cast for such invalid claims diluting the voting pool. *See In re Am. Cap. Equip., Inc.*, 405 B.R. 415, 422 (Bankr. W.D. Pa. 2009), *aff'd sub nom. Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*, 2010 WL 1337222 (W.D. Pa. Mar. 29, 2010), *aff'd sub nom. In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012) .

---

[21] *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993) .

## CONCLUSION

WHEREFORE, Century respectfully requests that the Court deny approval of the proposed Solicitation Procedures in its entirety and grant such further relief as is just and proper.

Respectfully submitted,

Dated: October 6, 2026

By: /s/ *Tancred Schiavoni*

**O'MELVENY & MYERS LLP**
Tancred V. Schiavoni, Esq.
Michael M. Klotz, Esq.
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone: 212-326-2000
Email: tschiavoni@omm.com
mklotz@omm.com

**CLYDE & CO US LLP**
Marianne May
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Telephone: (973) 210-6700
Facsimile: (973) 210-6701
E-mail: marianne.may@clydeco.us

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America*