**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-60507 (PGR) |
| THE ROMAN CATHOLIC DIOCESE OF OGDENSBURG, NEW YORK, | ) | Chapter 11 Case |
| Debtor. | ) | |

**CENTURY'S OBJECTION TO APPROVAL OF THE DISCLOSURE STATEMENT IN SUPPORT OF JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC DIOCESE OF OGDENSBURG, NEW YORK AND ADDITIONAL DEBTORS**

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
MICHAEL M. KLOTZ
1301 Avenue of the Americas,
Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
Email: tschiavoni@omm.com
mklotz@omm.com

*Attorneys for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America*

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....... 1

FACTUAL BACKGROUND ....... 3

A. The Plan and the Disclosure Statement ....... 3

B. The Plan Treatment of Insurance ....... 4

C. The Plan Treatment of Abuse Claims ....... 5

D. The Additional Debtors That Have Not Yet Been Identified ....... 6

E. The Non-Consensual Third-Party Injunction, Release, and Exculpation Provisions ....... 7

F. The Proposed 363 Sale Order. ....... 9

G. Motions to Disallow and Object to Claims. ....... 9

ARGUMENT ....... 9

I. THE COURT HAS AUTHORITY TO DENY THE DISCLOSURE STATEMENT AND FIND THAT THE PLAN IS PATENTLY UNCONFIRMABLE ....... 9

II. BECAUSE THE DISCLOSURE STATEMENT DESCRIBES A PLAN THAT IS PATENTLY UNCONFIRMABLE, IT CANNOT BE APPROVED ....... 12

A. The Broad Settlement Request Should be Stricken. ....... 12

B. The Plan's Delayed Discharge and Claim Enhancements are Contrary to Bankruptcy Law ....... 14

C. The Use of the Non-Consensual Injunction to Bar Claims Among Non-Debtor Insurers is Improper and the Judgment Reduction Provision is Inadequate ....... 18

D. The Plan Cannot Override the Statutory Scheme Imposed by Section 502 ....... 24

E. The Plan Impairs Century's Rights ....... 25

F. The Plan's Exculpation Is Impermissibly Broad ....... 30

G. Nonconsensual Third-Party Releases and Channeling Injunction Violate Purdue Pharma ....... 32

H. The Plan Excludes Insurers from Participating in the Resolution of Disputes Concerning the Cabrini Qualifying Proceeds ....... 35

I. Distributions Conditioned on Execution of the Release Agreement are Coercive. ....... 35

J. The Gatekeeper Injunction Exceeds the Court's Jurisdiction ....... 36

K. The Prepackaged Additional Debtors Structure Is Improper ....... 38

L. Due Process Concerns for Unknown and Post-Confirmation Claims ....... 39

M. The Jury Trial Waiver and Lack of Judicial Review Are Impermissible ....... 40

**TABLE OF CONTENTS**
**(continued)**

**Page**

III. APPROVAL OF THE DISCLOSURE STATEMENT IS PREMATURE BECAUSE KEY INFORMATION AND DOCUMENTS HAVE YET TO BE FILED ....41

IV. THE DISCLOSURES SET FORTH IN THE DISCLOSURE STATEMENT ARE MISLEADING ....45

- A. The Disclosure Statement Fails to Include the Liquidation Analysis, Financial Projections, and Additional Debtor Financial Information ....46
- B. The Disclosure Statement Fails to Adequately Disclose Insurance-Related Risks ....48
- C. The Disclosure Statement Fails to Explain Risks with Failing to Properly Treat SIRs and Deductibles ....52
- D. The Disclosure Statement Fails to Adequately Disclose the Basis for and Scope of Third-Party Releases, Injunctions, and Exculpation ....52
- E. The Disclosure Statement Misrepresents Recoveries ....53
- F. The Disclosure Statement Fails to Adequately Explain the Allocation Protocol ....54
- G. Additional Disclosure Deficiencies ....56
- H. The Disclosure Statement Excludes the Risk of Appeal ....58

V. THE CREDITOR POOL IS INCOMPLETE RENDERING IT IMPOSSIBLE TO SOLICIT VOTES ON THE PLAN ....58

CONCLUSION ....59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Austin Instrument, Inc. v. Loral Corp.*,
29 N.Y.2d 124 (1971) .......... 36

*Caldwell Trucking PRP Group v. Spalding Composites*,
890 F. Supp. 1247 (D.N.J. 1995) .......... 15

*Century Glove, Inc. v. First American Bank of New York*,
860 F.2d 94 (3d Cir. 1988) .......... 46

*DePippo v. Kmart Corp.*,
335 B.R. 290 (S.D.N.Y. 2005) .......... 39

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......... 37

*Eichenholtz v. Brennan*,
52 F.3d 478 (3d Cir. 1995) .......... 20

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024) .......... 2, 32, 33

*In re AIO US, Inc.*,
677 B.R. 509 (Bankr. D. Del. 2025) .......... 37

*In re AIO US, Inc.*,
No. 24-11836 (CTG), 2025 WL 2426380 (Bankr. D. Del. Aug. 21, 2025) .......... 13, 14

*In re Alexander Props., LLC*,
No. 10-38095-NVA, 2011 Bankr. LEXIS 5498 (Bankr. D. Md. Sep. 29, 2011) .......... 11

*In re Boy Scouts of America and Delaware BSA, LLC*,
642 B.R. 504 (Bankr. D. Del. 2022) .......... 13, 40

*In re Budd Co., Inc.*,
550 B.R. 407 (Bankr. N.D. Ill. 2016) .......... 48

*In re Cardinal Congregate I*,
121 B.R. 760 (Bankr. S.D. Ohio 1990) .......... 48

*In re Clamp-All Corp.*,
233 B.R. 198 (Bankr. D. Mass. 1999) .......... 44

*In re Combustion Engineering, Inc.*,
391 F.3d 190 (3d Cir. 2004) .......... 26

*In re Crowthers McCall Pattern, Inc.*,
120 B.R. 279 (Bankr. S.D.N.Y. 1990) .......... 54

*In re Diocese of Buffalo, N.Y.*,
No. 20-10322 (CLB), 2026 WL 585099 (Bankr. W.D.N.Y. Feb. 27, 2026) .......... 34

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Diocese of Camden, New Jersey*,
653 B.R. 309 (Bankr. D.N.J. 2023) ........ 13

*In re Duratech Indus., Inc.*,
241 B.R. 291 (Bankr. E.D.N.Y. 1999), *aff'd* 241 B.R. 283 (E.D.N.Y. 1999) ........ 46, 54

*In re Global Industrial Technologies, Inc.*,
645 F.3d 201 (3d Cir. 2011) ........ 15

*In re GOL Linhas Aereas Inteligentes S.A.*,
2025 WL 3456675 (S.D.N.Y. Dec. 1, 2025) ........ 34

*In re Green Jacobson P.C.*,
No. 15-41404-705, 2017 Bankr. LEXIS 2059 (Bankr. E.D. Mo. July 24, 2017) ........ 26

*In re Gulf Coast Health Care, LLC*,
No. 21-11336 (KBO), ECF No. 1236 (Bankr. D. Del. May 4, 2022) ........ 37

*In re Ionosphere Clubs, Inc.*,
179 B.R. 24 (S.D.N.Y. 1995) ........ 45

*In re Jiffy Lube Sec. Litig.*,
927 F.2d 155 (4th Cir. 1991) ........ 20

*In re Medley*,
58 B.R. 255 (Bankr. E.D. Mo. 1986) ........ 44

*In re Oneida Motor Freight, Inc.*,
848 F.2d 414 (3d Cir. 1988) ........ 46, 48

*In re Park Ave. Radiologists, P.C.*,
450 B.R. 461 (Bankr. S.D.N.Y. 2011) ........ 37

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ........ 30, 31

*In re Quigley Co.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) ........ 10

*In re R & G Props.*,
No. 08-10876, 2009 Bankr. LEXIS 2101 (Bankr. D. Vt. July 6, 2009) ........ 11

*In re Roman Catholic Archbishop of Baltimore*,
No. 23-16969-MMH, ECF No. 2813 (Bankr. D. Md. Aug. 4, 2026) ........ 11, 12

*In re Roman Catholic Diocese of Camden, N.J.*,
653 B.R. 309 (Bankr. D.N.J. 2023) ........ 38

*In re Sch. Asbestos Litig.*,
921 F.2d 1330 (3d Cir. 1990) ........ 20

*In re SportStuff, Inc.*,
430 B.R. 170 (B.A.P. 8th Cir. 2010) ........ 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re SunEdison, Inc.*,
576 B.R. 453 (Bankr. S.D.N.Y. 2017) ... 34

*In re Tonawanda Coke Corp.*,
662 B.R. 220 (Bankr. W.D.N.Y. 2024) ... 34

*In re Tonawanda Coke Corp.*,
No. 18-12156 CLB, 2024 Bankr. LEXIS 2032 (Bankr. W.D.N.Y. Aug. 27, 2024) ... 9

*In re Voyager Digital Holdings, Inc.*,
2026 WL 2241168 (S.D.N.Y. Aug. 4, 2026) ... 31

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ... 31

*In re Windwood Heights, Inc.*,
385 B.R. 832 (Bankr. N.D. W. Va. 2008) ... 10

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ... 47

*Lindsey v. Normet*,
405 U.S. 56 (1972) ... 18

*Matter of Highland Capital Mgmt., L.P.*,
48 F.4th 419 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 2714 (2024) ... 30

*Mission Product Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019) ... 17

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*,
25 F.3d 1132 (2d Cir. 1994) ... 9

*Mullane v. Central Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) ... 39

*Patterson v. Mahwah Bergen Retail Grp., Inc.*,
636 B.R. 641 (E.D. Va. 2022) ... 34

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) ... 34

*Resorts Int'l Fin., Inc. v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*,
372 F.3d 154 (3d Cir. 2004) ... 37

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
81 F.3d 355 (3d Cir. 1996) ... 10, 48

*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*,
549 U.S. 443 (2007) ... 17

*United States v. Como*,
340 F.2d 891 (2d Cir. 1965) ... 36

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Wu v. Uber Techs., Inc.*,
43 N.Y.3d 288 (2024) .................... 34

**Statutes**

11 U.S.C. § 1125(a)(1) .................... 49, 52

11 U.S.C. § 1125(b) .................... 49

11 U.S.C. § 1129(a)(1) .................... 16

11 U.S.C. § 1129(a)(3) .................... 13

11 U.S.C. § 1141(d) .................... 16

Century Indemnity Company as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century") files this objection (this "Objection") to the *Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Ogdensburg, New York and Additional Debtors, Dated August 31, 2026* [Dkt. No. 1395] (the "Disclosure Statement").[1] The Disclosure Statement cannot be approved because it is incomplete, omits material information concerning the Plan, and describes a Plan that cannot be confirmed as drafted. In support of this Objection, Century respectfully states as follows:

## PRELIMINARY STATEMENT

This Court should not allow the Diocese to solicit votes on a Plan that it cannot confirm. As the bankruptcy court explained just two months ago when denying approval of competing diocesan disclosure statements, "[i]t is a futile waste of precious estate resources to solicit votes on a plan that cannot satisfy section 1129 of the Bankruptcy Code, whether because the plan's terms conflict with applicable law, are insufficient under applicable law, or extend beyond the permissible bounds of the Bankruptcy Code and the jurisdiction of this Court." *In re Roman Catholic Archbishop of Baltimore*, No. 23-16969-MMH, ECF No. 2813, at 1-2 (Bankr. D. Md. Aug. 4, 2026). The same applies here. The Plan's defects appear on the face of the Plan; and no vote or confirmation hearing evidence can cure them. The Court can and should find the Plan facially unconfirmable now.

Century has standing and its objections to the Disclosure Statement and Plan must be heard. The Plan takes Century's policies as its target: it assigns to the Trust all Insurance Claims against Non-Settling Insurers, authorizes Trustee-selected Litigation Claimants to pursue judgments "fully

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Disclosure Statement or the *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Ogdensburg, New York and Additional Debtors Dated August 31, 2026* [Dkt. No. 1396] (the "Plan"). The "Allocation Protocol" is filed as Plan Supplement, Exhibit 1 [Dkt. No. 1431-1].

enforceable solely against, and paid by," Non-Settling Insurers, and channels Century's contribution rights to a Trust that will pay nothing on them. *See* Plan, §§ 4.6.1(d), 8.2.3, 12.6.1. An insurer facing that exposure is a party in interest that "may raise and may appear and be heard on any issue." 11 U.S.C. § 1109(b). The Plan cannot conscript Century's policies to fund recoveries, and bind Century to its injunctions, while denying Century a voice in whether that Plan may go forward.

The Plan is insurance neutral in name only. It recites that Non-Settling Insurers keep their rights and defenses, *see* Plan, §§ 6.1, 8.8.2, but its operative terms do the opposite. Only the Committee and, after the Effective Date, the Trustee may object to Class 4 Claims. *See* Plan, § 2.3.4(k). A Committee-developed Allocation Protocol values claims through an Abuse Claims Reviewer whose reconsideration rulings are "final and not subject to any further reconsideration, review or appeal by any party, including a court." Allocation Protocol, § 3.3; *see also* Plan, § 1.1.16. Litigation Claimants receive Claim Enhancement multipliers of up to 4.0x, and the Plan keeps claims alive against a nominal defendant solely to manufacture judgments payable by insurers. *See* Plan, §§ 4.6.2, 12.2.4. And the "judgment reduction" provision sets the credit owed to a Non-Settling Insurer at zero whenever a Settling Insurer fails to cooperate. *See* Plan, § 12.6.2(b). A plan that enlarges insurer exposure while stripping insurers of the right to contest it is not neutral; it is unconfirmable.

The defects do not stop there. The Plan imposes deemed, nonconsensual releases of non-debtors, including Contributing Non-Debtor Entities and Settling Insurers, with no opt in, contrary to *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) and the recent ruling in *Diocese of Buffalo* that silence is not consent. *See* Plan, §§ 1.1.157, 12.9. It channels claims against entities the Plan does not even define as Protected Parties. *See* Plan, §§ 1.1.31, 1.1.150. It exculpates non-

debtors and non-fiduciaries, erects a permanent Gatekeeper Injunction over future litigation between non-debtors, and asks for a blanket Rule 9019 blessing of every settlement "included in the Plan or contemplated." *See* Plan, §§ 1.1.84, 12.12, 12.13; Disclosure Statement, Art. 21. It binds dozens of Additional Debtors that have not filed for bankruptcy, assigns their insurance rights before any estate exists, and imposes a 21-day post-confirmation bar date on their creditors. *See* Plan, §§ 1.1.12, 8.2.3, 12.7. And it conditions every distribution on execution of a release agreement that has not been filed. *See* Plan, § 2.3.4(l).

Independently, the Disclosure Statement fails section 1125. Its Liquidation Analysis, Financial Projections, and Additional Debtor Financial Information are deliberately withheld through the objection deadline. And many of the explanations of the Plan terms in the Disclosure Statement (to the extent included) are misleading. The Disclosure Statement fails to explain the legal authority for many of the Plan provisions, the consideration supporting each release, or the effect on parties, including the Non-Settling Insurers. It further fails to disclose the economic consequences of the Allocation Protocol, the Litigation Claimant process, the Trust's control of Insurance Claims, and the Plan's shifting costs and risks to Non-Settling Insurers. No one reviewing the Disclosure Statement can make an informed judgment about the Plan.

The Court should deny approval of the Disclosure Statement and find the Plan patently unconfirmable.

## FACTUAL BACKGROUND

### *A. The Plan and the Disclosure Statement.*

On August 31, 2026, the Plan Proponents filed the Disclosure Statement [Dkt. No. 1395] and on September 1, 2026, they filed an incomplete Plan [Dkt. No. 1396]. The terms of the Plan that describe how claims are to be allowed, valued and handled and that govern how claims in the tort system are handled were withheld. In the run-up to a hearing on Century's motion to compel,

the Committee filed the document titled "Allocation Protocol" and Trust Agreement" on September 23, 2026 [Dkt. No. 1431] but continued to withhold the other plan documents described as "Plan Supplements".

The Plan does not disclose the allocation among the Diocese, the Additional Debtors, and the Contributing Non-Debtor Entities of the $45,000,000 DOO Entities' Cash Payment, *see* Plan, § 1.1.68, or how much of this amount is to be reserved to satisfy self-insured retentions and non-insured periods. Nor is there any disclosure of what portion each entity is contributing, what claims are asserted against each entity, or which entities are assigning what insurance—making it impossible to assess whether any individual entity's contribution supports the injunctions, releases and exculpation it receives and the extent to which insurance contracts are impaired.

***B. The Plan Treatment of Insurance.***

On the Effective Date, the Diocese and abuse claimants are deemed to assign, and each Additional Debtors will assign, to the Trust their rights to all Insurance Claims against the Non-Settling Insurers, including Century, without an explicit corresponding assignment of all the continuing obligations under the insurance contracts or provision for satisfaction of those obligations. *See* Plan, § 8.2.3(a). The plaintiff selected Trustee is absurdly left to control the claims that elect to proceed to litigation, *see* Plan, §§ 1.1.181, 4.6.1(e), and Century's rights to contribution and reimbursement are enjoined without consent or provision for payment and the Trustee exculpated. *See* Plan, § 12.6.1.

The Plan contains an illusory clause stating that Non-Settling Insurers' rights to raise coverage defenses, are preserved but in the next breath subjects that preservation to the Plan's discharge, injunctions, and releases and other conflicting provisions of the Plan. *See* Plan, §§ 8.8.2(d)-(e), 8.8.4. Because the Plan creates a scheme for the continuing litigation of the claims,

the policyholders' contractual obligations to cooperate in the defense, investigation, and settlement of claims are vital to the contracts, yet the Plan writes them out.

The Diocese and Additional Debtors "make no representations or warranties, and shall have no duty or obligations whatsoever, to the Trust with respect to the Insurance Claims"; neither the Trust nor the Diocese has "any obligation" to defend an action commenced by a Non-Settling Insurer; the Diocese's duty to satisfy Post-Effective Date Preconditions to Coverage is limited to "reasonable efforts"; and if the Trustee elects not to replenish the DOO Entities' Post-Effective Date Costs Reserve below $750,000, the Diocese and Additional Debtors are "irrevocably released" from any further obligations concerning Insurance Claims and Abuse Claims. *See* Plan, §§ 2.3.4(e), 6.3.1, 8.2.3(c), 8.11.1.

### *C. The Plan Treatment of Abuse Claims*

Similarly situated claims are not treated the same. Claims with an Abuse Action filed by January 18, 2024, are to arbitrarily receive a 1.25 multiplier with all other claimants drawing from the same pool to receive proportionately less. *See* Allocation Protocol, § 5.2. Contrary to the terms of the insurance contracts that require the Debtor to cooperate in the defense of the claims, the Plan contains provisions to incentivize claimants to pursue litigation against the Diocese and its parishes post-effective date by providing them an "enhancement" in the form of increased payment from the Trust. *See* Plan, § 4.6.2.

Abuse Claims are allowed and valued pursuant to an Allocation Protocol developed by the Committee. *See* Plan, § 1.1.16, 2.3.4(d). The Allocation Protocol provides no criteria for disallowing a claim. Late claimants must merely submit a statement addressing excusable neglect and whether the claim is within the applicable statute of limitations, and the Abuse Claims Reviewer "may, in his sole discretion," reduce their points. *See* Allocation Protocol, § 3.1. So, for instance, there is no provision for disallowing claims that are time barred either because they

never filed a complaint, did not timely file a proof of claim or are not revived by the CVA because the abuse occurred outside New York. *See id.* The Abuse Claims Reviewer's determination regarding reconsideration is final and not subject to appeal or judicial review. Allocation Protocol, §§ 3.2, 3.3. And Insurers are allowed no input.

The Plan creates a complicated series of Fund and Subfunds from which claimants are to be paid. The First Group Abuse Claim Fund consists of the DOO Entities Cash Contribution Remainder plus 97% of the Insurance Recovery Sub-Fund. The Second Group Abuse Claims Fund consists of only 3% of the Insurance Recovery Sub-Fund and no DOO Entities' cash. *See* Allocation Protocol, Art. I.

No reserve is established for insurer contribution or reimbursement claims.

### *D. The Additional Debtors That Have Not Yet Been Identified.*

The Plan and Disclosure Statement are predicated on multiple Parishes and Catholic Ministry Entities becoming debtors but does not provide basic information about those entities, the claims against them, or their assets and insurance. *See* Plan, § 1.1.11; Ex. A [Dkt. No. 1394].

The Disclosure Statement inconsistently describes the Additional Debtors as including 86 entities (Disclosure Statement, Art. 1) and 79 entities (Disclosure Statement, Art. 2.C). The Additional Debtors did not file with the Diocese and have not filed for bankruptcy. Under the Plan, the Additional Debtors contemplate filing Chapter 11 petitions before the Confirmation Hearing. *See* Disclosure Statement, Art. 2.C; Plan, § 11.1.9. The Plan nevertheless proposes to confer on them releases, injunctions, and exculpations, to affect an assignment of their Insurance Claims all before creditors have received information about their assets, liabilities, operations, and individual contributions.

The Additional Debtors Abuse Claim Bar Date is **21 days after** entry of the Confirmation Order so no one will know what claims or how many exist or will exist against any particular debtor until after confirmation. *See* Plan, §§ 1.1.12, 12.7.1.

### *E. The Non-Consensual Third-Party Injunction, Release, and Exculpation Provisions.*

The Plan contains sweeping injunctions, releases, and exculpation provisions that impact rights by and among non-debtors such as Century. These provisions are set forth primarily in Section 12 of the Plan. Each of the Protected Parties benefits from these protections regardless of its contribution under the Plan or whether they make any contribution whatsoever. The "Protected Parties" include the Diocese, the Additional Debtors, the Settling Insurers, and any Settling Insurer Covered Persons.

***Channeling Injunction***. The Channeling Injunction (Plan, § 12.3) provides, in relevant part:

> ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS ESTABLISHED UNDER THIS PLAN, THE ALLOCATION PROTOCOL, AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS. . . . ALL PERSONS WHO HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIMS AGAINST THE PROTECTED PARTIES. . . .

Plan, § 12.3. Notably, Contributing Non-Debtor Entities are not listed as Protected Parties, yet claims against them are defined as Channeled Claims "in all instances." *See* Plan §§ 1.1.31, 1.1.150.

***Releases***. Section 12.9 effects a deemed release by all holders of Channeled Claims — including Class 4 Claimants — in favor of Released Parties. "Released Parties" include the

Diocese, Additional Debtors, Contributing Non-Debtor Entities, and Settling Insurers. Plan, § 1.1.157. The Plan provides no opt-out or opt-in mechanism for affected claimants.

***Exculpation***. The Exculpation provision covers "Exculpated Parties" as defined in Plan: the Diocese, Additional Debtors, Contributing Non-Debtor Entities, Mediators, the Committee and its members, and their respective officers, directors, fiduciaries, and professionals. *See* Plan, §§ 1.1.84, 12.12. Contributing Non-Debtor Entities and Additional Debtors — which are not yet debtors in bankruptcy — are not estate fiduciaries and their inclusion in the exculpation is therefore improper.

***Injunction of Abuse Claims and Inbound Contribution Claims***. Section 12.2.2 of the Plan permanently enjoins the assertion of Abuse Claims and Inbound Contribution Claims against the Diocese, any Additional Debtor, or any other Diocese Settling Party.

Holders of Class 5 Inbound Contribution Claims are deemed to reject the Plan, but their claims are simultaneously disallowed and extinguished, and they are deemed to consent to the Plan's injunctions and releases unless they object. *See* Plan, §§ 2.3.5, 3.3. Class 4 Claimants must execute an Abuse Claim Release Agreement, which has been withheld, before receiving any distribution. Plan, § 2.3.4(l).

The conditions precedent to the Effective Date include, among others: entry of a Confirmation Order approving the Channeling Injunction and ratifying the Settling Insurer Injunction; the Additional Debtors filing for bankruptcy before the Confirmation Hearing; no more than 25 Post-Confirmation Claims being filed; and the Plan not having been materially amended. *See* Plan, § 11.1.

***F. The Proposed 363 Sale Order.*** The Plan is contingent on entry of an order approving the sale of the Debtors' insurance policies issued by Wausau, LMI and Interstate. The buyback agreements have been withheld. Notice has not been issued to approve a sale.

***G. Motions to Disallow and Object to Claims.***

In advance of the deadline for objecting to the Disclosure Statement, Century filed a series of objections to claims and motions to disallow claims. *See* Dkt. Nos. 1372, 1373, 1374, 1375, 1376, 1377, 1378. Century noted in its objections that the challenged claims were time-barred, insufficiently pleaded, or duplicative and should be resolved prior to solicitation. On August 18, 2026, the Court denied the objections as having been filed in violation of the Mediation Stay.

After the Plan Proponents filed the Plan and Disclosure Statement and obtained a September 29, 2026 hearing on a motion to approve a disclosure statement and solicitation procedures, in accordance with the Mediation Order, Century filed a motion for leave to allow the claim objections to go forward. *See* Dkt. No. 1388. The objections were denied as having been filed in violation of the Mediation Stay. *See* Dkt. No. 1393.

## <u>ARGUMENT</u>

### I. THE COURT HAS AUTHORITY TO DENY THE DISCLOSURE STATEMENT AND FIND THAT THE PLAN IS PATENTLY UNCONFIRMABLE

"[W]here the proposed plan is facially unconfirmable, . . . it is an abuse of the bankruptcy process to permit solicitation to go forward."); *Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Tonawanda Coke Corp.*, No. 18-12156 CLB, 2024 Bankr. LEXIS 2032, at *3 (Bankr. W.D.N.Y. Aug. 27, 2024).

("[T]he Court may decline to approve a disclosure statement that aims to solicit votes in favor of an unconfirmable plan.")

A plan is "patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'" *In re Am. Capital Equip., LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012). Bankruptcy courts within the Second Circuit regularly exercise this authority grounded in their equitable powers under section 105 of the Bankruptcy Code to control their own docket, to prevent a waste of estate resources. *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007); *In re Windwood Heights, Inc.*, 385 B.R. 832, 838 (Bankr. N.D. W. Va. 2008) (solicitation and evidence will not cure the defects inherent in the structure of the Plan); *In re Am.* Capital *Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012). This includes plans containing provisions that are not authorized by the Bankruptcy Code. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

Both prongs of the test for a patently unconfirmable plan are satisfied here. Each defect identified below arises from the plain text of the Plan and the Allocation Protocol and therefore turns on no disputed fact. And each is a question of law: whether the Bankruptcy Code permits a staggered, claimant-by-claimant discharge (Plan, § 12.2.4); nonconsensual third-party releases and channeling of non-debtor claims (Plan, §§ 12.3, 12.6.1, 12.9); exculpation of non-fiduciaries (Plan, §§ 1.1.84, 12.12); and the elimination of every party in interest's right to object to Class 4 Claims (Plan, § 2.3.4(k)). No vote of Class 4 Claimants can supply the consent of a non-voting Non-Settling Insurer, restore statutory rights that the Plan extinguishes, or authorize relief the Bankruptcy Code does not permit. Nor will evidence at a confirmation hearing change what the Plan says.

"It is a waste of all parties' resources for the court to approve such a disclosure statement and set the parties on the course of preparing for a confirmation hearing on a plan that is not legally viable." *In re Alexander Props., LLC*, No. 10-38095-NVA, 2011 Bankr. LEXIS 5498, at *6 (Bankr. D. Md. Sep. 29, 2011).

The court in *Roman Catholic Archbishop of Baltimore* recently did exactly that, denying approval of competing disclosure statements because "both proposed plans of reorganization contain certain provisions that render them patently unconfirmable," and explaining that "[i]t is a futile waste of precious estate resources to solicit votes on a plan that cannot satisfy section 1129 of the Bankruptcy Code." *In re Roman Catholic Archbishop of Baltimore*, No. 23-16969-MMH, ECF No. 2813, at 1-2 (Bankr. D. Md. Aug. 4, 2026). Similarly, in a bench ruling, the court in *Diocese of Camden, New Jersey* refused to approve a disclosure statement after finding the plan was "patently unconfirmable." *See In re Diocese of Camden, New Jersey,* No. 20-21257-JNP, ECF No. 530 (Bankr. D.N.J. Mar. 26, 2021). In reaching that decision, the court addressed the lack of information related to the non-debtor entities, including why their contributions were necessary and fair in exchange for the proposed releases, and the number and amount of claims being released against such entities. *Id.* In both the *Archbishop of Baltimore* and the *Diocese of Camden* cases, the courts heard objections from the insurers and, based on those objections and the objection of other parties, denied approval of the disclosure statements.

Allowing the Plan to continue towards confirmation will force the estate and other parties in interest to essentially work in futility. Declining to approve the Disclosure Statement at this stage will protect the estate from the expense of a costly and futile solicitation process.[2]

---

[2] *See In re R & G Props.*, No. 08-10876, 2009 Bankr. LEXIS 2101, at *8-9 (Bankr. D. Vt. July 6, 2009) (noting that the "solicitation process" was "costly" (internal citations omitted)).

## II. BECAUSE THE DISCLOSURE STATEMENT DESCRIBES A PLAN THAT IS PATENTLY UNCONFIRMABLE, IT CANNOT BE APPROVED.

The Plan has multiple defects that preclude confirmation, including an improper blanket settlement finding; a delayed, claim-by-claim discharge and Claim Enhancement structure designed to manufacture insured liability; the nonconsensual injunction and extinguishment of contribution claims among non-debtor insurers coupled with an inadequate judgment reduction provision; the elimination of parties in interest's rights under section 502; impairment of Century's contractual rights; an impermissibly broad exculpation; nonconsensual third-party releases and channeling contrary to *Purdue Pharma*; coercive release conditions on distributions; an improper Gatekeeper Injunction; an improper prepackaged Additional Debtor structure; due process defects for unknown and post-confirmation claimants; and a nonconsensual jury trial waiver without judicial review.[3]

For the reasons set forth below, the underlying Plan is patently unconfirmable on its face, and the Disclosure Statement cannot be approved.

### *A. The Broad Settlement Request Should be Stricken.*

Section 1129(a)(3) requires only that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Key to this requirement is the word "plan." The only finding required under the plain language of section 1129(a)(3) is that the Plan was proposed in good faith. In *Boy Scouts*, *Diocese of Camden*, and *Avon*, courts refused to

[3] Section 1109(b) of the Bankruptcy Code provides that any "party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter," and Federal Rule of Bankruptcy Procedure 3017(a) entitles parties in interest to object to a disclosure statement. Century satisfies that standard several times over, and its standing extends to every ground raised in this Objection, including the threshold question whether the Plan is patently unconfirmable. *See generally In re Roman Catholic Archbishop of Baltimore*, No. 23-16969-MMH, ECF No. 2813 (Bankr. D. Md. Aug. 4, 2026) (denying approval of disclosure statements describing patently unconfirmable plans after considering objections by insurers and other parties).

approve findings exceeding this scope. The Rule 9019 findings deeming the entire plan a settlement set forth in Article 21 of the Disclosure Statement is improper as a matter of law.

A chapter 11 plan "is not a settlement." *In re Boy Scouts of Am. and Del. BSA, LLC*, 642 B.R. 504, 626 (Bankr. D. Del. 2022) ("*BSA*"). A plan may establish a settlement process, but confirmation does Not "adjudicat[e] or resolv[e] any individual … claim, let alone the debtors' aggregate … liability." *In re AIO US, Inc.*, No. 24-11836 (CTG), 2025 WL 2426380, at *25 (Bankr. D. Del. Aug. 21, 2025). The request for approval under Bankruptcy Rule 9019 "of all compromises and settlements included in the Plan" improperly treats confirmation as if it were a settlement of every claim resolved under the Plan. *See* Disclosure Statement, Art. 21. The request is also irreconcilable with the Plan's own terms, which provide that the Abuse Claims Reviewer's determinations and Trust Distributions are "***not a settlement***, release, accord, or novation of any Abuse Claim." Plan, § 4.2.

In *Boy Scouts*, insurers challenged TDP-related findings as "designed to prejudice their rights in future insurance coverage litigation." *BSA*, 642 B.R. at 623. The Court declined to issue any findings lacking a "code or confirmation-related purpose," reasoning that broader findings were improperly "directed at post-confirmation litigation with insurers." *Id.* at 624-33. Accordingly, the Court found only that the plan itself was proposed in good faith under Section 1129(a)(3), not the TDPs. *See id.* at 632-33.

In *Diocese of Camden*, the court likewise declined to extend the good faith finding beyond the plan itself to accompanying documents, agreeing with *Boy Scouts* that such a finding is "not required to confirm a plan." *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 359–60 (Bankr. D.N.J. 2023).

In *Avon*, Judge Goldblatt found the plan was proposed in good faith but explicitly declined to make any finding regarding the TDPs, other plan documents, or abuse claims. *In re AIO US, Inc.*, No. 24-11836 (CTG), 2025 WL 2426380, at *22-23 (Bankr. D. Del. Aug. 21, 2025). The court set out five governing principles, the last being that "nothing in this process may expand or contract the rights of the insurers" and "any proposed 'finding' that would tilt the playing field in a subsequent coverage dispute one way or the other should be deleted." *Id.* at *24-25. The court was emphatic: "To the extent an argument is made to a court hearing an insurance coverage dispute that this Court's confirmation order reflects an adjudication by this Court about the 'fairness' or 'reasonableness' of the procedures, this Memorandum Opinion is intended to provide a clear and blunt answer: it doesn't." *Id.* at *22.

The Plan Proponents cannot obtain a preclusive Rule 9019 finding that binds Non-Settling Insurers or converts future Trust transactions into court-approved settlements without the notice, evidence, or party-specific findings required for each compromise. The Bankruptcy Code does not allow such a blanket finding and, therefore, the blanket Rule 9019 request is unlawful.

### *B. The Plan's Delayed Discharge and Claim Enhancements are Contrary to Bankruptcy Law*

The Plan's Litigation Claimant architecture is not a neutral mechanism for resolving Abuse Claims. It splits each abuse claim, delays the discharge for the portion that allows a liability verdict, manufactures judgments directed solely to a Non-Settling Insurer, channels and eliminates insurer contribution rights, and then enhances claim values. The result effectively rewrites the insurance contracts.

The delayed discharge of Abuse Claims set forth in Section 12.2.4 of the Plan violates Section 1141(d)(1) and renders the Plan unconfirmable as a matter of law. *See* 11 U.S.C. § 1129(a)(1) (a plan must "compl[y] with the applicable provisions" of the Bankruptcy Code).

Section 1141 of the Bankruptcy Code provides that the confirmation of a plan "discharges the debtor from any debt that arose before the date of confirmation." 11 U.S.C. § 1141(d). The Plan invokes section 1141(d) and discharges Inbound Contribution Claims on the Confirmation Date, but for Abuse Claims it substitutes a floating "Abuse Claim Discharge Date" that varies from claim to claim. *See* Plan, §§ 1.1.4, 12.2.4. Contrary to the Bankruptcy Code, discharge for these Abuse Claims turns on the resolution of insurance litigation, not confirmation or the Effective Date.

Section 1141(d)(1)(A) permits a plan or confirmation order to "otherwise provide," but it does not authorize an indefinite, claimant-by-claimant, Trustee-controlled discharge whose practical purpose is to manufacture liability for Non-Settling Insurers while the insured bears no corresponding economic exposure. Further, the Trustee has significant control over such claims to manufacture recovery—the Trustee may authorize Litigation Claims within one year, retains sole discretion over whether and how they are pursued, and receives all recoveries under the Plan, creating the collusion risk recognized by other courts. *See In re Global Industrial Technologies, Inc.*, 645 F.3d 201, 213-14 (3d Cir. 2011); *Caldwell Trucking PRP Group v. Spalding Composites*, 890 F. Supp. 1247, 1260 (D.N.J. 1995).

The Plan creates different Abuse Claim Discharge Dates depending on the claimant's status and whether the Trustee authorizes litigation. Sections 1.1.4 and 12.2.4 establish materially different Abuse Claim Discharge Dates. Claims implicating only Settling Insurer Policies, Unknown Abuse Claims and Post-Statute Filed Abuse Claims are discharged on the Effective Date. An authorized Litigation Claimant's claim remains alive until the earliest of final non-appealable adjudication, settlement, or dismissal of the Litigation Claim, the claimant's withdrawal, or the Trust's settlement of all Target Policies. An unauthorized claim connected to a Non-Settling Insurer Policy remains alive until the earlier of the first anniversary of the Effective

Date or withdrawal, while the Plan supplies an outside date only after the Trust has fully resolved all Insurance Claims against all Non-Settling Insurers.

If the Diocese is not discharged with respect to Litigation Claims, and a judgment is entered against the Diocese (as nominal party), the Abuse Claimant's counsel may argue the fiction that the Diocese suffered a "loss"—even though the Diocese will never pay the judgment. *See* Plan, §§ 4.6.1(d), 12.2.3(a). This manufactured "loss" has no bankruptcy purpose. It is the mechanism for generating the fiction necessary to assert bad-faith claims. If an insurer funds the settlement of a claim for which coverage is contested, it retains a contractual right of reimbursement against the policyholder. Employing the concept of a deferred discharge in an effort to write out of the contracts the insurers' right to reimbursement while manufacturing the fiction of a loss is contrary to the fundamental principle of bankruptcy law that contracts pass through bankruptcy whole.

Section 1141(d)(1) does not authorize multiple discharge dates designed to alter the parties' insurance contacts. This staggered structure is not an ordinary discharge of the Diocese's liabilities. It delays the discharge of some claims and creates additional liabilities and litigation leverage against Non-Settling Insurers. It keeps selected claims against the Diocese and Additional Debtors alive after the Effective Date solely to generate a judgment that can be presented to Non-Settling Insurers, while the judgment cannot be enforced against the Diocese, non-insurance assets, Protected Parties, or Settling Insurers. Recourse is limited to Trust Distributions, Non-Settling Insurer Policy proceeds, and other amounts recoverable from Non-Settling Insurers. The Plan uses a nominal defendant with no meaningful economic exposure to manufacture insured liability.

Tying the discharge date for Abuse Claims (pursued in the tort system) to resolution of those claims is not recognized in bankruptcy. Such a structure is also not necessary to preserve the

Abuse Claimants' direct-action rights against the Non-Settling Insurers. Direct-action rights only require that the underlying claim existed pre-confirmation and that a judgment has been obtained against the insured—not that the insured remain undischarged.

The Plan's litigation path also permits recoveries that may exceed the value of the underlying Abuse Claims. Those enhancements can be unrelated to a fixed, adjudicated, or policy-covered loss, and the Plan supplies no reliable ceiling tied to proven damages, legal responsibility, policy limits, occurrence limits, allocation among policy periods, or actual covered loss. The Trust controls whether to authorize litigation, may use Trust Assets to prosecute litigation against Non-Settling Insurers, and applies enhancement multipliers after settlements or verdicts, yet the Plan provides no clear ceiling tied to proven damages or covered loss. *See* Plan, §§ 4.6.1(e), 4.6.2, 6.4. The resulting overpayment violates the requirement that the Plan comply with the Bankruptcy Code and creates an additional reason why the Plan cannot be confirmed on its face. The Plan cannot enlarge the Diocese's property or an insurer's contractual obligations through bankruptcy. *See Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 450 (2007); *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019).

With the delayed discharge concept, the Plan goes much further than simply preserving claims that could exist; it instead attempts to manufacture bad faith claims against the Non-Settling Insurers. The Plan cannot override the statutory discharge mechanism to perpetuate the fiction of ongoing debtor liability solely for the purpose of bolstering litigation against Non-Settling Insurers.

The Plan also implicates 28 U.S.C. § 157(b)(5). Any judgment used to trigger coverage must rest on a proceeding in which the insured is legally obligated to pay, not merely named as a

nominal defendant, and the right to present every available defense must remain intact. *See Lindsey v. Normet*, 405 U.S. 56, 66 (1972).

### *C. The Use of the Non-Consensual Injunction to Bar Claims Among Non-Debtor Insurers is Improper and the Judgment Reduction Provision is Inadequate*

When more than one insurance company provides coverage for a claim, an insurer may seek contribution from the other insurer(s) to avoid paying more than its fair share of the claim. *See, e.g.*, *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994). The Plan upsets this arrangement. The Channeling Injunction channels all Insurer Contribution Claims to the Trust, and that channeling "does not entitle the holder of such Channeled Claim to a Trust Distribution." Plan, § 12.6.1. Only if a court declines to recognize that channeling does the Plan's fallback apply: Settling Insurers retain their Insurer Contribution Claims subject to specified non-pursuit, assignment, and reciprocal-release conditions, and any judgment or award obtained by an Alleged Insured or Abuse Claimant against a Non-Settling Insurer is "automatically reduced" by the Reduction Amount so that the Non-Settling Insurer's Insurer Contribution Claim is "satisfied and extinguished entirely." *See* Plan, § 12.6.2(a)-(b). When the Contribution Target is not a party, the Alleged Insured or Abuse Claimant must obtain a finding of the Reduction Amount before judgment, *see* Plan, § 12.6.2(b), but the Plan supplies no governing standard, procedure, or allocation of proof for that finding.

The Bankruptcy Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." *Purdue Pharma L.P.*, 603 U.S. at 227. Section 1123(b)(6) of the Bankruptcy Code "cannot be fairly read to endow a bankruptcy court with the 'radically different' power to discharge the debts of a nondebtor without the consent of affected nondebtor claimants." *Id.* at 218 (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 513 (2018)). Through the

Channeling Injunction and the judgment reduction provisions, the Plan Proponents effectively seek to discharge the Non-Settling Insurers' claims against the Settling Insurers without the Non-Settling Insurers' consent.

The Channeling Injunction permanently bars all holders of Channeled Claims from "taking any actions, directly or indirectly," to assert or enforce them against the Protected Parties, including by "asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind." Plan, § 12.3. Channeled Claims include "any Claim against any Protected Party or any of the Setling Insurer Policies arising from or related in any way to an Abuse Claim," expressly including claims "by way of subrogation, contribution, indemnity." *See* Plan, § 1.1.31. Such claims "shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under this Plan, the Allocation Protocol, and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims." Plan, § 12.3.

Once channeled, a Non-Settling Insurer's contribution claim against a Settling Insurer can be asserted only against the Trust, which will pay nothing on it. *See* Plan, § 12.6.1. The Non-Settling Insurers are thus forced to surrender their contribution claims against the Settling Insurers, which are both Protected Parties and Released Parties. *See* Plan, §§ 1.1.150, 1.1.157. Century has not consented and, therefore, *Purdue* dictates that those claims may not be released, enjoined, or channeled.

Further, the Reduction Amount is zero if the Contribution Target does not cooperate in good faith, shifting third-party non-cooperation risk to the Non-Settling Insurer. If the reduction eliminates the contribution claim, the Non-Settling Insurer must reimburse the Contribution Target's fees and expenses, yet the Plan expressly does not require the Trust to maintain any

reserves for those costs. *See* Plan, § 12.6.2(b), (e). The Plan also requires reciprocal releases in settlements between Alleged Insureds or Abuse Claimants and Non-Setling Insurers and permits assignment or retention of the Settling Insurers' claims depending on the Trust's indemnification. *See* Plan, § 12.6.2(c)-(d). Under the Plan, Settling Insurers receive notice, participation, cooperation, and court-order rights to effectuate the reduction, but there is no reciprocal protection for Non-Settling Insurers. *See* Plan, § 12.6.3.

The formula for judgment reduction is not a pro rata or proportionate share credit: it can reduce a judgment by an unadjudicated amount or provide no reduction at all based on conduct outside the Non-Settling Insurer's control. Bar orders and judgment credit provisions must protect non-settling defendants and operate fairly. *See Eichenholtz v. Brennan*, 52 F.3d 478 (3d Cir. 1995); *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1332 (3d Cir. 1990); *In re SportStuff, Inc.*, 430 B.R. 170, 179 (B.A.P. 8th Cir. 2010). New York General Obligations Law § 15-108 generally credits the greater of the amount paid or the released tortfeasor's equitable share, not an undefined amount that becomes zero upon non-cooperation. Tellingly, the Plan expressly preserves the rights of Tort Defendants to invoke General Obligations Law § 15-108 and reduce their liability by the "allocable share of fault" attributable to the Diocese and Protected Parties, *see* Plan § 15.14, while denying the Non-Settling Insurers any comparable, reliable credit for the Settling Insurers' share. Such treatment is unlawful.

The Plan's neutrality provisions do not cure the problem. Section 8.8.2(e) states that nothing in the Plan shall "impair any Non-Settling Insurer's Insurer Contribution Claims, which may be asserted as a defense or counterclaim against the Diocese, the Diocese Settling Parties or the Trust," and that a Non-Settling Insurer's liability to the Trust "shall be reduced by the amount of such Insurer Contribution Claims." Plan, § 8.8.2(e). But that subsection is expressly "subject

to Section 8.8.4," and it goes on to provide that "all Insurer Contribution Claims shall be channeled to the Trust in accordance with Section 12.3 of the Plan and no Insurer Contribution Claim shall be the basis for any affirmative recovery against any Protected Party." *Id.*

Section 8.8.4 then confirms that nothing in Section 8.8.2 shall "impair the effectiveness of" the Channeling Injunction, the Settling Insurer Injunction, or any other release or injunctive provision. Plan, § 8.8.4. And Section 8.8.3 limits the Non-Settling Insurers' remedies "to those available under applicable law." Plan, § 8.8.3. The Non-Settling Insurers may therefore use their contribution rights only defensively, as an offset against the Trust, and are barred from any affirmative recovery against the Settling Insurers that would otherwise bear their equitable share. After *Purdue*, this sort of nonconsensual third-party injunction is improper.

Nor is the judgment reduction mechanism an adequate substitute for the Non-Settling Insurers' extinguished contribution rights. Because no Insurer Contribution Claim may be the basis for any affirmative recovery, Plan, § 8.8.2(e), any portion of a Non-Settling Insurer's contribution claim that exceeds the judgment against it is simply extinguished. The mechanism does not compensate a Non-Settling Insurer for defense costs and provides no protection whatsoever if a claim is withdrawn or there is a defense verdict, because there is then no judgment to reduce. And the Reduction Amount is zero whenever a Settling Insurer fails to cooperate. Plan, § 12.6.2(b). A judgment reduction mechanism can serve as an adequate substitute for extinguished contribution rights only if it reliably provides full credit for the settling party's share, without preconditions outside the non-settling party's control. *See McDermott*, 511 U.S. at 220-21 (adopting proportionate judgment reduction as the appropriate method to protect non-settling defendants). The Plan fails to do so.

The Plan's internal inconsistencies compound the problem. Section 12.2.5 declares that "[n]othing in this Plan shall be deemed to modify or abridge any rights of the Non-Settling Insurers under their respective Non-Settling Insurer Policies," Plan, § 12.2.5, and Section 8.8.2(d) purports to preserve the Non-Settling Insurers' "legal, equitable, or contractual rights under any Non-Settling Insurer Policy," Plan, § 8.8.2(d). Yet each of those assurances is subordinated to Section 8.8.4, which preserves the full effect of the Plan's discharge, injunctions, and releases. *See* Plan, §§ 8.8.2(d)–(e), 8.8.4. The Plan cannot simultaneously preserve and extinguish the same rights.

Nor does the Plan give the Non-Settling Insurers any credit for amounts already paid to an Abuse Claimant by the Trust or any Settling Insurer. To the contrary, the Plan provides that the Non-Settling Insurers' obligations "are not reduced . . . by the Trust Distributions Class 4 Claimants receive, or are entitled to receive." Plan, § 2.3.4(i); *see also* Plan, §§ 8.8.1(d), 12.2.5. Nor does it account for the Claim Enhancement multipliers—of up to 4.0x a Litigation Claimant's point score—that the Trust applies to Litigation Claimants who obtain settlements or verdicts. *See* Plan, § 4.6.2.

The Plan cannot allow for the nonconsensual release of the Non-Settling Insurers' claims and "vitiate their ability to recover certain defense costs." *In re Boy Scouts of Am.*, 137 F.4th 126, 167 (3d Cir. 2025). When this issue was addressed by the Third Circuit in *Boy Scouts*, the court unanimously agreed that "the Confirmation Order's judgment reduction clause [was] intolerable because it, coupled with the Plan, impermissibly releases and enjoins contribution and indemnity claims they could otherwise assert against the Settling Insurers." *Id.* The judgment reduction mechanism here is likewise inadequate and unlawful. *See id.* at 168 (agreeing with the insurers that "[u]nless the judgment ... provides for plaintiff to recover ... all recoverable damages, no satisfaction of claim can occur").

Where the Non-Settling Insurers' contribution rights are being enjoined, "the courts issuing the injunction usually in connection with a settlement must take steps to ensure that the non-settling parties will be able to rely on an effective judgment reduction provision as a substitute." *See, e.g.*, *Eichenholtz*, 52 F.3d at 483-84 (affirming the use of a proportionate judgment reduction method to ensure non-settling defendants are only responsible for their portion of the liability as a substitute for their contribution claims). Here, the judgment reduction provision is unlawful insofar as it operates to extinguish the Non-Settling Insurers' claims without their consent. *See Purdue*, 603 U.S. at 227.

Worse, Section 12.6.2(a)(ii) provides that if a Non-Settling Insurer asserts its Insurer Contribution Claim only against the Trust, the Settling Insurers must assign their own Insurer Contribution Claims *against* that Non-Settling Insurer to the Trust, and "the Trust shall be free to assert such Insurer Contribution Claims against such Non-Settling Insurer." Plan, § 12.6.2(a)(ii); *see also id*. § 12.6.2(d) (requiring assignment to the Trust where the Trust fully indemnifies a Settling Insurer). This provision not only fails to protect the Non-Settling Insurers but affirmatively weaponizes the settlement framework against them, converting the Trust from a claims-resolution vehicle into an active adversary wielding the Settling Insurers' claims. That is inconsistent with the neutrality principles in *Boy Scouts* and constitutes a means "forbidden by law" under section 1129(a)(3).

The nonconsensual injunction barring Insurer Contribution Claims against non-debtor insurers should be stricken from the Plan as illegal under *Purdue Pharma*. The interests of Settled Insurers could be produced with a judgment reduction provisions revised to provide for an automatic, full-credit judgment reduction and to eliminate language that strips a Non-Settling Insurer of its rights with respect to contribution claims.

### *D. The Plan Cannot Override the Statutory Scheme Imposed by Section 502*

The Plan is unconfirmable for the additional reason that it explicitly deprives the Non-Settling Insurers of their statutory right to object to claims under section 502(a) of the Bankruptcy Code. Section 502(a) vests in all "parties in interest" the right to object to claims. Yet, the Plan limits that right—"[n]o Person, other than the Committee or, following the Effective Date, the Trustee, may: (i) object to any Class 4 Claim; or (ii) challenge the merit, validity, or amount of any Class 4 Claim," deems any pending objection withdrawn, and provides that Class 4 Claims "shall not be subject to any other review or judicial consideration." Plan, § 2.3.4(k). The only carve-out permits a Non-Settling Insurer to assert defenses "in response to any Litigation Claim"—that is, only where the Trustee, in its sole discretion, authorizes litigation. *Id.*; *see* Plan, § 4.6.1(e).

The Plan thus strips Century and the other Non-Settling Insurers of any ability to challenge the factual or legal validity of Abuse Claims in this Court, and vests the exclusive right to review, allow, and value those claims in the Committee-selected Trustee and the Abuse Claims Reviewer acting under the Committee-developed Allocation Protocol. *See* Plan, §§ 1.1.16, 1.1.181, 2.3.4(c)–(d), (k). Giving the Trust exclusive control over claim objections eliminates adversarial testing, strips the Non-Settling Insurers of their ability to challenge inflated valuations, and forces them to negotiate against artificial claim values. *Cf. Diocese of Camden*, 653 B.R. 309 (denying confirmation where the plan allowed payment of facially invalid claims and holding that a plan must include "some mechanism for review and denial of claims that are facially deficient").

The Plan cannot assign away Century's right to object to claims. Section 502 allows the Court and other parties in interest to evaluate whether a claimant's assertion that he or she has a claim is valid. The Bankruptcy Code does not allow for such a determination without scrutiny from the Court, and without any opportunity for other parties in interest to object to the claim.

The Non-Settling Insurers have a direct, concrete financial interest in the *allowed amount* of each Abuse Claim. An insurer is a "party in interest" with standing to object to the claim under section 502(a). *See Truck*, 602 U.S. at 277, 283-84; *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.27 (3d Cir. 2004) (recognizing that insurers may be parties in interest where claims affect their coverage obligations). The right to litigate coverage in a non-bankruptcy forum does not substitute for the statutory right to challenge claims *at the allowance stage*, where adversarial testing is most effective in preventing inflated or meritless claims from entering the system.

This restriction is not merely a standalone deficiency; it is a critical component of the broader scheme that impairs the Non-Settling Insurers' contractual rights. Under the Allocation Protocol, the Abuse Claims Reviewer assigns each claim up to 200 points under discretionary Evaluation Factors, and the Trustee then converts those points into a pro rata share of available funds. *See* Allocation Protocol §§ 3.1, 4.1, Art. VI. The Abuse Claims Reviewer's determination on reconsideration is "final and not subject to any further reconsideration, review or appeal by any party, including a court." Allocation Protocol, § 3.3. The Non-Settling Insurers have no meaningful opportunity to participate in or challenge that process, and the Allocation Protocol's criteria lack the adversarial safeguards that protect against inflated or meritless claims.

Because this feature violates section 502(a) of the Bankruptcy Code, the Plan violates section 1129(a)(1) and is thus unconfirmable. Statutory rights under section 502 cannot be contracted away under the Plan.

***E. The Plan Impairs Century's Rights***

It is a bedrock principle of bankruptcy law that a "debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019). Rather, "[w]hatever 'limitation[s] on the debtor's property [apply] outside of bankruptcy [] appl[y] inside of bankruptcy as well." *Id.* Absent express

statutory authority providing otherwise, the Debtor may not use the chapter 11 process to renegotiate its bargained-for contractual rights and obligations.

A debtor cannot transfer its insurance policies to a trust "with greater or fewer rights or obligations than it possessed outside of bankruptcy" and that any plan must leave the insurers' "rights and defenses intact." *In re Boy Scouts of America*, 137 F.4th 126, 164-65 (3d Cir. 2025). Yet the Plan, as proposed, would impair Century's rights and essentially modify the terms of the insurance policies, in clear violation of blackletter law.

The Plan contains superficial insurance neutrality language and then has numerous provisions throughout that prejudice the insurers. Language ostensibly preserving the insurers' rights is subject to exceptions that swallow the rule. The Plan attempts to transfer the benefits of coverage while leaving obligations and the conditions of the policies, including cooperation in the investigation, defense and settlement of claims, and notice, proof of loss, consent, and other conditions precedent unsatisfied or not transferred. It also purports to transfer or channel rights held by persons who are not debtors and whose rights are not property of the Diocese's estate. The Plan cannot rewrite the parties' insurance contracts or assign non-Debtor interests without authority under the Bankruptcy Code. *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 219 (3d Cir. 2004); *In re Green Jacobson P.C.*, No. 15-41404-705, 2017 Bankr. LEXIS 2059, at *14 (Bankr. E.D. Mo. July 24, 2017).

The Plan strips Century of meaningful participation in claim resolution. It permits the Trustee, a fiduciary for claimants selected by the Committee, to absurdly control the litigation of Abuse Claims, while the Allocation Protocol, which was developed by the Committee, gives the plaintiff-selected Abuse Claims Reviewer sole discretion to allow and value claims. *See* Plan, §§ 1.1.16, 1.1.181, 2.3.4(d), 4.6.1(e); Allocation Protocol, § 4.1. And, as discussed above, the Plan

bars everyone other than the Committee and the Trustee from objecting to Class 4 Claims. *See* Plan, § 2.3.4(k). This is not a neutral claims process; it puts the fox in charge of the henhouse—the Trust is both the beneficiary of distributions and the adversary pursuing insurance recoveries, without safeguards protecting a Non-Settling Insurer from inflated or duplicative liability. That structure materially alters the insurers' exposure and is insurance prejudicial rather than insurance neutral.

By channeling all Abuse Claims to the Trust, the Allocation Protocol will enable the Trustee and Abuse Claims Reviewer to significantly alter how Abuse Claims are liquidated. This process will shield Abuse Claims from any judicial scrutiny prior to allowance and payment, and will completely strip Non-Settling Insurers of their rights to meaningfully participate in the Abuse Claim resolution process.

This dynamic is reminiscent of the proposal in *Skinner I*, under which the debtor was not "financially incentivized" to defend against claims, and, in fact, "there [was] really no valid reason for the [d]ebtor to even care" if the claims got settled. *See In re American Capital Equipment, Inc*., 405 B.R. 415, 422–23 (Bankr. W.D. Pa. 2009) ("*Skinner I*"), *aff'd sub nom. Skinner Engine Co. v. Allianz Global Risk U.S. Ins. Co*., 2010 WL 1337222, at *1 (W.D. Pa. Mar. 29, 2010) ("*Skinner II*"), *aff'd sub nom. Skinner III, LLC*, 688 F.3d at 158–160 (explaining that proposed settlement embodying the proposed plan had "not been entered into in good faith" where, under its terms, the debtor was "nothing but financially incentivized to sabotage its own defense" and where "due process protections/procedural safeguards afforded to the Insurers … [had] been relaxed by relevant terms of the … Plan."). The same concerns that led the court in *Skinner I* to reject the proposed plan exist here; Claimants who would be entitled to nothing in the court system will naturally be "eminently happy" to vote in favor of this plan and the debtor will have no

incentive to cooperate in the pursuit of objections to claims that are presumptively invalid. *Skinner I*, 405 B.R. at 422.

The Diocese will have no real reason to care about the fate of Abuse Claims—nor the discovery necessary to defend against such claims. And, as in *Skinner*, where the court denounced the "extreme extent to which due process protections/procedural safeguards afforded to the Insurers" had "been relaxed by relevant terms of the" plan, *Skinner I*, 405 B.R. at 422–23, the Allocation Protocol here would override the express terms of insurance policies and deprive insurers of their bargained-for rights, such as the right to challenge a settlement, or even to participate in the process.

Non-Settling Insurers would thus be denied any role in determining whether to make a settlement offer—and in what quantum—to satisfy any Abuse Claim. And, "there is really no valid reason for the [d]ebtor to even care if the Asbestos Claims get settled"; even if they were settled, any excess judgment beyond what is covered by insurance would be "worthless" because, inter alia, "the [d]ebtor is in bankruptcy" and would not have to pay on any judgments. *Id*. at 422–23. The debtor "hope[d] that its defense—or, more aptly, the Insurers' defense of itself—[would] be unsuccessful, given that such defense must fail in order for the [d]ebtor to obtain [the 20%] surcharge," and the proposed plan was simply an attempt "to facilitate [such] defeat." *Id*. Such "relaxing" of procedural safeguards, coupled with the perverse incentives created for the Diocese and claimants, render the "collusion" "readily apparent." *Skinner I*, 405 B.R. at 421.

On appeal, the district court affirmed, finding "no error, let alone a clear error," with the bankruptcy court's determination, including that the proposed plan "was the result of collusion between the [d]ebtor and the asbestos claimants." *Skinner II*, 2010 WL 1337222, at *1. The Third Circuit also affirmed, finding that the plan was not proposed in good faith because "it establishe[d]

an inherent conflict of interest," namely, a system in which the debtor would be "financially incentivized to sabotage its own defense." *Skinner II*, 688 F.3d at 158.

The court observed that "[a]lthough settlements will be controlled by a Plan Trustee with no financial interest in the outcome of the proceedings, it is not as if [debtor] can entirely remove itself from the process," because "these settlements [would] require [debtor]'s involvement in both defense and discovery." *Id*. at 158–59. Because this "inherent conflict of interest" undercut any incentive to defend against the claims, the plan failed § 1129(a)(3)'s good faith requirement. *Id*. The same concerns loom here and render the Plan patently unconfirmable on that basis.

Further, the Plan channels and extinguishes Non-Settling Insurers' contribution, indemnity, reimbursement, and subrogation rights without providing a reliable, procedurally fair credit against any judgment or mechanism of reimbursement. That structure functions as a nonconsensual release of third-party claims and cannot be cured by relabeling it judgment reduction.

The Plan's claims process is designed to inflate Abuse Claims. The Plan imposes claim enhancement multipliers for settlements and jury verdicts, including up to a 4.0x multiplier for a jury verdict, while the Trust may pursue recoveries based on those claims. *See* Plan, § 4.6.2. The enhancements are utterly contrary to Century's insurance contracts, which require the policyholder's cooperation in the investigation, defense and settlement of claims. The enhancements, which the Court is being asked to approve as part of the Plan, would further require the proceeds of policies that are only obligated to pay for injury within their policy period to pay claimants whose alleged injury is outside their policy period. The Plan terms are in this way contrary to the insurance contracts' policy limits, occurrence limits, allocation among policy periods, and the amount of each claimant's actual loss. A process that can multiply claim values

while restricting insurer defenses imposes liability beyond the value of covered claims and independently defeats insurance neutrality.

### *F. The Plan's Exculpation Is Impermissibly Broad*

The Plan defines "Exculpated Parties" to include Contributing Non-Debtor Entities, Additional Debtors, Mediators, the Committee and its members, and the officers, directors, fiduciaries, and professionals of each. Plan, § 1.1.84. And, while the defined term "Exculpated Parties" does not include Settling Insurers, the Disclosure Statement tells creditors that the "Protected Parties" (which include the Settling Insurers) "shall receive certain releases, exculpation, and injunctions." Disclosure Statement, Art. 1. The exculpation provision shields those parties from liability for acts or omissions in connection with the Chapter 11 Cases and Plan formulation, subject only to narrow exceptions, and separately grants protection for reasonable reliance on advice of counsel. *See* Plan, § 12.12. The provision therefore reaches non-debtors, non-fiduciaries, plan-formulation conduct untethered to any bankruptcy case, and legal advice that may itself be negligent or wrongful.

Exculpation is authorized under the Bankruptcy Code only for estate fiduciaries acting within the scope of their duties during the bankruptcy case, drawing from 11 U.S.C. §§ 1103(c) and 1125(e). *See Matter of Highland Capital Mgmt., L.P.*, 48 F.4th 419, 437 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 2714 (2024); *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000). The protection does not extend to non-fiduciaries or to entities that have never been subject to the Court's jurisdiction as debtors.

Contributing Non-Debtor Entities have not filed for bankruptcy. They are not debtors, they do not have estates, and they owe no fiduciary duties arising from this case. They are therefore categorically ineligible for bankruptcy-derived exculpation. Similarly, the Additional Debtors cannot receive protection for conduct outside a properly supervised bankruptcy case. The

Additional Debtors are not debtors as of the date the Plan was filed and have no estate from which fiduciary obligations could flow. *See In re Wash. Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011) (exculpation "only extends to conduct that occurs between the Petition Date and the effective date" and is appropriately limited to those serving as fiduciaries to the estate); *see also In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *in re Voyager Digital Holdings, Inc.*, 2026 WL 2241168 (S.D.N.Y. Aug. 4, 2026).

Further, the advice of counsel language cannot convert advice into an absolute bar against liability; reliance may be a defense, but it does not immunize negligent or wrongful conduct by the protected party or its advisors. An exculpation provision that sweeps in prepetition conduct and non-fiduciary actors exceeds the permissible scope of the remedy. *See In re Voyager Digital Holdings, Inc.*, 2026 WL 2241168 (S.D.N.Y. Aug. 4, 2026) (finding that exculpation provisions that extended beyond proper estate fiduciaries were unauthorized by the Bankruptcy Code); *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 700–01 (E.D. Va. 2022).

The Plan's exculpation provision must be stricken or limited to estate fiduciaries acting within the scope of court supervised duties during the bankruptcy case, with express carve outs for gross negligence, willful misconduct, fraud, and breach of the fiduciary duty of loyalty, *see* Plan, § 12.12, must be expanded to include bad faith, breach of other fiduciary duties, and professional negligence.

As written, the exculpation would insulate plan-formulation conduct of entities that are not debtors—and for the Contributing Non-Debtor Entities, never will be—and that have and never served as estate fiduciaries. Because the Additional Debtors' "applicable Petition Date" has not yet occurred, every act they have taken to negotiate and formulate this Plan is prepetition conduct, yet the second prong of Section 12.12 would exculpate it. *See* Plan, §§ 1.1.17, 12.12. This extends

protection to the precise actors who may bear the greatest independent liability for the abuse at the heart of this bankruptcy.

### *G. Nonconsensual Third-Party Releases and Channeling Injunction Violate Purdue Pharma*

In *Purdue Pharma*, the Supreme Court held that the Bankruptcy Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a non-debtor without the consent of affected claimants." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 227 (2024). This holding is unequivocal: absent express statutory authorization, a plan of reorganization cannot extinguish claims against non-debtors without affirmative consent.

The Plan's Channeling Injunction channels all Channeled Claims into the Trust as the "sole and exclusive remedy" and permanently bars all holders from asserting such claims against the Protected Parties. Plan, § 12.3. It extends to claims against Contributing Non-Debtor Entities, which the Plan defines as Channeled Claims "in all instances," even though Contributing Non-Debtor Entities are not listed as "Protected Parties" under the Plan. *See* Plan, §§ 1.1.31, 1.1.150. This inconsistency compounds the statutory infirmity: the Plan purports to channel claims against entities outside its own definition of Protected Parties.

Similarly, the release deems all holders of Channeled Claims, including Class 4 Claimants, to "provide a full release to the Released Parties." Plan, § 12.9. The Released Parties include the Diocese, Additional Debtors, and non-debtor parties, including Contributing Non-Debtor Entities and Settling Insurers. Plan, § 1.1.157. There is no mechanism for an abuse claimant to consent to the release of claims against non-debtor parties. A deemed release imposed by plan language, without any individual claimant election, is precisely the construct that *Purdue Pharma* condemned. *See* 603 U.S. at 227.

Moreover, Inbound Contribution Claims are disallowed and extinguished with no distribution. *See* Plan, § 2.3.5. The Channeling Injunction channels Inbound Contribution Claims, and Insurer Contribution Claims to the Trust without any entitlement to distribution from the Trust. *See* Plan, § 12.6.1. Holders of those claims thus receive nothing in exchange for the permanent extinguishment of their claims against non-debtor parties.

Under *Purdue Pharma*, a plan "may adjust claims without consent only to the extent those claims concern the debtor." 603 U.S. at 227; *see also In re Diocese of Buffalo, N.Y.*, No. 20-10322 (CLB), 2026 WL 585099 (Bankr. W.D.N.Y. Feb. 27, 2026) (quoting *Purdue*, 603 U.S. at 221) (the bankruptcy discharge "reserves this benefit to 'the debtor'- the entity that files for bankruptcy"). Contributing Non-Debtor Entities, Settling Insurers, and their Related Persons are not debtors and claims asserted against them are not claims against the bankruptcy estate. And to the extent the deferred discharge provisions of the Plan leave the Diocese or a parish without a discharge post-Effective Date, those entities are by definition not permissible recipients of a channeling injunction barring Century's rights and claims. Accordingly, the Plan cannot adjust, discharge, or channel those claims without each claimant's and Century's express and voluntary consent.

The only statutory provision that expressly authorizes nonconsensual third-party releases or a channeling injunction is section 524(g) of the Bankruptcy Code, which applies exclusively to asbestos-related bankruptcies. *See Purdue Pharma*, 603 U.S. at 222–23. Because this case does not involve asbestos, there is no statutory basis on which this Court can enter the Channeling Injunction or approve the nonconsensual third-party releases in the Plan.

The Plan's reliance on deemed consent to satisfy *Purdue Pharma*'s consent requirement is legally untenable. Century has not consented. Silence does not constitute consent to the release of claims against non-debtors. *See Diocese of Buffalo*, 2026 WL 585099; *In re GOL Linhas Aéreas*

*Inteligentes S.A.*, 675 B.R. 125, 131 (S.D.N.Y. 2025). New York contract law likewise requires "an objective manifestation of mutual assent" before a release can bind a party. *Wu v. Uber Techs., Inc.*, 43 N.Y.3d 288 (2024); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004). Passive non-objection satisfies neither standard.

The failure of a claimant or anyone else to object to confirmation therefore cannot establish consent to release claims against non-Debtor institutions that may bear independent liability for the abuse. *See In re Tonawanda Coke Corp.*, 662 B.R. 220, 223 (Bankr. W.D.N.Y. 2024); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017); *Patterson v. Mahwah Bergen Retail Grp., Inc*., 636 B.R. 641, 684–85 (E.D. Va. 2022).

The Plan and ballot do not provide even an opt-out mechanism, much less the affirmative, informed opt-in that courts in this Circuit require for third-party releases to be consensual. Courts have refused to treat failure to opt out, or failure to object, as the equivalent of affirmative consent to the release of claims against non-debtors. *See In re Diocese of Buffalo, N.Y.*, No. 20-10322 (CLB), 2026 WL 585099 (Bankr. W.D.N.Y. Feb. 27, 2026) (holding that under New York law "silence does not constitute consent," that the Committee "has no power or right to consent to a third-party release," and directing the plan proponents "to re-design a ballot that will require creditors expressly to 'opt-in' to a release of third parties"); *In re Tonawanda Coke Corp.*, 662 B.R. 223 (holding that "the mere ability to opt out of a release is insufficient to establish that consent"); *In re GOL Linhas Aereas Inteligentes S.A.*, 2025 WL 3456675, at *5 (S.D.N.Y. Dec. 1, 2025) (holding that opt-out releases remain nonconsensual under Purdue Pharma and cannot be imposed through a plan of reorganization).

Accordingly, the Channeling Injunction and all nonconsensual third-party release provisions in the Plan must be stricken, and the Plan cannot be confirmed as presented.

### *H. The Plan Excludes Insurers from Participating in the Resolution of Disputes Concerning the Cabrini Qualifying Proceeds*

The Plan has several provisions discussing how Cabrini Qualifying Proceeds can be applied to the Trust. *See* Plan, §§ 1.1.27–1.1.29, 8.2.5.

In particular, the Plan provides that Cabrini Qualifying Proceeds not transferred under a settlement agreement are to be held in a segregated account pending agreement among the Trustee, the Diocese, and, if applicable, any recipient Additional Debtors as to their ultimate disposition, and that no party may apply to the Court for judicial intervention until the parties have attempted to negotiate in good faith for at least six months. *See* Plan, § 8.2.5(b).

The language regarding the Cabrini Qualifying Proceeds alters a Century's contractual and common law right to set off. Any Cabrini Qualifying Proceeds transferred to the Trust "shall be included in the Abuse Claims Settlement Fund," Plan, § 8.2.5(c), and may therefore be used to pay Abuse Claims for which coverage is sought from Non-Settling Insurers. *See* Plan, §§ 1.1.8 (Abuse Claims Settlement Fund is the fund from which Trust Distributions are made to Abuse Claimants), 4.6.1(e) (Litigation Claimants receive "rights, to the extent set forth in the Plan and Allocation Protocol, to Distributions from the Trust"). Yet the Plan simultaneously provides that Non-Settling Insurers' obligations "are not reduced" by Trust Distributions. Plan, § 2.3.4(i). Consequently, the Non-Settling Insurers should be included in the process by which the various parties reach an agreement "as to the ultimate disposition of such Cabrini Qualifying Proceeds." Plan, § 8.2.5(b).

### *I. Distributions Conditioned on Execution of the Release Agreement are Coercive.*

No Class 4 Claimant will receive any distribution from the Trust until and unless that claimant executes an Abuse Claim Release Agreement, which requires the release of all claims against all Protected Parties. *See* Plan, §§ 2.3.4(l), 4.5.2; Allocation Protocol, Art. VII. This "take-it-or-leave-it" structure is coercive as a matter of law. "A consent is not a voluntary one if it is the

product of duress or coercion, actual or implicit." *United States v. Como*, 340 F.2d 891, 893 (2d Cir. 1965). A creditor who must surrender claims against non-debtors to receive any recovery from the estate has not freely consented to that release; economic necessity has supplied the coercion.

Under New York law, "[a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Austin Instrument, Inc. v. Loral Corp*., 29 N.Y.2d 124, 130 (1971). Conditioning a survivor's only available recovery on the surrender of claims against entities that may bear independent liability for that survivor's abuse constitutes precisely such coercion.

A chapter 7 liquidation could not require a creditor to release claims against non-debtors as a condition of receiving a distribution from the estate. That principle does not change merely because the proceeding is labeled a chapter 11 reorganization. Requiring such a release as a condition of receiving a distribution under a chapter 11 plan, absent the individual creditor's prior and voluntary consent, is inconsistent with the "best interests of creditors" test under 11 U.S.C. § 1129(a)(7)(A).

The coercive structure is particularly egregious in this case because the claimants are abuse survivors who, in many instances, lack the financial resources and legal sophistication to pursue independent litigation against non-debtor parties. The collective action dynamics of an institutional bankruptcy further erodes their ability to withhold consent. Conditioning their recovery on submission to a release they have not meaningfully agreed to exploit the very vulnerability that the bankruptcy process is supposed to protect.

***J. The Gatekeeper Injunction Exceeds the Court's Jurisdiction***

The Plan requires that no Enjoined Party commence or pursue against a Protected Party an Abuse Claim or a wide range of other claims without first obtaining a determination from this

Court that the claim is "colorable." Plan, § 12.13. This gatekeeper mechanism purports to vest permanent, continuing jurisdiction in the Bankruptcy Court over future litigation involving non-Debtors, including disputes that are non-core and between non-debtors, and the Plan states the Court's injunctions are permanent and cannot be vacated or modified. *See* Plan, § 12.14. The Plan cannot create jurisdiction that Congress has not conferred.

Post-confirmation, this Court's jurisdiction is materially circumscribed. The Plan cannot convert the bankruptcy court's jurisdiction into exclusive post-confirmation jurisdiction over claims between non-debtors. "A bankruptcy court's post-confirmation jurisdiction is limited to matters pertaining to the implementation or execution of the confirmed plan." *In re Park Ave. Radiologists, P.C.*, 450 B.R. 461, 468 (Bankr. S.D.N.Y. 2011); *see also Resorts Int'l Fin., Inc. v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168 (3d Cir. 2004). Future civil litigation by non-parties against non-debtors does not pertain to the implementation of the confirmed Plan merely because the Plan purports to regulate it. *See In re AIO US, Inc.*, 677 B.R. 509, 564 (Bankr. D. Del. 2025); *In re Gulf Coast Health Care, LLC*, No. 21-11336 (KBO), ECF No. 1236, Tr. at 30:18–23 (Bankr. D. Del. May 4, 2022).

A permanent injunction is an extraordinary remedy and must independently satisfy the four-factor test articulated in *eBay Inc. v. MercExchange, L.L.C.*: (1) the movant has suffered irreparable injury; (2) inadequacy of remedies at law; (3) a balance of hardships warranting equitable relief; and (4) consistency with the public interest. 547 U.S. 388, 391 (2006). The Plan Proponents have made no particularized showing satisfying those requirements for each category of claim or each Protected Party. The Gatekeeper Injunction instead imposes a threshold burden on claimants before they may even file suit.

Most fundamentally, the Gatekeeper Injunction converts what is, at most, an affirmative defense (the release) into a pre-adjudicated jurisdictional bar. Future claimants who have not participated in this bankruptcy, and whose claims may not be covered by the release, would be required to seek permission from the court that may have no jurisdiction over their claims before litigating in any forum. This is an impermissible extension of bankruptcy court authority.

***K. The Prepackaged Additional Debtors Structure Is Improper***

The Additional Debtors have not filed for bankruptcy. The Plan nevertheless contemplates that they will file their petitions "shortly before the Confirmation Hearing," after which they will instantly be treated as participants in the Plan. *See* Disclosure Statement, Art. 2.C. The Plan itself defines "Additional Debtors" as entities listed on Exhibit A "that have filed for relief under chapter 11 of the Bankruptcy Code," a definition that no entity currently satisfies. *See* Plan, § 1.1.11. Even so, the Plan lists them as Plan Proponents, "Exculpated Parties," and "Released Parties," and purports to govern their claims and insurance as if they already had bankruptcy estates. *See* Plan, §§ 1.1.184, 1.1.141, 1.1.157, 8.2.3(a). This sequence inverts Chapter 11's statutory prerequisites.

Other courts have refused to bind the property of non-debtor diocesan entities through a plan where those entities had not invoked the protections of the Bankruptcy Code. *See In re Roman Catholic Diocese of Camden, N.J.*, 653 B.R. 309, 352 (Bankr. D.N.J. 2023). While the Additional Debtors intend to file, they have not yet filed; have no estates; and owe no fiduciary obligations to any creditor constituency. The Plan's treatment of them as though they do violate the foundational requirements of the Code.

Further, the assignment by Additional Debtors of their Insurance Claims against Non-Settling Insurers to the Trust, effectuated before those entities filed for bankruptcy, raises a threshold concern under 11 U.S.C. § 541. Section 541 defines property of the estate as property existing when the petition is filed. Before filing, the Additional Debtors have no bankruptcy estate

from which property can be transferred, assigned, or contributed pursuant to a plan of reorganization.

Finally, imposing a 21-day bar date for Abuse Claims against the Additional Debtors, *see* Plan, § 12.7, and tying it to petitions that have not yet been filed, is improper. This compressed timeline provides no realistic opportunity for unknown claimants to receive notice and file timely claims. As discussed below, the timeline raises serious due process concerns that independently render the Plan unconfirmable.

### *L. Due Process Concerns for Unknown and Post-Confirmation Claims*

Unknown Abuse Claims and Post-Statute Filed Abuse Claims are discharged on the Effective Date. *See* Plan, § 12.2.4. The Second Group Abuse Claims Fund, which is the only fund available to holders of Second Group Abuse Claims (which include Unknown Abuse Claims), consists solely of 3% of the Insurance Recovery Sub-Fund and receives no portion of the DOO Entities' Cash Payment. *See* Allocation Protocol, Arts. I, VI; Plan, §§ 1.1.68, 1.1.186. This minimal allocation does not reflect a genuine effort to compensate unknown claimants; it reflects a structural decision to minimize the cost of discharging their claims.

Due process requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Unknown claimants cannot be reached reliably by publication or mailed notice if they have not yet discovered their injuries or have been unable to come forward. *See DePippo v. Kmart Corp.*, 335 B.R. 290, 295 (S.D.N.Y. 2005) (binding creditors "only when they received notice sufficient to satisfy due process"). Where notice is constitutionally inadequate, the confirmation order cannot bar the claim. The Plan's discharge of unknown claimants' claims, coupled with a 3% allocation and a compressed bar date, therefore raises an independent due process defect.

Federal Rule of Bankruptcy Procedure 3003(c)(3) authorizes the Court to fix a bar date for proofs of claim, but it does not bind persons who received no notice of the case or of the bar date. Unknown claimants who were never notified cannot be bound by the Plan's discharge provisions, regardless of how the Plan characterizes their claims. The Plan's attempt to discharge unknown claims on the Effective Date, while allocating only 3% of one sub-fund to their recovery, does not satisfy due process and cannot support confirmation.

### *M. The Jury Trial Waiver and Lack of Judicial Review Are Impermissible*

Section 2.3.4(c) of the Plan provides that, upon the Effective Date, Class 4 Claimants waive their right to a jury trial with respect to their Abuse Claims, except for authorized Litigation Claims. The Allocation Protocol separately provides that the Abuse Claims Reviewer's determination on reconsideration is "final and not subject to any further reconsideration, review or appeal by any party, including a court." Allocation Protocol, § 3.3. Taken together, these provisions strip abuse survivors of both a constitutional right and a fundamental procedural protection without any meaningful consent.

In *Boy Scouts*, the court held that "[w]hether [as] a due process concept or simply the application of [Section] 502 of the Code," some form of judicial review of claims determinations must be preserved in a confirmable plan. 642 B.R. 504, 672 (Bankr. D. Del. 2022). The Plan here eliminates judicial review entirely: the Abuse Claims Reviewer's determinations are final, and no court may review them. *See* Plan, § 2.3.4(k); Allocation Protocol, §§ 3.2, 3.3.

The complete absence of judicial review over the Abuse Claims Reviewer's determinations is especially troubling because claimants face a $425 reconsideration fee and a 10-day window to request reconsideration. *See* Allocation Protocol, § 3.3. Those barriers, combined with the finality provision, effectively insulate the Reviewer's determinations from oversight and create a private adjudication system outside the constitutional and statutory framework governing claims.

The Plan's waiver of jury trial rights for abuse survivors, without any informed consent mechanism, is an extraordinary deprivation of a constitutional right guaranteed by the Seventh Amendment. Imposing such a waiver through confirmation would be an abuse of the bankruptcy process. The Plan is therefore unconfirmable on this independent ground.

## III. APPROVAL OF THE DISCLOSURE STATEMENT IS PREMATURE BECAUSE KEY INFORMATION AND DOCUMENTS HAVE YET TO BE FILED.

The Disclosure Statement lacks the most basic information concerning the Additional Debtors and Covered Parties: there is no disclosure of the number of claims against each Additional Debtor, the assets held by each Additional Debtor, coverage (if any) allegedly available to each entity, or what any of the Additional Debtors will contribute to Plan funding. The Plan is structured around funding from non-Debtor entities but lacks any information regarding those entities contributing to Plan funding and receiving the benefit of the Plan's releases and injunctions. The "Covered Parties" include the Diocese, the Additional Debtors, the Contributing Non-Debtor Entities, every Entity that is a named insured or otherwise entitled to coverage under the Insurance Policies, and a broad universe of related parties (predecessors, successors, affiliates, officers, directors, trustees, members, employees, agents, attorneys, and other professionals). Plan, § 1.1.55. The Plan does not identify all of those entities or disclose each party's contribution and available assets.

Further demonstrating that the Plan remains materially incomplete, the "Covered Party" definition refers to persons listed on Exhibit "__", but a completed exhibit has not been filed. Plan, § 1.1.55. No one can assess the breadth of the protections being afforded or contracts assigned under the Plan without knowing who will receive them or what each entity contributes. The Plan further contemplates that the Additional Debtors will file prepackaged petitions prior to confirmation, become debtors, contribute to the DOO Entities' Cash Payment, and receive the

benefit of the Plan's injunctions and releases. Yet the Disclosure Statement fails to provide any entity-specific financial information for the Additional Debtors.

Moreover, the Plan Proponents have not filed documents necessary for anyone to understand the Plan's operative terms. The documents being withheld contain key terms related to the Plan, treatment of insurance policies, and post-Effective Date issues.

Two of the missing documents, the Abuse Claim Release Agreement and the Litigation Claimant Agreement, are particularly critical. *See* Plan, §§ 1.1.5, 1.1.114, 2.3.4(l), 4.5.2. These documents govern significant aspects of claimants' recovery potential and limit each claimant's ability to act in relation to his or her asserted claim.

- ***Abuse Claim Release Agreement.*** The Abuse Claim Release Agreement is a condition to receiving any Trust Distribution and releases claims against the Protected Parties. Every claimant is required to execute the Abuse Claim Release Agreement, and to release all Claims against the Protected Parties, before receiving any distribution from the Trust. Plan, §§ 2.3.4(l), 4.5.2. That agreement not only dictates the terms of the distribution but also defines the scope of the release each claimant must give.
- ***Litigation Claimant Agreement.*** If a claimant elects to pursue a Litigation Claim against the Diocese or an Additional Debtor for the limited purpose of establishing liability and damages, and pursuing Insurance Claims against Non-Settling Insurers, the claimant must execute the Litigation Claimant Agreement. The Litigation Claimant Agreement gives the Trustee sole discretion to authorize and manage the litigation, limits enforcement of any judgment to applicable Non-Settling Insurer Policies, requires turnover of recoveries to the

Trust, automatically releases the claimant's claim against the Diocese and Additional Debtors on the applicable Abuse Claim Discharge Date, and makes each Protected Party an intended third-party beneficiary. *See* Plan, § 1.1.114.

The Court is thus asked to approve the Disclosure Statement and solicitation procedures before it or anyone else can even review the documents that could modify the rights of the parties, condition their right to receive any payment, and define the scope of the release they are required to provide to a broad group of parties before receiving any distribution from the Trust. The withheld documents control whether and how a Litigation Claimant may pursue a claim, limit enforcement of any judgments, and require turnover of recoveries. These are material limitations on the claimants' and Century's rights, not ministerial details that may be supplied after solicitation.

The Insurance Settlement Agreement governs the sale or settlement of insurance rights and the releases and injunctions afforded to Settling Insurers. The DOO Trust Note governs a substantial portion of the DOO Entities' Cash Payment. The Non-Monetary Commitments contain the Diocese's post-Effective Date commitments concerning healing, reconciliation, and prevention. Without these documents, the Court cannot evaluate whether and to what extent the Disclosure Statement describes a plan that is patently unconfirmable or whether the disclosure of the Plan's risks is misleading.

The Insurance Settlement Agreement materially impacts Century's rights under its policies, including potential claims against other Settling Insurers and other parties. It will also define the protections afforded under the Plan to Settling Insurers and Settling Insurer Covered Persons. Plan, §§ 1.1.165, 1.1.168, 12.5. The Plan relies on the Settling Insurer payments as a principal source of Trust funding. Plan, §§ 1.1.102, 5.4. But creditors, including Non-Settling Insurers, have no way to evaluate the settlement consideration, conditions, impact on other carriers,

or consequences of nonpayment without even a form agreement. They cannot verify the terms of these settlements, determine whether any conditions to their effectiveness have been or will be satisfied, or assess whether the consideration being provided is reasonable. The absence of this document leaves a substantial informational gap regarding a primary source of funding for the Abuse Claims Settlement Fund.

Finally, the Non-Monetary Commitments and DOO Trust Note, each of which is identified as a Plan Supplement exhibit have also been withheld. The DOO Trust Note governs up to $7 million of the $45 million DOO Entities' Cash Payment, payable over 18 months after entry of the Confirmation Order. *See* Plan, §§ 1.1.68, 1.1.74. Without the DOO Trust Note, there is no disclosure of such basic matters as security, default provisions, or enforceability. The Non-Monetary Commitments govern the Diocese's obligations beginning within 30 days after the Effective Date concerning healing, reconciliation, and prevention of future Abuse. *See* Plan, § 8.4. Those commitments affect operating costs, feasibility, and the value of the consideration offered to claimants.

A disclosure statement hearing should not proceed while the underlying plan remains a moving target. Bankruptcy Rule 3017(d) contemplates transmission of the entire approved disclosure statement. And Bankruptcy Rule 3017(a) requires meaningful notice after a complete disclosure statement is provided. Leaving core documents for later supplementation or deliberately holding them back until after the objection deadline deprives the parties and Court the opportunity to evaluate the Plan as a whole and makes solicitation premature. *See In re Medley*, 58 B.R. 255, 256 (Bankr. E.D. Mo. 1986); *In re Clamp-All Corp.*, 233 B.R. 198, 206 (Bankr. D. Mass. 1999).

The Disclosure Statement should not be approved until the Plan Proponents file the complete Plan Supplement, identify the parties that will receive a release or injunction, disclose the claims against each party, each such party's contribution and available assets and insurance, and explain the terms governing the Trust's allowance and valuation of claims. Without that information, no one can determine what anyone will receive, what rights they will surrender, the terms of the insurance assignment or what is being assigned, or whether the Plan can be confirmed.

## IV. THE DISCLOSURES SET FORTH IN THE DISCLOSURE STATEMENT ARE MISLEADING.

Section 1125(b) prohibits solicitation unless the Court approves a disclosure statement containing "adequate information." *See* 11 U.S.C. § 1125(b). Section 1125(a)(1) defines adequate information as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan, . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(a)(1). The Plan Proponents bear the burden of providing candid, material information, not merely a summary of the Plan's aspirations. A proper disclosure statement must tell what creditors will receive, when they will receive it, and what contingencies may prevent or reduce that recovery.

The bankruptcy court may require disclosure appropriate to the circumstances of each case. *In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (S.D.N.Y. 1995). The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of

whether to approve or reject the debtor's plan. *In re Duratech Indus., Inc.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd* 241 B.R. 283 (E.D.N.Y. 1999).

In addition to the withheld documents discussed above, the omissions throughout the Disclosure Statement are especially serious because the Plan depends on uncertain insurance litigation, contributions from entities whose individual obligations are not disclosed, a Trust process that fixes claim values without ordinary judicial review, and releases and injunctions that may be unavailable as a matter of law.

### *A. The Disclosure Statement Fails to Include the Liquidation Analysis, Financial Projections, and Additional Debtor Financial Information*

Nearly all financial information for the Plan is marked "[to be filed]" and was withheld before the objection deadline. *See* Disclosure Statement, Exs. B (Liquidation Analysis), C (Financial Projections), D (Additional Debtor Financial Information). These omissions are not trivial — each exhibit addresses information that is essential to consideration of a disclosure statement and whether a plan is patently unconfirmable.

The 108-page decision denying confirmation in the *Roman Catholic Bishop of Oakland* issued on October 2 devotes almost two dozen pages to the essential nature of the liquidation analysis in a diocesan bankruptcy. *See In re Roman Cath. Bishop of Oakland*, No. 23-40523 (WJL), ECF No. 3548, at 3, 50–66 (Bankr. N.D. Cal. Oct. 2, 2026) (emphasizing that the best interests test "is essential protection for creditors in Chapter 11 case"). Without a liquidation analysis, no one can evaluate whether the Plan satisfies the "best interests" test under section 1129(a)(7) of the Bankruptcy Code, which requires that each dissenting creditor receive at least as much under the plan as it would receive in a chapter 7 liquidation. *See id.* at 50-51; *In re Oneida Motor Freight, Inc.*, 848 F.2d 414 (3d Cir. 1988); *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (3d Cir. 1988). Where, as here, a disclosure statement omits the liquidation

analysis it fails to provide the basic financial benchmark against which any plan must be measured and cannot be approved.

Without financial projections, no one can assess whether the Plan is feasible under section 1129(a)(11) — i.e., whether there is a reasonable likelihood that confirmation will not be followed by liquidation or the need for further financial reorganization. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). As a matter of law, the Court cannot evaluate the adequacy of disclosure or the extent to which the Plan is patently unconfirmable in the complete absence of financial projections prior to the objection deadline for the Disclosure Statement.

The Disclosure Statement also internally contradicts itself on a matter fundamental to the structure of the Plan: the number of Additional Debtors. Article 1 states that the Additional Debtors include "86 parishes and other Catholic entities," while Article 2.C states that they include "79 Parishes and Catholic Ministry Entities," each referring to the same Exhibit A to the Plan. Disclosure Statement, Art. 1 at 2; Art. 2.C at 15. This discrepancy and others undermine the reliability of the Disclosure Statement and raise serious questions about whether the information provided is complete and accurate.

The Additional Debtor Financial Information is particularly critical because the Additional Debtors are contributing to the $45 million DOO Entities' Cash Payment under the Plan. Plan, § 1.1.68. Yet no financial information about the Additional Debtors' assets, revenues, liabilities, or ability to fund these contributions has been provided. Creditors are asked to accept as adequate a plan funded in significant part by dozens of entities about which they have received no financial disclosure whatsoever. This is precisely the type of omission that renders a disclosure statement inadequate under section 1125 of the Bankruptcy Code.

***B. The Disclosure Statement Fails to Adequately Disclose Insurance-Related Risks.***

The Disclosure Statement also lacks "adequate information" to enable holders of Abuse Claims to make an informed judgment about the material risks presented by the Plan and how the provisions of the Insurance Policies will implicate distributions.[4] The importance of providing "adequate information" is particularly true with respect to material, known risks that may affect the debtor's reorganization or ability to satisfy claims.[5] The disclosure statement is meant to function as the means by which creditors are provided with "all pertinent information bearing on the success or failure of the proposals in the plan of reorganization," and it "should likewise contain all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization."[6]

While the Disclosure Statement contains some risk factors associated with the confirmability of the Plan and describes, at a high level, certain objections to confirmation that could be raised by parties in interest, the level of detail provided about specific, material insurance-related risks under the Plan is inadequate.

***Insurance Contributions***. The Disclosure Statement states in Article 19.I that "[l]itigation of the Insurance Claims against the Non-Settling Insurers could take years and may require the Trust to expend several million dollars in litigation costs" and that "[t]here is no guarantee that any Litigation Claimant will succeed in establishing liability of the Diocese or any Participating Party, [or] that the Trust will prevail in its prosecution of Insurance Claims against a Non-Settling Insurer." The Disclosure Statement likewise acknowledges that "[i]n the event the Non-Settling

[4] 11 U.S.C. § 1125(a)(1); *see Ryan Operations G.P.*, 81 F.3d at 362; *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir. 1988).

[5] *See In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

[6] *In re Budd Co., Inc.*, 550 B.R. 407, 412 (Bankr. N.D. Ill. 2016) (quoting *In re Cardinal Congregate I*, 121 B.R. 760, 765-66 (Bankr. S.D. Ohio 1990)).

Insurers successfully defend against the Insurance Claims, the DOO Entities' Cash Payment and the settlement payments from Settling Insurers would be the sole source of recovery for Abuse Claims."[7] But the Disclosure Statement does not explain the magnitude of the risk that poses to Abuse Claimants and ultimately to any distribution from the Trust.

***Insurance Coverage Risks & Insurance Coverage Actions***. The Disclosure Statement fails to adequately explain the material, insurance-related risks that Non-Settling Insurers' coverage defenses pose to the projected recoveries. With respect to recoveries for Abuse Claims, these issues pose a significant risk.

The Plan provides that "the Diocese and the Additional Debtors make no representations or warranties, and shall have no duty or obligations whatsoever, to the Trust with respect to the Insurance Claims against Non-Settling Insurers" and that "[t]he Trust shall assume all risks with respect to the litigation, liquidation, and collection of the Insurance Claims against Non-Settling Insurers."[8] The Disclosure Statement further acknowledges that "[t]he Non-Settling Insurers are likely to assert factual and legal defenses to both their coverage obligations and to the underlying liability of the Diocese and other Additional Debtors for Abuse Claims."[9] Although the Disclosure Statement lists categories of coverage defenses that Non-Settling Insurers have asserted, including late notice, it does not assess the likelihood of success of those defenses or quantify their potential effect on recoveries.[10]

The Plan depends heavily on contributions from insurers yet the Disclosure Statement fails to inform claimants that insurers may assert that the resolution of Abuse Claims through the Trust's Allocation Protocol breaches multiple provisions of the relevant insurance policies. The Disclosure

---

[7] Disclosure Statement, Art. 19.I.
[8] Plan, § 8.2.3(c).
[9] Disclosure Statement, Art. 19.I.
[10] *See* Disclosure Statement, Art. 19.I.

Statement concedes that Non-Settling Insurers may raise objections to confirmation asserting "that the Plan impermissibly alters contractual rights, duties, and obligations under its Insurance Policies."[11] Generically identifying the risk that insurers may raise coverage defenses that could reduce or eliminate any recovery relating to the Abuse Claims is inadequate.

The Disclosure Statement should also explain that insurers may assert in coverage litigation that the resolution of Abuse Claims solely by the Trust and Abuse Claims Reviewer without the insurers' participation or consent breaches multiple provisions of the insurance policies and thus may relieve the insurers of any obligation to indemnify such claims under their policies. If that defense prevails, the Plan could result in the loss of insurance coverage for Abuse Claims liquidated under the Allocation Protocol.

Even if coverage litigation would result in desirable outcomes for claimants, the time taken to conduct the litigation would delay distributions. The Disclosure Statement notes that post-confirmation litigation may not result in additional recovery and could take years and cost several million dollars, but fails to provide any analysis of the coverage risks.[12] To make an informed judgment about the terms of the Plan, claimants need to understand the risk that they could ultimately recover less after paying for the costs of litigating coverage defenses.

***Insurance Assignment Risks***. The Disclosure Statement does not adequately discuss the risks associated with the proposed assignment of insurance rights. The Plan provides that, on the Effective Date, the Diocese and the abuse claimants "will be deemed to have assigned to the Trust their respective rights, if any, to all Insurance Claims against the Non-Settling Insurers," and that each Additional Debtor "will assign to the Trust the Additional Debtors' rights, if any, to all

[11] Disclosure Statement, Art. 19.H.
[12] Disclosure Statement, Art. 19.I.

Insurance Claims against the Non-Settling Insurers."[13] It further provides that, if the Bankruptcy Court determines that the Insurance Claims Assignment is inconsistent with the Bankruptcy Code, the Diocese, the abuse claimants, and each affected Additional Debtor "will retain their respective Insurance Claims against the Non-Settling Insurers" and, to the extent reasonably requested by the Trust, the Diocese or an Additional Debtor will assert those retained claims.[14] Separately, Insurance Policies that are not Settling Insurer Policies are to be assumed pursuant to sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code or continued in accordance with their terms. Plan, § 7.5.

The Disclosure Statement recognizes that "Non-Settling Insurers may object to confirmation of the Plan by asserting that the Plan impermissibly alters contractual rights, duties, and obligations under its Insurance Policies."[15] If the insurers prevail on their objections, "the Bankruptcy Court might find that the Plan is not feasible or otherwise not confirmable."[16] Yet the Disclosure Statement does not provide any analysis of the risk related to the enforcement of anti-assignment clauses or the potential consequences for Trust recoveries.

The Plan's assignment violates the anti-assignment clauses in the insurance policies, which would eliminate the Trust's ability to obtain coverage under those insurance policies. The Plan Proponents do not even try to quantify the impact on recoveries if a court determines the insurance rights cannot be assigned.

The Disclosure Statement should inform claimants that insurers assert that the Plan cannot be confirmed under the Bankruptcy Code because it purports to strip insurers of their contractual

[13] Plan, § 8.2.3(a).
[14] Plan, § 8.2.3(b).
[15] Disclosure Statement, Art. 19.H.
[16] Disclosure Statement, Art. 19.H.

rights and insurance-coverage defenses and that the Plan may operate to vitiate any available insurance coverage under the insurers' policies for the Abuse Claims.

### *C. The Disclosure Statement Fails to Explain Risks with Failing to Properly Treat SIRs and Deductibles*

The Court should also reject the Disclosure Statement because it lacks any coherent explanation of how the Plan will treat deductibles and self-insured retention and the amount reserved to satisfy deductibles, retentions and uninsured periods ("SIRs"). Various of the Debtor's insurance policies require the insured to pay a fixed amount per occurrence. But the Disclosure Statement does not explain how self-insured retentions will actually be funded or the perils of this approach. Failure to satisfy the self-insured retention is a condition precedent to coverage.

### *D. The Disclosure Statement Fails to Adequately Disclose the Basis for and Scope of Third-Party Releases, Injunctions, and Exculpation*

The Plan contains broad third-party releases, a Channeling Injunction, an exculpation provision, and a gatekeeper injunction — each of which has profound consequences for Class 4 Claimants' rights against non-debtor parties. The Disclosure Statement does not adequately explain the legal effect of these provisions or what rights Class 4 Claimants will permanently lose upon Plan confirmation.

Most critically, the Disclosure Statement does not explain that Class 4 Claimants will have no mechanism to consent to, or opt out of, the releases of their claims against non-debtor parties. The Plan releases are not conditioned on an affirmative vote in favor of the Plan. A claimant who votes to reject the Plan — or who does not vote at all — will nevertheless be deemed to have released claims against Released Parties upon confirmation. Plan, § 12.9. This consequence is not disclosed to creditors in plain terms anywhere in the Disclosure Statement.

The definition of "Related Person" in section 1.1.154 of the Plan is extraordinarily broad, encompassing predecessors, successors, assigns, shareholders, members, affiliates, subsidiaries,

employees, agents, brokers, adjusters, managing agents, claims agents, officers, directors, trustees, partners, attorneys, and more. Plan, § 1.1.154. The Disclosure Statement does not explain in plain language what it means for Class 4 Claimants to release claims against this universe of persons and entities, or provide any illustrative examples of who falls within this definition. Creditors evaluating their vote are entitled to understand the full scope of what they are being asked to relinquish.

Nor does the Disclosure Statement address or explain the Plan's internal inconsistency, discussed in Section II.G above, under which Contributing Non-Debtor Entities receive the benefit of the Channeling Injunction "in all instances" without being defined as Protected Parties. Plan, §§ 1.1.31, 1.1.150.

The scope and consequences of the deemed release under section 12.9 of the Plan, the exculpation under section 12.12, and the gatekeeper injunction under section 12.13 are not described in plain English in the Disclosure Statement. Plan, §§ 12.9, 12.12, 12.13. Creditors — including self-represented abuse survivors — cannot reasonably be expected to understand the import of these provisions without accessible guidance. A disclosure statement that requires creditors to parse dense plan provisions on their own does not satisfy the adequate information standard of section 1125.

### *E. The Disclosure Statement Misrepresents Recoveries*

The Disclosure Statement does not disclose any estimated per-claimant recovery or point value anywhere in its text. For Class 4 Abuse Claimants — the parties who are most directly affected by the Plan and whose votes are most critical — the absence of this information is a fundamental deficiency.

The Allocation Protocol awards up to 200 points per claim based on a matrix of factors. *See* Allocation Protocol, § 4.1. However, neither the Allocation Protocol nor the Disclosure

Statement discloses: (a) what each point is expected to be worth in dollars; (b) how many Class 4 Claims are expected to be filed or allowed; or (c) the anticipated timing of distributions from the Trust. *See* Allocation Protocol, § 4.1; Disclosure Statement, Art. 5 at 33-39. Without knowing the total number of points that will be awarded across all claims (i.e., the denominator), each individual claimant's allocated points are meaningless as a measure of actual economic recovery.

Without this information, Class 4 Claimants cannot make an informed judgment about whether to vote in favor of or against the Plan, as required by section 1125 of the Bankruptcy Code. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990); *In re Duratech Indus., Inc.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999). Soliciting a creditor's vote without disclosing the anticipated value of that creditor's recovery is not adequate disclosure — it is no disclosure at all.

This deficiency is compounded with respect to the Second Group Abuse Claims Fund, which receives only 3% of the Insurance Recovery Sub-Fund and no portion of the DOO Entities' Cash Payment. *See* Plan, §§ 1.1.68, 1.1.186; Allocation Protocol, Art. I. The Disclosure Statement provides no information whatsoever about the expected size of this fund, the number of Second Group or Unknown Abuse Claimants who may be entitled to share in it, or why a 3% allocation is adequate to compensate these survivors. Creditors in this group are left entirely in the dark about the value of the recovery being offered to them.

***F. The Disclosure Statement Fails to Adequately Explain the Allocation Protocol***

The Disclosure Statement incorporates the Allocation Protocol by reference but fails to provide a plain-English summary of how Abuse Claims will be evaluated and receive payment. The Disclosure Statement should provide a separate, accessible explanation of the claims evaluation process, stated in terms comprehensible to a lay reader. It should explain in detail the process for reviewing each Abuse Claim. The Reviewer assigns points based on the nature and

impact of the Abuse and other factors. Then, based on that analysis and point value, each claimant will receive a pro rata distribution. The Disclosure Statement should also identify who Abuse Claimants may contact post-Effective Date with questions about their claims or distributions. Abuse Claimants should not be required to translate a technical matrix into an estimate of recovery without an accessible explanation of the process. This deficiency is grounds for denial of disclosure statement approval.

The Allocation Protocol also uses terms that are undefined or inconsistent with the Plan. It repeatedly uses "Participating Party," stating that the term is "as defined in the Plan," but the Plan does not define it; the Disclosure Statement uses the same undefined term. *See* Allocation Protocol, Art. I & § 4.1(c)(3); Disclosure Statement, Art. 19.I. The Plan separately defines "Protected Parties," "Released Parties," and "Diocese Settling Parties," Plan, §§ 1.1.61, 1.1.150, 1.1.157, but the relationship between those terms and "Participating Party" is not explained. The Allocation Protocol likewise refers to a "DOO Entities' Cash Contribution Remainder" and to First Group and Second Group claims keyed to the Effective Date, while the Plan uses the "DOO Entities' Cash Payment Remainder," the "Filed Abuse Claim Fund," and the "Unknown Abuse Claim Fund," and leaves the operative dates in the definition of "Filed Abuse Claim" blank. *Compare* Allocation Protocol, Art. I, *with* Plan, §§ 1.1.69, 1.1.88, 1.1.89, 1.1.186. These ambiguities create the risk that survivors will not understand which parties are, and which are not, released by their participation in the claims process, or which fund will pay their claims.

Although the Allocation Protocol identifies Roger L. Kramer of Kramer Law, LLC as the Abuse Claims Reviewer, *see* Allocation Protocol, § 2.7, the Disclosure Statement provides no information about the Abuse Claims Reviewer's compensation structure, independence requirements, qualifications, or potential conflicts of interest. *See* Disclosure Statement, Art. 5.A

at pp. 33-34. The Reviewer is the sole initial adjudicator of each survivor's claim value, subject only to a limited reconsideration process. Creditors are entitled to know who the Reviewer is, how the Reviewer and each claimant will be compensated, and what safeguards exist to ensure the Reviewer's impartiality.

The Allocation Protocol imposes a $425 reconsideration fee, which is waivable only upon a sworn statement that the claimant is unable to pay, and provides that the Reviewer's determination is final with no mechanism for judicial review. *See* Allocation Protocol, § 3.3. Neither the fee requirement, the waiver process, nor the finality of the Reviewer's decision is clearly explained in plain language in the Disclosure Statement. Abuse survivors — many of whom are elderly, unrepresented, or unfamiliar with legal proceedings — are entitled to understand in accessible terms the procedural rights (and limitations on those rights) that will govern their claims.

### *G. Additional Disclosure Deficiencies*

Section 1.1.68 of the Plan provides that the DOO Entities' Cash Payment will be reduced by $1 million if any Non-Settling Insurer remains as of the Initial Plan Filing Date. Plan, § 1.1.68. The Disclosure Statement does not explain this reduction mechanism, does not identify the Non-Settling Insurers, and does not disclose whether this condition has already been triggered. If it has been triggered, the total available for distribution to Class 4 Claimants is $1 million less than the headline figure suggests — a material fact that creditors are entitled to know before voting.

The DOO Entities' Post-Effective Date Costs Reserve provisions of section 8.11 of the Plan are not adequately explained in the Disclosure Statement. Plan, § 8.11. The Plan establishes a $2 million minimum reserve, triggers a meet-and-confer obligation if the reserve falls below $900,000, and — critically — provides that the Diocese and Additional Debtors are irrevocably released from any further obligations under the Plan with respect to Insurance Claims and Abuse

Claims, including efforts to satisfy Post-Effective Date Preconditions to Coverage, if the reserve falls below $750,000. Creditors are not told that the Diocese's continued cooperation with Trust administration is contingent on the adequacy of this reserve, or what obligations will lapse if the $750,000 threshold is crossed.

Section 8.2.3 of the Plan provides that the Diocese and the Class 4 Claimants are deemed to assign, and the Additional Debtors will assign their Insurance Claims against Non-Settling Insurers to the Trust on the Effective Date. Plan, § 8.2.3. The Disclosure Statement does not adequately explain this assignment, including: (a) whether policy obligations that are preconditions to coverage — such as cooperation obligations, proof of loss requirements, or consent-to-settlement clauses — will continue to be performed post-assignment and by whom; (b) whether any insurer may assert anti-assignment defenses; or (c) the impact of the assignment on pending or future coverage litigation.

Section 2.1.5 of the Plan provides that payments made to the Trust by any Person other than the Diocese, and payments made by the Trust, are not "disbursements" for purposes of the quarterly fee obligations under 28 U.S.C. § 1930. Plan, § 2.1.5. Although the Disclosure Statement acknowledges that the United States Trustee intends to seek fees on Trust contributions and Trust distributions, it does not quantify the potential fees or explain how an adverse ruling would affect the amount available for distribution to abuse survivors. *See* Disclosure Statement, Art. 19.J.

The Disclosure Statement also merely repeats, without explanation, the Cabrini Foundation provisions in section 8.2.5 of the Plan, and does not describe the nature of the Cabrini Foundation's involvement, the likelihood or anticipated amount of any Cabrini Qualifying Proceeds, or the potential impact on Trust funding. Plan, §§ 1.1.27–1.1.29, 8.2.5. Finally, all voting and

confirmation dates throughout the Disclosure Statement remain blank, as do the operative dates in the Plan's definition of "Filed Abuse Claim." *See* Plan, § 1.1.88. Creditors cannot evaluate the timeline under which they must act—including the deadline to file objections to confirmation, the voting deadline, and the scheduled confirmation hearing date—because none of these dates has been provided. This alone is grounds to deny approval of the Disclosure Statement until the solicitation timeline is complete and disclosed.

***H. The Disclosure Statement Excludes the Risk of Appeal.***

The Disclosure Statement fails to address the significant risk that any confirmation order will be appealed. Given the magnitude of the legal issues presented—including the assignment of insurance rights, the nonconsensual release of contribution claims, the delayed discharge provisions, and the scope of the injunctive relief—it is virtually certain that one or more parties will appeal any confirmation order. Appellate review to the Second Circuit or beyond could add years to the process. This omission deprives creditors of critical information about the likely timeline for receiving distributions and the risk that distributions may be delayed by years of appellate litigation.

## V. THE CREDITOR POOL IS INCOMPLETE RENDERING IT IMPOSSIBLE TO SOLICIT VOTES ON THE PLAN

As discussed in Century's Objection to the Solicitation Procedures filed contemporaneously herewith, unless and until the Diocese adequately identifies the creditor pool, it cannot reliably solicit votes on the Plan.

The creditor pool is not sufficiently identified to permit reliable solicitation or confirmation. The Disclosure Statement alternates between 86 and 79 Additional Debtors, omits the individual contributions and financial condition of the entities that will fund the Plan and receive releases, and proposes to impose a 21-day bar date after confirmation on claims against

entities that had not filed when solicitation began. It also treats Inbound Contribution Claimants as deemed to reject the Plan while purporting to channel and extinguish their claims without distribution and to bind them to the Plan's injunctions and releases if they do not object. *See* Plan, § 3.3. The Plan Proponents must identify the complete creditor pool, the parties entitled to vote, the claims included in each class, and the notice that will be provided before any claim is barred or released.[17]

## CONCLUSION

For the foregoing reasons, Century respectfully requests entry of an order (1) denying approval of the Disclosure Statement because it fails to provide adequate information as required by 11 U.S.C. § 1125; (2) finding that the Plan is patently unconfirmable on its face; and (3) granting such other and further relief as the Court deems just and proper.

[17] Century expressly reserves the right to supplement, amend, or modify this Objection, whether or not the bases for such objections are expressly referred to herein. Further, Century reserves the right to join in any argument or objection made by other parties relating to adequacy of the Disclosure Statement and confirmability of the Plan. Moreover, nothing contained herein shall be deemed an admission by Century as to the existence of, or coverage under, any insurance policies alleged to have been issued by Century. Nothing in this Objection shall be construed as a waiver of any rights, claims, or defenses of Century, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise.

Dated: October 6, 2026

Respectfully submitted,

By: /s/ Tancred Schiavoni

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
MICHAEL M. KLOTZ
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
Email: tschiavoni@omm.com
mklotz@omm.com

*Attorneys for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America*