**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>The Roman Catholic Diocese of Ogdensburg, New York,<br><br>Debtor. | Hearing Date: October 13, 2026 at 1:00 pm ET<br>Hearing Location: Alexander Pirnie U.S. Courthouse and Federal Building 10 Broad Street, Utica, New York<br><br>Objection Deadline: October 6, 2026<br><br>Chapter 11<br><br>Case No. 23-60507 (PGR) |

**OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO OBJECTIONS TO (I) APPROVAL OF THE DISCLOSURE STATEMENT AND (II) THE PROPOSED SOLICITATION PROCEDURES AND CASE MANAGEMENT ORDER, AND IN SUPPORT OF THE MOTION**

The Official Committee of Unsecured Creditors (the "**Committee**") of The Roman Catholic Diocese of Ogdensburg, New York (the "**Diocese**" or the "**Debtor**"), a co-proponent of the *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Ogdensburg, New York and Additional Debtors* [Dkt. No. 1396] (as may be amended, the "**Plan**"), submits this omnibus reply (this "**Reply**") in support of the Debtor's motion [Dkt. No. 1398] (the "**Motion**") for approval of the *Disclosure Statement in Support of Joint Chapter 11 Plan* [Dkt. No. 1395] (as may be amended, the "**Disclosure Statement**"), the proposed solicitation procedures (the "**Solicitation Procedures**"), and the proposed case management order for the Additional Debtors (the "**Case Management Order**"). This Reply responds to: (a) the *United States Trustee's Objection* [Dkt. No. 1448] (the "**UST Objection**"); (b) *Century's*[1] *Objection to Debtor's Proposed Solicitation Procedures and Case Management Order* [Dkt. No. 1449] (the

[1] Century Indemnity successor to CCI Company, as Insurance Company, as successor to Insurance Company of North America ("**Century**"). Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Plan.

"**Century Solicitation Objection**"); and (c) *Century's Objection to Approval of the Disclosure Statement* [Dkt. No. 1450] (the "**Century DS Objection**" and, together with the Century Solicitation Objection, the "**Century Objections**"; all three together, the "**Objections**").

## PRELIMINARY STATEMENT

1. The Plan is the product of 3 years of litigation and mediation. It would fund a trust (the "**Trust**") with $83,375,000: a $44,000,000 DOO Entities Cash Payment from the Diocese, the Additional Debtors, and the Contributing Non-Debtor Entities, and $38,375,000 from four Settling Insurers (Wausau, LMI, Interstate, and Granite State). The Plan also preserves, for Abuse Claimants' benefit, the rights to pursue recoveries from Non-Settling Insurers, including Century, that have not contributed. The Committee is the estate fiduciary for Abuse Claimants, whose Class 4 votes will decide whether the Plan is accepted. The Committee believes the Plan is the best outcome for the Abuse Claimants and asks the Court to let the Abuse Claimants vote and move this Case to resolution.

2. The three Objections fall into two groups. The US Trustee's objection is mainly about completeness (blank financial exhibits, unfiled Plan Supplement documents, and inconsistencies between the Disclosure Statement and the Plan), plus four confirmation issues: the Settling Insurer protections, the gatekeeper injunction, quarterly fees, and exculpation.[2]

3. The Century Objections are something else. Together they run more than eighty pages and amount to an early confirmation objection from a Non-Settling Insurer. Century's core complaint is not that Abuse Claimants lack information necessary to vote. It is that the Plan preserves the possibility to recover from Century. Century calls the Plan "insurance neutral in name only." Century DS Obj. at 2. Yet Century's own description shows that the Plan expressly

[2] It is the Committee's understanding that the Debtor will file the Liquidation Analysis (Ex. B), Financial Projections (Ex. C), and Additional Debtor Financial Information (Ex. D) prior to the hearing on the Disclosure Statement. The outstanding Plan Exhibits will be filed in Plan Supplements prior to the Voting Deadline.

preserves Non-Settling Insurers' coverage rights and defenses. *Id.* at 2, 4, 20–22 (citing Plan §§ 6.1, 8.8.2(d)–(e), 12.2.5). Century creates straw man arguments to manufacture alleged abrogation of its rights, but the Plan preserves Century's rights as a Non-Settling Insurer because the Plan provides that (a) Century's policies will "ride through" confirmation without impairing or limiting either Century's or the insured's rights and obligations under the policies and (b) allows Abuse Claimants with claims covered by Century policies to pursue a judgment in New York State Courts. There is no abrogation of Century's rights. Further, the issue of whether the Plan abrogates the rights of a Non-Settling Insurer is a classic confirmation question. It is a legal question on the operation of the Plan, it is not a ground to deny Abuse Claimants the chance to vote.

4. The bar for refusing a disclosure statement because the plan is "patently unconfirmable" is high, and Century does not clear it. By Century's own standard, the defect must be one that voting cannot cure, and the material facts must be undisputed or fully developed at the disclosure statement hearing. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012). Each of Century's arguments fails that test for at least one of three reasons:

- it depends on contested facts, such as good faith, alleged collusion, whether the judgment-reduction mechanism is fair, and whether the contributions are adequate;
- it raises questions of law that should be decided on a full confirmation record, such as whether the Plan is insurance neutral or whether the Plan contains non-consensual releases of third-parties; or
- it is a drafting point that the Plan Proponents can fix, if necessary, prior to confirmation of the Plan – it does not impact the adequacy of the disclosure to the Abuse Claimants entitled to vote on the Plan.

5. The Committee therefore asks the Court to overrule the Objections to the extent they are not otherwise resolved by Disclosure Statement Exhibits filed before the hearing or by revisions to the Disclosure Statement itself. The Committee further asks the Court to approve the

Disclosure Statement, Solicitation Procedures, and Case Management Order once any Court-required revisions are made. Alternatively, the Court could continue the hearing for the limited purpose of reviewing any supplemental filings, without reopening objections already heard.

6. The Committee joins in the replies to the Objections being filed by the Diocese and the Additional Debtors and incorporates them herein by reference. In light of the volume of the Objections, the Committee has not briefed each issue and joins in the arguments made on any such issues by the Diocese and the Additional Debtors and reserves its right to respond to any of the Objections.

## BACKGROUND

7. On July 17, 2023 (the "**Petition Date**"), the Diocese filed a voluntary chapter 11 petition. On August 11, 2023, the United States Trustee appointed the Committee consisting of seven individuals who were sexually abused as minors by perpetrators for whom the Debtor was responsible.

8. On July 28, 2023, the Diocese moved for an order referring the issues raised in the Insurance Adversary Proceeding to mediation and for the appointment of a mediator to mediate all issues among the Diocese, the Committee, and the Insurers (the "**Mediation Motion**"). On January 26, 2024, the Bankruptcy Court entered a text order [Dkt. No. 340] granting the Mediation Motion per an order entered on January 17, 2024 in the Insurance Adversary Proceeding (the "**Mediation Order**") [Adv. Proc. Dkt. No. 69].

9. Since entry of the original Mediation Order, the Diocese, the Committee, and the Insurers have engaged in more than three years of mediation with dozens of virtual and in-person mediation meetings, interspersed with ongoing negotiations and communications among the mediation parties. The mediation resulted in a settlement among the Committee on behalf of

Abuse Claimants, the Diocese and the Additional Debtors now embodied in the Plan. Additional mediation sessions with Insurers resulted in settlements with nearly all of the Insurers, now defined as Settling Insurers in the Plan. During the mediation process, Century has – uniquely among the insurers – engaged in scorched earth, aggressive litigation in this Case by, among other things, (a) seeking to obtain discovery from multiple other insurers, (b) seeking to litigate objections to claims, (c) opposing Abuse Claimants' impact statements, (d) appealing the Court's order authorizing impact statements all the way to the Second Circuit, and (e) now opposing the Disclosure Statement by prematurely pressing confirmation objections.

10. On August 31, 2026, the Diocese filed the Disclosure Statement [Dkt. No. 1395] and the Plan exhibits [Dkt. No. 1394]. On September 1, 2026, the Diocese and the Committee filed the Plan [Dkt. No. 1396], and the Diocese filed the Motion [Dkt. No. 1398]. On September 23, 2026, the Allocation Protocol and Trust Agreement were filed as Plan Supplement exhibits [Dkt. No. 1431].

11. Under the Plan, the Additional Debtors (parishes and Catholic ministry entities listed on Plan Exhibit A) will file their own prepackaged chapter 11 cases within twenty-four hours before the Confirmation Hearing. The Plan will then resolve Abuse Claims against both the Diocese and the Additional Debtors. UST Obj. ¶ 9; Case Management Procedures § 2.b. Two Contributing Non-Debtor Entities are identified: Catholic Charities of the Diocese of Ogdensburg and St. Joseph's Home, Ogdensburg, N.Y. UST Obj. ¶ 4. Importantly, the Contributing Non-Debtor Entities are not receiving releases pursuant to the Plan.

12. Before the Plan was filed, Century filed objections and motions to disallow certain Abuse Claims [Dkt. Nos. 1372–1379]. The Court denied them as filed in violation of the

Mediation Stay. Century later moved for leave to proceed with them [Dkt. No. 1388], and the Court denied that motion as well [Dkt. Nos. 1384, 1393].

13. No Abuse Claimant objected to approval of the Disclosure Statement.

14. This Bankruptcy Case has been pending for three years, and Abuse Claimants have been waiting decades for resolution of their Abuse Claims against the Diocese and the Additional Debtors. The Diocese, the Additional Debtors, the Committee and all but two of the Diocese's insurers reached a settlement. The Joint Plan embodies those settlements. Approval of the Disclosure Statement is the critical first step in moving forward with the confirmation of the Plan, resolving the Bankruptcy Case, and making distributions to Abuse Claimants.

15. This Court should not permit Century to delay this process with its false assertion that the Plan is patently unconfirmable. The Plan Proponents believe that the Plan is confirmable, and that the Disclosure Statement contains adequate information for the creditors impacted by the Plan, the Abuse Claimants, to vote to accept or reject the Plan.

## ARGUMENT

### I. The Disclosure Statement Hearing Decides Whether Information Is Adequate. It Is Not an Early Confirmation Hearing.

#### A. The Section 1125 Standard Is Flexible and Practical.

16. Section 1125(a)(1) requires "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records," that would let a hypothetical investor of the relevant class make an informed judgment about the plan. 11 U.S.C. § 1125(a)(1); *see also In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994). The court must weigh "the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(a)(1). The standard depends on the facts of

each case. *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir. 1988); *In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (S.D.N.Y. 1995) (disclosure appropriate to the circumstances). As the US Trustee acknowledges, adequate information is a floor, not a ceiling. UST Obj. ¶ 12 (citing *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006)).

17. The relevant "hypothetical investor" here is a Class 4 Abuse Claimant. The question is whether that Abuse Claimant can understand what the Plan offers, what he or she gives up, and the risks. The question is not whether a Non-Settling Insurer agrees with the Plan Proponents' view of the law. A disclosure statement does not have to adopt an objector's advocacy, rebut every argument the objector may make at confirmation, or predict how contested legal questions will come out.

18. *Notably, not a single Abuse Claimant that may vote on the Plan has filed an objection to the adequacy of the Disclosure Statement.*

**B. The "Patently Unconfirmable" Exception Is Narrow and Does Not Apply Here.**

19. Courts may decline to approve a disclosure statement for a plan that is unconfirmable on its face. However, such a remedy is reserved for defects that cannot be cured and that turn on undisputed facts. *Am. Capital Equip.*, 688 F.3d at 154–55; *see In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). Where an objection depends on contested facts or open legal questions, it belongs at confirmation. Deciding it at the disclosure stage would turn a limited hearing into a confirmation trial without the evidentiary record § 1129 requires.

20. Century's arguments do not fit the exception. Many depend expressly on factual claims the Plan Proponents dispute:

- that the Litigation Claimant structure is a "mechanism for generating" bad-faith claims (Century DS Obj. at 16);

- that the Plan is collusive like the plan in *Skinner* (*id*. at 27–29); and

- that the contributions of the Additional Debtors and Contributing Non-Debtor Entities are inadequate (*id.* at 3–4, 41).

21. Others raise legal questions on the interpretation of the Plan that should be determined in connection with confirmation.

- The Plan does not provide for any non-consensual releases of non-debtors in violation of *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) (hereinafter, "*Purdue*");

- The delayed discharge and claim enhancements are legal and appropriate (Century DS Obj. at 14-18);

- The Channeling Injunction and Judgment Reduction with respect the Non-Settling Insurers are appropriate and adequately protect the Non-Settling Insurers (*id*. at 18-23);

- The Plan does not override or violate section 502 of the Bankruptcy Code *id*. at 24-25);

- The Plan does not impair Century's rights (*id*. at 25-30 );

- The Plan's Exculpation provision is not impermissibly broad (*id*. at 30-32)

- The Plan does not impermissibly exclude Century from participating in the resolution of disputes concerning Cabrini Qualifying Proceeds, if any (*id*. at 32-34);

- The requirement of an executed release agreement for distribution is not coercive (*id*. at 35);

- The Gatekeeper Injunction does not exceed the Court's jurisdiction (*id*. at 36-38);

- The Rapid Prepackage Procedures are appropriate (*id*. at 38-39);

- The Unknown Abuse Claimants and Post-Confirmation Claimants are receiving appropriate due process. (*id*. at 39-40); and

- There is nothing improper in the Jury Trial Waiver or lack of judicial review for Abuse Claims (*id*. at 40-41).

### C. Century May Be Heard, but Being Heard Does Not Give It a Veto or Constitutional or Prudential Standing.

22. The Committee does not dispute that Century, as an insurer that may be financially responsible for Abuse Claims, is a party in interest that may appear and be heard under 11 U.S.C. § 1109(b) on issues that impact them. *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024). But the right to be heard is not a right to win. Nor does it turn a Non-Settling Insurer's coverage strategy into a disclosure deficiency. *See id.*

23. A large share of Century's Objections claim to protect Abuse Claimants. Century argues that survivors are coerced by the release agreement (Century DS Obj. at 35–36); that survivors are deprived of jury trial rights (*id.* at 40–41); that the Second Group Fund is unfair to Uknown Abuse Claimants (*id.* at 39–40, 54); and that the Abuse Claimants may not understand the Allocation Protocol (*id.* at 54–56). The Committee is the court-appointed fiduciary for those Abuse Claimants. The state court counsel representing the individual Committee members represent the vast majority Abuse Claimants in this case. The Committee negotiated these Plan provisions and supports them. The Court may of course consider any issue relevant to confirmation. But an insurer that is resisting payment of survivors' claims is not a reliable proxy for survivors' interests, and its arguments on their behalf deserve that context.

24. The Plan Proponents do not agree that the Disclosure Statement must adopt Century's conclusions. For example, the Disclosure Statement need not state as fact that the Plan's insurance assignment "violates the anti-assignment clauses" or that the Plan "may operate to vitiate" coverage. Century DS Obj. at 51–52. Disclosure requires a fair description of the risk and of the parties' positions. The Plan Proponents will describe Century's position fairly and identify it as Century's.

25. Further, Century asserts objections that could only be properly pressed by an affected party with standing. The Committee reserves all rights regarding Century's standing to assert arguments at the confirmation hearing.

## II. The Solicitation Procedures and Case Management Order Should Be Approved.

### A. If Necessary Votes Will Be Tabulated Debtor by Debtor.

26. Century argues that § 1129(a)(10) must be satisfied for each Debtor separately, and that the Solicitation Procedures do not let votes be counted per Debtor. Century Solicitation Obj. ¶¶ 18–29 (citing *In re Trib. Co.*, 464 B.R. 126, 180–83 (Bankr. D. Del. 2011)). Courts disagree on whether § 1129(a)(10) applies per debtor or per plan. *Compare Tribune*, 464 B.R. at 180–83, *with In re Transwest Resort Props., Inc.*, 881 F.3d 724 (9th Cir. 2018). The Court need not resolve that question now. As a practical matter, if there are no votes that reject the Plan, there will be no reason to determine whether a particular Ballot relates to a particular Additional Debtor. If necessary, the Plan Proponents can determine whether any Ballot relates to a particular Additional Debtor based on the information contained in Abuse Claims and complaints.

27. The concept of a prepackaged structure is authorized and often used under the Bankruptcy Code. The Diocese and Additional Debtors are seeking specific procedures to facilitate rapid prepackaged plans for the Additional Debtors so that the Plan can be implemented in a manner in accordance with the Bankruptcy Code that avoids prolonged and expensive bankruptcy process in a case where the only impaired creditors, the Abuse Claimants, will have had a full and fair opportunity to consider and vote on a Plan that will provide all Abuse Claimants with a mechanism for a meaningful recovery from the Diocese and the Additional Debtors. The creditors of the Additional Debtors that have filed lawsuits against Additional Debtors will be provided with solicitation packages and the opportunity to vote on the Plan.

28. A holder who accepts or rejects a plan before the case begins is treated as having accepted or rejected it, if the solicitation complied with applicable nonbankruptcy disclosure law or, if there is none, followed disclosure of "adequate information" as defined in § 1125(a). 11 U.S.C. § 1126(b); *see* Fed. R. Bankr. P. 3018(b). The Additional Debtors' creditors entitled to vote will receive the Court-approved Disclosure Statement and a Ballot. That satisfies § 1126(b).

**B. Creditors of the Additional Debtors Will Be Solicited.**

29. Century objects on the basis that holders of claims against only an Additional Debtor, who did not file a claim against the Diocese, receive a Solicitation Package only on request. Century Solicitation Obj. ¶¶ 10, 23, 26. The Plan Proponents will (i) mail Solicitation Packages to all known holders of Abuse Claims against any Additional Debtor, including plaintiffs in pending state-court actions naming an Additional Debtor, and (ii) the publication notice will be widely noticed and offers an opportunity for an unknown Abuse Claimant against the Debtor or Additional Debtors to request a Ballot. This also answers Century's *Purdue* argument (*id.* ¶¶ 24–27), because the Additional Debtors will be debtors whose own creditors vote on the Plan.

**C. Sending Solicitation Materials Through Counsel Is Appropriate and Protects Survivors' Confidentiality.**

30. Century objects to sending Solicitation Packages to survivors' counsel where the proof of claim lists counsel's address. It demands verified Rule 2019 statements from every firm and powers of attorney specific to this Plan. Century Solicitation Obj. ¶¶ 30–48. Survivors chose to give counsel's address as their noticing address, under the confidentiality protections of the Bar Date Order. Motion ¶ 27. Many survivors did so specifically to keep their identity and home address confidential. This is critical as many survivors may not have told even their closest family members about their abuse.

31. The Solicitation Procedures provide for counsel to Abuse Claimants to provide them with the Solicitation Documents and Ballots. Counsel will not be executing the Ballots. The voting will be done by the individual Abuse Claimants, who must sign their own ballots if they choose to vote. Century's reliance on New York Rule of Professional Conduct 1.8(g) (Century Solicitation Obj. ¶¶ 44–45) is also misplaced. Each claimant will cast his or her own vote on a plan proposed by the estate. That is not an aggregate settlement negotiated by plaintiffs' counsel. This is not a mass tort case with master ballots being filled out by counsel. Rather, what is being done here is a process for providing solicitation materials to the Abuse Claimants without violating their confidentiality and privacy. Century attempts to muddy the water here by opposing procedures that are not applicable in this case.

32. Rule 2019 is a disclosure rule. It applies to groups, committees, and entities representing multiple creditors "acting in concert to advance their common interests." Fed. R. Bankr. P. 2019(b). It does not make a power of attorney a condition of voting where the lawyer is not executing the Ballot or not voting on behalf of his or her clients. Further, the identity of state court counsel for each Abuse Claimant is provided in both complaint and the filed Abuse Claims. As such, Century knows precisely who is represented by each attorney in this case.

**D. Century's Claim Challenges Do Not Justify Delaying Solicitation.**

33. A proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). The Court denied Century's claim objections as filed in violation of the Mediation Stay. Century DS Obj. at 9. Century's view that six specific claims, and claims of deceased claimants generally, are not legally cognizable (Century Solicitation Obj. ¶¶ 49–55) raises disputed questions of New York law and fact.

34. Those questions are not resolved by Century's say-so, and they likely would not change the outcome of a vote among Class 4 claimants. As a practical matter, the issue of whether a claimant is voting on a disallowable claim is only an issue if there are sufficient votes against the plan that would render the plan unconfirmable. If there is a split vote, then the Court may have to assess whether some votes should be disallowed if the vote tally would impact the question of whether the vote reached the two-thirds threshold for confirmation. If there is an issue once the votes are in, the specific claims may be examined. Rule 3018(a) provides the method for addressing disputes about temporary allowance for voting. The Solicitation Procedures already include procedures for temporary allowance and estimation. (Motion § I.D.ii.) The Plan's treatment of late-filed and other challenged claims for distribution purposes is a confirmation issue.

**E. Century's Assertions that the Disclosure Regarding Insurance-Related Risks Is Inadequate Are Incorrect or Can Be Fixed By Providing Additional Disclosure.**

35. Century asserts that the Disclosure Statement contains inadequate disclosure about payment of self insured retentions (SIRs) and deductibles. This is a confirmation issue. First, Century's policies do not contain self insured retentions or deductibles. Second, under New York law, an insurer's liability persists where the insured debtor does not have sufficient funds to pay a self-insured retention. *See Admiral Ins., Co. v. Grace Indus., Inc.*, 409 B.R. 275, 282 (E.D.N.Y. 2009). As such, this is another baseless objection.

**F. Century's Additional Purported Disclosure Deficiencies Are Without Merit or Will be Addressed.**

36. *First*, as the conditions have been met for the reduction of the DOO Entities' Cash Payment by $1 million have been met, the Plan and Disclosure Statement will be revised to reflect that adjustment.

37. *Second*, the description of the operation of the Post-Effective Date Cost Reserve provision are adequately explained as evidenced by Century's own ability to explain them in its objection. The Disclosure Statement informs Abuse Claimants that the Trust will manage litigation matters and will make determinations regarding the Post-Effective Date Cost Reserve and other reserves in accordance with the Trust Documents. The fact that the Trustee will be managing and administering the Trust for the benefit of the Abuse Claimants is more than adequately disclosed.

38. *Third*, the Disclosure Statement explains that the Insurance Claims will be assigned and matters related to litigation of any assigned Insurance Claims. The risks related to the assignment are adequately disclosed.

39. *Finally***,** the Plan Proponents will add additional language to the Disclosure Statement regarding the risk of an appeal.

**II. The Plan Is Not Patently Unconfirmable.**

40. As noted above, both Century and the US Trustee raise issues regarding the confirmability of the Plan. However, no issue raised by the Objections rises to the high level of making the Plan "patently unconfirmable" requiring denial of the Disclosure Statement. Rather, the confirmation issues raised by the Objectors rely on legal and/or factual questions that can be resolved at the Confirmation Hearing and should not prevent Abuse Claimants, many who have waited decades for their resolution, to have the opportunity to vote to accept or reject the Plan.

41. The Plan Proponents believe that they will be able to meet all of the requirements for confirmation at the Confirmation Hearing. The Committee addresses the various confirmation arguments in turn here briefly and reserves all rights with respect to the presentation of evidence and legal argument in connection with these issues at the Confirmation Hearing.

### A. The Plan Does Not Violate Purdue.

42. Both the US Trustee and Century argue that the Plan violates *Purdue* because it provides for non-consensual releases of non-debtors. Both are wrong.

43. *First*, the Plan does not provide for any non-consensual release of any third party. The Additional Debtors will have filed for bankruptcy prior to the Confirmation Hearing and so will be entitled to releases and a discharge in connection with the provisions of the Plan and section 1129 of the Bankruptcy Code.

44. *Second*, the release of the Settling Insurers is not prohibited by *Purdue*. By a separate motion, the Debtor will seek to sell the insurance policies of the Settling Insurers back to the Settling Insurers free and clear of all liens, claims and encumbrances under section 363(f) of the Bankruptcy Code. This does not violate *Purdue*., and the release by Abuse Claimants of their direct claims, if any, against the Settling Insurers will be consensual.

45. *Purdue* does not limit the Court's authority to approve a sale of estate property free and clear of interests as provided in section 363(f) of the Code.[3] Indeed, many courts following the *Purdue* ruling have explicitly found that a third-party injunction issued to implement a section 363 free and clear sale does not offend *Purdue*. *See, e.g.*, *In re Hopeman Bros.*, 667 B.R. 101, 107-08 (Bankr. E.D. Va. 2025) ("A decision that would permit a creditor to independently pursue its claim against property of the debtor after it been sold in bankruptcy would have a chilling effect on the sale of assets in bankruptcy. *Purdue* was not intended to thwart that process . . . Nothing in [the *Purdue*] opinion suggests that the protections afforded a buyer pursuant to § 363, including the ability of the purchaser to obtain the asset free of the

[3]Insurance policies are generally property of the estate. *See, e.g., Sosebee v. Steadfast Ins. Co.*, 701 F.3d 1012, 1023 (5th Cir. 2012). In the contexts of mass-torts, the proceeds of such policies are also considered property of the estate where the asserted claims exceed policy limits. *See, e.g.*, *In re OGA Charters, L.L.C.*, 901 F.3d 599, 604 (5th Cir. 2018) (stating that "where a siege of tort claimants threaten the debtor's estate over and above the policy limits, we classify the proceeds as property of the estate.").

claims of the debtor's creditors, were intended to be abrogated.") (collecting cases); *see also* Amended Order, *In re Bird Glob., Inc.*, No. 23-20514 (CLC) (Bankr. S.D. Fla. Aug. 2, 2024), ECF No. 1214, *aff'd sub nom.* Order Denying Emergency Motion to Stay Confirmation Order Pending Appeal, *Wright v. Bird Glob., Inc.*, No. 24-CV-23086 (RAR) (S.D. Fla. Aug. 21, 2024), ECF No. 35 (approving an insurance policy buyback "free and clear" of all claims and interests, including direct-action claims); *In re Com. Express, Inc.*, 670 B.R. 573, 584-85 (Bankr. M.D. Fla. 2025) (holding that *Purdue* does not foreclose relief sought in an insurance sale motion and did not address sales of estate property); *In re Roman Cath. Diocese of Rockville Ctr., N.Y.,* 665 B.R. 71, 86 (Bankr. S.D.N.Y. 2024) (overruling objection of U.S. Trustee and holding "sale of insurance policies is entitled to 'free and clear' protections under section 363(f) of the Bankruptcy Code").[4]

46. The ability to sell the insurance policies free and clear encompasses selling such policies free and clear of any alleged direct action claim. *See, e.g., Hopeman Bros.,* 667 B.R. at 108-09.

47. The *Hopeman Brothers* court reasoned;

> [W]e're talking about the insurance policies and the settling insurance companies' obligations to pay under these policies. That is what's being sold. The policies are owned by the debtor. And if the debtor is selling these policies, certainly I think, under 363, in order for it to work, the insurance companies who are paying for these policies, or these buybacks, certainly are entitled to have no other parties trying to pursue claims for coverage under the same policies."

Transcript of Hearing at 199:23 – 200:5, *In re Hopeman Bros., Inc.,* No. 24-32428 (Bankr. E.D. Va. Jan. 22, 2025), ECF No. 515.

---

[4] As stated by Judge Martin Glenn of the *Rockville Center* court, "what I see . . . is the U.S. Trustee standing in the way of over 600 sex abuse survivors being denied the recovery that they have fought for years to get in this case when you do not have a single case that supports your position that they can't consent. . . . If *Purdue* is the only thing you have, you've made your argument." Transcript of Hearing at 31:7-19, *In re Roman Cath. Diocese of Rockville Ctr., N.Y.*, No. 20-12345 (MG), ECF No. 3432.

48. Similarly, in *Bird Global*, the court approved an insurance policy buyback "free and clear" of all claims and interests, including direct-action claims. Notably, the U.S. Trustee in *Bird Global* concurred that *Purdue* did not apply to the 363 sale of the debtor's insurance policies *even* in a direct action state:

> [U.S. Trustee:] The plan on its face does not appear to raise *Purdue* issues. In general, injunctions involving the insurance settlement do not raise the same concerns as third-party releases, because the insurance assets are property of the estate, which the debtor can monetize, settle and dispose of, subject to Court approval.
>
> This is true even in what we would call a direct action state, where a claimant can sue the insurer directly, without first going after the policyholder. In that instance that would be *Bird*. The reference to Section 363 wasn't about the earlier asset sale, but about the insurance buyout in the plan itself.
>
> So for these reasons, Your Honor, the United States Trustee does not believe that *Purdue* had an impact on Your Honor's decision as to whether this case should be confirmed at this time.

Transcript of Hearing at 13:3-20, *In re Bird Glob., Inc.*, No. 23-20514 (CLC) (Bankr. S.D. Fla. Aug. 7, 2024), ECF No. 1230.

**B. The Delayed Discharge and Claim Enhancements are Legal and Appropriate.**

49. Century argues that tying the Abuse Claim Discharge Date to the conclusion of litigation against Non-Settling Insurers violates section 1141(d)(1). Century DS Obj. at 14–18. The statute says otherwise. Section 1141(d)(1) begins: "Except as otherwise provided in this subsection, *in the plan, or in the order confirming the plan*, the confirmation of a plan . . . discharges the debtor . . . ." 11 U.S.C. § 1141(d)(1) (emphasis added). Congress expressly allowed a plan to set the timing and scope of the discharge. Century concedes as much and argues only that the Plan's use of that authority is improper. Century DS Obj. at 15. That is a

dispute about how the authority is exercised, which goes to good faith and is for confirmation. It is not a facial defect.

50. The structure also has an obvious, legitimate purpose. When a debtor is discharged, other parties' liability for the same debt is unaffected. 11 U.S.C. § 524(e) (discharge "does not affect the liability of any other entity on . . . such debt"). Non-Settling Insurers that did not contribute should not get a windfall from the Diocese's reorganization. A survivor's recovery from a liability insurer ordinarily depends on first establishing the insured's liability. Century implicitly concedes this when it argues that direct-action rights require a judgment against the insured. Century DS Obj. at 17. The Plan simply keeps the procedural vehicle needed to establish liability so the policies Century sold remain available to the people they were meant to protect.

51. Century's other theories (manufactured liability, fictional loss, and bad-faith exposure) are coverage arguments. Century DS Obj. at 16–17. The Plan preserves Non-Settling Insurers' right to raise them. *See id.* at 4, 22 (citing Plan §§ 8.8.2(d), 12.2.5). In any Litigation Claim, a Non-Settling Insurer may assert every defense available to it. *Id.* at 24 (describing Plan § 2.3.4(k) carve-out). Whether a judgment against a nominal or discharged insured triggers coverage, and in what amount, is for the coverage court under the policies and applicable law. Nothing in the Plan asks this Court to decide it. Century's argument based on 28 U.S.C. § 157(b)(5) (Century DS Obj. at 17–18) concerns where personal-injury claims are tried, a question the Plan does not change.

52. Century also misreads the Claim Enhancements. The multipliers in Plan § 4.6.2 determine how a Litigation Claimant shares in *Trust Distributions*. They allocate Trust assets among Abuse Claimants. They do not increase the amount of any judgment or what any Non-Settling Insurer owes under its policy. A Non-Settling Insurer's exposure is set by the judgment

or settlement on the underlying claim, subject to its policy terms, limits, and defenses, none of which the Plan changes. Century's claim that the enhancements would make its policies pay for injuries outside the policy period (Century DS Obj. at 29) confuses the Trust's internal allocation with coverage. The enhancements are appropriate because the Litigation Claimants are seeking recoveries that will enhance the Trust Assets available for Abuse Claimants.

53. *Skinner*[5] does not apply. Century DS Obj. at 27-29. In *Skinner*, the debtor itself stood to gain from losing its own defense, through a 20% surcharge on insurance recoveries. *Id.* (describing *In re Am. Capital Equip., Inc.*, 405 B.R. 415 (Bankr. W.D. Pa. 2009), *aff'd sub nom. Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*, No. 09-0886, 2010 WL 1337222 (W.D. Pa. Mar. 29, 2010), *aff'd sub nom. In re Am. Capital Equip., LLC*, 688 F.3d 145 (3d Cir. 2012). Here, no part of any insurance recovery goes back to the Diocese or the Additional Debtors. Recoveries go to the Trust for survivors. The Trust also keeps a $2 million reserve to cover post-Effective Date obligations, including Post-Effective Date Preconditions to Coverage. Plan § 8.11; Century DS Obj. at 5, 56–57. Whether the Plan was proposed in good faith under § 1129(a)(3) is a fact question to be decided at confirmation. It cannot be resolved on Century's description of the Plan.

### C. The Claims Resolution Process Is a Standard Trust Mechanism and Does Not Bind Non-Settling Insurers.

54. Century argues that Plan § 2.3.4(k), which gives the Committee (and, after the Effective Date, the Trustee) the exclusive right to object to Class 4 Claims, violates § 502(a). Century DS Obj. at 24–25. This argument ignores what Trust allocation actually does. Under the Plan, the Abuse Claims Reviewer's determinations and Trust Distributions are not a settlement,

[5] *See In re Am. Capital Equip., Inc.*, 405 B.R. 415 (Bankr. W.D. Pa. 2009) ("*Skinner*"), *aff'd sub nom. Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*, No. 09-0886, 2010 WL 1337222 (W.D. Pa. Mar. 29, 2010), *aff'd sub nom. In re Am. Capital Equip., LLC*, 688 F.3d 145 (3d Cir. 2012).

release, accord, or novation of any Abuse Claim. *Id.* at 13 (quoting Plan § 4.2). They also do not reduce any Non-Settling Insurer's obligations. *Id.* at 22 (citing Plan § 2.3.4(i)). Allowance in the Trust process therefore determines only how Trust assets are shared among survivors, to which Non-Settling Insurers contribute nothing. It does not fix the value of any Abuse Claim or determine any amount Century must pay. Century keeps the right to contest liability and damages in any litigation with respect to any Abuse Claim and to contest coverage in any coverage action. *Id.* at 24. Simply put, the allocation process simply apportions the limited settlement fund among Abuse Claimants. It does not value any claims because it does not assess or determine what a claim may be worth in the tort system. It does not specifically "allow" a claim. It does not prejudice any of Century's rights in any litigation that may follow Century's refusal to settle on a reasonable basis.

55. Century's real concern is that it may not challenge how survivors divide a fund it has refused to contribute to -that is not a § 502 violation, and it is certainly not one evident on the face of the Plan. Nor is it an issue that Century has standing to assert.

**D. The Insurance Assignment Preserves Insurers' Rights and Defenses.**

56. Century argues the Plan impairs its contracts by assigning Insurance Claims to the Trust without the corresponding obligations. Century DS Obj. at 25–30. But Century's own authority recognizes the governing principle: insurance rights may be transferred to a trust so long as the insurers' rights and defenses are left intact. *Id.* at 26 (describing *In re Boy Scouts of America,* 137 F.4th 126, 164-65 (3d Cir. 2025)). The Plan follows that principle. It provides that Non-Settling Insurers' rights and defenses are preserved. Plan §§ 6.1, 8.8.2(d), 12.2.5. If the assignment is held unenforceable, the Plan provides a fallback under which the Diocese and the Additional Debtors keep and assert the claims. Plan § 8.2.3(b); Century DS Obj. at 51.

57. Century argues that the preservation language is subordinated by Plan § 8.8.4. Century DS Obj. at 4, 22. The Plan Proponents will clarify how §§ 8.8.2 and 8.8.4 work together, so that nothing in the Plan's injunctions or releases impairs a Non-Settling Insurer's coverage defenses under its own policies, except as to Insurer Contribution Claims addressed below. Questions about anti-assignment clauses, cooperation obligations, and conditions precedent are coverage questions governed by the policies and applicable law. The Disclosure Statement will describe them as risks (Part II), and the Court can address them at confirmation if needed.

**E. The Exculpation Provision is Narrowly Tailored.**

58. Both objectors challenge the exculpation provision. UST Obj. ¶¶ 48–52; Century DS Obj. at 30–32.

59. Exculpation of estate fiduciaries acting within the scope of their duties during the case is well recognized. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000). The remaining dispute, including the effect of *In re Voyager Digit. Holdings, Inc.*, No. 23-21-71, 2026 WL 2241168 (S.D.N.Y. Aug. 4, 2026), is a confirmation question. To the extent that any change to Exculpation is required by the Court, the Plan Proponents will make such changes.

**F. The Legality of the Gatekeeper Provision Is a Confirmation Issue.**

60. A bankruptcy court has jurisdiction to interpret and enforce its own orders, including a confirmation order. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). The Fifth Circuit upheld a gatekeeping provision while striking a non-debtor exculpation. *See In re Highland Capital Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022). Other courts have declined to approve similar provisions. *See* UST Obj. ¶ 39 (citing *In re Gulf Coast Health Care, LLC*, No. 21-11336 (Bankr. D. Del.) and *In re AIO US, Inc.*, 677 B.R. 509, 564 (Bankr. D. Del. 2025)). Plan § 12.13 applies only "[t]o the extent permitted by law." Courts disagree on these provisions,

and a gatekeeper provision can be narrowed or removed without affecting the rest of the Plan, so it is not a basis for denying approval of the Disclosure Statement.

**G. The Rule 9019 Request Is Wholly Appropriate.**

61. Century objects to the Rule 9019 request in Disclosure Statement Article 21. Century DS Obj. at 12–14. The Plan Proponents do not seek a finding that binds Non-Settling Insurers in coverage litigation, or that the Allocation Protocol adjudicates any Abuse Claim. Plan § 4.2 already says so. The Plan Proponents request approval of specific settlements embodied in the Plan, namely the settlements with the Settling Insurers and the DOO Entities, and to state that no finding is intended to enlarge or diminish Non-Settling Insurers' rights in coverage litigation. That approach follows *In re AIO US, Inc.*, No. 24-11836, 2025 WL 2426380, at *22–25 (Bankr. D. Del. Aug. 21, 2025), on which Century relies. Century DS Obj. at 14.

**H. The Release Agreement, Jury Waiver, and Finality Provisions Reflect Choices Survivors Make, and Their Fiduciary Supports Them.**

62. Century calls the Abuse Claim Release Agreement condition "coercive" and objects to the jury-trial waiver and the finality of the Reviewer's reconsideration decisions. Century DS Obj. at 35–36, 40–41. Each Abuse Claimant chooses how to proceed. A survivor may accept a Trust Distribution and sign a release, or, where authorized, pursue a Litigation Claim with full jury-trial rights against the Non-Settling Insurers' insureds. Plan §§ 2.3.4(c), 4.6. Getting consideration in exchange for a release is how consensual releases ordinarily work. *Purdue* left consensual releases untouched. Whether any feature of this structure fails § 1129 is a confirmation question. The Abuse Claimants' own fiduciary supports these provisions, and the voting process will show what Abuse Claimants want. Further, not a single Abuse Claimant has asserted that the procedures are improper. The Committee expects overwhelming support for the

Plan by Abuse Claimants. This very issue will be voted on by Abuse Claimants and their approval will put to bed any assertion that the process is improper.

63. Moreover, the Abuse Claim Release Agreement merely ensures full understanding of the terms of the Plan. Class 4 Abuse Claimants will have consented to the releases in the Plan and the terms of the Plan, including signing releases as a condition to receiving distributions. The Abuse Claim Release Agreement is also necessary to give the Trust the ability to conduct the necessary Medicare Secondary Payers Act reporting for certain claims.

64. There is nothing improper with the allocation procedures, the jury waiver and finality provisions. Abuse Claimants, through the Committee, have negotiated a settlement that is being put to vote. Abuse Claimants can choose, through their vote, to accept the terms of the settlement. It is their choice. Not Century's.

**I. The Due Process Arguments Are Confirmation Issues and Will Be Addressed in the Notice Program.**

65. Century's arguments about Unknown Abuse Claims and the Additional Debtors' bar date (Century DS Obj. at 38–40) concern whether notice was adequate and whether the Second Group Fund is fair. Both are confirmation questions.

66. As described in the Solicitation Procedures there will be broad notice of the Plan and Confirmation Hearing. Moreover, there will be broad notice of the Additional Debtors' Bar Date. The claims of Unknown Abuse Claimants arose before the Petition Date and there was already broad notice of the Bar Date in the Diocese case.

67. Under the circumstances, the Committee believes that the Unknown Abuse Claimants have been afforded due process with respect to the Plan.

### J. The Cabrini Provisions Do Not Affect Whether the Disclosure Statement Can Be Approved.

68. Century's request to take part in negotiations over the disposition of Cabrini Qualifying Proceeds (Century DS Obj. at 35) is not a disclosure objection. Whatever setoff rights Century claims against the Trust are preserved to the extent provided in Plan § 8.8.2(e) and can be raised at confirmation. There is currently no prospect of there being Cabrini Qualifying Proceeds. If there were to be Cabrini Qualifying Proceeds, Century has no special right to negotiate the disposition of those proceeds. Rather it maintains whatever rights it has to argue that it is entitled to a set-off or benefit with respect to such proceeds if they were to ever come into existence.

## RESERVATION OF RIGHTS

69. This Reply addresses the Objections as they relate to approval of the Disclosure Statement, Solicitation Procedures, and Case Management Order. The Committee reserves all rights to respond to any objection to confirmation, to supplement this Reply, and to respond to any further objection to the amended documents. Nothing in this Reply waives any right, claim, or defense of the Committee, the Trust, or any Abuse Claimant against any Non-Settling Insurer, including Century.

**CONCLUSION**

The Committee respectfully requests that the Court (i) overrule the Objections to the extent not resolved by the revisions described in this Reply; (ii) approve the Disclosure Statement, the Solicitation Procedures, and the Case Management Order, as revised, upon the filing of the revised documents; or, alternatively, continue the hearing for the limited purpose of reviewing those filings; and (iii) grant such other and further relief as is just and proper.

Dated: October 9, 2026
New York, NY

PACHULSKI STANG ZIEHL & JONES LLP

By: *Ilan Scharf*
James I. Stang, Esq. (admitted *pro hac vice*)
Ilan D. Scharf, Esq.
Karen B. Dine, Esq.
1700 Broadway, 36th Floor
New York, NY 10017
Telephone: (212) 561-7700
Email: jstang@pszjlaw.com
ischarf@pszjlaw.com
kdine@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*