**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC DIOCESE OF OGDENSBURG, NEW YORK,<br><br>Debtor. | Case No. 23-60507 (PGR)<br><br>Chapter 11 Case |

**CENTURY'S OBJECTION TO APPROVAL OF THE DISCLOSURE STATEMENT IN SUPPORT OF JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC DIOCESE OF OGDENSBURG, NEW YORK AND ADDITIONAL DEBTORS**

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
SAMANTHA M. INDELICATO (*pro hac vice* forthcoming)
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
Email: tschiavoni@omm.com
sindelicato@omm.com

*Attorneys for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America*

## TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....................................................................................1
RELEVANT FACTUAL BACKGROUND....................................................................4
ARGUMENT ..........................................................................................................5

I. THE DISCLOSURE STATEMENT IS INADEQUATE BECAUSE THE PLAN PROPONENTS DID NOT MAKE THE REVISIONS THEY COMMITTED TO MAKE AND IT REMAINS MISLEADING ..........5

A. The Plan Proponents Failed to Implement the Disclosure Statement Revisions They Committed to Make. ..........6

B. The Disclosure Statement Fails to Adequately Disclose Risks ..........11

C. The Disclosure Statement Fails to Adequately Disclose the Basis for and Scope of Third-Party Releases, Injunctions, and Exculpation ..........13

II. APPROVAL OF THE DISCLOSURE STATEMENT IS PREMATURE BECAUSE NOT ALL PLAN DOCUMENTS HAVE BEEN FILED ..........15

III. THE *ALEXANDRIA* DECISION WARRANTS RECONSIDERATION OF THE COURT'S OCTOBER 13 RULING ..........17

IV. CENTURY HAS STANDING TO OBJECT TO THE DISCLOSURE STATEMENT ..........21

RESERVATION OF RIGHTS ..........22
CONCLUSION ..........23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alexander Props., LLC*,
No. 10-38095-NVA, 2011 Bankr. LEXIS 5498 (Bankr. D. Md. Sept. 29, 2011) .................... 22

*In re Allied Gaming Mgmt., Inc.*,
209 B.R. 201 (Bankr. W.D. La. 1997) .................... 18

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) .................... 18

*In re Budd Co., Inc.*,
550 B.R. 407 (Bankr. N.D. Ill. 2016) .................... 12

*In re Cardinal Congregate I*,
121 B.R. 760 (Bankr. S.D. Ohio 1990) .................... 12

*In re Clamp-All Corp.*,
233 B.R. 198 (Bankr. D. Mass. 1999) .................... 16

*In re Copy Crafters Quickprint, Inc.*,
92 B.R. 973 (Bankr. N.D.N.Y. 1988) .................... 18

*In re Diocese of Alexandria*,
No. 25-31257, Dkt. No. 465 (Bankr. W.D. La. Oct. 26, 2026) .................... passim

*In re Ferretti*,
128 B.R. 16 (Bankr. D.N.H. 1991) .................... 11

*In re Medley*,
58 B.R. 255 (Bankr. E.D. Mo. 1986) .................... 15

*In re Roman Catholic Archbishop of Baltimore*,
No. 23-16969-MMH, ECF No. 2813 (Bankr. D. Md. Aug. 4, 2026) .................... 3

*In re The Diocese of Camden, New Jersey*,
No. 20-21257-JNP, Dkt. No. 530 (Bankr. D.N.J. Mar. 26, 2021) .................... 18

*In re Tonawanda Coke Corp.*,
No. 18-12156 CLB, 2024 Bankr. LEXIS 2032 (Bankr. W.D.N.Y. Aug. 27, 2024) .................... 20

*Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*,
848 F.2d 414 (3d Cir. 1988) .................... 11

*Phillips v. Ottey*,
2016 WL 6582647 (D. Md. Nov. 7, 2016) .................... 17

*Porter Hayden Co. v. Bullinger*,
350 Md. 452 (Ct. of Appeals 1998) .................... 16

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
81 F.3d 355 (3d Cir. 1996) .................... 11

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Shrader v. CSX Transp., Inc.*,
70 F.3d 255 (2d Cir. 1995) ........................................ 22

**Rules**

Fed. R. Civ. P. 54(b) ........................................ 22

Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century") files this objection (this "Objection") to the *Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Ogdensburg, New York and Additional Debtors, Dated October 30, 2026* [Dkt. No. 1480] (the "Disclosure Statement").[1] In accordance with this Court's instruction[2], this Objection is directed to the changes made to the Disclosure Statement, the changes that were promised but not made, and is also a request for reconsideration in light of an intervening decision denying approval of a disclosure statement describing a plan with similar features as patently unconfirmable. In support of this Objection, Century respectfully states as follows:

## PRELIMINARY STATEMENT

The October 13 hearing ended with the Plan Proponents being directed to "take that basket of edits" promised at the hearing and return with a redline that addressed the objections, including Century's objections. The redline filed on October 30 did not deliver what was promised. The Plan Proponents left untouched defects and misleading disclosures that the Court was told would be addressed but have not been.

For example, the Committee represented at the October 13 hearing that an untimely claim "will not be brought as a litigation claim." Oct. 13 Hr'g Tr. at 48:10-12; *see also id.* at 47:15-48:2. Even so, the Court understood Century's concern and "wouldn't begrudge [Century] . . . for not

---

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Disclosure Statement or the *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Ogdensburg, New York and Additional Debtors, Dated October 30, 2026* [Dkt. No. 1479] (the "Plan"). The "Allocation Protocol" is filed as Plan Supplement, Exhibit 1 [Dkt. No. 1481-1].

Century incorporates by reference *Century's Objection to Approval of the Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Ogdensburg, New York and Additional Debtors* [Dkt. No. 1450] (the "Prior Disclosure Statement Objection"). This Objection seeks to focus on the revisions the Plan Proponents committed to make but did not, together with defects introduced by the revisions to the Plan.

[2] *See* Transcript of Hearing Held Oct. 13, 2026 ("Oct. 13 Hr'g Tr."), at 120:11-14.

taking [the Committee] at its word." Oct. 13 Hr'g Tr. at 48:5-7. The Court ultimately relied on the Committee's representation in addressing Century's section 502 objection. But there are no changes in the Plan or Disclosure Statement to clarify that time-barred claims will not be allowed or released to the tort system. "Abuse Claim" is still defined to include time-barred claims. *See* Plan, § 1.1.3. Nor did the Committee make any changes to preclude the allowance of claims previously enjoined and released such as Boy Scouts claims or that are otherwise legally non-cognizable.

As another example, the Plan Proponents represented at the October 13 hearing that they do not seek through confirmation of the Plan a finding approving the Plan as a settlement under Rule 9019 or a good faith finding that goes beyond the phrasing of section 1129. Yet, no revision has been made to the Disclosure Statement clarifying that the only Rule 9019 findings sought would be with respect to the insurer settlements.

These are just two examples where the Plan Proponents agreed to make changes to the Plan and/or Disclosure Statement but failed to do so. They represented to the Court that the revised documents would implement those changes but as the U.S. Trustee warned, "a promise to revise is not a revision." Oct. 13 Hr'g Tr. at 24:24-25. That proved true. There are many changes that the Plan Proponents agreed to in the filings and on the record that are not incorporated, as discussed in Section I.A below.

The Plan Proponents also represented that they would supplement their risk disclosures based on the objections, which was not done. In light of this, Century proposes that it be permitted to include with the Disclosure Statement the insert attached hereto as **Appendix A**, describing the insurance risk factors identified by Century.

With respect to missing documents that were addressed at the hearing, none of the insurer settlements that are touted as a centerpiece of the Plan have been filed or disclosed, leaving the Court without any ability to assess the adequacy of disclosure of a key aspect of the Plan.

After the October 13 hearing, the bankruptcy court in the *Diocese of Alexandria* bankruptcy denied approval of a diocesan disclosure statement describing a plan with many of the same features at issue here as patently unconfirmable. Century respectfully requests that the Court reconsider its denial of Century's objections based on this subsequent decision. As is the case here, the plan of reorganization in the *Diocese of Alexandria* bankruptcy (1) conditioned litigation implicating insurance on trustee authorization; (2) deemed recoveries assigned to the trust; (3) assigned insurance interests that the debtor did not own; and (4) characterized the plan as a global compromise. The court held that these are "substantive legal defects, not deficiencies that additional disclosure can cure." *In re Diocese of Alexandria*, No. 25-31257, Dkt. No. 465, at 1 (Bankr. W.D. La. Oct. 26, 2026) (the "*Alexandria* Decision").

The *Alexandria* Decision follows the August decision in the *Archbishop of Baltimore* bankruptcy, where Judge Harner held that it is "a futile waste of precious estate resources to solicit votes on a plan that cannot satisfy section 1129 of the Bankruptcy Code, whether because the plan's terms conflict with applicable law, are insufficient under applicable law, or extend beyond the permissible bounds of the Bankruptcy Code and the jurisdiction of this Court." *In re Roman Catholic Archbishop of Baltimore*, No. 23-16969-MMH, ECF No. 2813, at 1-2 (Bankr. D. Md. Aug. 4, 2026) (the "*Baltimore* Decision").

While this Objection focuses on disclosure issues, Century respectfully asks this Court to reconsider its October 13 ruling in light of the *Alexandria* Decision. The Court should require, at

a minimum, that the Plan Proponents correct any Plan defects and add Century's proposed risk factors.

## RELEVANT FACTUAL BACKGROUND

On August 31, 2026, the Plan Proponents filed the prior disclosure statement [Dkt. No. 1395] and on September 1, 2026, they filed the prior plan [Dkt. No. 1396]. The Allocation Protocol and Trust Agreement were filed as part of the Plan Supplement. [Dkt. No. 1431]. Other plan documents, including the release agreement, litigation claimant agreement, liquidation analysis, and financial projections were withheld until after the objection deadline. *See* Dkt. Nos. 1455, 1457. Century filed the Prior Disclosure Statement Objection addressing significant issues with the Plan terms. The Diocese [Dkt. No. 1454] (the "Diocese Reply") and the Committee [Dkt. No. 1458] (the "Committee Reply") filed replies in support of the prior disclosure statement on the eve of the hearing and each committed to specific revisions at the October 13 hearing.

During the October 13 hearing, the Plan Proponents noted revisions they would make to the Plan and Disclosure Statement to address certain objections. The Court overruled the patently unconfirmable objections without prejudice, adjourned approval of the Disclosure Statement, directed the Plan Proponents to file a revised disclosure statement and plan, and set related deadlines.

On October 30, the Plan Proponents filed redlines of the proposed changes to the revised Plan and Disclosure Statement. *See* Dkt. No. 1476. On November 2, the Plan Proponents filed the revised Disclosure Statement, Plan, and Plan Supplement. *See* Dkt. Nos. 1479 (Plan), 1480 (Disclosure Statement), 1481 (Plan Supplement). The structure and key terms are unchanged. The principal revisions are: (i) reduction of the DOO Entities' Cash Payment from $45 million to $44 million, now subject to a new credit for Committee professional fees; (ii) addition of Evanston and

International as Settling Insurers; (iii) removal of the Contributing Non-Debtor Entities from the definition of Released Parties; (iv) deletion of the Unknown Abuse Claim Fund and the Insurance Recovery Sub-Fund; (v) moving the Additional Debtors Abuse Claim Bar Date to the first day of the Confirmation Hearing; and (vi) incorporating changes requested by the Settling Insurers. *See* Plan, §§ 1.1.3, 1.1.11, 1.1.76, 1.1.112, 1.1.123, 1.1.171, 1.1.178.

The Disclosure Statement was modified to (i) add one sentence to Article 19.H that Non-Settling Insurers have asserted anti-assignment defenses and resolution of Abuse Claims through the Allocation Protocol breaches policy conditions, and that "[s]uch coverage litigation has the potential to delay or reduce distributions"; (ii) identify Century as a Non-Settling Insurer; (iii) add a risk factor stating that the Confirmation Order may be appealed; and (iv) reflect the revised funding figures. *See* Disclosure Statement, Arts. 1, 19.H, 19.I. But the Plan Proponents did not make other revisions they committed to making both in their filings and on the record.

The remaining features of the Plan described in the Prior Disclosure Statement Objection, including the undisclosed allocation of the DOO Entities' Cash Payment, the subordination of the insurance neutrality provision to Section 8.8.4, the Channeling Injunction, the deemed releases in Section 12.9, the exculpation in Section 12.12, the treatment of Inbound Contribution Claims, and the conditions precedent in Section 11.1 are all unchanged in substance. *See* Prior Disclosure Statement Objection, at 3-9.

## ARGUMENT

### I. THE DISCLOSURE STATEMENT IS INADEQUATE BECAUSE THE PLAN PROPONENTS DID NOT MAKE THE REVISIONS THEY COMMITTED TO MAKE AND IT REMAINS MISLEADING.

The adequacy of a disclosure statement is measured against the plan it actually describes, not the plan its proponents say they will file. During the October 13 hearing and in their filings, the Plan Proponents treated at least some revisions to the Plan and Disclosure Statement as

necessary. The Diocese, for example, represented that it would "insert appropriate language into the Disclosure Statement to address these requests," and argued that doing so "moots these portions of the Century DS Objection." Diocese Reply, ¶ 88. Where the promised language was not inserted, nothing has been mooted.

### *A. The Plan Proponents Failed to Implement the Disclosure Statement Revisions They Committed to Make.*

In the Diocese Reply and the Committee Reply, as well as at the October 13 hearing, the Plan Proponents agreed to make a series of changes to the Disclosure Statement and Plan to address objections raised by both Century and the U.S. Trustee. But the redlines do not include all of those changes.

At the October 13 hearing, the Court pressed the Plan Proponents on what would happen to a claim that Century contends is untimely. The Court observed that it "wouldn't begrudge Mr. Schiavoni, with all due respect, for not taking you at your word," and Committee counsel responded on the record: "we can clarify that that would not be brought as a -- as a -- an untimely-filed claim will not be brought as a litigation claim . . . it's not an issue in this case." Oct. 13 Hr'g Tr. at 48:5-14. The Court then relied on that representation in addressing Century's section 502 objection, asking: "we have now Mr. Scharf's representation that they would not be pursuing a time-barred claim as a litigation claim. So with those two provisos, how is Century prejudiced . . . ?" *Id.* at 84:17-22; *see also id.* at 88:10-13. Century responded that it would "feel a little better when I see it in writing." *Id.* at 88:14-16.

It is not in writing. The only related change is a proviso excluding holders of Post-Statute Filed Abuse Claims from becoming Litigation Claimants, a category defined by filing date alone. *See* Plan, §§ 1.1.123, 1.1.159. That proviso does not reach the claims Century identified as time-

barred. To the contrary, the Plan affirmatively sweeps those claims into the Trust. The Disclosure Statement does not tell creditors that the Committee's representation was not carried into the Plan.

The time-bar representation was not the only one. The Diocese asked the Court to defer approval of the Disclosure Statement so that it could "take that basket of edits" and "present to the Court . . . a redline document that addresses those issues." Oct. 13 Hr'g Tr. at 31:5-8. The Diocese Reply represented that, "[a]lthough the Diocese disputes that any of these items renders the Disclosure Statement inadequate," the Diocese would "insert appropriate language into the Disclosure Statement to address these requests." Diocese Reply, ¶ 88. The Committee likewise promised that "[t]he Plan Proponents will describe Century's position fairly and identify it as Century's." Committee Reply, ¶ 24. As the U.S. Trustee warned, "a promise to revise is not a revision." Oct. 13 Hr'g Tr. at 24:22-25:4. The following committed revisions were not made or were made inadequately:

***Sections 8.8.2 and 8.8.4***. The Diocese told the Court that Century "reads [Section 8.8.4] backwards," because Section 8.8.4 is "intended solely to ensure that the Plan leaves intact and does not alter or affect any rights or interests of the Non-Settling Insurers" and "does not cut back any protection afforded to Non-Settling Insurers." Diocese Reply, ¶ 58. If that is how the provisions are meant to operate, the Plan does not say so. Section 8.8.4 is unchanged; it still provides that nothing in Section 8.8.2 shall "impair the effectiveness of any provision of the Plan, including . . . the Channeling Injunction, the Settling Insurer Injunction, or any other release or injunctive provisions," and Sections 8.8.2(d) and (e) remain "subject to Section 8.8.4." Plan, §§ 8.8.2(d)-(e), 8.8.4. The Disclosure Statement does not explain how the two provisions interact and does not disclose the Diocese's stated reading of them. *See* Disclosure Statement, Art. 9.

***Rule 9019 Request***. The Diocese represented that it "does not seek a finding that the Joint Plan is itself a compromise or settlement." Diocese Reply, ¶ 70. "[T]he Diocese does not seek a finding that the joint plan is itself a compromise or settlement, and Article 21 of the plan does not ask the Court to deem the joint plan a settlement of every abuse claim or to adjudicate any individual abuse claim or the Diocese's aggregate liability; rather, it seeks approval of the specific compromises and settlements identified in the joint plan, including the insurance settlement agreements with the settling insurers." Oct. 13 Hr'g Tr. at 51:18-52:2. Century was explicit: "Let's clarify it and make it clear like that" and noted that "the plan, right now, does not say that." Oct. 13 Hr'g Tr. at 91:24-92:1, 92:16-17. The Committee represented that the request would be limited to "specific settlements embodied in the Plan" and would "state that no finding is intended to enlarge or diminish Non-Settling Insurers' rights in coverage litigation." Committee Reply, ¶ 61. Article 21 is unchanged; it still requests approval "of all compromises and settlements included in the Plan or contemplated," with no limitation. Disclosure Statement, Art. 21.

***Insurance-Related Risks***. The Diocese committed to "supplement Article 19 of the Disclosure Statement to further describe the Non-Settling Insurers' asserted coverage defenses, including their contention that resolution of Abuse Claims through the Allocation Protocol breaches policy conditions, the Non-Settling Insurers' asserted anti-assignment defenses to the Insurance Claims Assignment, and the potential for coverage litigation to delay or reduce distributions, together with the Plan Proponents' position that such contentions lack merit." Diocese Reply, ¶ 89. The promise was to *describe* the defenses. The result is a single sentence in Article 19.H that names them and then pronounces them meritless. *See* Disclosure Statement, Art. 19.H. It does not describe the defenses, explain what happens to Trust recoveries if the anti-assignment defense or the policy-condition defense succeeds, or estimate the effect of either on

distributions. Article 19.J (formerly 19.I) is otherwise unchanged. The deficiencies identified in Section IV.B of the Prior Disclosure Statement Objection therefore remain. *See* Prior Disclosure Statement Objection at 48-52.

***Contributing Non-Debtor Entities***. The Diocese Reply represented that "there will not be any Contributing Non-Debtor Entities." Diocese Reply, ¶ 86. At the hearing, Diocese counsel described that statement as "imprecise," identified two Contributing Non-Debtor Entities (Catholic Charities of the Diocese of Ogdensburg and St. Joseph's Home), represented that neither is "seeking to be included in the channeling injunction and releases," and promised that the "redline will address that issue and just take it off the table." Oct. 13 Hr'g Tr. at 40:18-41:15. The Committee represented that "the Contributing Non-Debtor Entities are not receiving releases pursuant to the Plan." Committee Reply, ¶ 11. The redline removed them from the definition of Released Parties but did not take the issue off the table. The Contributing Non-Debtor Entities remain listed on Exhibit E and remain Covered Parties, Diocese Settling Parties, and Exculpated Parties. Plan, §§ 1.1.60, 1.1.63, 1.1.69, 1.1.93. They still pay "in consideration for the releases set forth herein, including the release of the Estate Causes of Action," *see* Plan, § 8.2.2, and Section 12.15 still has the Diocese and the Additional Debtors release all Estate Causes of Action against them "in consideration for the Contributing Non-Debtor Entity Contribution." Plan, § 12.15. The Disclosure Statement still describes the DOO Entities' Cash Payment as funded in part by these entities and describes their contributions as "made in exchange for the releases and channeling injunctions provided under the Plan." Disclosure Statement, Arts. 1, 19.K. The Disclosure Statement does not identify what each entity contributes or what claims are released.

***Cash Payment Reduction***. The Diocese committed to "state the resulting amount of the DOO Entities' Cash Payment." Diocese Reply, ¶ 90; *see also* Committee Reply, ¶ 36. The Plan

states $44,000,000 but then provides that the payment "will be reduced by the amount of any payments made during these Chapter 11 Cases for professional fees incurred by the Committee after the Initial Plan Filing Date." Plan, § 1.1.76. The Disclosure Statement neither quantifies nor estimates that credit, so creditors still cannot tell what the Diocese will actually pay.

***U.S. Trustee Statement and Additional Debtor Count***. The Diocese committed to "remove the statement that the U.S. Trustee 'has not played a particularly active role' in this case." Diocese Reply, ¶ 26. The statement remains verbatim. *See* Disclosure Statement, Art. 19.K. The internal inconsistency between "86 parishes and other Catholic entities" and "79 Parishes and Catholic Ministry Entities," each keyed to the same Exhibit A, also remains. *See* Disclosure Statement, Arts. 1, 2.C.

***Trust Agreement Conformity***. In response to the U.S. Trustee, the Diocese conceded that the Trust Agreement's references to a "Claim Litigation Protocol" that does not appear in the Plan were "drafting conformity points that will be addressed in the Plan Supplement." Diocese Reply, ¶ 19. The Trust Agreement filed with the November 2 Plan Supplement still requires that "[a]ll Abuse Claims shall be resolved exclusively in accordance with the Allocation Protocol and the Claim Litigation Protocol," and still conditions Distributions on that undefined protocol. *See* Plan Supp. Ex. 3 §§ 1.2, 4.1, 4.3(a), 7.2(b). The Trust Agreement, Abuse Claim Release Agreement, Litigation Claimant Agreement, and Allocation Protocol all continue to recite that they implement the plan "dated August 31, 2026," not the current Plan. Plan Supp. Exs. 1 § 1.1, 2, 3, 6.

***Plan Supplement and Remaining Disclosures***. The Non-Monetary Commitments, the List of Assumed Contracts and Leases, the DOO Trust Note, and the form of Insurance Settlement Agreement still "will be filed at a later date." Plan Supplement, at 2 [Dkt. No. 1481]. And the Plan Proponents did not address the requested disclosure of estimated per-claimant recoveries, the

Abuse Claims Reviewer's compensation and independence, the DOO Entities' Post-Effective Date Costs Reserve thresholds, or the Cabrini Qualifying Proceeds. These deficiencies are addressed in Sections III and IV.E-G of the Prior Disclosure Statement Objection, which Century incorporates by reference. *See* Prior Disclosure Statement Objection at 41-45, 53-58. Each of those deficiencies goes to the adequacy of information in the Disclosure Statement.

### *B. The Disclosure Statement Fails to Adequately Disclose Risks.*

The Disclosure Statement lacks "adequate information" to enable holders of Abuse Claims to make an informed judgment about the material risks presented by the Plan and how the provisions of the Insurance Policies will implicate distributions.[3] The importance of providing "adequate information" is particularly true with respect to material, known risks that may affect the debtor's reorganization or ability to satisfy claims.[4] The disclosure statement is meant to function as the means by which creditors are provided with "all pertinent information bearing on the success or failure of the proposals in the plan of reorganization," and it "should likewise contain all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization."[5]

While the Disclosure Statement contains some risk factors associated with the confirmability of the Plan and describes, at a high level, certain objections to confirmation that could be raised by parties in interest, the level of detail provided about specific, material insurance-related risks under the Plan is inadequate.

---

[3] 11 U.S.C. § 1125(a)(1); *see Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir. 1988).

[4] *See In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

[5] *In re Budd Co., Inc.*, 550 B.R. 407, 412 (Bankr. N.D. Ill. 2016) (quoting *In re Cardinal Congregate I*, 121 B.R. 760, 765-66 (Bankr. S.D. Ohio 1990)).

The Plan Proponents agreed to at least two additional disclosures regarding insurance assignment risk and the risk of appeal.

***Insurance Assignment Risks***. The Disclosure Statement does not adequately discuss the risks associated with the proposed assignment of insurance rights. The Plan provides that, on the Effective Date, the Diocese and the abuse claimants "will be deemed to have assigned to the Trust their respective rights, if any, to all Insurance Claims against the Non-Settling Insurers," and that each Additional Debtor "will assign to the Trust the Additional Debtors' rights, if any, to all Insurance Claims against the Non-Settling Insurers."[6] It further provides that, if the Bankruptcy Court determines that the Insurance Claims Assignment is inconsistent with the Bankruptcy Code, the Diocese, the abuse claimants, and each affected Additional Debtor "will retain their respective Insurance Claims against the Non-Settling Insurers" and, to the extent reasonably requested by the Trust, the Diocese or an Additional Debtor will assert those retained claims.[7]

The Disclosure Statement recognizes that "Non-Settling Insurers may object to confirmation of the Plan by asserting that the Plan impermissibly alters contractual rights, duties, and obligations under its Insurance Policies."[8] If the insurers prevail on their objections, "the Bankruptcy Court might find that the Plan is not feasible or otherwise not confirmable."[9] Yet the Disclosure Statement does not explain that this could eliminate the Trust's ability to obtain coverage under those insurance policies or even try to quantify the impact on recoveries if a court determines the insurance rights cannot be assigned.

The Plan Proponents added one sentence to Article 19.H but that does not cure these deficiencies. The Diocese promised to "supplement Article 19 of the Disclosure Statement to

[6] Plan, § 8.2.3(a).
[7] Plan, § 8.2.3(b).
[8] Disclosure Statement, Art. 19.H.
[9] Disclosure Statement, Art. 19.H.

further describe the Non-Settling Insurers' asserted coverage defenses." Diocese Reply, ¶ 89. The new language merely names those defenses, states that coverage litigation "has the potential to delay or reduce distributions," and then gives the Plan Proponents' conclusion that the defenses lack merit. *See* Disclosure Statement, Art. 19.H. Stating one side's conclusion is not describing the risk. The new language does not describe what the defenses are, what happens to recoveries if the anti-assignment defense succeeds, or the magnitude of the risk.

***Risk of Appeal***. The Diocese committed to add a risk factor disclosing that parties may appeal the Confirmation Order and that any appeal could delay the Effective Date and distributions, and the Committee likewise committed to add language regarding the risk of an appeal. *See* Diocese Reply, ¶ 92; Committee Reply, ¶ 39; *see also* Oct. 13 Hr'g Tr. at 56:3-6. The result is new Article 19.I, which states in two sentences that "[o]ne or more parties may appeal the Confirmation Order" and that, because the Effective Date is conditioned on the Confirmation Order and Sale Order(s) becoming Final Orders, "any such appeal could delay the occurrence of the Effective Date and distributions to holders of Abuse Claims." Disclosure Statement, Art. 19.I. It does not identify the issues likely to be appealed, including the Insurance Claims Assignment, the channeling of Insurer Contribution Claims, the delayed discharge, and the scope of the injunctions, nor does it give any estimate of how long appellate review could delay distributions. The Disclosure Statement should include at least this type of information with respect to the risk of appeal to satisfy the "adequate information" standard.

### *C. The Disclosure Statement Fails to Adequately Disclose the Basis for and Scope of Third-Party Releases, Injunctions, and Exculpation*

The Plan contains broad third-party releases, a Channeling Injunction, an exculpation provision, and a gatekeeper injunction — each of which has profound consequences for Class 4 Claimants' rights against non-debtor parties. The Disclosure Statement does not adequately

explain the legal effect of these provisions or what rights Class 4 Claimants will permanently lose upon Plan confirmation.

Most critically, the Disclosure Statement does not explain that Class 4 Claimants will have no mechanism to consent to, or opt out of, the releases of their claims against non-debtor parties. The Plan releases are not conditioned on an affirmative vote in favor of the Plan. A claimant who votes to reject the Plan — or who does not vote at all — will nevertheless be deemed to have released claims against Released Parties upon confirmation. Plan, § 12.9. This consequence is not disclosed to creditors in plain terms anywhere in the Disclosure Statement.

The definition of "Related Person" in Section 1.1.168 of the Plan is extraordinarily broad, encompassing predecessors, successors, assigns, shareholders, members, affiliates, subsidiaries, employees, agents, brokers, adjusters, managing agents, claims agents, officers, directors, trustees, partners, attorneys, and more. Plan, § 1.1.168. The Disclosure Statement does not explain in plain language what it means for Class 4 Claimants to release claims against this universe of persons and entities, or provide any illustrative examples of who falls within this definition. Creditors evaluating their vote are entitled to understand the full scope of what they are being asked to relinquish.

Nor does the Disclosure Statement explain the continuing role of the Contributing Non-Debtor Entities, which remain on <u>Exhibit E</u> and continue to make contributions "in consideration for the releases set forth herein," even though they have been removed from the definition of Released Parties. Plan, §§ 1.1.60, 1.1.171, 8.2.2. The Disclosure Statement also continues to describe the Additional Debtors inconsistently, as "86 parishes and other Catholic entities" in Article 1 and "79 Parishes and Catholic Ministry Entities" in Article 2.C.

The scope and consequences of the deemed release under Section 12.9 of the Plan, the exculpation under Section 12.12, and the gatekeeper injunction under Section 12.13 are not described in plain English in the Disclosure Statement. Plan, §§ 12.9, 12.12, 12.13. Creditors — including self-represented abuse survivors — cannot reasonably be expected to understand the import of these provisions without accessible guidance. A disclosure statement that requires creditors to parse dense plan provisions on their own does not satisfy the adequate information standard of section 1125.

## II. APPROVAL OF THE DISCLOSURE STATEMENT IS PREMATURE BECAUSE NOT ALL PLAN DOCUMENTS HAVE BEEN FILED.

A disclosure statement hearing should not proceed while the underlying plan remains a moving target. Bankruptcy Rule 3017(d) contemplates transmission of the entire approved disclosure statement. And Bankruptcy Rule 3017(a) requires meaningful notice after a complete disclosure statement is provided. Leaving core documents for later supplementation deprives creditors of the opportunity to evaluate the Plan as a whole and makes solicitation premature. *See In re Medley*, 58 B.R. 255, 256 (Bankr. E.D. Mo. 1986); *In re Clamp-All Corp.*, 233 B.R. 198, 206 (Bankr. D. Mass. 1999).

The Plan Supplement is still missing several key documents, and the Plan Proponents noted those documents "will be filed at a later date." *See* Plan Supplement, at 2. The form of Insurance Settlement Agreement governs the sale or settlement of insurance rights and the releases and injunctions afforded to Settling Insurers. The DOO Trust Note governs a substantial portion of the DOO Entities' Cash Payment. The Non-Monetary Commitments contain the Diocese's post-Effective Date commitments concerning healing, reconciliation, and prevention. Without these documents, the Court cannot evaluate whether and to what extent the Disclosure Statement

describes a plan that is patently unconfirmable or whether the disclosure of the Plan's risks is misleading.

The insurance settlements and the Plan are symbiotic. *See* Oct. 13 Hr'g Tr. at 63:15-18 ("the insured [*sic*] settlement agreements and the plan are symbiotic when we get to confirmation. I mean, you know, you can't have one without the other."); *see also id.* at 66:2-3 ("the plan and the settlement agreements are symbiotic"). When the documents are integral to the very structure of the Plan and how it is intended to operate, such documents must be disclosed prior to approval of the Disclosure Statement.

Nothing whatsoever was filed for the insurance settlements, which are presented as the centerpiece of the funding for the Plan.

Whatever document that memorializes the insurance settlements—whether a term sheet, memorandum of understanding, stipulation or exchange of letters—is not privileged. *See Porter Hayden Co. v. Bullinger*, 350 Md. 452, 466 (Ct. of Appeals 1998) ("Given the broad scope and purpose of Maryland's discovery rules, the relevancy of the amounts of the settlements to the damages petitioners were required to pay, the fact that the settlement agreements are not privileged, and the persuasive authority from other jurisdictions, we conclude that the relevant portions of such settlement agreements are discoverable."); *see also Phillips v. Ottey*, 2016 WL 6582647, at *3 (D. Md. Nov. 7, 2016) (holding confidential settlement agreement relevant, not privileged and discoverable, and noting the Fourth Circuit does not recognize a settlement privilege).

The information contained in the withheld documents is of enormous substantive significance. All parties in interest are also materially impacted by the insurance settlements. While the Committee touts what it says is the amount of the insurance settlement, nothing whatsoever else is disclosed. None of the terms and conditions are disclosed or even whether a

binding term sheet has been signed. As a matter of law, the Court cannot assess the adequacy of the disclosure of the insurer settlements without the operative document memorializing such settlements.[10]

## III. THE *ALEXANDRIA* DECISION WARRANTS RECONSIDERATION OF THE COURT'S OCTOBER 13 RULING

The *Alexandria* Decision issued thirteen days after this Court's ruling, analyzes a diocesan plan built on the same architecture as this one, and identifies four facial defects that are present here. Century does not contend that the *Alexandria* Decision binds this Court, but it is persuasive authority addressing the precise structure at issue here. At a minimum, it warrants consideration as a supplemental objection.[11]

In *Alexandria*, the court denied approval of the disclosure statement because the plan (i) restricted litigation against non-debtors whenever a claim "implicates" insurance coverage by conditioning prosecution on trustee authorization and a litigation agreement; (ii) deemed recoveries on abuse claims "assigned to the Plan Trust"; (iii) assigned "insurance interests" without limiting the assignment to rights the debtor itself owned, despite non-debtor parishes being co-insureds; and (iv) characterized the plan as an "integrated and global good faith compromise and settlement."[12] *Alexandria* Decision, at 4-11. The court held these are "substantive legal defects,

---

[10] In the *Boy Scouts of America* bankruptcy, it was belatedly disclosed that Hartford inserted a "most favored nation" clause in its term sheet that required the estate to reduce its settlement amount based on funding provided by others, making the Hartford settlement largely illusory and which led to the withdrawal of that settlement and collapse of the plan it was to accompany. Disclosure and production of the alleged settlement terms and conditions is of vital importance and has a material impact.

[11] Century recognizes that the Court limited objections to "the adequacy of the information, not to the plan terms." Oct. 13 Hr'g Tr. at 120:11-14. The Court also preserved the parties' rights to re-raise patent unconfirmability arguments. *Id.* at 117:22-25. Century raises the *Alexandria* Decision here because it was issued after the October 13 hearing. To the extent the Court declines to consider these objections, Century respectfully requests that this Section III be treated as a motion for reconsideration.

[12] Bankruptcy courts have denied approval of a disclosure statement where the plan it describes is patently unconfirmable. *See, e.g.*, *Alexandri*a Decision, at 3 ("Although disclosure adequacy is ordinarily the principal inquiry at this stage, a bankruptcy court need not approve a disclosure statement when the plan it supports is patently unconfirmable on its face."); *Baltimore* Decision, at 1-2; *In re The Diocese of Camden, New Jersey*, No. 20-21257-

not deficiencies that additional disclosure can cure," and that the plan's general insurance-neutrality language "does not cure that defect." *Id.* at 1, 10.

***Trustee-Controlled Litigation***. In *Alexandria*, the plan conditioned any litigation that "implicates" insurance on trustee authorization and a litigation agreement. *See Alexandria* Decision, at 4-11. The Plan does the same. An Abuse Claim may be litigated only if the Trustee, "after notice to the Diocese, believes in good faith" the claim is covered by a Non-Settling Insurer and authorizes it, Plan, §§ 1.1.122, 1.1.123, 4.6.1(a); the claimant must first sign a Litigation Claimant Agreement, *id.* § 4.6.1(b); and the Trustee has "sole discretion" to authorize the claim, decide whether it is pursued, and control its "management and timing," *id.* § 4.6.1(e). The injunctions bar all other litigation. *Id.* §§ 12.2.3(a), 12.3.

***Deemed Assignment of Recoveries***. The *Alexandria* plan deemed recoveries on abuse claims "assigned to the Plan Trust." *See Alexandria* Decision, at 4-11. Here, "[a]ny recovery (including payment of a judgment or an unpaid judgment) from the prosecution of a Litigation Claim is deemed assigned to the Trust to the extent provided in the Plan," Plan, § 4.6.1(d); any judgment "will be turned over to the Trust," *id.* § 12.3; and Class 4 Claimants "will be deemed to have assigned to the Trust their respective rights, if any, to all Insurance Claims against the Non-Settling Insurers and recoveries on account of such Insurance Claims," *id.* § 8.2.3(a).

***Assignment of Insurance Interests the Debtor Does Not Own***. The *Alexandria* plan assigned "insurance interests" without limiting the assignment to rights the debtor owned, even

---

JNP, Dkt. No. 530 (Bankr. D.N.J. Mar. 26, 2021) (bench ruling); *see also In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed"). The Plan Proponents' own authorities agree: a disclosure statement should be disapproved where the plan's defects "could not be cured by voting and where the pertinent material facts are either not at issue or have been fully developed at the disclosure statement hearing." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) (cited at Diocese Reply, ¶ 13); *see In re Am. Capital Equip., LLC*, 688 F.3d 145, 154-55 (3d Cir. 2012) (cited at Committee Reply, ¶ 4).

though non-debtor parishes were co-insureds. *See Alexandria* Decision, at 4-11. Here, the assignment reaches the rights of Class 4 Claimants and of each (yet to file) Additional Debtor. Plan, § 8.2.3(a); Disclosure Statement, Art. 1. "Insurance Claims" are defined to include claims "held by the Diocese, the Additional Debtors or any other Diocese Settling Party," Plan, § 1.1.108, a term that still includes the Contributing Non-Debtor Entities, *id.* § 1.1.69. And the Plan's "Covered Party" definition sweeps in every person "otherwise entitled to insurance coverage under the Insurance Policies." *Id.* § 1.1.63. The assignment is "effective to the maximum extent permissible under applicable law," precisely the kind of general qualifier *Alexandria* held insufficient. *See id.* § 8.2.3(a).

***<u>Global Compromise</u>***. The *Alexandria* plan characterized itself as an "integrated and global good faith compromise and settlement." *Alexandria* Decision, at 10-11. The Plan "provides for . . . the settlement of all Abuse Claims," Plan, Intro.; provides that all consideration is distributed "in complete satisfaction, settlement, discharge, termination, and release of, all Abuse Claims," *id.* § 12.2.1; and the Disclosure Statement states that the Plan "furnishes . . . valuable consideration in compromising . . . Claims . . . (including Abuse Claims and the Insurance Coverage Adversary Proceeding)" and requests Rule 9019 approval "of all compromises and settlements included in the Plan or contemplated." Disclosure Statement, Arts. 20.J, 21. The Plan Proponents declined to narrow that request despite committing to do so. *See* Section I.A, *supra*.

As in *Alexandria*, the Plan's neutrality language does not cure these defects. *See Alexandria* Decision, at 9-10. Sections 8.8.2(d) and (e) are "subject to Section 8.8.4," which preserves "the effectiveness of any provision of the Plan, including . . . the Channeling Injunction, the Settling Insurer Injunction, or any other release or injunctive provisions." Plan, §§ 8.8.2, 8.8.4.

"[T]he Court may decline to approve a disclosure statement that aims to solicit votes in favor of an unconfirmable plan." *In re Tonawanda Coke Corp.*, No. 18-12156 CLB, 2024 Bankr. LEXIS 2032, at *3 (Bankr. W.D.N.Y. Aug. 27, 2024). A plan is patently unconfirmable "when it is clear under the law that there is no set of facts under which the plan as proposed may be confirmed." *Alexandria* Decision, at 3. The standard is legal, not evidentiary. The inquiry is whether the plan "contains facial legal defects that make it patently unconfirmable, rather than whether additional disclosure would enable creditors to make an informed judgment about the proposed treatment." *Id.* This inquiry requires analysis of the plan's operative text. And, it requires consideration of the plan as proposed. A debtor should not send an unconfirmable plan out for votes now and amend later. With substantive legal defects, additional disclosures cannot cure such issues. *Id.* at 1. When the problem is what the plan does, rather than what the disclosure statement says, more disclosure is no remedy, and approval should be denied. *Id.* at 1, 11.

Century recognizes the Court's inclination to address all objections at confirmation, but deferral serves no purpose here because confirmability does not turn on facts an evidentiary record can develop. It also will impose an irreversible cost on all parties. In addition to the four *Alexandria* defects, the Plan still (i) imposes a claim-by-claim delayed discharge (Plan, § 12.2.4); (ii) channels Insurer Contribution Claims to a Trust that pays nothing on them (Plan, §§ 8.8.2(e), 12.6.1); (iii) strips parties in interest of the right to object to Class 4 Claims (Plan, § 2.3.4(k)); (iv) defines time-barred claims into the Trust (Section I.A, *supra*); and (v) releases Estate Causes of Action against non-debtor Contributing Non-Debtor Entities (Plan, § 12.15). *See* Prior Disclosure Statement Objection, at 12-41. As in *Alexandria*, each defect appears on the face of the Plan, turns on no disputed fact, and cannot be cured by the vote. *See Alexandria* Decision, at 3, 11.

"It is a waste of all parties' resources for the court to approve such a disclosure statement and set the parties on the course of preparing for a confirmation hearing on a plan that is not legally viable."[13] The *Baltimore* court did exactly that, denying approval of competing disclosure statements because "both proposed plans of reorganization contain certain provisions that render them patently unconfirmable." *Baltimore* Decision, at 1–2. "It is a futile waste of precious estate resources to solicit votes on a plan that cannot satisfy section 1129 of the Bankruptcy Code." *Id.* Soliciting votes on an unconfirmable plan consumes estate resources that would otherwise be available to creditors.

On October 13, the Court found that the objecting parties "have not established that the plan, as proposed, is patently unconfirmable," while emphasizing that "it doesn't mean it is confirmable," and overruling those objections without prejudice. Oct. 13 Hr'g Tr. at 117:16-25. That ruling is interlocutory. The Disclosure Statement has not been approved and the hearing was adjourned. A court may revisit an interlocutory ruling before entry of a final order, and reconsideration is warranted where the movant identifies "controlling decisions or data that the court overlooked" that "might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see* Fed. R. Civ. P. 54(b).

Century respectfully requests that the Court reconsider its October 13 ruling to the extent it overruled Century's patently unconfirmable objections or, alternatively, treat this as a supplemental objection, and deny approval of the Disclosure Statement unless and until the Plan is amended to cure each defect identified by Century and other objecting parties.

## IV. CENTURY HAS STANDING TO OBJECT TO THE DISCLOSURE STATEMENT

Section 1109(b) of the Bankruptcy Code provides that any "party in interest . . . may raise

[13] *In re Alexander Props., LLC*, No. 10-38095-NVA, 2011 Bankr. LEXIS 5498, at *6 (Bankr. D. Md. Sept. 29, 2011).

and may appear and be heard on any issue in a case under this chapter," and Federal Rule of Bankruptcy Procedure 3017(a) entitles parties in interest to object to a disclosure statement. Century has standing to be heard on each of the arguments in this Objection.

The Committee concedes that Century, "as an insurer that may be financially responsible for Abuse Claims, is a party in interest that may appear and be heard under 11 U.S.C. § 1109(b) on issues that impact them." Committee Reply, ¶ 22. The issues raised herein go directly to Century's rights: the Plan authorizes time-barred claims to be litigated against Century's policies, assigns rights under those policies to the Trust, and asks the Court to make findings the Plan Proponents intend to use in coverage litigation. Those are precisely the "issues that impact" Century. Century has standing and its objections to the Disclosure Statement and Plan must be heard.

## RESERVATION OF RIGHTS

Century expressly reserves the right to supplement, amend, or modify this Objection, whether or not the bases for such objections are expressly referred to herein. Further, Century reserves the right to join in any argument or objection made by other parties relating to adequacy of the Disclosure Statement and confirmability of the Plan. Moreover, nothing contained herein shall be deemed an admission by Century as to the existence of, or coverage under, any insurance policies alleged to have been issued by Century.

Nothing in this Objection shall be construed as a waiver of any rights, claims, or defenses of Century, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise.

## CONCLUSION

For the foregoing reasons and those set forth in the Prior Disclosure Statement Objection, Century respectfully requests entry of an order (i) denying approval of the Disclosure Statement because it fails to provide adequate information as required by 11 U.S.C. § 1125, including because the Plan Proponents failed to implement the revisions they committed to make; (ii) reconsidering the Court's October 13 ruling in light of the *Alexandria* Decision and finding the Plan patently unconfirmable; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: November 10, 2026

Respectfully submitted,

By: */s/ Tancred Schiavoni*

**O'MELVENY & MYERS LLP**
TANCRED V. SCHIAVONI
MICHAEL M. KLOTZ
SAMANTHA M. INDELICATO (*pro hac vice* forthcoming)
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
Email: tschiavoni@omm.com
mklotz@omm.com
sindelicato@omm.com

*Attorneys for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America*

# APPENDIX A

**Century's Proposed Insert For Inclusion in the Disclosure Statement**

Century Indemnity Company as successor to CCI Insurance Company, as successor to Insurance Company of North America (collectively, the "Insurers") contend that this Disclosure Statement does not adequately inform Abuse Claimants and other creditors of Diocese of Ogdensburg and the Additional Debtors about the potential risks relating to the confirmation process, the Joint Plan, and litigation that the Joint Plan contemplates will take place following confirmation of the Joint Plan. The following discussion was prepared by the Insurers. The Plan Proponents do not agree with some or all of the discussion.

1. **Failure to project recoveries**

The Disclosure Statement does not contain adequate information advising any Class 4 Abuse Claimants of the amount of their projected recoveries under the Joint Plan, whether from Trust Distributions, Litigation Claims, or both. Abuse Claimants therefore cannot determine how much, if anything, they are likely to recover if the Joint Plan is confirmed.

2. **The Plan is not "insurance neutral," which could preclude confirmation or give Insurers defenses to insurance claims by Abuse Claimants, thereby reducing recoveries by Abuse Claimants**

Century—whose policies are a potential source of payment for certain Insurance Claims pursued by the Trust—will or may object to the Joint Plan on various grounds, including on the basis that the Plan is not "insurance neutral," that it violates their contractual and legal rights, and that it is not confirmable. Holders of Class 4 Abuse Claims should understand that, if the Court agrees with Non-Settling Insurers' arguments in whole or in part, or if provisions of the Plan are determined to impair coverage or to breach conditions of the Non-Settling Insurer Policies, the Plan may not be confirmed or recoveries from the Non-Settling Insurers—on which total recoveries by Class 4 Abuse Claimants under the Plan substantially depend—may be materially reduced, delayed, or completely eliminated.

3. **The Trust will incur fees and costs that will reduce Trust Distributions to holders of Class 4 Abuse Claims**

The Trustee's current hourly rate is likely to be approximately $[___], and the Abuse Claims Reviewer's current hourly rate is likely to be approximately $[___]. In addition, it is anticipated that the Trust will also retain one or more law firms whose fees and costs will also be paid out of the Trust. The Trust will also pay, from the DOO Entities' Post-Effective Date Costs Reserve, the fees and expenses incurred by Diocese of Ogdensburg and the Additional Debtors in defending Litigation Claims and in connection with the Trust's pursuit of Insurance Claims, which will further reduce amounts available for Distribution.

If the Trust pursues insurance coverage litigation against one or more Insurers, the Plan provides that the fees and costs of such litigation would be paid out of the Trust. Such litigation could be lengthy and involve appeals. The Plan Proponents estimate that the Trust's costs of prosecuting Insurance Claims against Non-Settling Insurers (including counsel and experts) could

total $[___] to $[___]. Those amounts, which could be substantial, would be borne by the Trust and will reduce amounts available for Distribution to Abuse Claimants.

In addition, Abuse Claimants who become Litigation Claimants under the Joint Plan may also be responsible for paying case-related out-of-pocket expenses (like filing fees or expert witness costs) in their individual cases, depending on the specific terms of their retainer agreement with their lawyer and whether they receive an individual settlement or payment of a Litigation Award. These fees and costs would be separate from, and in addition to, the contingency fees charged by lawyers for individual Abuse Claimants on any distribution made by the Trust.

**4. Litigation Claims may not succeed in establishing that Diocese of Ogdensburg is liable to particular Abuse Claimants**

The Joint Plan gives the Trustee discretion over whether and when Class 4 Abuse Claimants may pursue Litigation Claims, for the purpose of obtaining additional recoveries (beyond Trust Distributions) from Non-Settling Insurers. The Non-Settling Insurers who would defend such Litigation Claims are likely to assert factual and legal defenses to Diocese of Ogdensburg's and the Additional Debtors' underlying liability for Abuse Claims. Litigation of the Abuse Claims could take years at Litigation Claimants' own expense. There is no guarantee that any Litigation Claimant will succeed in establishing liability of the Diocese of Ogdensburg or any Additional Debtor.

**5. Lawsuits by Litigation Claimants against Insurers may not be successful, in whole or in part, thereby reducing or eliminating insurance coverage for individual Abuse Claims**

Any Litigation Claimant who obtains a judgment establishing the Diocese of Ogdensburg's or an Additional Debtor's liability for a particular Abuse Claim may then pursue insurance coverage litigation against Non-Settling Insurers in an attempt to collect on the judgment. The Non-Settling Insurer contend that the Non-Settling Insurer Policies condition coverage on, among other things, cooperation by the insured, prompt notice of claims, insurers' consent to any settlements, no voluntary payments, and the insurers' rights to participate in and control the defense. Litigation conducted under the terms of the Joint Plan, under which the Trustee holds consent rights over certain litigation steps and may enter into global settlements, would or might breach these conditions precedent, potentially voiding insurance coverage for some or all Class 4 Abuse Claims and, as a result, bar insurance recoveries by Class 4 Abuse Claimants who become Litigation Claimants.

In addition, whether a Litigation Claimant can recover insurance proceeds depends on both the facts of individual Abuse Claims and the terms of the potentially applicable insurance policies. Recoveries from Non-Settling Insurer Policies are uncertain, in part because the Insurers do or may dispute coverage for particular Class 4 Abuse Claims. Without limitation, the Insurers have asserted or reserved, among others, the following defenses: (i) "expected or intended" defenses to coverage and/or defenses arising from the insureds' knowledge of the proclivities of specific perpetrators of abuse; (ii) failure to satisfy notice conditions; (iii) failure to satisfy no-voluntary-payment, consent-to-settlement, cooperation, and defense-control conditions; (iv) exhaustion of underlying policy limits and other applicable limits, including where other insurers issued shared

or underlying coverage; (v) disputes over the existence, terms, and periods of alleged policies; and (vi) allocation defenses. In addition, Non-Settling Insurers may, for example, assert that a particular claim is not entitled to insurance because a claimant's abuse did not take place during a particular policy's policy periods, did not involve "bodily injury" or "personal injury" as defined in the policy, did not reach the attachment point of a particular policy, or is subject to exclusions included in the policy. There can be no assurance that a Litigation Claimant would be able to recover all or part of any judgment in his or her favor from Non-Settling Insurers or of when any such recovery would be received.

Because recoveries under the Joint Plan depend in part on insurance proceeds, how each individual lawsuit is resolved significantly impacts the recoveries of Class 4 Abuse Claimants. There can be no assurance that any lawsuit seeking insurance coverage from Non-Settling Insurers will be successful. It is also possible that any litigation of insurance coverage issues will be prolonged, delaying recovery from Non-Settling Insurers even if the lawsuit is successful.

**6. Payment by the Trust of Late-Filed and Unknown Abuse Claims, and payment of a legally non-cognizable claims, may dilute or reduce payments to other Abuse Claimants**

Allowance of additional late-filed Claims, and payment of such Claims by the Trust, reduce pro rata recoveries. Creditors should understand that the Joint Plan and Allocation Protocol contain no prohibition on the payment of late-filed claims, time barred claims, enjoined or released claims such as Boy Scout claims; no reserve is established for such claims and any that may be established may prove too low or too high; and that the Non-Settling Insurers contend that legally non-cognizable claims present distinct coverage issues—including timeliness, notice, and proof—that may make insurance recoveries on such claims less likely. These provisions do or may dilute and reduce payments by the Trust to other Abuse Claimants.

**7. The Plan's failure to properly provide for Insurer Contribution Claims may bar confirmation of the Joint Plan**

The Plan seeks to channel Non-Settling Insurers' Insurer Contribution Claims to the Trust, substitutes a judgment-reduction mechanism in place of Non-Settling Insurers' right to pursue Insurer Contribution Claims, and fails to account for defense costs. In *In re Boy Scouts of America*, 137 F.4th 126 (3d Cir. 2025), decided after *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), the U.S. Court of Appeals for the Third Circuit held that a judgment-reduction-only structure could not nonconsensually extinguish insurers' contribution claims, and on remand the plan was revised to require the settlement trust to pay valid contribution claims that could not be satisfied by judgment reduction. Century contends that the language of the judgement reduction clause fails to include mandatory "shall pay" language as required in *Boy Scouts* with respect to contribution claims that could not be satisfied by judgment reduction, instead providing only that the Non-Settling Insurers "do[ ] not waive" their claims or their right to seek affirmative recovery from the Trust. Century contends that the Plan's structure—channeling or extinguishing contribution claims without mandating affirmative recovery from the Trust when judgment reduction does not satisfy the claim—remains impermissible and renders the Plan unconfirmable as proposed.

**8. The Plan does not or may not satisfy the "best interests of creditors" requirement for plan confirmation**

Section 1129(a)(7) of the Bankruptcy Code requires that, in order for a plan to be confirmed, the "best interests of creditors" test be satisfied. This test requires the proponent(s) of a plan to prove, as to each holder of a claim that has not accepted the plan, that such holder(s) will receive or retain under the plan on account of their claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. Because the best interests test is measured claimant by claimant, any single holder of an impaired Claim who does not accept the Plan may put the best interests test at issue, and the Court must find that such holder will receive at least as much under the Plan as in a hypothetical Chapter 7 liquidation. This Disclosure Statement does not project that holders of Class 4 Abuse Claims would fare better under the Plan than in a Chapter 7 case. There is, therefore, a risk that the Plan cannot be confirmed if any Class 4 Abuse Claimant does not accept the Plan.

**9. The Joint Plan's provisions regarding Delayed or Deferred Discharge of Abuse Claims may render the Joint Plan not confirmable**

Under the Joint Plan, Abuse Claims are not discharged on the Effective Date; instead, discharge occurs claim by claim on different "Abuse Claim Discharge Dates" that can extend years past the Effective Date and are keyed to the progress of individual Litigation Claimants' lawsuits against Non-Settling Insurers. Century contends that these provisions violate § 1141(d)(1) of the Bankruptcy Code, which they read to grant a single discharge applicable to all debts on a single date, thus rendering the Plan unconfirmable under Bankruptcy Code § 1129(a)(1).

**10. Century contends that the Joint Plan has not been proposed in good faith as required**

Section 1129(a)(3) of the Bankruptcy Code requires that, in order for a plan to be confirmed, the Bankruptcy Court must find that the plan has been proposed in good faith and not by any means forbidden by law. Century contends or may contend that a plan whose economics depend on litigation devices it characterizes as manufacturing or inflating insurer liability—including the Claim enhancement, the Allocation Protocol's valuation mechanics, the Plan's failure to expressly provide that Non-Settling Insurers may control the defense of Litigation Claims, and the Plan's deferred discharge provisions—and also on Bankruptcy Court approval of the transfer of non-debtors' insurance rights without the consent of the Non-Settling Insurers, cannot satisfy that requirement. *See, e.g.*, *In re American Capital Equipment, LLC*, 688 F.3d 145, 156-58 (3d Cir. 2012) (plan premised on generating insurer liability not confirmable).

**11. Issues with Trust governance may adversely impact Claimant recoveries**

Century contends that the Trustee and the Trust Advisory Committee are not or may not be independent and, if not independent, may be unable to serve without bias. Century contends these features are inconsistent with §§ 1129(a)(5)(A)(ii) and 1123(a)(7) of the Bankruptcy Code, which require that the appointment of post-confirmation fiduciaries be consistent with the interests of creditors and with public policy, and would render the Plan unconfirmable under §§1129(a)(1) and 1129(a)(5) of the Bankruptcy Code.

**12. Claim Enhancement**

The Plan entitles a Litigation Claimant to an enhanced point allocation depending on how far litigation of a particular Litigation Claim progresses. Century contends or may contend that these enhancements incentivize prolonged litigation rather than settlement, impair settlement rights, impermissibly alter contractual cooperation obligations, inflate asserted covered loss beyond that which the policies insure, could vitiate coverage, and cannot bind any Non-Settling Insurer to pay enhanced, non-tort-system amounts. Class 4 Abuse Claimants who elect to not become Litigation Claimants, or who wish to become Litigation Claimants but are not selected by the Trust to become Litigation Claimants, should understand that payment of such enhancements to other Abuse Claimants may dilute their own recoveries. Further, if the enhancement provisions are invalidated, or if they cause coverage litigation to be prolonged or coverage to be lost, net recoveries may be lower than they otherwise would be.

**13. Allocation Protocol Mechanics**

Class 4 Abuse Claimants should review the Allocation Protocol in full. Among its features: Abuse Claims are scored and valued by a single Abuse Claims Reviewer, whose determinations are final and subject only to limited reconsideration; awards may be adjusted by the Claim Enhancements described in the Plan and Allocation Protocol; awards are partially based on the Abuse Claimant's participation as described in the Allocation Protocol; late-filed claims and claims arising out of consensual conduct may receive distributions to the extent provided in the Allocation Protocol, thus diluting and reducing recoveries by other Abuse Claimants; and the Abuse Claims Reviewer exercises broad discretion. Century contends that these features may inflate values above compensable injury and remove adversarial checks, creating insurance-neutrality and insurance-recoverability risk; and it contends the Allocation Protocol contains no anti-fraud protections to ensure that only compensable claims are paid.

**14. The Insurance Claims Assignment Is Contested**

The Joint Plan transfers to the Trust the Insurance Claims of the Diocese, the Class 4 Abuse Claimants, and the Additional Debtors. Century contends that (i) no statutory predicate exists, under the Bankruptcy Code or otherwise, for assigning a non-debtor entity's insurance rights and interests to the Trust over an insurer's objection; (ii) any assignment of insurance contracts or their rights or benefits must also carry the burdens and obligations under those contracts and cannot be used to override consent, cooperation, or defense-control provisions, or anti-assignment rights (other than the initial assignment of the debtor's own interest to the Trust); and (iii) the Trust may therefore acquire less than the Joint Plan assumes, or nothing, as to particular policies.

**15. Appeals and Adjudicatory-Authority Challenges**

Given the magnitude of the legal issues presented—including the terms of the assignment of Diocese of Ogdensburg's insurance rights, the purported assignment of the insurance rights of non-debtors, the treatment of Insurer Contribution Claims, the delayed or deferred discharge provisions, and the scope of the injunctive relief—it is likely that one or more parties will appeal any order confirming the Plan. There is also a possibility that the Bankruptcy Court lacks constitutional authority to approve certain releases, exculpations, and injunctions, and that

confirmation may need to proceed through the District Court, which may prevent or delay the occurrence of the Effective Date. Appellate review in the District Court, the Second Circuit, or beyond could take years before the Plan becomes effective and any Distributions are made to Abuse Claimants, if ever.